Woodrow STERLING, et al, Plaintiffs,

v.

**VELSICOL CHEMICAL CORPORATION,**
Defendant.

**No. 78–1100.**

United States District Court,
W.D. Tennessee, E.D.

Aug. 1, 1986.

**306**

James S. Wilder, III, Somerville, Tenn., Sidney W. Gilreath, Knoxville, Tenn., for plaintiffs.

James W. Gentry, Jr., Chattanooga, Tenn., Sidney W. Spragins, Jackson, Tenn., for defendant.

## OPINION AND ORDER GRANTING JUDGMENT TO PLAINTIFFS

HORTON, District Judge.

This class action lawsuit was originally filed by plaintiffs against Velsicol Chemical Corporation in the Circuit Court of Hardeman County, Tennessee, on December 4, 1978.

Plaintiffs are a class of persons who owned property or lived within a three mile radius of the northern most boundary line of a 242 acre chemical waste burial site in Hardeman County, Tennessee, owned and operated by Velsicol from late 1964 until it was closed as hazardous in 1973 by order of the State of Tennessee. Plaintiffs in this class action seek damages for personal injury and damages to their property allegedly suffered when water in their home wells became contaminated by hazardous chemicals which escaped from Velsicol's burial site. Chemical waste from Velsicol's Memphis manufacturing plant was placed in fifty-five gallon metal drums, (some dry waste was placed in boxes or other containers), loaded on trucks and hauled from Velsicol's Memphis plant to Velsicol's chemical waste burial site in Hardeman County, near Toone, Tennessee.

The lawsuit was removed from the Circuit Court of Hardeman County, Tennessee, to this Court by Velsicol on allegations of diversity of citizenship and requisite amount in controversy. The Court finds it has jurisdiction over the lawsuit and the parties to this properly certified class action.

The claims of the five plaintiffs against Velsicol have been fully presented to the Court over a period of sixty-five trial days and are representative of all of the claims of the party plaintiffs to this class action.

While Veliscol claims the jurisdictional amount requirement of *Zahn v. International Paper Co.*, 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973), [*see also Zahn v. International Paper Co.*, 469 F.2d 1033 (2nd Cir., 1972), and *Zahn v. International Paper Co.*, 53 F.R.D. 430 (D.Vermont 1971)], has not been met, the Court finds the pleadings are proper in this class action, the jurisdictional amount requirement has been met as to these plaintiffs, and the notice requirements of *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), have been complied with in all respects.

This class action proceeded to trial with five representative plaintiffs selected because their claims are generally representative of the claims of all class members. The five representative plaintiffs are:

1) Steve Sterling

2) James E. Wilbanks

3) Curry A. Ivy

4) Daniel R. Johnson

5) James O. Maness, Jr.

Based upon the Court's consideration of all of the material evidence presented in this case during the sixty-five day trial, the findings of fact and conclusions of law submitted by the parties, upon consideration of the applicable law, and upon the entire record, the Court finds Velsicol is liable to plaintiffs upon the legal theories of strict liability, common law negligence, trespass and nuisance.

In an effort to fairly compensate each of the five plaintiffs for the injuries suffered as a result of ingesting, inhaling, using and being otherwise injured by water contaminated by hazardous chemicals which escaped from Velsicol's burial site, the Court awards the following damages to each plaintiff:

| | | |
|---|---|---:|
| 1) | Steve Sterling | $ 673,492.50 |
| 2) | James E. Wilbanks | 675,000.00 |
| 3) | Curry A. Ivy | 350,000.00 |
| 4) | Daniel R. Johnson | 1,275,000.00 |
| 5) | James O. Maness, Jr. | 2,300,000.00 |

The Court has concluded that a single award of punitive damages is appropriate and should be awarded in this case. The Court finds this decision appropriate, because it has heard all of the evidence on all of the significant issues that can be presented for decision in this class action. The Court finds Velsicol's actions in locating, creating, maintaining and operating its chemical waste burial site constituted gross negligence and a wilful and wanton disregard for the health and well being of plaintiffs and the adjacent environment. This is particularly true when the Court considers Velsicol's superior knowledge about chemicals used in its manufacturing process. The Court agrees with Mr. William Howard Bealsey, III, Vice Chairman of the Board, Velsicol Chemical Corporation, who, in a letter dated April 23, 1979, (Ex. 176), addressed to "Dear Senators" stated:

On the other hand, the social costs imposed by improperly disposed of chemicals are high even though they are difficult to quantify. Additionally, the economic consequences for existing, financially responsible firms for previously improperly disposed of chemicals can be severe. Because of these consequences, it is difficult for me to imagine a responsible company knowingly disposing of chemicals in an improper way. For all of these many reasons, social as well as economic, there can be no substitute for the proper manufacture and disposal of chemicals.

While the Velsicol chemical site in Hardeman County has been called a landfill by Velsicol, a burial site by the Court and a dump by plaintiffs, the Court concludes the substantial evidence in this record shows plaintiffs are correct. The site is in fact nothing more than a chemical waste dump. The amount of punitive damages which all plaintiffs in the class are entitled to receive is

$7,500,000.00

The Court has also determined that in the exercise of its informed discretion, plaintiffs are entitled to recover pre-judg-

ment interest at the rate of eight (8)% per annum on all compensatory damages awarded to each plaintiff in this lawsuit from July, 1965.

The Court will further explain the award of compensatory damages in a later part of the opinion.

*Plaintiff's Contentions*

The substance of plaintiffs' claims is that they have suffered physical injury, bodily harm, mental and emotional anguish, property damage, and loss and destruction of an entire community and a way of life, all proximately resulting from Velsicol's grossly negligent selection, implementation, operation and burial of more than 300,000 fifty-five gallon drums filled with ultrahazardous chemical waste, and hundreds of boxes of ultrahazardous dry chemical waste on its burial site which adjoined plaintiffs' homes and property. Plaintiffs contend Velsicol was grossly negligent in the selection and implementation of its chemical waste burial site, in the manner in which it containerized chemical waste, in its burial operations, and in allowing ultra hazardous and highly toxic chemical waste to escape from the burial site, infiltrate into and contaminate their underground well water.

Plaintiffs contend that as a result of their drinking, bathing, cooking, canning, cleaning, breathing steam from hot water, and otherwise using their home wellwater contaminated by hazardous chemicals from Velsicol's burial site, over a period of years—from on or about August 24, 1964 until June 1, 1973—they have suffered severe and permanent physical injuries, mental and emotional anguish, and damage to and loss of their property. Plaintiffs contend these injuries are permanent and they are left with an enhanced risk of future disease and cancer and remain frightened as to what the future holds for their lives. It is plaintiffs' contention that Velsicol's negligence and gross negligence, emanating from the totality of the circumstances surrounding Velsicol's site selection, its creation and operation of the chemical waste burial site and the escape and infil-

tration of hazardous and highly toxic chemicals from the site into their underground wellwater injured them, disrupted their lives and completely destroyed, not only their peaceful rural home community, but a way of life.

Plaintiffs contend that among the hazardous and highly toxic chemicals buried in the burial site are:

1) carbon tetrachloride
2) chloroform
3) chlorobenzene
4) hexachlorobutadiene
5) hexachloroethane
6) hexachloronorobornadiene
7) napthalene
8) tetrachloroethylene
9) toluene
10) endrin
11) heptachlor

Plaintiffs predicate this lawsuit and their right to recover damages from Velsicol upon the following legal theories:

1) strict liability
2) common law negligence
3) trespass
4) nuisance

Plaintiffs claim they are entitled to both compensatory and punitive damages from Velsicol. Generally, plaintiffs claim Velsicol was grossly negligent in the way it selected the site for its chemical waste burial. Plaintiffs contend there was no site selection study before Velsicol acquired its site in rural Hardeman County and commenced its chemical waste burial operations. There was no hydrogeologic study to determine if the chemical waste site was being located on top of a water aquifer. Plaintiffs claim Velsicol was grossly negligent in not putting chemical waste in drums that would contain the chemicals and that drums selected and used were inadequate and not corrosion resistant. Plaintiffs claim the drums were often leaking chemical contaminants when they were hauled from Velsicol's Memphis Plant to the burial site and, that drums and boxes of waste were recklessly dumped into

trenches and were often battered and ripped open while being buried and covered with dirt by a bulldozer. Finally, plaintiffs contend Velsicol was grossly negligent in its failure to monitor the chemical waste burial site for a long time after the burial site was in operation.

Plaintiffs assert claims of trespass, nuisance, common law negligence and strict liability. Plaintiffs contend that Velsicol is strictly liable because its burial site for chemical waste was a non-natural use of the land, a nuisance and an abnormally dangerous activity and Velsicol allowed dangerous, ultra hazardous and highly toxic chemical waste to escape from its burial site and cause actual harm, personal injury and property loss to plaintiffs and the class of persons they represent.

In addition to compensatory damages, plaintiffs contend they are entitled to, and Velsicol is liable to them for punitive damages. Plaintiffs base their claim for punitive damages upon their allegations, among others, that Velsicol knew and had every reason to know it was operating a dangerous and ultra hazardous activity on the chemical waste burial site and, even when faced with knowledge of that fact, blatantly continued burial dumping operations. Plaintiffs contend Velsicol, in selecting and operating its chemical waste disposal site, wilfully failed to comply with the known state of the art existing at the time.

Plaintiffs charge Velsicol supplied the State of Tennessee with false information about its chemical waste dumping activities. Plaintiffs contend Velsicol informed officials of the State of Tennessee that it was dumping solid and semi-solid waste when, in fact, it was dumping liquid waste as well. Plaintiffs contend Velsicol informed the state it was using corrosion resistent containers when, in fact, it was not. Plaintiffs contend Velsicol did not inform the State of Tennessee what chemicals were being dumped into the site.

Plaintiffs claim Velsicol did not provide the Environmental Protection Agency (EPA) with a true and exact listing of chemicals buried on the site. Plaintiffs contend that when Velsicol actually knew or should have known that chemical waste was leaking and/or leaching from the site, Velsicol continued expanding its burial operations on the site. Plaintiffs contend Velsicol never advised people living in the area of the burial site of its dangerous and hazardous potential. In fact, plaintiffs contend Velsicol maintained there was never any hazard. Plaintiffs contend that when the State of Tennessee issued an order, pursuant to Tennessee law, directing Velsicol to stop its burial operations, Velsicol continued its chemical waste burial operations for months in defiance of the order. Plaintiffs claim Velsicol's conduct was wilful, wanton, oppressive and so reckless as to evidence a conscious indifference to the consequences of its actions on the burial site.

*Velsicol's Contentions*

Velsicol has admitted, almost from the beginning of this lawsuit, that some of the wells along the Toone-Teague Road, used by families as a source of home water supply, were and are contaminated with chemicals from its waste burial site. On September 11, 1981, during a hearing before Chief Judge Robert M. McRae, Jr., Mr. James W. Gentry, Jr., chief trial counsel for Velsicol, stated:

And it is obvious to the Court, and Velsicol is prepared to admit, that some of those wells along Toone-Teague Road were indeed, adulterated. And we are prepared to argue that there has been a nuisance visited upon a number who are in the local aquifer.

Again, during that hearing, Mr. Gentry stated:

But there are, indeed, people along the Toone-Teague Road who were affected by the existence of the Velsicol landfill, and they were damaged by invasion of their property, i.e., their water table. And within that particular aquifer, I must be very careful, because I have my general counsel here, but I believe within that particular aquifer, we may be prepared to admit our chemicals could be expected to be found there.

Hearing on Area of Notice, September 11, 1981, (Tr. pp. 53, 56–57).

During the making of Velsicol's opening statement at the beginning of this trial on June 21, 1982, at Jackson, Tennessee, Mr. Gentry referred to the fact that the State of Tennessee had declared the operation of Velsicol's waste burial site to be a public nuisance. (Tr. 75). He then went on to say: "We would respectfully suggest to the Court, that on the basis of that factual circumstance the Court will find and should find that it's a permanent nuisance." (Tr. 77).

In Velsicol's proposed Findings of Fact and Conclusions of Law, Part II, Footnotes, p. 3, Velsicol states in part: "It has admitted its liability to some members of the class under the theories of nuisance and trespass." Also, on page 102 of that document, Velsicol admits liability to two of the five representative plaintiffs, Daniel R. Johnson and Steve Sterling. Velsicol proposed to the Court:

That Daniel R. Johnson is entitled to an award of _____ due to the anxiety and concern that he suffered as a result of defendant's trespass.

That Steve Sterling is entitled to an award of _____ due to the anxiety and concern that he suffered as a result of the defendant's trespass and further due to the inconvenience he experienced and the diminution of the value of his property which occurred because of the defendant's trespass.

The consequence of these admissions, which was a Velsicol theme throughout the trial, is that Velsicol admits liability to some of the members of the class of this lawsuit. Velsicol also admits liability to two of the five representative plaintiffs of the class. This apparent admission of liability is limited and is predicated upon its admission to trespassing upon plaintiffs' property and creating a nuisance.

With these asserted admissions forming a framework of reference, the Court turns to Velsicol's contentions. First, Velsicol asserts a state of the art defense. Velsicol contends it exceeded the then known state of the art in its selection, implementation and operation of its chemical waste burial site in Hardeman County, Tennessee. Specifically, Velsicol contends expert testimony in the case demonstrated that its site selection, the manner of its disposal of chemical waste and the existence of a monitoring well exceeded what was at that time, the state of the art in the disposal of chemical waste. Further, Velsicol contends its acquisition, implementation and burial operations from 1964 until June of 1973 were not considered inherently or abnormally dangerous. Velsicol contends the Court must view this particular activity as it was looked upon from 1964 until 1973 and not as it might appear to the Court at the time of the trial of the lawsuit.

Second, during the relevant times, Velsicol contends there is only one inherently dangerous activity defined in Tennessee law—and that is blasting. Velsicol contends it had a legal right to do what it did on its Hardeman County property so long as it did not create a public nuisance.

Third, Velsicol contends it had a legal right to use its property as it did during the years 1964–1973. Velsicol contends it had a legal right to rely upon Tennessee's Solid Waste Disposal Act (T.C.A. § 68–31–101, et seq.) and the Water Quality Control Act (T.C.A. § 69–3–101, et seq.) both enacted during the time Velsicol operated its chemical waste burial site.

Fourth, while Velsicol admits that among the various chemicals buried on its site are carbon tetracholoride and choloroform, Velsicol questions whether these chemicals are health hazards and whether they had any adverse impact upon the health of plaintiffs, considering the dosages they suffered. Velsicol contends carbon tetracholoride was used for years and years for dry cleaning. Velsicol contends choloroform was used in toothpaste and that the New Orleans, Louisiana, water supply has a substantial amount of choloroform in it.

*Conclusions of Law*

The Court heard all of the evidence presented during the course of the sixty-

five days trial of this case. The Court has spent many hours and days reviewing the record in this case, including the proposed findings of fact and conclusions of law submitted by the parties. Based upon its extensive participation in this lawsuit, its knowledge of the case, its numerous conferences with all of the attorneys for the parties, and upon the entire record, the Court makes the following conclusions of law:

1. Velsicol is guilty of common law negligence in the creation, implementation, operation and closure of its chemical waste burial site in Hardeman County, Tennessee.

2. Velsicol's acts of common law negligence were the proximate cause of the injuries inflicted upon Steve Sterling, James E. Wilbanks, Curry A. Ivy, Daniel R. Johnson and James O. Maness, Jr.

3. Velsicol was carrying on an abnormally dangerous activity when it created, implemented, operated and closed its chemical waste burial site in Hardeman County, Tennessee.

4. The operation of such an abnormally dangerous activity by Velsicol makes Velsicol strictly liable to the plaintiffs for all injuries caused thereby.

5. Velsicol's acts in operating such an abnormally dangerous activity were the proximate cause of each of plaintiffs' injuries.

6. The creation, location, operation and closure of Veliscol's chemical waste burial site containing highly toxic and ultrahazardous chemicals, immediately adjacent to the plaintiffs' properties, is an interference with the right of plaintiffs for the enjoyment of their lives and property, therefore, a nuisance.

7. Velsicol is guilty of trespassing upon the property of plaintiffs by the allowance of the escape of their toxic and hazardous chemicals from their waste burial site in Hardeman County, Tennessee, to the property of the plaintiffs.

8. Velsicol's acts in so trespassing upon the properties of the plaintiffs is a proximate cause of each plaintiff's injuries.

9. The location, creation, operation, closure and maintenance, of Velsicol's chemical waste burial site containing highly toxic and ultrahazardous chemicals immediately adjacent to plaintiffs' properties created a common law private nuisance.

10. Velsicol's acts in creating such a private nuisance were a proximate cause of plaintiffs' injuries which included the interference with plaintiffs' right to the uninterrupted enjoyment of their lives and property.

11. The acts of Velsicol in creating, implementing, operating and closing its chemical waste burial site in Hardeman County, Tennessee, constituted gross, wilful, oppressive and wanton misconduct and entitle plaintiffs to recover punitive or exemplary damages.

### Discussion of Legal Theories

The Court concludes Velsicol is liable to plaintiffs and the class of persons they represent upon the legal theories of strict liability, common law negligence, trespass and nuisance. The Court will discuss those theories in this part of this opinion.

### Strict Liability Theories

Plaintiffs in this action argue Velsicol should be held responsible for damages, without regard to fault, on the theory of strict liability. The genesis of that theory stems from the "non-natural uses of lands" principle set forth in the landmark English case, *Rylands v. Fletcher*, L.R. 3 H.L. 330 (1868). Lord Blackburn authored the opinion for the Exchequer Chamber and an abridged version is contained in *W. Prosser, J. Wade & V. Schwartz, Cases and Materials on Torts*, Ch. 14, at 712–13 (7th Ed.1982).

BLACKBURN, J. * * * It appears from the statement in the case, that the

plaintiff was damaged by his property being flooded by water which, without any fault on his part, broke out of a reservoir constructed on the defendants' land by the defendants' orders, and maintained by the defendants. * * *

The plaintiff, though free from all blame on his part, must bear the loss, unless he can establish that it was the consequence of some default for which the defendants are responsible. The question of law therefore arises, what is the obligation which the law casts on a person who, like the defendants, lawfully brings on his land something which though harmless whilst it remains there, will naturally do mischief if it escape out of his land. It is agreed on all hands that he must take care to keep in that which he has brought on the land and keeps there, in order that it may not escape and damage his neighbors; but the question arises whether the duty which the law casts upon him, under such circumstances, is an absolute duty to keep it in at his peril, or is, as the majority of the Court of Exchequer have thought, merely a duty to take all reasonable and prudent precautions, in order to keep it in, but no more. If the first be the law, the person who has brought on his land and kept there something dangerous, and failed to keep it in, is responsible for all the natural consequences of its escape. If the second be the limit of his duty, he would not be answerable except on proof of negligence, and consequently would not be answerable for escape arising from any latent defect which ordinary prudence and skill could not detect. * * *

We think that the true rule of law is that the person who for his own purposes brings on his lands and collects and keeps there any thing likely to do mischief if it escapes, must keep it in at his peril, and if he does not do so, is prima facie answerable for all the damage which is the natural consequence of its escape. He can excuse himself by showing that the escape was owing to the plaintiff's default; or perhaps that the escape was the consequence of vis major, or the act of God; but as nothing of this sort exists here, it is unnecessary to inquire what excuse would be sufficient. The general rule, as above stated, seems on principle just. The person whose grass or corn is eaten down by the escaping cattle of his neighbor, or whose mine is flooded by the water from his neighbor's reservoir, or whose cellar is invaded by the filth of his neighbor's privy, or whose habitation is made unhealthy by the fumes and noisome vapors of his neighbor's alkali works, is damnified without any fault of his own; and it seems but reasonable and just that the neighbor, who has brought something on his own property which was not naturally there, harmless to others so long as it is confined to his own property, but which he knows to be mischievous if it gets on his neighbor's, should be obliged

Prosser's text also contains an abridged version of Lord Chancellor Cairns' opinion affirming the judgment of the Court of Exchequer Chamber. Lord Cairns stated:

[I]f the defendants, not stopping at the *natural use* of their [land] had desired to use it for any purpose which I may term a non-natural use ... and if in consequence of their doing so, or in consequence of any imperfection in the mode of their doing so, the water came to escape and to pass off into the [land] of the plaintiff, then it appears to me that that which the defendants were doing they were doing at their own peril; and, if in the course of their doing it the evil arose ... then for the consequence of that, in my opinion, the defendants would be liable.

*W. Prosser, supra,* at 715 (emphasis added). In summary, the rule of law from *Rylands v. Fletcher* allows for the imposition of liability for damages proximately caused by the defendant's dangerous, non-natural use of land regardless of the standard of care defendant utilized in conducting that activity. Generally, modern courts have applied this strict or absolute liability to activities "variously characterized as

'perilous,' 'ultra or extra-hazardous,' or 'abnormally dangerous.'" *C. Morris & C.R. Morris, Morris on Torts*, Ch. IX, at 231 (2d ed. 1980). "The judicial rationalization seems to be that one who conducts a highly dangerous activity should prepare in advance to bear the financial burden of harm proximately caused to others by such an activity." *Id.*

The Restatement (Second) of Torts also adopts a rule of strict liability for damages resulting from certain activities. Section 519 states:

> (1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.
>
> (b) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

Section 520 lists the factors to be considered in determining what constitutes an abnormally dangerous activity:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
>
> (b) likelihood that the harm that results from it will be great;
>
> (c) inability to eliminate the risk by the exercise of reasonable care;
>
> (d) extent to which the activity is not a matter of common usage;
>
> (e) inappropriateness of the activity to the place where it is carried on; and
>
> (f) the extent to which its value to the community is outweighed by its dangerous attributes.

Comment (f) to § 520 provides guidances in the application of these factors:

> In determining whether the danger is abnormal, the factors listed in clauses (a) and (f) of this Section are all to be considered, and are all of importance. Any one of them is not necessarily sufficient of itself in a particular case, and ordinarily several of them will be required for strict liability. On the other hand, it is not necessary that each of them be present, especially if others weigh heavily. Because of the interplay of these various factors, it is not possible to reduce abnormally dangerous activities to any exact definition. The essential question is whether the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for harm which results from it, even though it is carried on with all reasonable care.

The rationale for imposing strict liability under the Restatement is similar to that under *Rylands v. Fletcher*. It is "founded upon a policy of the law that imposes upon anyone who for his own purposes creates an abnormal risk of harm to his neighbors, the responsibility of relieving against that harm when it does in fact occur. The defendant's enterprise, in other words, is required to pay its way by compensating for the harm it causes because of its special, abnormal and dangerous character." Restatement (Second) of Torts § 519, Comment (d) (1977).

*Tennessee Law*

While research revealed no Tennessee cases that expressly adopts *Rylands v. Fletcher* or Restatement (Second) of Torts § 519, several cases indicate strict or absolute liability is an accepted theory of recovery under Tennessee law. Initially, it should be noted Tennessee has adopted the Restatement (Second) of Torts § 402A, the strict products liability section. *See Ellithorpe v. Ford Motor Company*, 503 S.W.2d 516, 519 (Tenn.1973). In *Ellithorpe* the court was faced with the issue of what defenses were available to strict products liability claims and in discussing § 402A, noted:

> the Restatement, at comment m to Sec. 402A, states that strict products liability is "similar in nature" to the absolute liability imposed upon defendants who conduct ultrahazardous or abnormally dangerous activities ... Such activities are generally not excusable on the basis of a plaintiff's ordinary contributory neg-

314

ligence. 3 Restatement (First) of Torts, Sections 515 and 524 (1938). Contributory negligence is not available as a defense to those types of conduct which are not based on negligence; for the same reasons, we think it should not be available to defendants in cases where strict products liability is imposed.

503 S.W.2d 522 (citations omitted)

In *Thomason v. Wayne County*, 611 S.W.2d 585 (Tenn.Ct.App.1980), *cert. denied*, (1981), the plaintiff sought recovery under negligence, nuisance and strict liability for injuries received when decedent plaintiff's car collided with a temporary highway guardrail. In addressing plaintiff's strict liability claim, the court stated:

By strict liability the appellant refers to cases where the defendant was engaged in certain ultrahazardous activities such as storing explosives, blasting, or impounding water on land where it creates a highly dangerous situation. *Rylands v. Fletcher*, 3 Hurl. 4 C 774 (1865); L.R. 1 Ex. 265 (1866); L.R. 3 H.L. 330 (1868).

We are of the opinion that this is not such a case. Here the defendants were not storing substances or carrying on activities that are inherently dangerous. This case is one of negligence and does not fall within that class of cases.

611 S.W.2d at 587.

In another products liability case, *Caldwell v. Ford Motor Company*, 619 S.W.2d 534 (Tenn.Ct.App.), *cert. denied*, (1981), the Court had occasion to discuss the rationale underlying strict liability. Citing *Ellithorpe*, the Court noted the similarity between strict products liability and absolute liability associated with ultrahazardous or abnormally dangerous activities and then stated:

Professors Noel and Phillips in their textbook *Products Liability—Cases and Materials* (West Publishing Co., 1976), agree with Ellithorpe's equation of causation in the products liability context with the risk of loss associated with the maintenance of an inherently dangerous condition. Their explanation of the theory is as follows:

Another reason for application of the foreseeability rule ... is that given by Harper and James in a similar context—that of the vicarious liability of the employer for the acts of the employee. They write: "We are not here looking for the master's fault but rather for risks that may be fairly regarded as typical of or broadly incidental to the enterprise he has undertaken. Now one of the purposes for such a quest is to mark out in a broad way the extent of tort liability (as a cost item) that it is fair and expedient to require people to expect when they engage in such an enterprise, so there can be a reasonable basis for calculating this cost. And while many things may enter into the matters of fairness and expediency besides what men at any point may reasonably expect, ... yet fairness probably cannot be altogether divorced from some kind of foreseeability. What is reasonably foreseeable in this context, however, is quite a different thing from the foreseeably unreasonable risk of harm that spells negligence. In the first place, we are no longer dealing with specific conduct but with the broad scope of a whole enterprise. Further, we are not looking for that which can and should reasonably be avoided, but with the more or less inevitable toll of a lawful enterprise. The foresight that should impel the prudent man to take precautions is not the same measure as that by which he should perceive the harm likely to flow from his long-run activity in spite of all reasonable precautions on his part.

Ch. 8, p. 528.

Accord: Prosser, supra, *Strict Liability*, ch. 13, at 522.[4] "

619 S.W.2d at 541–42. Footnote 4, citing Professor Prosser's *Strict Liability* at page 522, is as follows:

The explanation must lie in part in the element of wilful creation of an unreasonable risk to others by abnormal conduct which is inherent in most of the

strict liability cases; and in part in the policy which places the absolute responsibility for preventing the harm upon the defendant, whether his conduct is regarded as fundamentally anti-social, or he is considered merely to be in a better position to transfer the loss to the community. The statutory policy of workmen's compensation acts, which places all risk upon the defendant, finds a parallel in strict liability at common law.

619 S.W.2d at 542 n. 4.

Finally, in the most recent Tennessee case found dealing with strict liability, *Summit Hill Association v. Knoxville Utility Board*, 667 S.W.2d 91 (Tenn.Ct. App.1983), *cert. denied*, (1984), the Tennessee Court of Appeals reviewed the issue of whether the lower court should have applied the doctrine of strict liability. The court ultimately concluded strict liability was not applicable to suits for damages resulting from ruptured water lines. In reaching that conclusion the court discussed "the extent to which the American courts have applied the principles laid down in the English case of *Rylands v. Fletcher*" and quoted Dean Prosser as follows:

> On the other hand, the conditions and activities to which the American courts have refused to apply *Rylands v. Fletcher*, whether they purport to accept or reject the case in principle, have been with few exceptions what the English courts would regard as "natural" use of land, and not within the rule at all. They include water in household pipes, the tank of a humidity system, or authorized utility mains ... The conclusion is, in short, that the American decisions, like the English ones, have applied the principle of *Rylands v. Fletcher* only to the thing out of place, the abnormally dangerous condition or activity which is not a "natural" one where it is.

667 S.W.2d at 94–95 (quoting *W. Prosser, Law of Torts* 510–12 (4th ed.1971)). From the court's discussion and treatment of cases from other jurisdictions, it is clear the refusal to apply strict liability to a ruptured water line case was based on the conclusion such activity was not "non-natural," "ultrahazardous," or "abnormally dangerous."

*Conclusion*

As noted earlier, no Tennessee cases were found expressly adopting *Rylands v. Fletcher* or the Restatement (Second) of Torts § 519. However, the cases discussed herein lead to the inescapable conclusion that under Tennessee law, Velsicol would be subject to strict or absolute liability for the non-natural, ultrahazardous and abnormally dangerous activities it conducted which gave rise to this action. The facts in the present case align squarely with both the application and the rationale underlying the rule of strict or absolute liability as that doctrine is viewed by Tennessee courts.

Dr. Clark testified, and the Court adopts as a finding that the disposal of hazardous liquid waste could be a dangerous activity *viz:*

> Yes, it could be, it could be dangerous all along the way from generation of the waste, transport of the waste, to the ultimate disposal or storage of the waste, whichever the process was designed to be. (Tr. 1055).

In fact, Mr. John M. Rademacher, Velsicol's Vice President for Environmental Health and Regulatory Affairs agreed that the chemical waste dumped on the farm from 1964 through 1973 "would be characterized as hazardous waste." (Tr. 4355). And Velsicol, in belatedly complying with Tennessee law in 1975, filed a statement on June 28, 1975 with the Hardeman County Registrar of Deeds entitled "Notice of a Former Landfill Site." That notice stated, *inter alia:* "The materials deposited in and under the [farm dump] consisted of chemical process by-products which are hazardous." (Ex. 171). The Court holds that the creation, location, operation and closure of the toxic chemical dump site by defendant was and is an inherently and abnormally dangerous activity.

Moreover, the Court concludes that Velsicol's activity on the farm was not only

ultrahazardous activity, but also abnormally dangerous activity and therefore the defendant is strictly liable for any damages that have occurred. This conclusion is made for *inter alia* the following reasons:

1. There was a high degree of risk of some harm to the person, land or chattels of others, particularly after the 1967 USGS report:

2. There was a likelihood that the harm that results would be great, such as the increased risk of many diseases including cancer, and the destruction of plaintiffs' quality of life;

3. The inability to eliminate the risk by the exercise of reasonable care;

4. The extent to which the activity at the dump was not a matter of common usage and as a means of disposal and violated the state of the art;

5. The inappropriateness of the location of the dump where it was carried out; and

6. The extent to which its value to the community (none) was outweighed by its dangerous attributes (great).

*Common Law Negligence*

 The Court concludes the doctrine of common law negligence applies to this case and Velsicol is clearly guilty of negligence in this case for the following reasons:

1. The Court concludes that there was a duty, a standard of conduct, imposed by law on Velsicol to protect others from unreasonable harm arising from the dumping of the chemicals on it's farm; and

2. The Court further concludes that defendant breached that duty by it's failure to do the following:

a. Defendant failed to investigate the geological makeup or strata under the dumpsite prior to its purchase or operation;

b. Defendant failed to investigate the hydrological, or water bearing zones under the dumpsite prior to its purchase or operation;

c. Defendant failed to hire knowledgeable persons to investigate the geological and hydrogeological area under the dumpsite prior to its purchase or operation;

d. Defendant failed to install proper monitoring procedures in and around the dumpsite prior to commencing dumping operations at the dumpsite;

e. Defendant failed to investigate the geological and hydrogeological situation at the dumpsite after being warned by the USGS in 1967 that their chemicals were escaping from their burial trenches and were in fact contaminating the local water table aquifer;

f. Defendant failed to hire professional geologists or hydrogeologists at the time the 1967 USGS was circulated to properly analyze the data generated therein as any reasonable person would do;

g. Defendant failed to heed the warning in said report by continuing to dump and even expanding the size of the dump;.

h. Defendant failed to heed the warning of the USGS and the State of Tennessee personnel about the expansion of the dumpsite to the south site, in March of 1971;

i. Defendant failed in the selection, location, operation and maintenance of the dumpsite under the prevailing state of the art for such operation during the entire length of time the dumpsite was open from 1964 to 1973;

j. Defendant failed to obey the administrative order, which the defendant agreed to in May of 1972, by its continuing to dump in the southern site of the farm and its continuation to dump hazardous materials from August of 1972 until June 1, 1973. This activity was illegal and amounted to negligence *per se;*

k. Defendant failed to take steps in 1967 to halt the leakage that was already occurring from the dumpsite;

l. Defendant failed to properly monitor the dumpsite from its opening in October of 1964 to it's closing in June of 1973;

m. Defendant failed to monitor the dumpsite at all from June of 1973 to the forced monitoring imposed on them by the State of Tennessee in 1980;

n. Defendant failed to operate said dumpsite according to the state of the art methods to protect the plaintiffs by their failure to cover their wastes daily thereby allowing an increase in the infiltration rate;

o. Defendant failed to properly close the dumpsite in 1973 pursuant to the state of the art;

p. Defendant failed to timely register the dumpsite as a hazardous waste disposal site as required by the State of Tennessee;

q. Defendant failed to timely, completely and correctly respond to the requests of governmental agencies as to what was put into the dumpsite;

r. Defendant failed to warn plaintiffs that they should watch their water for the presence of any chemical odors or tastes as early as 1967;

s. Defendant failed to transport the chemicals from their plant site in Memphis, Tennessee to the dumpsite in Hardeman County, Tennessee in a safe and proper manner to insure the safety of plaintiffs and their property as the defendant allowed said chemicals to spill out of the trucks on to the roadway;

t. Defendant failed to contain their chemicals within the boundaries of their property in Hardeman County and did allow them to escape and pollute the drinkable ground water used by plaintiffs; and

u. Defendant failed to contain their chemicals within the boundaries of their property in Hardeman County and did allow the fumes from said chemicals to escape into the air which drifted onto the property and into the houses of the plaintiffs.

3. The Court further concludes that defendant's breach of the above duties were in fact the proximate cause of plaintiffs' injuries.

The Court concludes that the landmark case which sets the stage for recovery for exposure of persons to hazardous chemical substances is *Rylands v. Fletcher*, 3 H. & C. 774, 159 Eng.Rep. 737 (1865), revised L.R. 1 Ex. 265 (1866), Aff'd. L.R. 3 H.L. 330 (1868). The English Court reasoned:

We think that the true rule of law is that the person who for his own purposes brings on his land and collects and keeps there anything likely to do mischief if it escapes must keep it at its peril and if he does not do so its prima facie answerable for all the damage which is the natural consequence of its escape.

In *Bangor, an A.R. Company v. Ship Fernview*, 455 F.Supp. 1043 (D.C.Md.1978), defendant chemical manufacturer was held to be causally negligent by producing chemical emissions from its plant which obstructed visibility at the area of the collision of a dry cargo vessel with a pier while the ship was attempting to dock.

*Trespass*

A number of the plaintiffs in this class action are attempting to hold Velsicol liable for damages to their real property, chattel and person under various legal theories; one of those is trespass. Plaintiffs state "[t]he tort of trespass is defined as intentional invasion and interference with an individual's exclusive right to possession of his property." See Plaintiffs' Findings of Fact and Conclusions of Law, at pg. 478. "Trespass is an intentional harm, and where there is no intentional act, in the sense of an act voluntarily done, there is no trespass." *Kite v. Hamblen*, 192 Tenn. 643, 241 S.W.2d 601, 603 (1951). "Plaintiff need not show that the act was done out of malice or any wrongful intent. So far as the right to maintain trespass is concerned, it is sufficient if it were done without a lawful or justifiable cause, though it may have been done accidently or by mistake." 24 Tenn.Jur. *Trespass* § 3 (1985) (citing cases). "Every entry upon another's soil

without lawful authority is a trespass; and it matters not that there is no actual force, for the law in such cases implies force." *Id.* "An action of trespass presumes a wrongdoer's active agency in causing the injury complained of and doing of an act wantonly or in total disregard of others' rights, while an action of trespass on the case assumes that the injury was the result of negligence or nonfeasance, not deliberate intent." *Id.* at § 5 (citing *Sing v. Headrick*, 34 Tenn.App. 187, 236 S.W.2d 95 (1950)). In *Sing* the court noted the distinction between trespass and trespass on the case was abolished by statute: "All wrongs and injuries to the property and person, in which money only is demanded as damages, may be redressed by an action on the facts of the case." 236 S.W.2d at 97. The Court did, however, comment that the distinction must be recognized for the purposes of defenses asserted. *Id.* 97–98. In *Kite v. Hamblen,* the court drew a distinction between trespass vi et armis (assault and battery) and trespass on the case, and noted, in the latter, remedy could be sought for consequential injuries resulting from negligence or nonfeasance. 241 S.W.2d at 603.

While not expressly adopted by Tennessee courts, the Restatement (Second) of Torts § 165 (1965) appears consistent with Tennessee law applicable to the present case. Section 165, Liability for Intrusions Resulting From Reckless or Negligent Conduct and Abnormally Dangerous Activities, states:

> One who recklessly or negligently, or as a result of an abnormally dangerous activity, enters land in the possession of another or causes a thing or a third person so to enter is subject to liability to the possessor if, but only if, his presence or the presence of the thing or the third person upon the land causes harm to the land, to the possessor, or to a thing or a third person in whose security the possessor has a legally protected interest.

Comment c. to § 165 also states:

> A trespass on land brought about under the circumstances stated in this Section subjects the actor to liability to the possessor of the land if, and only if, harm of the sort herein stated results. The harm may be an impairment of the physical condition of the land or an invasion occurring on the land of some other legally protected interest of the possessor, connected with his interest of exclusive possession. These interests include those in bodily security and freedom from confinement, and in the possession and physical condition of his chattels and the physical condition of members of his family and the servants belonging to his household. This enumeration is not intended to be exclusive. There may be other interests of the possessor which are also protected against invasion by means of an unintended intrusion on the land.

Actual trespass is not an issue in this case. Velsicol admits the movement of certain chemicals from its dump site through the local aquifer and "onto property owned by various plaintiffs and into the sphere of influence of various wells constitutes a trespass under Tennessee law." See Defendant's Proposed Findings of Fact and Conclusions of Law, pg. 88. Defendant also states: "Velsicol, in fact, has admitted that such an incursion has occurred with regard to a number of plaintiffs. It has further admitted that the incursion is a trespass to those persons and/or their property affected by this incursion." *Id.* Velsicol further proposes:

> The Court would observe that under Tennessee law, even an innocent and inadvertent trespass is compensable (*Inland Container Corp. v. March*, 529 S.W.2d 43 (Tenn.1975)), and that if that trespass leads to a personal injury that naturally and necessarily follows from the trespass, then an action for trespass to the person will also lie. (Of course, if the trespass is a result of a negligent act on the part of the defendant, it would appear that the plaintiff would have a cause of action for either negligence or trespass.)

Defendant's Proposed Findings, at pg. 88.

Velsicol admits liability in trespass to plaintiffs Sterling and Johnson but claims,

for various other reasons, liability to others should be limited or found not to exist. However, Velsicol's interpretation of the theory of trespass recovery under Tennessee law does not appear to be substantially different from that of the plaintiffs'.

■ In general, Tennessee trespass law as applied to the present case allows for the recovery of damages caused by admitted "incursion" of Velsicol's chemical waste onto property owned by various plaintiffs within the designated area surrounding Velsicol's Chemical waste burial site. Those damages may include consequential, special, and with proper showing, punitive damages. *Inland Container Corp. v. March,* 529 S.W.2d 43 (Tenn.1975); *Franks v. Burks,* 688 S.W.2d 435 (Tenn.Ct. App.1984), *cert. denied,* (1985); *Jones v. Morrison,* 458 S.W.2d 434 (Tenn.Ct.App.), *cert. denied,* (1970). Actual damages would include those damages to real property, chattel and persons proximately caused by the trespass of Velsicol's chemical waste through the water supply onto the plaintiffs' property.

The doctrine of trespass is applicable to this case. The Court finds Velsicol, by its own admissions, has trespassed upon the property of plaintiffs.

Trespass is closely related to the law of nuisance, and the trespass remains actionable as long as it continues. Restatement of Torts Second, Section 158, comment (m). The Court holds that Velsicol's interference and said cause of action continues today.

It was agreed at trial that the cause of action for trespass to property might deal only with Steve Sterling's property in this phase of the trial. This is because the other four flagship plaintiffs had no real property within the impacted zone or had allegedly sold it to Velsicol by the time of trial.

However, the Court believes that certain common questions can and should be decided here:

a. On the basis of Exhibit 279, the Court concludes that the value of all property within the first contaminated zone is reduced to $275 per acre. The basis for this is the Court's conclusion that with the exception of the value of timber the property has no value at least for the foreseeable future.

b. That the property within the second or intermediate zone is valued at $275 per acre for timber plus 50% for any improvements.

c. That all remaining property, not included in the zones above, but within a three-mile radius of the center point in the northern most line of the defendant's farm is reduced in value by 10% of the value of the property above $275 per acre.

■ In addition to the traditional measure of damages for trespass, namely the diminution in value of plaintiffs' properties, Courts have allowed evidence of emotional distress in environmental cases as proof of damages for trespass and this Court concludes that such damages are recoverable in this case. Also, the Court concludes that plaintiffs' are allowed to recover for their concerns over diminished property values and their fear of potential health hazards (*Lunda v. Mathews,* 46 Or.App. 701, 613 P.2d 63 (1980) and *Edwards v. Talent Irrigation District,* 280 Or. 307, 570 P.2d 1169 (1977)). See also *Freeman v. Intalco Aluminum Corporation,* 15 Wash.App. 677, 552 P.2d 214 (1976).

■ This Court further concludes that Tennessee also recognizes the general rule of law that punitive damages are recoverable in actions based upon trespass and the plaintiffs are entitled to recover punitive damages in this case on this theory alone. *Whittington v. Grand Valley Lakes, Inc.,* 547 S.W.2d 241 (Tenn.1977).

*Nuisance*

The doctrine of nuisance applies to this case. The Court finds Velsicol has interfered with plaintiffs' right to the use and enjoyment of their property—whether owned or leased—by the creation of a nuisance. This fact of nuisance is admitted by Velsicol.

Occasionally, a nuisance proceeds from a malicious deisre to do harm, but usually a nuisance is intentional in the sense that the defendant has created or continued the condition causing the nuisance with full knowledge that the harm to the plaintiffs' interest is substantially bound to follow therefrom. A nuisance may also result from conduct which is merely negligence, to-wit: a failure to take precautions against a risk apparent to a reasonable man. Finally, a nuisance may occur when a defendant carries on in an inappropriate place an abnormally dangerous or hazardous activity. The Court finds that the Velsicol chemical dump meets all of the above requirements which are basic Hornbook nuisance elements. See "Liability Under Federal Law For Hazardous Waste Injuries," Harvard Environmental Law Review, Vol 6:1, page 4–6.

In *Reynolds Metals Company v. Martin*, 337 F.2d 780 (1964), the court upheld the verdict and judgment of the lower court finding that the defendant's manufacturing operation was responsible for the contamination of the plaintiff's cattle ranch. Plaintiff contended that the emission of fluoride fumes and particulates from the defendant's nearby plant caused his land and drinking water to become unfit for consumption by livestock. The judgment was based upon a theory of private nuisance.

The Courts of Tennessee have held that damages are recoverable in Tennessee for the maintenance of a nuisance and they have specifically held that such are recoverable where a defendant has polluted the water of another. See *William I. Love v. Nashville Agricultural Normal Institute et al*, 146 Tenn. 550, 243 S.W. 304, 23 ALR 887 (1922). In this case the defendant contaminated the plaintiffs spring water with sewage.

The *Love* Case specifically states that: "Whatever damages have resulted to the complainant have resulted from the maintenance of a nuisance. It is well settled law that if a person renders the water of another impure by filth, offal, or other substances, to his injury, he thereby creates a nuisance, under our statute as well as the common law, ..."

### Compensatory Damages

Plaintiffs contend that as a result of the wrongful conduct of Velsicol, they suffered immense damage. The record is replete with evidence of such physical and mental damage. Moreover, the law recognizes that a plaintiff who is awarded a verdict is entitled to damages for the inconvenience and disruption of his or her life and normal activities as a result of the wrongful conduct of defendant.

The elements which are to be considered in determining damages are discussed in detail in the case of *Thompson v. National R.R. Passenger Corp.*, 621 F.2d 814 (6th Cir.1980). They are:

(1) Extent of injury and disability and whether such is permanent.

(2) Pain and suffering, physical and emotional.

(3) Impairment of enjoyment of life.

(4) Impairment of earning capacity.

(5) Expenses.

(6) Punitive damages.

Velsicol's conduct caused chemical contaminants to come in contact with or invade each particular plaintiff's body, and impacted upon his or her body. Because those contaminants were of such a nature as to cause the reported symptoms and cellular damage, and adverse biological change, (however slight), the Court considers that this ingestion, inhalation or contact caused emotional distress in each plaintiff. See *Robert Laxton et ux, et al, v. Orkin Exterminating Company, Incorporated*, 639 S.W.2d 431 (Tenn., 1982).

Moreover, plaintiffs are entitled to recover for fear, distress, or emotional injury because that fear or distress reasonably and naturally flowed or resulted from the disclosure of the nature and possible effects of those chemical contaminants. The Court has considered the nature, extent or duration of such fear of distress, since any award must compensate plaintiffs for any

distress experienced since the disclosure of the contaminants in the water up to the present time, and even into the future, because the Court finds the medical and scientific evidence provided justifies the conclusion that such fear and apprehension has continued after disclosure and/or will continue into the future. The Court has considered each plaintiff's age, his ability to perceive or understand the risk involved, as well as his or her family status and any medical history plaintiff may have which impacts upon the issue of emotional distress. The Court has also considered further the reasonableness of each plaintiff's response to the disclosure of the contaminants in his water. See *Orkin, supra.* Of course, fear of developing a disease in the future, such as cancer, is an established item of damages not only in Tennessee but elsewhere. *Lorenc v. Chemirad Corp.,* 37 N.J. 56, 179 A.2d 401 (1962); *Ferrara v. Galluchio,* 5 N.Y.2d 16, 176 N.Y.S.2d 996, 152 N.E.2d 249 (1958); *Dempsey v. Hartley,* 94 F.Supp. 918 (E.D.Pa.1951); *Flood v. Smith,* 126 Conn. 644, 13 A.2d 677 (1940) (fear of paralysis); *Southern Kansas Railway Company of Texas v. McSwain,* 55 Tex.Civ.App. 317, 118 S.W. 874 (1909) (fear of blood poisoning occurring and proving fatal).

Separate and apart from the viability of the claims for mental and emotional distress *qua* personal injury claims, it is well settled and a traditional principle of law, that damages for anxiety, discomfort and other distress are recoverable in a nuisance action. In other words, such claims are an incidental element of damages to the property damages recoverable when a nuisance is created. *E.g., Dixon v. New York Trap Rock Corp.,* 293 N.Y. 509, 58 N.E.2d 517 (1944); *Alonso v. Hills,* 95 Cal.App.2d 778, 214 P.2d 50 (1950); *Nitram Chemicals Inc. v. Parker,* 200 So.2d 220 (Fla.Ct.App.1967); *Riblet v. Spokane-Portland Cement Co.,* 45 Wash.2d 346, 274 P.2d 574 (1954); *Vestal v. Gulf Oil Corp.,* 149 Tex. 487, 235 S.W.2d 440 (1951).

A leading case is *Dixon v. New York Trap Rock Corp., supra.* There, plaintiff's property was injured by a nuisance maintained by defendants. In addition to the property damage, one of the plaintiffs sought damages for a "neurotic condition known as an anxiety state" which resulted from the nuisance. 293 N.Y. 514. The New York Court of Appeals stated the applicable principle: "discomfort and inconvenience caused by the disturbance of the property are valid grounds of recovery in an action for nuisance."

One of the prime reasons a nuisance is actionable is that it adversely affects the occupants' right to enjoy the property. In the case of a residence, the life of the occupants is disrupted. In a sense, then, although a nuisance is a property action, its gravamen is the disruption of the lives and well being of the residents. The residents may recover damages for the disruption in the quality of their lives caused by the wrongdoing of defendants. It is well-settled that disruption and inconvenience, in addition to the mental injury are compensible items in a nuisance action. *E.g., Dixon v. New York Trap Rock Corp.,* 293 N.Y. 509, 58 N.E.2d 517 (1944); *Kornoff v. Kingsburg Cotton Oil Co.,* 45 Cal.2d 265, 288 P.2d 507 (1955); *Nailor v. C.W. Blakeslee & Sons, Inc.,* 117 Conn. 241, 167 A. 548 (1933). Simply put, plaintiffs may testify to, and recover damages for, the disruption in their everyday lives and the inconvenience caused by their lack of a potable water supply.

It is imperative at the outset to set forth the exact nature of the item of damages commonly known as "increased susceptibility" or "increased risk." For once it is understood what that item of damages consists of, it becomes clear those damages are recoverable under traditional principles of damage law. In other words, compensation for increased susceptibility to disease is not a new or novel concept.

To begin with, it must be emphasized that the increased susceptibility to kidney and liver disease and cancer is a presently existing condition in each plaintiff who suffered exposure to the various toxins. Plaintiffs produced scientific experts who

testified, that, to a reasonable degree of scientific certainty, each plaintiff now has a presently existing condition known as "enhanced or increased susceptibility" to disease. Finally, they testified that the condition resulted from consuming the Velsicol chemicals in the water.

Recognizing that enhanced susceptibility is an existing condition, and not a speculative future injury, Courts have regularly upheld awards for such a claim. A case on this point is *Feist v. Sears Roebuck & Co.*, 267 Or. 402, 517 P.2d 675 (1973), where the Oregon Supreme Court upheld an instruction to the jury "that it could consider susceptibility to menningitis in its award of damages" to a young plaintiff. Id. Specifically, the trial judge charged the jury that:

> you can't compensate the plaintiff for probably having menningitis in this case, but you can compensate if you choose to, and if it's been proven to you by the evidence that plaintiff has a susceptibility for such a future problem.

In affirming the award of damages, the Court rejected defendants' argument that "the condition of being susceptible to a disease is not compensible as such, at least in the absence of any present harm caused by the possibility." *Id.* 517 P.2d at 679. Instead, the Court concluded that once the condition was established to a reasonable probability by expert testimony, it was for the jury to determine whether to award damages.

That same conclusion was reached in Pennsylvania in *Schwegel v. Goldberg*, 209 Pa.Super. 280, 228 A.2d 405 (1967). In that case, compensation was awarded for an enhanced risk of epilepsy. The Court pointed out that, because the enhanced risk presently existed, there was no element of speculation in awarding damages for it: "Nor was the neurosurgeon speculating or guessing when, based on statistics in his field of expertise, he indicated the probabilities of this particular plaintiff suffering from epileptic seizures as a result of a condition caused by this accident." 228 A.2d at 409.

Numerous other Courts have routinely upheld compensation for enhanced susceptibility to injury. Indeed, an Illinois Appellate Court recently found it unnecessary to extensively analyze the issue, ruling matter-of-factly that "an increase in the risk of injury traceable to the conduct of a defendant is compensible ..." *Lindsay v. Appleby*, 91 Ill.App.3d 705, 414 N.E.2d 885, 891 (1980); *accord, e.g., Redmon v. Sooter*, 1 Ill.App.3d 406, 274 N.E.2d 200 (1971). And, as long ago as 1947, the Connecticut Supreme Court recognized that although compensation for future injury was not permissible unless development of the disease were probable, recovery for the present fact of enhanced risk was a proper element of damages. *Figlar v. Gordon*, 133 Conn. 577, 53 A.2d 645 (1947). More recently, a federal court in Pennsylvania sustained an award of damages for increased risk of arthritis, noting that the medical expert had testified that the plaintiff's bone joint "*is* placed at an increased risk for the development of degenerative or wear and tear arthritis." *Starlings v. Ski Roundtop Corp.*, 493 F.Supp. 507, 510 (M.D.Penn. 1980). The Court recognized that this testimony satisfied the "reasonable probability" standard and that there was no impermissible speculation involved.

█ The enhanced risk of liver and kidney disease and cancer suffered by the five flagship plaintiffs fits squarely within the rule articulated in those decisions, and plaintiffs are entitled to be compensated for the condition.

In sum, it is generally recognized that a plaintiff is entitled to damages for an enhanced risk of injury occasioned by a defendant's wrongdoing. There is simply no element of speculation in awarding those damages between the condition and defendant's wrongdoing.

*Punitive Damages*

The actions and/or inactions of Velsicol amounted, not only to negligence, but also to gross, wilful and wanton negligence. As the evidence clearly showed, Velsicol's actions between 1964 and the trial of this case were controlled by the defendant's

overriding concern for keeping its Memphis plant operating at the expense of human health and the environment. In this regard, the Court notes that in paragraph 7 of its Answer, Velsicol admitted that it gave "no consideration as to the contamination which it was creating until it finally ceased dumping in June of 1972 under a direct order from the Tennessee Department of Health."

The general principles underlying the award of punitive damages in nuisance actions are found in 31 A.L.R.3d at page 1349. The principal requirements for the recovery of punitive damages are:

(1) Proof of an independent cause of action, since there is no cause of action for punitive damages only, 22 Am. Jur.2d Damages § 241.

(2) Proof of actual or compensatory damages, 22 Am.Jur.2d Damages § 241, 242.

(3) Evidence that the defendant's wrongful act was characterized by either willfulness, wantonness, maliciousness, gross negligence or recklessness, oppression, outrageous conduct, insult, indignity, or fraud, 22 Am. Jur.2d Damages §§ 249, 250.

In Tennessee, punitive damages are awarded in cases involving fraud, gross negligence or oppression, *Knoxville Traction Co. v. Lane*, 103 Tenn. 376, 53 S.W. 557 (1899); or where a wrongful act is done with such bad motive or so recklessly as to imply a disregard of social obligations, *Stepp v. Black*, 14 Tenn.App. 153 (1931); or where there is such wilful misconduct or entire want of care as to raise the presumption of conscious indifference to consequence. *Honaker v. Leonard*, 325 F.Supp. 212 (E.D.Tenn.1971); *Inland Container v. March*, 529 S.W.2d 43 (Tenn.1975).

In the State of Tennessee, punitive damages are not recoverable as a matter of right but rest within the sound discretion of the trier of fact. The theory of punitive damages is not to compensate an injured plaintiff for personal injury or property damages but to punish a defendant, to deter him from committing acts of a similar nature and to make a public example of him. *Huckeby v. Spangler*, 563 S.W.2d 555 (Tenn.1978). Damages of this type are placed upon a defendant for his wrongful conduct and with a view to prevent similar wrongs in the future. They are not allowed as a matter of course, but only when there are some features of aggravation, e.g., the wrong is done wilfully and maliciously, under circumstances of rudeness or oppression, or in a manner which evinces a wanton and reckless disregard of the plaintiff's rights. *Liberty Mutual Insurance Company v. Stevenson*, 368 S.W.2d 760 (Tenn.1963). Factors informing the sound discretion of the Court are matters such as the nature of the case, the nature or character of the act, the malice or wantonness of the act, the motive for the act, the manner in which it was committed, the injury intended or likely to result from a disregard of duty, and the character and extent of the injury. *Booth v. Kirk*, 53 Tenn.App. 139, 381 S.W.2d 312 (1963).

The Court concludes that Velsicol's actions in creating, maintaining and operating its chemical waste burial site, with superior knowledge of the highly toxic and harmful nature of the chemical contaminants it disposed of therein, and specifically its failure to immediately cease dumping said toxic chemicals after being warned by several state and federal agencies several years prior to the final cessation of such abnormally hazardous and harmful activity, constituted gross, wilful and wanton disregard for the health and well-being of the plaintiffs, and therefore is supportive of an award of punitive and exemplary damages.

The Court further concludes that Velsicol's attempts to allege that the plaintiffs were guilty of assuming the risk, or were guilty of contributory negligence is without factual basis and so outrageous as to subject the defendant to punitive damages.

In addition the Court further finds that Velsicol has also attempted to shift the liability and causation for the psychological

disorders suffered by the plaintiffs to the local, state and federal authorities, claiming that the defendant cooperated with them in their attempts to monitor the situation and persuade Velsicol to limit its activities. They contend that news coverage of this case specifically caused the post-traumatic stress disorders. The Court concludes that these attempts by Velsicol are also so outrageous that punitive damages should be imposed.

If there has ever been a civil action filed in this Court that justifies the levy of punitive damages, it is the case at bar. All of the elements necessary to an award of punitive damages are present in this lawsuit. In fact, failure to award punitive damages in this case would, in itself, be an act of injustice.

Moreover, the general rule followed by a majority of jurisdictions that have considered the issue is that evidence of a defendant's wealth or financial state is admissible on the issue of punitive damages. *Odom v. Gray*, 508 S.W.2d 526 (Tenn.1974).

■■■ Although the usual action in which punitive damages are levied is often predicated upon the general misconduct of a defendant, here an obvious measure of punitive damages was given by Velsicol itself. Throughout this case, Velsicol has taken the position that without the farm, the Memphis plant would close. Thus, the Court believes that it would be appropriate to deprive Velsicol of a reasonable part of the profit it made by improperly disposing of those chemical wastes to keep that plant open.

Mr. William Howard Bealsy, III, then Vice-Chairman of the Board of Velsicol, wrote a letter to the United States Committee on Environment and Public Works (Ex. 176). While the underlying data specifically referred to PCL waste, waste that Velsicol had admitted contained carbon tetrachloride and chloroform (Interrogatory Answer 2), the Court concludes that such cost estimates apply across the board today. Certainly, Mr. Beasley did not limit the comparisons to any specific chemical.

Mr. Bealsy was quite specific. He stated:

Attached is a current comparison between the disposal cost using a landfill and the disposal cost using incineration. This is an actual situation and represents what outside contractors are now charging. I feel that this is a relevant comparison, since these costs should represent full costs of disposal including operating costs, capital costs, and future maintenance of the site. This analysis shows that landfilling costs approximately $66 per barrel, while incineration costs $210, or over three times as much. If transportation costs are excluded, the costs are $46 versus $183, or four times as much. Due to the short supply of acceptable secure landfills, I would expect the landfill costs to escalate more rapidly in the future than the cost of incineration. However, this large gap is not likely to disappear in the foreseeable future. It should be noted that it takes 66 gallons of fuel oil to burn 50 gallons of residue and obviously the cost of fuel will increase substantially in the future.

Plaintiffs claim that because the testimony appears to imply that some heptachlor catalyst cannot be incinerated that the award for unjust profits falls between $23,800,000 and $63,000,000. The median of those figures, according to plaintiffs, is $44,000,000. This is computed by 300,000 barrels times both $66 and the $210 figures. Thus, plaintiffs assert this figure should be $44,000,000 to $66,000,000. At no time did Velsicol present any testimony claiming such figures were inaccurate or not applicable. Indeed, Mr. Beasley reaffirmed them. These figures also do not take into account the interest which this money earned subsequent to use of the chemical waste burial site.

*Pre-Judgment Interest*

The Court concludes pre-judgment interest should be granted beginning in July, 1965. Pre-judgment interest is a proper element of damages under the statutory and common law of the State of Tennessee, *Tenn.Code Ann.* § 47–14–123. That code

section provides that pre-judgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by statutory and common laws of the State as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of the maximum effective rate of ten percent (10%) per annum:

> Pre-judgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the state as of April 1, 1979 may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum; provided, however, that with respect to contracts subject to § 47–14–103, the maximum effective rates of pre-judgment interest so awarded shall be the same as set by that section for the particular category of transaction involved. In addition, contracts may expressly provide for the imposition of the same or a different rate of interest to be paid after breach or default within the limits set by § 47–14–103. [Acts 1979, ch. 203, § 22.]

The Court finds there are four starting points to determine when prejudgment interest should begin to run in this case:

(1) Interest should begin to run from the first wrongful act of Velsicol. As Mr. Jones of the Tennessee Department of Health testified:

> "Q. But the actual pollution that you were concerned with, when ... was the starting point?"·
>
> "A. When the first barrel was dumped ...". (Tr. 1453).
>
> Thus, prejudgment interest should commence running from October 24, 1964.

(2) The Federal Water Pollution Control Agency, as pointed out *supra*, in July 1965 found some chemicals dumped by Velsicol were already in Steve Sterling's well including the pesticides Endrin and Dieldrin (Ex. 85). Prejudg-

ment interest should at least begin to run at this point, if not before.

(3) Third, and in any event, prejudgment interest should begin to run on the date the chemicals were predicted to arrive at the wells by computer modeling. The date calculated by plaintiffs' water model was 1969 (see Exs. 374 and 375) for at least the Sterling and Johnson wells.

(4) The fourth possibility is to start prejudgment interest running from 1974, the date that Velsicol's own water model indicates that the chemicals arrived at the Sterling and Johnson wells.

■ The principles of equity, when applied to the facts in this case, dictate that prejudgement interest in this case should be awarded and should begin to run from July, 1965, when some Velsicol chemicals were found in Steve Sterling's home well water.

## Explanation of Compensatory Damages Awarded

### Steve Sterling

Plaintiff Sterling was sixty years old at the time of trial. While he might not have been a highly educated man, he was a good family man and provider. He had seen fit to own enough real property so as to provide land and homes for his five children as they grew up, married and had families. These homes were together on the Toone-Teague Road and used a common well for water.

Mr. Sterling was born December 25th, 1922 at the place where he still lives, namely Hardeman County on the Toone-Teague Road. He has been a farmer and carpenter all of his life and has continued to live at the same location. Mr. Sterling was normal at birth and was a healthy child and physically active. After his formal schooling, he went to work farming with his father. This is still his present occupation, although his activities are now somewhat restricted.

He drank from the Sterling Well (his own well), and he drank between ten to twelve glasses of water a day. He stated that he increased his fluid intake when he was working outside to over a gallon a day in 1975 to 1976. He stated that his "kidney's hurt" and that he had to go to the hospital with a kidney infection. He testified that he noticed an oily substance on the water from the well in 1975 to 1976, and that he pulled the pump in early 1976 because of this but didn't find anything wrong with the pump. Later that year he noticed there was odor to the water and that it had developed a bad taste. He has a bathtub, but does not have a shower.

Mr. Sterling stated that with the exposure to Velsicol's chemicals he became very tired, very listless, with marked shortness of breath. These symptoms have become worse, and now he states that he is too weak to even go fishing. He also noticed headaches beginning in 1975 to 1976. These headaches were bilateral temporal in position. While these have improved over the past several years, he still has instances of severe headaches.

Mr. Sterling started wearing glasses in 1964, but noticed considerable decrease in his vision since 1977. He also had some ringing in his ears during 1976 to 1978, with a decrease in his hearing during that period of time as well as since then. The ringing, however, has disappeared. At the time of the exposure there was some soreness of his mouth, and he noticed a loss of taste.

He has had diffuse chest pain with severe cough over the past few years. This is a productive cough, with hemoptysis, or bleeding in his sputum, every few weeks. Marked shortness of breath is present with recurrent respiratory infection. This has been present since 1976, but he states that it has become worse in the last few years. The burning in his chest with a deep breath has cleared somewhat since he stopped using the water.

His appetite is poor and has been since the water was at its worst. He stated that he had some nausea and vomiting, which was most marked in 1977–78, but that has improved. These symptoms have caused a weight loss of approximately fifteen to twenty pounds, from which he stated he has not recovered.

He has some urinary frequency, with some urgency and burning on urination, and has noticed that he has to get up at night now some to void. He has noticed some tingling of his hands and feet since 1978, but no pain or discomfort in his legs with walking.

Mr. Sterling had an elevated BUN which is a rough measurement of kidney function. There are two areas of the kidney that form urine, and one of them is a filtering plant, which is the glomerulus, and the other are the tubules, and the BUN is a rough estimate of kidney function. It takes about three-fourths destruction of the kidney before the BUN becomes elevated, and with the elevation that Mr. Sterling has, Dr. Rhamy testified that Mr. Sterling has about only twenty percent of normal renal function still present. That loss of kidney function, according to Dr. Rhamy, was most probably due to the chemical exposure.

Defendant's wilful and wanton poisoning of Steve Sterling has wrecked his health. He suffers constant reminders of poor health due to splitting headaches and shortness of breath. His immune surveillance system has been destroyed. He worries continually about his family, his children and grandchildren. He had a lifetime expectancy, without the effects of these chemicals, of 17.2 years at the time of trial. Moreover, the record is also replete with instances of inconveniences caused to Mr. Sterling by Velsicol's actions. And, his property is worthless except for its timber value.

Steve Sterling testified Velsicol opened the chemical dump site in the Toone-Teague Road area in the early part of 1960. (2045). He said he visited the dump site regularly because he had friends who worked on the site. He described the dumping operations as follows:

Q. Did you know the people that were there that were employed by Velsicol?

A. The which now?

Q. The people that were employed at the dump that were employed by Velsicol, the managers?

A. I still didn't understand.

Q. Did you know the people who worked at the dump that worked for Velsicol?

A. Yes, sir.

Q. Did anyone ever tell you that the chemicals were dangerous?

A. No.

Q. Did anyone tell you not to go down there—not to come down there and go on the dump?

A. No, sir.

Q. Were those people who worked for Velsicol down at the dump at the times that you would be down there?

A. Yes, sir.

Q. Would you tell the court what you recall about the drums that the chemicals were in?

A. Well, they were just steel drums, and they just hauled them in there and backed the truck up to the ditch and dumped them over in there, and my brother-in-law most of the time was running the dozer covering them up, and of course, they would cover the barrels up, and most of the time pretty close, you know, all of them, and most of the time just leave them laying out there, and the next time they went to dumping, they would just dump against that, you know, and cover it on up and down, just like that. You could see some of the barrels at all times.

Q. Did all of the barrels have tops on them?

A. No.

Q. Did you ever see any of the contents of the barrels on the ground?

A. Yes.

Mr. Sterling described his family's various uses of water from the Woodrow Sterling well and the consequences of using that water: (2048–2053)

Q. Steve, will you tell the Court what all the things were that you used the well water for?

A. Well, we used it for everything at the house, cooking, taking baths, washing cars, cleaning carpets, floors, and washing the clothes, just everything you can think of that you would use water for in a household.

Q. During those years did you drink very much water?

A. Well, I did, on up to somewhere in this period of time about '77, I couldn't drink the water.

Q. How about iced tea, did you drink much iced tea?

A. Got to where you couldn't drink that either; coffee and everything changes taste.

Q. When was the first time that you noticed something unusual about the water?

A. Well, I couldn't recall just the time I noticed something unusual about it, but we kept trying to use it and use it, oh, up until around '77 and I thought maybe it was the well, so we done everything we could to the well, redone it over, changed the motor and all in it, thought maybe it was leaking, you know, in it, but nothing we done helped it.

Q. Steve, would you explain for me and for the Court what it was that caused you to think there might be something wrong with the well or with your pump?

A. Well, everybody that come out there kept telling us that there's nothing wrong with the water, you know, it's all right, there's nothing wrong with it. Nobody would drink none of it. We just, you know, had an idea that maybe you know, something was wrong with the well

Q. Tell the judge, if you would, what it smelled like.

A. Well, really, I don't know, like cotton poison or some kind of chemical, you know, that you would kill bugs with, garden spray. It had all kinds of smells to it. You couldn't really tell.

Q. When you overhauled your well and pump did the smell change?

A. Couldn't tell no difference either.

Q. Did it ever get better?

A. No, got worse.

Q. Was there ever any time that you had to drink more water than usual?

A. Yes, I took something wrong with my kidneys and I went to the doctor and he told me to drink all the water I could, try to drink a gallon a day.

Q. What doctor was that?

A. That was Barham in Bolivar.

Q. About what year and month, if you recall, was it that he had you drinking a gallon of water a day?

A. That was I think in '77 too.

Q. Steve, what type of—well, let me ask you this. About how many baths or showers would you take in a week's time? How many times were you noticing the smell in the water?

A. Usually you take one nearly averaging, you know, once a day, sometimes you'd miss, not hardly ever, but it got along in '77, why, I got to where I wouldn't take a bath because I couldn't stand the bathroom. I would open the door and I couldn't stand it, it would just smother me to death.

Q. Tell the Court, if you would, please, what it was that was smothering you.

A. Well, when you run that warm water in the tub, really it wasn't that hot, but I mean you get a little steam like, you know, it just smothered me and it would irritate me breathing in my throat, and of course after you took a bath, why, you would just be dry as a bone and that night you couldn't sleep because you would itch all night long and scratch, and then the next morning you would be scaly, you noticed flaking like on your body, and—

Q. Had you ever had any problems with your skin like that before?

A. No.

Q. Did you put any lotion on it? What did you do for your skin problem?

A. Well, I rubbed alcohol on me and lotion and just everything that I could think of, but it didn't seem to anything do it any good.

Q. Did any of it help?

A. I couldn't tell you that it did.

Q. Steve, you said that your throat would be irritated. Would you explain what you mean by that?

A. Well, I would do a lot of coughing. I would get started to coughing and smothering and just, well, like you had had a real bad cold or something or other and, you know, just got raw down in your chest.

Q. Did taking a bath or shower cause you any problems with your eyes?

A. Yes, my eyes would burn when I was in trying to take a bath, especially—well, you could let that water run, in the kitchen or anything, washing your hands, and if it was real hot and you didn't just really notice it, you know, and run too much hot water and it would come up and hit you in your eyes, it would burn your eyes.

Q. What are all the other uses around the house that you were putting water to at that time?

A. Well, we was putting it in the washing machine, dishwashers, well, in just really everything that you would use water in a house for, I mean we used it for everything.

Q. Did you wash your car?

A. Yes, washed my car in it. And when you would—if you was out in the yard and everything, you had been out all day and you would come in, like if there was a washing in the house, of course the clothes washer was setting just in the—well, it wasn't in the kitchen, a little utility room made with the kitchen there, you couldn't hardly stay in the house if you had been out all day and you just run in there and they had that washing machine odor or open that dishwasher, I knew I had to get out of there.

Q. You could tell when you opened the door that your wife had been washing that day?

A. Yes.

Q. What did that smell like?

A. That same old smell, just some kind of chemicals, you know, spray or something or other.

Q. Did you and Nancy ever complain to anyone about the water?

A. Oh, we talked about it just every day. We argued about it and everything else because, you know, I couldn't believe it was in there and she kept telling me it's got to be on account of that dump, and I said, no, that's too far, that can't be getting in that water.

Q. When you had these discussions did you ever go and check anybody else's water?

A. Yes, I went all over the country drinking water and all and nobody—all but any distance was all right as far as I could tell, but right there all of them, and finally got to where when I went up to J.D.'s from our'n, and up at the Johnson well, it was in the same shape.

Q. Do you know where Hut King lives?

A. Yes.

Q. Did you ever check his well?

A. Yes, checked his well. So a lot of friends around, I went and checked their wells. Then, of course, we went there and took baths, round about, went to Chickasaw, took baths up there. That was after we just plumb quit using it.

Q. Did it get so bad you couldn't use it anymore?

A. Yes, it just got to where you could not use it.

He said they stopped using the water in 1977. (2055).

On November 2, 1978, the Regional Administrator, Environmental Protection Agency, (EPA), notified the Sterlings by letter not to use water from the Woodrow Sterling well. That letter reads:

"Dear Mr. Sterling: In August 1978 a water sample taken from the Woodrow Sterling well, which you use, was found to contain 4800 parts per billion (ppb) of carbon tetrachloride. It is the opinion of this Agency's Regional Toxicologist that water containing this amount of carbon tetrachloride should *not* be used for any human contact. This includes bathing, washing dishes and clothes as well as food preparation and drinking. Also, the water should not be used by any animals, especially those used as a source of human food.

"I have directed that water samples be collected on Wednesday, November 1, 1978, from all the known drinking water supply wells in the vicinity of the Hardeman County landfill in order to determine the extent of chemical contamination and to confirm the high concentration of carbon tetrachloride found in your well water. The results of the analysis of these samples for organic chemicals will be provided to each of the well owners as soon as they become available. In addition, an advisory on further use of the water from each well will be provided based upon the analysis of the chemicals found.

"Also, this Agency is contacting the Department of Housing and Urban Development and the Farmers Home Administration in order to expedite the construction of the permanent water system extension to your property.

"I am enclosing a copy of a letter to Woodrow Sterling directing him not to use the water for any human contact.

"If you have any questions concerning this matter, please contact Ms. Kitty Taimi of my staff.

"Sincerely yours, John C. White."

Carbon copy to Dr. Eugene Fowinkle, Tennessee Bureau of Environmental Health Services, Dr. Elmo Luma, Tennessee Department of Public Health, and Michael Cody, U.S. Attorney for the Western District of Tennessee.

The Regional Administrator mailed Steve Sterling a follow-up letter dated November 9, 1978, confirming the presence of the chemical Carbon Tetrachloride in the Woodrow Sterling well (2062–63).

On November 5, 1978, the Tennessee Department of Public Health notified Mr. Sterling by letter that water in the Woodrow Sterling well should not be used (2064–65):

MR. GARRETY: It is a letter to Woodrow Sterling from the Department of Public Health, Environmental Health Services, 646 Old Hickory and U.S. 45 Bypass, Jackson, Tennessee.

It is dated October 5th, 1978.

(Reading) "The sample collected from your well on August 14, 1978, has been tested and found to contain the chemicals shown on the attached sheet. In comparing this data with that taken in April, some of the chemicals appear to have increased in concentration while others have decreased. At this time we can offer no explanation as to why some increased while others did not.

"It is still our position that the water from your well should not be used for consumption or food preparation. If you have any questions, please do not hesitate to contact me or Pat Patrick.

"Sincerely yours,
"Wayne Max
"Environmental Engineer
"Division of Water
Quality Control"

The inability to use water from the well caused the Sterling family severe inconvenience (2067):

Q. Did having to haul your water and having to go someplace else to take showers and take baths, did that have any effect on scheduling what you were going to do or your social activities at all?

A. Yes, it did. Well, sometimes it was just plumb, you know, difficult, because knowing you had something else that you needed to be doing, and you would have to go get water and have to drive to take a bath, and it was—well, it was just, you know, something that kept you uncertain what you was even going to get to do.

Mr. Sterling described his health as follows:

Q. Steve, would you tell the Judge what your health problems are today?

A. Well, really I have been sick ever since '70—well, some before that, but I got really sick in '77, and I started going to doctors and they started giving me medicine and tell me to drink water, and the more water I drunk, the sicker I got. I am real nervous, and I have a hurting in my chest, and I stay sick a lot in the upper part of my stomach, and I have a headache, and have deadness in my arm and leg, and my nerves, I mean they are real bad.

Q. Would you describe your headaches, please?

A. Well, it hurts mostly in my temples here and around my eyes (indicating). Of course, it hurts some, you know, all over. But the worst place I have is right in my temples and seems like behind my eyes that I have a lot of headaches.

Q. How often do you have those, Steve?

A. I would say some every day, some days are worse than others.

Q. Did you have headaches before 1977?

A. I never did, as I know of. I didn't have hardly any. You know, my head never did bother me.

Q. You mentioned problems with shortness of breath and your chest. Would you explain how that affected you?

A. Well, now, I just—I ain't got not wind. I mean, I can't hardly do anything. I just walk a little piece and I am out of wind, and if I am going upgrade, I can't go nowhere. I just run slam out of wind, and when I breathe, it just seems like I am raw, you know. You get to hurting in here (indicating), or trying to hurt, and then I get started to coughing and just run plumb out of air.

Q. Has this running out of air had any effect on your ability to go hunting and fishing and those things that you talked about earlier?

A. Practically stopped it.

Q. Did you enjoy that?

A. Yes.

He participated in a medical health study conducted by Dr. Scott Clark, a professor of the University of Cincinnati (2071).

On cross-examination, Sterling testified he has smoked cigarettes for years (2096–97). He has emphysema (2097) which was first diagnosed in 1976 (2098). He testified Velsicol replaced some plumbing and household applicances in their home in 1978 (2103), and purchased their canned and frozen foods (2105).

During the time Mr. Sterling's well water was smelling and tasting bad, he pulled his water pump out of the ground. He described what he observed (2108–09).

Q. When the water was smelling bad and tasting bad and you thought it might be something with the well, did you pull that pump up?

A. Yes.

Q. Now, when you pulled it did you find anything unusual on it?

A. Yes, it had just a slum and all in the pipes, the whole pump. Well, it's an inch pipe and the hole wasn't through it, you couldn't stick your little finger down in it, there was just an old slummy looking stuff all in the pipe.

Q. Did you clean it?

A. No, we run a wire through it and pulled a mop through it and mopped it out and cleaned it as we could.

Q. Did you put that same pump back?

A. No, not the same motor. We put the same pipes back in.

*Nancy Sterling*, wife of Steve Sterling, testified she knew there was something wrong with their water. She said, (2114–15):

But the water, I could not hardly drink it, I knew down deep in my heart that there was something wrong with that water, I knew it had to be.

Q. Do you remember what year that was?

A. . That was in 1977.

Q. What did it taste like?

A. Cotton poison, oak spray, shoe polish, tractor fuel, I don't know. It was just all combined. It's hard to explain as to what it tasted like.

Q. Did it have an odor to it?

A. Yes, it did.

Q. Did the smell stay the same?

A. No, it gradually got worse.

Q. Was it any difference to you, Nancy, between the hot water and the cold water?

A. Yes, it was. The vapors from the hot water was just absolutely stifling. It hurt you so bad to breathe. Your eyes would burn so bad, and your nostrils would burn.

Q. Did you own a dishwasher?

A. Yes,. I did.

Q. When you opened the dishwasher, did you notice anything about the smell?

A. Yes. Also, there would be a substance on the dishes like a powder—maybe a face powder, a dust, a white dust.

Q. Had you ever had any of these problems with dishes before?

A. No.

Q. Had you changed your dishwashing powder?

A. No.

Q. You were using the same kind?

A. Right.

She described the water when it was used for bathing and for showers and how her hair started falling out (2116–17):

Q. Tell the court about the bath and shower water?

A. Now, that was really terrible. You would go in the bathroom, close the door, and run your bathwater, and when you would go in there, it would just—it would take your breath, almost. But you had to take a bath for sure, and it would also make you so weak you would just want to just get out and sit down and not get up. You didn't have energy enough to get up. Your skin was so dry until it felt like it would break.

Q. How close in time did the problem with the skin develop in relation to when you first smelled the water?

A. Very shortly. For a long time you would take a bath, and you would say, what the heck, my hair is all falling out. Look, the brush is full. I am going bald. You look at your skin and you would say, what is happening to it. It's breaking. Well, maybe it's this and maybe it's that, and pinpoint it all down. It's water. You wash your hair, and you dry it, and the towel is full of hair. You brush it and your brush is full of hair.

Q. Now, on this problem of the hair, did that change when you got off the water from the house and had to go someplace else to take a bath or shower?

A. Yes, it did. It really did. It didn't completely stop, but it really helped it.

Mrs. Sterling had problems with headaches and her personal energy level (2119):

Q. When did you first notice these headaches that you were having?

A. My headaches started approximately 1974. I was working at Kilgore, and during that time, day by day by day, I hated to go to work, even worse every day, because I did not absolutely have energy to go all day, to do eight hours work there and to do the work I had to do at home.

Mrs. Sterling testified that Dr. Dan Marks, chemist at Velsicol, declined and refused to taste the water when he visited her home (2135–36):

Q. Nancy, when the water began to taste and smell enough that you thought it was the water, did you complain to any public officials?

A. Yes, we did.

Q. Who came out on behalf of the County or the State to look at your water?

A. Well, in November Steve carried some water to the Health Department at Bolivar. In December Mr. George Wallace and some guys from Nashville came out to our house and got some water. And I think in January 1978 Mr. Wallace came back, I was at Woodrow's house, he and two other guys, one of them was Mr. Dan Marks that was on the witness stand here the other day, and got water and—

Q. Would any of those people drink the water?

A. No. Mr. Dan Marks, I asked him if he could smell the water. He said no, he couldn't smell it because he worked for Velsicol in the chemicals and he got to where he couldn't smell it.

I said, "Maybe you can taste it. Why don't you have a drink?" He said, "No way. I probably wouldn't live until I got back to Memphis."

Mrs. Sterling described the changes and fears of her and her family as a result of this experience:

Q. Nancy, you have lived out there a long time and if you would, would you tell the Judge what changes have taken place out there on the road since Velsicol moved up there and what this has meant to you.

A. It has just about completely destroyed everything that my husband and I have worked for for the past forty years. It has about destroyed what my children worked for, the life in their lifetime since they have been there. We have worked hard, we all shared in the work to build what we have out there. We were happy. Overnight our water was contaminated, our lives were completely changed, and they will never be the same no matter what.

Q. Are you concerned about your grandchildren?

A. I'm concerned more about my grandchildren than I am myself. I've lived my life, just about. I've had a good life up until 1977.

My grandchildren haven't lived their life; they are just beginning. My oldest one is seventeen years old. My youngest one's five years old. What will it do to them?

 The Court awards the following monies to Steve Sterling in an attempt to compensate him for his injuries:

1. Personal
 a. Extent of injury and disability, including increased risk of disease and cancer in the sum of $150,000;
 b. Impairment of Mr. Sterling's immune system in the sum of $75,000;

c. Psychiatric damage.

(1) Post traumatic stress disorder in the sum of $50,000;

(2) Fear of increased risk of disease and cancer in the sum of $75,000;

d. Physical pain and emotional suffering in the sum of $125,000;

e. Impairment of Mr. Sterling's quality of life in the sum of $150,000.

2. Real Property in the sum of $48,-492.50.

## James E. Wilbanks

Plaintiff Wilbanks and his family were the first to be stricken by Velsicol's dumping, for the Velsicol chemicals didn't have to go through the aquifer. Those chemicals were washed from the Velsicol well and from the road at the gate near the tavern well and somehow contaminated the tavern well. This alone necessitated the replacement of three hot water heaters at the tavern from 1969–1972.

Mr. Wilbanks was born in Walton, Mississippi, on July 15, 1931. In 1938 he moved to Selmer, Tennessee. In 1952 he moved to Henderson, Tennessee, and in 1968 he moved to a trailer behind the tavern across from the entrance to the Velsicol dumpsite.

He had a normal childhood without illness. He went to work on his father's farm after completing the fourth grade of school. He went to work then in a sawmill in 1948 where he worked until 1968, when he went to work for Mr. Mills at the tavern. He worked there until 1977, when he moved and went to work at the Hardeman County Jail, where he still works.

His history of water intake was that he drank from the well located on the tavern property and used that water for his showers. He states that an odor was noticed by him and his wife as well as the customers as early as in 1969. Mr. Wilbanks stated that he stopped drinking the water in 1978 and remained in fairly good health with a minimum of visits to his doctor until January of 1981, when he noticed the appearance of blood in his urine. He immediately sought consultation and was seen by a neurologist in Jackson, Tennessee, who admitted him to the hospital and performed a urogram, which is a picture of the kidneys, and on January 23, 1981 an operation was performed removing one of his kidneys because of cancer. He had twenty-five cobalt treatments and other chemotherapy.

During the time of exposure he stated that he felt very weak, had dizzy spells and experienced severe headaches. In addition he had severe leg cramps. He just felt bad all the time, and was having considerable nervousness, which caused marital conflicts. This improved after stopping the water ingestion.

On symptom review, he had severe bilateral headaches daily, which caused him to become faint at times with dizziness noticed somewhere around 1973 to 1975. In 1974 he had one episode of passing out for a few minutes. He noticed some numbness of the right side of his face in 1981. He testified that his eyes were going bad and he couldn't see to read. He has some ringing in his ears until after he stopped drinking the water. He had some burning of the nose with smelling hot water, particularly when he was in the shower, along with soreness of his throat as well as hoarseness.

He had soreness of the mouth with coating of his tongue, with difficulty in swallowing during the period of time of odor to the water. Like others, Mr. Wilbanks just lost taste. There wasn't any taste to the food. He described this in approximately 1974. He stated that this persisted until after he moved away from the tavern area and stopped drinking the water.

He does have some shortness of breath with exertion and some questionable nocturnal paroxysmal dyspnea since the mid–1970's. This is a shortness of breath in the middle of the night, and he would sit up in a chair and try to gain easier breathing. He also stated that he had some pedal edema, swelling of his feet, late in the day.

During the time that he was drinking the water he had nausea and vomiting with approximately a fifteen pound weight loss,

but he gained this back and the nausea and vomiting disappeared after stopping drinking the water, but has recurred again after he had his x-ray and cobalt treatments for his kidney cancer. He has some urinary frequency with cloudy urine, and he first had the blood in his urine in January of 1981. He has pain in his low back. He has pain in both lower extremities.

During the time that he was using the water he described a rash of the skin, itching, with tingling particularly immediately after the shower. He changed soaps because of this, but the symptoms did not go away, until he stopped using the water. He has had tingling and paresthesias of both upper and lower extremities.

Mr. Wilbanks has already lost one kidney to cancer which the Court finds was the result of Velsicol's contamination. He was also forced to move his family away from the Toone-Teague Road. He lives with the fear that his other kidney will fail. At the time of trial, his life expectancy was 23.2 years, without the effects of these chemicals.

Mr. Wilbanks testified he started having dizzy spells in 1973 (2210). He blacked out. His wife helped him up and he went to see a physician (2211). He has suffered headaches the past seven or eight years. His eye sight is failing. His weight was normally about 165 pounds (2212). When he moved away from the Toone-Teague area, his weight had dropped to 148 pounds. He said his legs hurt a lot from his hips down (2214). Then, he described a bleeding episode (2214–15):

Q. In 1981, state whether or not you had any bleeding?

A. Yes, sir.

Q. Tell the court about that. How did that happen?

A. Well, I started bleeding from my kidneys.

Q. And where did this bleeding first occur? Where were you?

A. I was at home.

Q. I want you to describe in detail to the court what happened? What did you experience?

A. Well, that was on a Saturday evening. You want me to just tell the way it happened and everything, the way it started?

Q. Yes.

A. Well, I was at home there, and I just started bleeding, and so I didn't say anything—

Q. Was that in the area of your privates?

A. Yes, sir. So I didn't tell my wife or kids nothing about it, because they had set up to go to the skating rink that night. So I went ahead and got ready, and we went on up there and got them all with their skates on, and I was sitting there and I got me a coke. We were sitting there, and I started cramping and hurting, and I went to the bathroom, and it locked up on me, and I finally got it unlocked, and I went and told my wife that I had to go to the doctor fast. So they took me up there to the Bolivar emergency room, and admitted me in the hospital. I stayed there about three days, the best I can remember, and they got hold of Dr. Driver.

After a kidney was surgically removed, he underwent twenty-five treatments of chemotherapy or cobalt treatments (2218):

Q. After January 18th, 1981, Mr. Wilbanks, did you have certain chemotherapy or cobalt treatments?

A. I took twenty-five treatments.

Q. And over how long a period of time were these twenty-five chemotherapy or cobalt treatments?

A. It took five weeks.

He described the physical effect of these treatments upon him (2220).

Q. What effect did these twenty-five cobalt treatments have on your physical system, Mr. Wilbanks? How did they make you feel, how did the cobalt treatments make you feel?

A. They made me sick, and then when I would comb my hair, the hair would come out. Before I got through with them, the hair started coming out.

Q. Did they ever make you nauseous or sick to your stomach, the cobalt treatments?

A. Yes, sir. I quit eating. I just got to where I didn't want anything to eat.

Q. Did it ever make you weak?

A. Yes, sure did.

Q. And how about your hearing? Did you ever have any trouble with your hearing?

A. Real bad.

Q. State what period of time that you had problems with your hearing as far as these cobalt treatments were concerned?

A. Well, it started going bad on me just right after I had the cobalt, the best I remember. It started going bad on me the last year and a half or two years, my hearing, really falling back on me, getting worse.

He also described his condition further as it has affected his family (2222):

Q. What effect has this operation and the uncertainty over this had upon you and your wife and your family, Mr. Wilbanks? Just tell the court?

A. Well, I slowed up on some of my work, slowed up on some of my work around there. I changed a lot. I know I have. When a man has got cancer, you know he studies about it, just wondering where it's going to hit him next—the other kidney or what.

Q. What effect has that had on your wife, that you have observed?

A. Well, it changed me and her both, you know. I don't think I can get along with her half the time, because I, you know, changed a lot. A lot of times she wants to sit down and talk a conversation, and I start, and I don't never finish it out.

Mr. Wilbanks admitted he tasted moonshine whisky (2242) and smoked cigarettes about twenty-five years (2251).

▮ The Court awards the following monies to James E. Wilbanks in an attempt to compensate him for his injuries:

a. Extent of injury and disability, including the loss of one kidney already to cancer and optic atrophy and neuritis and the increased risk of disease and risk of cancer to his other kidney and organs in the sum of $150,000;

b. Impairment of Mr. Wilbanks' immune system in the sum of $75,000;

c. Psychiatric damages:

(1) Post traumatic stress disorder in the sum of $25,000;

(2) Fear of increased risk of disease and cancer in the sum of $100,000;

d. Pain and emotional suffering including 25 cobalt treatments in the sum of $250,000.

2. Impairment of Mr. Wilbanks' quality of life in the sum of $75,000.

*Curry A. Ivy*

Plaintiff Ivy is the one plaintiff who not only was subjected to the drinking of the Velsicol chemicals in water but also was occupationally exposed to heavy doses of those same chemicals. He not only suffers from increased risk of disease and cancer as do the other plaintiffs, he has optic nerve damage and optic neuritis which is a known effect of exposure to carbon tetrachloride.

Mr. Ivy was born on January 3, 1926, in Chester County, Tennessee, where he lived until 1942 when he moved to Madison County. He lived there until 1966 when he moved to the Rosetta Brooks property on the Toone-Teague Road. He moved to Toone, Tennessee in 1972 but continued to drink from the well at the Rosetta Brooks property as well as the Velsicol farm well.

In 1971 he started driving a truck, hauling chemicals from the Velsicol plant in Memphis, Tennessee to the dumpsite, and he hauled approximately two to three loads per day. He drank from the Brooks well as well as the Johnson well, and since he was around chemicals all the time and his clothes were saturated with these, he did not notice any particular change in the odor of the water until sometime in 1978.

He described his symptoms of exposure as that he got very tired and very irritable when he was hauling these materials. His nerves got very bad, and he said that this caused problems between him and his wife. He had severe headaches while driving the truck, and there was some dizziness associated with this. The headaches persist, but they are better when he is not around the chemicals.

He has worn glasses since 1946, but feels that his vision is worse at the present time, and he had marked burning of his eyes when he was around the chemicals, as well as some discomfort to light or photophobia. He described his hearing as being poor with some ringing in his ears, and some burning and pain in the nose when around the chemicals, and at that time he had some episodes of nosebleeds, but has had none at present.

At the time he was around the chemicals, he had some soreness of his tongue, but did not describe other changes. He had some nausea, particularly when he was hauling the chemicals, but it had gotten better since he had been away from the chemicals, and at that time he also experienced some diarrhea. As far as his extremities were concerned, he had noticed some tingling of his lower extremities, as well as "pins and needles" type sensation. On physical examination he had multiple sebaceous cysts around the area of his head, with his eyes demonstrating the disc to be poor, with decrease in his optic fields and his peripheral vision.

Upon examination, he was slightly tender over his liver, but his liver could not be felt to be enlarged. His current (1982) laboratory studies were within normal limits as far as his liver enzymes and his kidney enzymes, and he had a neuro-opthalmology by Dr. Drewry, which did show decrease in visual acuity, as well as decrease in optic peripheral fields.

In 1979, Mr. Ivy's SGGT, the albumin, the SGPT, the SGOT, and the CO2 combining power, and the BUN as well as the non-fasting SLCC were all abnormal as far as the laboratory norms given with this examination. This was evidence that indeed there was liver injury and damage even by 1979 examinations were drawn, and particularly with the bile acids, that this was conformatory of the other liver enzymes.

Insofar as Mr. Ivy's eyes were concerned, the discs looked pale to Dr. Rhamy and in examination of the optic field, it appeared to Dr. Rhamy that they were indeed restricted; that there was a decrease from normal.

Mr. Ivy's life expectancy is 19.3 years.

Mr. Ivy testified he washed dirt and chemical waste off the bulldozer treads at the burial site (Tr. 2266). He described Velsicol's burial operations at the site (2267):

Q. Did you ever see the bulldozer driving over any of the barrels?

A. That's right.

Q. What would happen to the barrels when that would happen?

A. Well, it's just like any other barrel you would drive a bulldozer over, it would mash.

Q. Did you ever see chemicals coming out of the barrels?

A. Yes, sir.

Q. How far was the tavern from the entrance to the dump?

A. I'd say a hundred yards, maybe 200, somewheres in that neighborhood.

Q. When you were driving up from Memphis with a full load, which way would you be turning off the Toone-Teague Road to get into the dump?

A. I would be turning right.

Q. When you made that turn would any of the chemicals ever leak from the truck?

A. Yes, sir, it leaked all up and down the road.

He said he could smell the chemicals when he was driving the truck hauling chemicals waste to the site (Tr. 2269). He described his health problems as follows (2269–70):

Q. Would you tell the Court, Curry, what health problems you noticed while you were hauling for Mr. Thomas and working up there on the dump site?

A. Well, I had eye problems. My eyes would burn and hurt me all the time. A lot of times I would lay down at night, I would have to put damp cloths on my eyes to keep them from burning.

And I got short of breath, I couldn't hardly breathe. I· got extremely nervous.

Q. Did you have any throat problems?

A. Well, not too much throat problem. My throat would burn some, but, you know, not too much throat problem. I never had too much throat problem.

A. You mentioned a problem with your eyes. Did you notice any effect on your eyesight or your ability to see during that time?

A. Yes, sir, my eyes would get blurry. They wouldn't clear up.

Q. When you stopped hauling for Mr. Thomas, did that have any effect on your health problems?

A. Well, it seemed like I got some better about my seeing.

Q. Did you ever get back to where you felt you were before you started hauling?

A. No.

He testified he suffers emphysema (2283) and has smoked cigarettes for years (2284).

The Court awards the following monies to Mr. Ivy in an attempt to compensate him for his injuries:

a. Extent of injury and disability, including optic atrophy and neuritis and the increased risk of disease and risk of cancer in the sum of $75,000;

b. Impairment of Mr. Ivy's immune system in the sum of $75,000;

c. Psychiatric damage:
(1) Post traumatic stress disorder in the sum of $50,000;
(2) Fear of increased risk of disease and cancer in the sum of $50,000;

d. Physical pain and emotional suffering in the sum of $50,000;

e. Impairment of Mr. Ivy's quality of life in the sum of $50,000.

*Daniel R. Johnson*

Mr. Johnson was gainfully employed as an experienced heavy duty equipment operator until stricken by Velsicol's chemicals. Without repeating the facts above, he is now a mental cripple. Until his death, he must depend on the good will and graces of his wife and children who themselves have already had cancer to escape from the confines of his immediate environment. He also suffers from the fear that his children will get cancer.

Mr. Johnson was born on May 18, 1938, in Algoma, Mississippi. In 1940 his family moved to Memphis. They remained there until 1945, when his family went into the military and was stationed in Arkansas, Missouri and Texas. In 1948 they returned to Mississippi, where he left school while in the sixth grade and went to work for his father on the farm.

In 1954 he went to Pascagoula, Mississippi, where he worked with heavy machinery. He did this for approximately one year and returned to Algoma, where he again worked on the farm and stayed there until 1962, when he went to Memphis, Tennessee, where he again worked with heavy machinery until 1964, when he moved to St. Louis, Missouri, where he worked in a service station. He then moved to Hardeman County on the Toone-Teague Road and lived there from 1976 to 1979. He has since then moved back to Missouri to West Plains, Missouri.

During his early life he was in good health. In 1955 he had a right inguinal hernia repaired. He feels that his health was good until the time of drinking water from the dump. He moved with his family to the dump area in 1976. He was farming as well as working in a service station after moving to the Toone-Teague Road.

They had a deep well which gave cool water, he stated, and in early 1977 he noticed an oily substance appearing on the surface of the water. They also noticed an

odor in 1977 which became worse during 1978. Because of the oily substance, they called the county agent in 1977, who told them then that the water was all right.

In 1978 Mr. Johnson stated the water smelled like Black Flag insecticide and that they called the State Health Department, who tested the water and the air in his living room and told them to stop drinking the water and to move out of the house and they moved, he stated, in 1979. Mr. Johnson stated he did not drink water from any other source until the National Guard hauled water into them and their consumption of water was from his own well, the Johnson Well.

As you look at the number of times that he has been to a physician over the years, he had only been there one or two times at the most per year until 1980, when he started then going ten to twelve times per year and in '81 he stated he went twelve to fifteen times a year. He does not smoke. He drank a little at age seventeen, but then quit. His diet is normal. He does take BC powders for headaches and Tylenol Number 3 occasionally for backache. He developed headaches in 1977 to 1978 along with an upset stomach, extreme weakness and "problems with his nerves at that time."

There were and are a great deal of family problems because the family, Mr. Johnson stated, is always sick. Evidently the family is also very anxious about their illness and this causes a great deal of friction within the family. He is currently disabled by the State of Missouri and receives some sort of disability because of a psychiatric condition. He is probably unable to engage in gainful employment for the rest of his life.

He denies any previous problems other than the congenital right inguinal hernia which was repaired in 1955 and 1974 and a pulled back muscle in 1974. As far as symptoms related to the head were concerned, he said until 1976 and '77 he had had no problems, but then started to develop severe bilateral temporal headaches daily. These were worse during and for several hours after taking a shower. This caused him to get dizzy and to feel faint. On one occasion he stated that he passed out.

He stated that he had intense burning of the eyes, which was present all of the time but was worse when he was bathing. He stated his eyes were bloodshot and he "felt like there was sand in my eyes" most of the time. There was some photophobia present and he states that since '77–78 he has noticed some deterioration in his sight.

As far as the ear, nose and throat, there was some decrease in hearing being noticed with ringing of his ears at the time of the exposure. His nose burned all the time during exposure, being much worse when taking a shower. Those symptoms have disappeared since he has moved away from this area and has stopped using the water. His throat became sore and remained so with hoarseness during that period of time, but that also has cleared. His throat and mouth tingled during that period of time and that has also cleared.

His teeth were hard to keep clean and he stated he had a coating on his tongue which was so bad that he had to use a toothbrush on his tongue and he lost all taste for a while during the period of 1977 to 1978. He has had marked problems with his teeth since 1977 and 1978 and he has been seen by a dentist in Missouri, and has had almost a full mouth extraction by that dentist.

As far as his chest was concerned, he had marked coughing during 1977 to 1979, particularly when taking showers, but that has completely cleared. At the time of exposure he states that he had an increased number of upper respiratory infections and that it hurt to take a deep breath. That also has cleared.

He had nausea and vomiting which was severe during the period of 1977 and 1978 when the odor and the taste of the water were the worst. As far as his skin was concerned, he stated that he had a rash during the period of exposure. He would get blisters with taking a shower, with intense itching. There were red blotches

all over his body and his skin would become very dry and scaly. He stated that the family, in order to try to avoid the symptoms, tried boiling the water and stated that that did not relieve the irritation when bathing.

And as far as his neurological symptoms were concerned, he does have some tingling of his hands, particularly on the left, as well as his legs. He has some problems with balance and states that he is still very weak and that he cannot do fine movement with his hands.

On physical examination he had some decreased vision with decreased optic fields. His blood pressure was 158 over 100. There was some tenderness in what we call the right upper quadrant in the area of his liver. He has weakness of both hands and legs and on neurological examination he had decreases in his reflexes in the lower extremities. His current liver enzymes at trial were within normal limits.

He has decrease in visual acuity which cannot be explained by an aberration of the lens of his eye, plus a decrease in his visual fields. On discussion with Dr. Drewry, as well as Dr. Rhamy's impression, the Court believes that this is evidence of optic nerve dysfunction, most probably due to the chemicals.

During the period of the ingestion, particularly in 1977–78, Mr. Johnson became somewhat nervous. Mr. Johnson wasn't concerned as much about himself but that he just couldn't get out of his mind that his kids are going to develop cancer. He didn't say they might. Mr. Johnson feels that his kids are going to develop cancer and he is extremely concerned about their future health. For example, he has a daughter who already has had an ovarian tumor which was removed. Mr. Johnson is absolutely convinced that she got this tumor because of the exposure to chemicals and he is almost psychotic about his concern and apprehension for his family.

At the time of trial, Mr. Johnson's life expectancy was 29 years.

*Patsy Faye Johnson,* wife of Daniel Johnson, testified during the trial she and her husband had been married 20 years and have 5 children (2296–97). She said they moved from Memphis, Tennessee, to the Toone-Teague area in August of 1976 (2287). She said the home had a well for water supply. At first, the water was fine and all members of her family were in good health (2298). Daniel Johnson was a heavy equipment operator (2299). In 1977, she noticed her children were not as energetic as they had been (2301). She described what happened in her family (2302–08):

Q. You mentioned that the children didn't seem to have as much energy. Did they have any specific medical or health problems that they had not had before?

A. Yes, sir. Over towards I guess the fall of '77 they started having medical problems.

Q. What were those?

A. Well, Pamela took a cold and she got down real sick, so we took her to doctors and they couldn't find anything wrong with her. She missed a month of school. I sat by her side for a month because of the way she was doing. She would start choking and coughing, she couldn't breathe. She would fight me just like a person drowning. And she would be vomiting, she would vomit up green slime, phlegm, whatever you call it. And where she would vomit on a wood floor, it would be bleached white.

Q. Did any of the other children develop problems?

A. Yes, sir.

Q. What types of problems would they have?

A. Well, we all had headaches and nausea; some vomited, but mostly nausea at the time; and Dan was sick; we all had the same thing, upset stomachs.

Q. At this period of time, you said toward the fall of 1977, Patsy, had you noticed any changes in the water?

A. Yes, sir, we noticed it—well, Dan first noticed it. When we watered the dogs, the kids always took care of them. Dan got onto them because the pan, he said, wasn't

clean, it had an oily film on it. And it was the same way the next day and he had washed it, so we—

Q. Go ahead.

A. So we called Hardeman County Health Department to come out and check it.

Q. Who came out, if you know?

A. I believe it was Mr. Wallace. It's been so long, so much has happened. He came out and checked it I guess the first part of the fall and didn't seem too concerned about it. He lit a piece of paper and put it under the faucet, I don't know what he was doing, let it burn under the faucet for a little while. And that's all.

Q. Did anyone from the County ever tell you that there was ever anything wrong with your water?

A. No, sir.

Q. What did the water smell like?

A. The water to us smelled like fly spray or bug spray and it was stronger—you know, the longer we stayed there the stronger it got.

Q. This film that you testified first appeared in the dog pan, did that ever show up anywhere else?

A. Yes, inside on some of the dishes. You could get a glass of water and empty it and it would leave a film, you know, in the dishes or whatever you had it in.

Q. Did the taste and odor change over time?

A. Yes.

Q. What was the change?

A. Well, as time went on, you know, it got worse, got stronger. I know at one time Dan and I both were afraid that we were going to lose Pam, that's how bad she got. She would walk across the yard and her legs would give out, she'd fall, she couldn't go.

Q. Would drinking the water while she was sick have any effect on her problem while she was having this sickness that you testified about?

A. I think it did, it made her worse, because we didn't know nothing about the chemicals at that time. And we were steadily—well, the way Dan looks at it now, we were steadily poisoning our kids ourselves and didn't know it because nobody had told us.

Q. Did you ever boil your water?

A. Yes, sir. We thought maybe if it was sewer or bacteria in the water, by boiling it might help, you know. We boiled it for a long time.

Q. Was this after the time that you had called Mr. Wallace?

A. Yes, sir. We boiled it until someone, I don't remember exactly who, told us we made it twice as worse, that's after we found out, and we had made it twice as bad on us by boiling it.

Q. Do you recall who that person was?

A. I couldn't be positive, I will have to say.

Q. Were they with some agency, State or—

A. I would say EPA was who told us.

Q. You testified to some of the problems that particularly Pam was having and some of the other children, headaches. What were the problems that you noticed in Dan?

A. Well, Dan, he could go down the hill, it's not that far, and I would look out and he would be sitting down, he couldn't make it back up the hill, he would be fatigued, you know, whatever you want to call it. He would have to be so tired he would have to sit down and rest. And I don't know, it caused a lot of problems between us. Dan was—after we found out about it, I think he kind of blamed himself, you know, for moving us there.

Q. You say nervous?

A. Yes.

Q. What were some of the things that you could see as a wife that led you to believe he was nervous?

A. He was depressed a lot, but due to what happened he kind of took it out on us, I think, his frustrations over—after all this has happened, not being able to work now and take care of us. It depressed him. I

don't know, he just worried so much about the kids and what had happened.

Q. Did he have any problems with his eyesight?

A. Yes.

Q. What happened to that?

A. Well, they have been daily getting worse. We have all had problems with our eyes. The doctor told me my girls was like the blind leading the blind.

Q. Did the State ever test the water, to your knowledge?

A. Yes, sir, I'm sure they did.

Q. During this time, Patsy, would you tell the Judge all of the things that you were using water for in and around the house?

A. We used it for everything, cooking, bathing, washing dishes and clothes, mopping the floors, just everything that you would use water for, washing our vehicles, we used it for that, feeding our dogs.

Q. How old were the four children that you had in 1976?

A. At that time?

Q. Yes.

A. Oh, let's see. It's been five or six years since we lived there, moved there. It would be—I'd say Danny was about 14, Pam about 13, and Sandy and Connie about 10 and 9, just off the top of my head.

Q. How many loads of wash would you do in a week?

A. With four kids I washed two or three loads a day.

Q. Did the washing machine going through its cycle have any effect? Could you smell the water from the washing machine?

A. When you first opened it, it was pretty strong, after washing.

Q. How often would your children and you and Dan take a bath or a shower?

A. Well, Dan and I usually once a day, but the kids usually twice a day, especially when it was warm.

Q. Did that have any effect on their skin?

A. Well, at the last when they kept taking baths they would break out in rashes, the skin would be flaky, you know, and dry. They would come out of the bathroom, they couldn't hardly see straight, they would be so—the steam, you could smell it so strong they would have to come out, they would be dizzy when they come out of the bathroom.

Q. Could you smell it when they opened the door?

A. Uh-huh. The way our living room and bathroom is situated, if you were standing there when they opened the bathroom door and the steam, you could smell it real strong.

Q. How about Dan's skin, did he have any rashes and itching?

A. Yes, sir.

On April 16, 1978, she received a letter warning her that water in her family well contained chemicals (2309–10). She described the effects of this trauma upon her family (2310–11):

Q. As a result of receiving that letter, did you stop using the water for drinking?

A. Yes, sir.

Q. Where would you go to get your water?

A. Well, we've hauled it from the Chickasaw State Park and we've hauled it from Memphis, we've hauled it from Bolivar, anywhere we could get it.

Q. Was that inconvenient to you?

A. Of course, yes, sir.

Q. Did it cause a change in your daily life and routine?

A. Yes, sir. When we first left Memphis to come to Toone-Teague, we had never had a home in our life. It was the first time we ever had. We was proud of it. The kids liked their schools, our neighbors. Dan liked it because he could get out closer to his fishing and hunting. And when all this fell through when we drank that water that had the chemicals in it, Dan was disappointed, we were all disappointed, but Dan, when he realized what effects it could have on us and our children, he—I don't

know how to describe it. He changed. It caused our whole family to change. We lost everything.

She described Daniel Johnson's health as follows:

Q. What is Dan's health like today?

A. It's not good.

Q. Would you tell the judge what type of problems he is having?

A. Well, Dan has had a lot of problems with his stomach—headaches, his eye problems, and he has had a lot of numbness in his left hand and arm. It goes up in here (indicating). He has had a lot of problems mentally, also, worrying about the kids.

Q. Did he have any of these problems before you moved to Toone-Teague and started having the problems?

A. No. He didn't have no worries about medical problems, or anything like that, and Dan has got worse, as we learned more about the chemicals, and Pamela developed a tumor, an ovarian tumor, and they removed it.

Q. Have you developed any tumors?

A. Yes. I have three tumors now at this time in my legs. I had a tumor in my breast. They operated and told me it was in the early stages of malignancy, and they operated, which I was lucky at that time, because I have fibrocystic disease, and I have to watch it real close.

On November 9, 1978, she stopped using water from the well completely after receipt of the following letter from the Environmental Protection Agency (2317):

A. (Reading) "These analyses confirm the presence of carbon tetrachloride in your well. The analysis of your well shows 1.7 parts per million of carbon tetrachloride. This constitutes an imminent health hazard and all usage of the well water should be discontinued. This affirms my letter to you of November 2nd, 1978, in which I requested that you discontinue all uses of the water until additional tests could be performed. It is my understanding that you or your attorney was informed of this latest information in a meeting in Mr. John Wilder's office in Somerville, Tennessee, on Saturday, November 4th, 1978."

They moved from the home immediately (2319). Mrs. Johnson described how all this has affected Daniel Johnson:

Q. How old is he now?

A. Forty-two.

Q. Would you describe for the Court, Patsy, what's Dan's emotional and nervous condition like today?

A. Compared to what it was five or six years ago, his condition today is pretty bad.

Q. Would you tell the Court some examples of changes that you noticed in him and the effect it's had on the life of you and your family?

A. Since Dan and I found out about the chemicals, he moved us up here and let us drink it, it's caused him to be depressed a lot, it's caused problems between us, his nerves are bad, due to worry about it all, I guess, what the future is going to be for the kids.

Q. Has it affected his sleep?

A. Yes, sir. He's anxious. He don't know what to expect, which none of us do, really.

■ The Court awards the following monies to Mr. Johnson in an attempt to compensate him for his injuries:

a. Extent of injury and disability, including increased risk of disease and cancer in the sum of $150,000.

b. Impairment of Mr. Johnson's immune system in the sum of $150,000.

c. Psychiatric damage:

(1) Post traumatic stress disorder and severe trauma in the sum of $250,000;

(2) Fear of increased risk of disease and cancer in the sum of $250,000.

d. Physical pain and emotional suffering in the sum of $125,000.

e. Loss of earnings capacity and lost wages in the sum of $250,000.

f. Impairment of Mr. Johnson's quality of life in the sum of $100,000.

*James O. Maness, Jr.*

This seven year old plaintiff was bathed by Velsicol's chemicals even while he was still in the uterus of his mother.

Jimmy Maness was born on September 1, 1976 and lived at Steve Sterling's home much of the time in his early life. He drank from the Sterling well as well as the Maness well. His birth was normal, but his birth weight was three pounds two ounces and his early development was somewhat slow, with severe allergies, blood discrasias, as well as an episode of seizures in early 1982.

His mother spent much of her time at the Steve Sterling home during her pregnancy and drank from his well. His symptomatology was that he had frequent headaches, they were particularly in the frontal area, with some dizziness, with episodes of seizures during which he passes out. His eyes during the period of when he was bathing in the water during the time of odor were bloodshot, with photophobia being noticed. He had nosebleeds, had a sore throat, he had hoarseness of his throat or his voice, and his tongue was coated. His skin was like leather as a baby. He had lymph node adnopathy, including enlargement of the nodes of the neck. He has a chronic cough with some shortness of breath. He had some nausea and vomiting at the time of the exposure and supposedly had some black tarry stools during the first three years of life. He also had some urinary frequency, dysuria, some urgency and nocturia.

On physical examination this child had a rather thin facial appearance as well as an enlarged liver. It was the opinion of the medical witnesses that the description of headaches, the description of bloodshot eyes, the description of nosebleeds, the upper respiratory irritation are symptoms which are associated with breathing and drinking of the Velsicol chemicals in significant concentrations. The boy's liver was abnormally large and he had on examination an elevated alkaline phosphatase, which is approximately three times the upper limits of normal. This may be due to

the fact that he is a child and he is growing, but he also has an elevation of the SGGT as well as the SGOT and as well as the LDH. The SGGT is hard to ascribe to anything other than liver damage.

Dr. Rhamy knew of no other origin for this boy's liver problems other than the exposure to chemicals during his early infancy and during the time that he was being carried by his mother *in utero*. Dr. Rhamy also believed that it was more probable than not that Jimmy Maness' condition are related to the exposure to chemicals. He also believed Jimmy was at increased risk of cancer in his later life.

As in the case of the other plaintiffs, Jimmy Maness' immune surveillance system has been destroyed. His normal life expectancy is 74.4 more years.

■ For the reasons set forth, the Court awards the following monies to Master Maness in an attempt to compensate him for his severe personal injuries:

a. Extent of injury and disability, including increased risks of disease and cancer in the sum of $250,000.

b. Impairment of Jimmy Maness' immune system in the sum of $500,000.

c. Psychiatric damage:

(1) Learning disorders in the sum of $150,000;

(2) Fear of increased risk of disease and cancer in the sum of $250,000;

c. Physical pain and emotional suffering in the sum of $150,000;

d. Loss of earnings capacity in the sum of $500,000;

e. Impairment of Jimmy Maness' quality of life in the sum of $500,000.

The Court read the proposed findings of fact and conclusions of law submitted by counsel for plaintiffs and for Velsicol. Having made its own independent determination that a preponderance of the evidence in the record proves that Velsicol is liable to plaintiffs on the legal theories of strict liability, common law negligence, trespass and nuisance; and, having determined that Velsicol's hazardous chemicals escaped from the burial site and contaminated the

wellwater of plaintiffs; and, having determined those hazardous chemicals were and are the proximate cause of injuries and damages suffered by plaintiffs; and, having determined that Velsicol was, in its chemical waste disposal program, engaged in an ultrahazardous and abnormally dangerous activity, the Court finds the proposed findings and conclusions presented by plaintiffs support the Court's findings and judgment in this case. The Court therefore adopts and incorporates into this opinion the following findings of fact (numbered 1 through 719) submitted by plaintiffs:

## A.

## FINDINGS OF FACT

### I. BACKGROUND AND ISSUES TRIED

1. This action was originally filed on December 4, 1978 in the Circuit Court of Hardeman County, Tennessee as a class action seeking damages and other relief from defendant's dumping and abandoning the equivalent of an estimated 300,000 55-gallon drums (1.6 million gallons) of chemical waste on a farm owned by defendant and located along the Toone-Teague Road in Hardeman County, Tennessee. (Petition for Removal).

2. Defendant removed the action to this Court, the Federal District Court for the Western District of Tennessee, on December 8, 1978 alleging, *inter alia,* diversity of citizenship and that the matter in controversy exceeded the sum of $10,000, exclusive of interest and costs. (Petition for Removal).

3. The amended complaint, filed in this Court, tracked the original complaint filed in the Circuit Court of Hardeman County, Tennessee. It asked for the certification of a class and sought both compensatory and punitive damages and injunctive relief due to the involuntary exposures of plaintiffs to certain chemical substances known to cause cancer, effect the central nervous system and permanently damage other organs of the human body. It also sought damages for the loss of value to the real property owned by plaintiffs in the region affected by the chemicals. The complaint is bottomed upon the theories of strict liability, negligence, trespass and nusiance.

4. The answer admitted many of the factual allegations of the complaint. The allegations that were admitted include the following:

a. That plaintiffs were all residents or property owners of Hardeman County, Tennessee and lived on or owned property within the close proximity of the farm owned by Velsicol and where Velsicol dumped its chemical waste. That farm is located in the northern part of Hardeman County on the Toone-Teague Road. Plaintiffs had enjoyed the benefits of clean well water on their own property (Am. Comp't para. 1; Answer para. 1). Although defendant objected to characterizing the farm dump as a "hazardous waste dumping site" in its answer (Am. Comp't para. 1), in ultimately complying with State law in 1973, Velsicol filed a statement on June 28, 1975 with the Hardeman County Registrar of Deeds entitled "Notice of a Former Landfill Site". That Notice stated *inter alia:*

"The materials deposited in and under the [farm dump] consisted of chemical process by-products which are hazardous." (Ex. 171)

b. That for many years Velsicol has operated a chemical plant in Memphis, Tennessee wherein certain pesticides are manufactured. As a result of such manufacturing, there occurs certain wastes or by-products. (Am. Comp't para. 3, Answer para. 3) Velsicol refused to admit in its answer that the by-products or wastes were "ultra-hazardous to the health and well-being of the public." (Am. Comp't, para. 3).

c. That from October 1964 to June 1972, Velsicol deposited the wastes and by-products associated with its manufacturing facility in Memphis on a Hardeman County farm. (Am. Comp't para. 4; Answer para. 4) Velsicol refused to

admit that at least some of this material was liquid in form. (Answer para. 4)

d. That in 1967 a report was prepared by the United States Geological Survey to study the potential contamination effects of the waste that had been dumped up to that time. (Am. Comp't para. 6, Answer para. 6)

e. That since the 1967 study, of which Velsicol had actual knowledge, Velsicol continued to dump more waste into its disposal in the same manner as it had done before *with no consideration as to the contamination which it was creating* until it finally ceased dumping in June of 1973 under a order from the Tennessee Department of Public Health. (Am.Comp't para. 7; answer para. 7). (Emphasis Supplied).

f. That during the period from 1962 to 1973, Velsicol more than doubled the size of the disposal site. Velsicol between 1964 and 1973 cleared the land of trees, and the surface soil texture was disturbed by excavation and back-filling of numerous trenches. The site clearing and trenching have brought about both a decrease in the rate of transpiration from the site and an increase in the rate of infiltration of precipitation through the disturbed soil. In addition, depressions formed over the disposal trenches owing to compaction and soil subsidence around the water drums. There depressions tended to increase infiltration either by allowing ponding of rain water on the surface or by providing ready access to the subsurface by water flow through tension cracks associate with the depressions, all of which were pointed out as contributing factors to the situation in Hardeman County discussed in the 1978 report of the United States Geological Survey.

Velsicol refused to admit in its answer that the farm dump in Hardeman County was a "terrible contamination problem" but alleged that the Farm was only a "situation." (Am. Comp't, para. 8; Answer, para. 8).

5. In addition, defendant's counsel made the following admissions or assertions relevant to the issues raised by the pleadings and during the trial namely:

a. " ... these people that were in the original lawsuit were discomfitted, had their life thrown out of kilter, and they are entitled to something." (Tr. 90).

b. "Velsicol admits there is a plume out there, and admits that it has damaged certain people. The amount of the damage, of course, is in dispute." (Tr. 3535).

c. "The defendant feels that the people within the plume, the original plaintffs, have in all likelihood experienced a trespass and if there is property damage as a result of that trespass, if the court feels that personal injury is a result of that trespass, i.e., drinking of the water damage and the like, then trespass is truly the cause of action that should be pursued in this Court." (Tr. 3538).

d. " ... we would agree that that [real] property has experienced some damage. The question will be the extent of that damage." (Tr. 5412)

e. "As we view this case, the negligence and strict liability aspect of it really aren't too important because the defendant in the case may have liability to some or all of the members of the class, irrespective of whether we are guilty of any acts of negligence, or irrespective of whether the strict liability concepts are met by the plaintiffs' proof" (Statement by Velsicol's counsel. (Tr. 5406)

6. On the other hand, at trial and as pointed out below, the position taken by Velsicol's witnesses and counsel showed an unrepentant and almost abusive or callous attitude towards plaintiffs' rights. Velsicol under no theory had any basis to abuse these rights, particularly with the arguments that Velsicol had the right to make a profit or that Velsicol's actions were of economic necessity to it. For example:

a. "Think solely [Your Honor] in terms of carbon tet, chloroform, what it really does to a human being at those levels in the water. Sure, it's bad to taste, but does it have any lasting effects. (Tr. 90) (Mr. Gentry in his opening statement).

b. " ... you know, I've been trying not to use that word dump, but the news media just finally rubbed off on me, I guess. I really take exception to the use of the word dump for the Hardeman County landfill because in my opinion it is really not a dump, its a landfill. It was not operated like a dump" (Tr. 4172) (Testimony of Charles R. Hanson, former plant manager and present Director of Velsicol's Environmental Center).

c. "Several of the names are those of people who are extreme conservationists and would consider a stone throw in a brook a matter of great importance" (Ex. 165; letter of Mr. Anthony, plant manager referring to persons invited by the State to attend the March 4, 1971 meeting concerning the dump. These individuals were *all* federal or state or local health officials concerned with Velsicol's use of the dump).

d. "As you know from experience with the Overton Park expressway deal, minor groups seem to have overwhelming power" (Ex. 165; Mr. Anthony's letter referring to the local citizenry and authorities that were trying to curtail the dumping on the farm). See the exercise of such power by "minor groups" referred to by Mr. Anthony in *Citizens to Preserve Overton Park vs. Volpe* 401 U.S. 402, 28 L.Ed. 136, 91 S.Ct. 814 (1971).

e. In having his objection overruled to introduction of financial information showing incineration was more costly than the costs of a landfill, Velsicol's counsel stated: "I understand Mr. Gilreath's position to be that any corporation that is striving to save money is guilty of negligence." (Tr. 1761).

f. Dr. Francis C.P. Roe, identified by Velsicol's counsel as "a world expert [in cancer] and we are lucky to have him for such a short time in Memphis" (Tr. 8397) testified that cancer "is probably one of nature's many ways of eliminating sexually effete individuals who would otherwise in nature's view compete for available food resources without advantage to the species as a whole." (Tr. 8445–46). He further explained that the statement means "people or animals that are past the point at which they reproduce the species. They are no longer capable of reproducing." (Tr. 8446). Such individuals "would certainly be women after menopause" (Tr. 8450) but as to Winston Churchill: "I have no idea when he became sexually effete. I think he kept it up until his deathbed." (Tr. 8452)

g. Velsicol alleges that "inflammatory and distorted" newspaper articles, describing Velsicol's activities, the dissolution of a federal task force studying health effects of plaintiffs without presenting to plaintiffs any written conclusions (Velsicol was a member or participant) and Dr. Clark's study which Velsicol claims to be "gross negligence" were "separate, independent and efficient intervening causes" creating the damage to plaintiff's real property and the post traumatic stress disorders which Velsicol has now conceded in its defense actually did occur to plaintiffs. Thus the effects are not the result of Velsicol's deliberate and indiscriminate dumping. (Second Amended Answer and Supplemental Pleading (¶ 9)).

7. This Court issued an order on February 12, 1981 granting class certification under Rule 23(b)(3) of the Federal Rules of Civil Procedure (Judge Robert M. McRae). In that order, Judge McRae stated, in pertinent part:

In the opinion of this Court, the factor which compels class certification is that common questions of law and fact overshadow issues affecting only individual members. Each class member will have

lived in the vicinity of the landfill and will have suffered damages, whether to person or property as a result of contact with water contaminated by toxic chemical wastes. For each, almost identical evidence will be required to establish the source of contamination, defendant's responsibility, and proximate causation.... The major issue distinguishing the class members is the amount of damages sustained (Order on Class Certification, filed February 12, 1981).

8. On September 11, 1981, Judge McRae held a hearing to determine the geographic area to be used to devise the notice for the ultimate determination of the class. Judge McRae after hearing testimony from four witnesses and arguments from all parties determined that:

> What I would like to do is, based on being totally arbitrary, I would like to send it to a three mile radius, measured from the centermost point in the north line of the Velsicol property. My theory being, I think from this hearing I have learned that there is more risk to the north, and start from that, and then that will mean it won't come as far south. (Tr. 70).

9. By Order filed on June 2, 1982, the Court established the manner in which the case was to be tried. In pertinent part, that order stated:

1. The first phase of the trial will commence on June 21, 1982 with the Plaintiffs' attorneys selecting representative members of the class and presenting proof as to the issue of liability on behalf of each representative and the entire class, their claims for individual compensatory damages for personal injury and where applicable, property damage. Additionally, the issue of punitive damages, for the entire class will be tried at that time.

2. The initial phase of the trial will concern itself with the question of the defendant's liability under the plaintiff's theories of negligence, strict liability, trespass and nuisance as to

be outlined in the Plaintiffs' theory of liabilities in the final Pre-Trial order.

\* \* \* \* \* \*

4. The manner and mode of the subsequent phases of the trial, including, but not limited to the establishment of sub-classes, a future fund, damages to wildlife, the establishment of compensatory damages to the remaining members of the class, if applicable, and the division of the punitive damage award, if any shall be deferred until after the initial phase of the trial is completed.

10. Plaintiffs timely designated five (5) representatives of the class and trial of the first phase of this action begun on June 21, 1982. Evidence was received for these five representatives and the class as follows:

(a) Proof to determine liability as to all members of the class;

(b) Assuming liability for damages on the part of defendant, proof was introduced to show the damages of the 5 flagship plaintiffs, both personal and property; and

(c) On behalf of the class concerning liability for punitive damages and the amount that should be levied.

11. After 65 days of taking testimony, the trial was concluded on December 16, 1983. A total of 97 witnesses gave testimony. The trial transcript consists of over 10,000 pages as of February 3, 1984. There are 536 exhibits.

## II. THE CAST OF PRINCIPAL CHARACTERS

**A. Plaintiffs and the five designated representatives of the class**

12. Plaintiffs all resided or owned property or both within close proximity of a farm purchased by defendant Velsicol on July 18, 1964 and located along the eastern side of Toone-Teague Road in the northern part of Hardeman County, Tennessee. (Am. Comp't para. 1; Answer para. 1).

13. The five designated flagship plaintiffs, together with a brief description of their injuries and life expectancies, are:

a. Mr. Steve Sterling, property damage, personal injury which includes liver damage and destruction of his body's immune surveillance system and psychological damage. He was born on December 25, 1922 with a life expectancy at the time of trial of 17.2 years (Ex. 269, Tr. 3206);

b. Mr. James E. Wilbanks, personal injury, which includes the removal of one kidney caused by cancer, destruction of his body's immune surveillance system and psychological damage. He was born on July 15, 1931 with a life expectancy at the time of trial of 23.2 years (Ex. 269, Tr. 3206);

c. Mr. Curry A. Ivy, personal injury, which includes optic nerve damage, optic neuritis, damage to the central nervous system and destruction of his body's immune surveillance system. He was born on January 3, 1926 with a life expectancy at the time of trial of 19.3 years (Ex. 269, Tr. 3206);

d. Mr. Daniel R. Johnson, personal injury which includes nerve damages, optic damage, headaches, rashes, destruction of his body's immune surveillance system and psychological damage. He was born on May 18, 1938 with a life expectancy at the time of trial of 29.0 years (Ex. 269, Tr. 3206); and

e. Master James O. Maness, Jr. a seven year old boy at the time of trial, personal injury which includes allergies, seizure-type activities, psychological and learning disorders and destruction of his body's immune surveillance system. He was born on September 1, 1976 with a life expectancy at the time of trial of 74.4 (Ex. 269).

14. Although some twelve to fifteen drinking water wells were ultimately contaminated and closed by the authorities (Tr. 1526), some five wells for the purposes of this phase of the trial were of major importance because it was from those wells that the five flagship plaintiffs had obtained their water. These wells were designated as:

1. The Steve (or Woodrow) Sterling well from which plaintiffs Steve Sterling and James O. Maness, Jr., drank their water;

2. The Daniel Johnson well upon which plaintiff Daniel Johnson and his family drank their water;

3. The Mosier well upon which plaintiff James O. Maness, Jr., drank some of his water;

4. The Brooks well from which plaintiff Curry A. Ivy drank "a whole lot of water" (Tr. 997) and plaintiff James E. Wilbanks also drank (Tr. 2245–46); and

5. The Tavern well from which plaintiff James E. Wilbanks and his family and plaintiff Curry A. Ivy (Tr. 997) drank water for many years.

15. Most of the five flagship plaintiffs live or once lived near the area of the dump on the north-northwest side of the farm. For the convenience of the reader, the Court finds that the following map illustrates, in general, the area and wells at issue.

16. Evidence was also received relevant to the issues concerning punitive damages and future health monitoring of all individuals in the class and their offspring exposed to the chemicals.

17. As to these flagship plaintiffs (excepting James Wilbanks), Velsicol has *never* alleged nor claimed that they were not exposed to the chemicals hauled to or emanating from the farm dump. In fact, all five were exposed and over a lengthy period of time. Presumably therefore, defendant's counsel's observations are apposite namely:

... Velsicol originally and at the present time is not taking the position that carbon tetrachloride and chloroform did not trespass upon certain of the plaintiffs.

We think there are fifteen or twenty people who are involved in that trespass who are still in court, and, candidly, the primary thrust, if I can use state of the art—we have used it, and I am not sure we have defined it yet, but we will attempt to do that this morning—the primary thrust of Velsicol's presentation of that, of course, goes to good faith and punitive damages as opposed to a complete defense or defense to the trespass of these fifteen or twenty people who have actually been affected by the landfill that are still in court. (Tr. 4705–06).

EXHIBIT 259

Figure 1

Location of Contaminated Private Wells Near Hardeman County Toxic Waste Dump (designated by ■)

## B. Defendant Velsicol (sometimes "defendant")

18. Velsicol Chemical Corporation, defendant in this action, is a corporation organized under the laws of the State of Delaware. It is wholly owned by Northwest Industries (Tr. 3670) and has its principal place of business in Chicago, Illinois. (Ans. para. 2).

### 1. Velsicol's Chicago Employees

19. Mr. Howard H. Beasley, is now Vice-Chairman of Northwest Industries. In 1978, Mr. Beasley was working for Ben Heineman, Chairman of the Board of Northwest Industries. Mr. Beasley "was directed to come to Velsicol as vice-chairman of the board, responsible for the environmental affairs of Velsicol, in about 1978. I believe it was at Mr. Heineman's direction that Mr. Beasley came to Velsicol." (Tr. 4189) In 1980 he became President of Velsicol before returning to Northwest Industries. (Ex. 320).

20. Mr. John M. Rademacher, Vice-President of Environmental Health and Regulatory Affairs for Velsicol since November 14, 1979. (Tr. 4251). Although he claimed that he had been "Regional Administrator for Region VII, Kansas City, MO, both for EPA and its predecessor agency, the Federal Water Quality Administration" (Ex. 312), he admitted that he had never been so. He was rather an "interim regional coordinator" during the short period of time after the EPA was created and before appointments could be made by the newly appointed Administrator William D. Ruckelshaus. (Tr. 4331–33).

21. Mr. Eugene J. Nesselson, the corporate environmental manager for Velsicol during the period of time from 1964 through 1971. (Tr. 365). He visited Memphis and the dump from time to time (Tr. 365; 3723). He was supposedly retired from Velsicol at the time of trial, and no attempt was made by Velsicol to call him as a witness nor explain his absence. He was the primary individual to whom Mr. William Anthony, the Memphis plant manager, reported in the purchase and operation of the farm dump. Moreover, he was the individual who made or relayed the 1966 Velsicol decision to the Memphis employees that Velsicol would not pay to drill a well at the farm to monitor the local water aquifer. (Ex. 9)

22. Mr. Neil R. Mitchell, Vice President and General Counsel for Velsicol prior to 1964 and until December 1, 1982. He was indicted along with five other Velsicol employees and Velsicol itself for having made false statements to EPA concerning adverse health effects arising from the pesticides heptachlor and chlordane, conspiracy to make those false statements and violations of the mail fraud statute. In re *November 1979, Grand Jury* 616 F.2d 1021 (7th Cir., 1980). That indictment was quashed for prosecutorial misconduct before the grand jury. *U.S. v. Gold* 470 F.Supp. 1336 (N.D., Ill., 1979). A plea to a lesser crime was accepted by Velsicol and an individual defendant in settlement.

23. Mr. C.L. Dickinson, Velsicol's Vice President of manufacturing in 1970 and for sometime thereafter (Tr. 441; 446; 517).

24. Mr. Richard Owen, an Velsicol employee in Chicago to whom Mr. Anthony reported on occasion. (Tr. 587–88)

### 2. Velsicol's Memphis Employees

25. Mr. William Anthony, manager of the Memphis plant from 1963 to December 31, 1972. He had primary responsibility for the dump during that time (Tr. 371–72; 3591). He was deceased at the time of trial (Tr. 364–65).

26. Mr. Silvan B. Lutkewitte, manager of the plant from December 31, 1972 (Tr. 613; 1183) to May 1, 1975 (Tr. 1183; 4007). During that period of time, he was responsible for the Memphis plant and for the farm area in Hardeman County, Tennessee (Tr. 1183). He ordered the dumping of *all* chemical waste operated by the Memphis plant buried at the farm in the first six months of 1973 in direct violation of an order of the State of Tennessee.

27. Mr. Marvin Lissner, head of the engineering department (plant engineer) and

later superintendent (Tr. 212; 364; 3591). He was deceased at the time of trial (Tr. 364).

28. Mr. Charles R. Hanson, Director of Velsicol's Environmental Center at trial (Tr. 1682) worked under Marvin Lissner and was later plant manager from May 1975 through 1979. He was one of the two principal Velsicol employees testifying at this trial.

29. Dr. Daniel Rayford Bolian Marks, Ph.D. in chemistry (Tr. 363), manager of the Velsicol Environmental Analytical Laboratory at the time of trial (Tr. 89; 363) and one of the two principal Velsicol employees testifying at this trial. He was Velsicol's chief chemist with a specialty in analytical chemistry (Tr. 7044) during the lifetime of the dump and in charge of its technical aspects. He was employed by Velsicol on two different periods; the last time he began working at the Memphis facility in May 1955 (Tr. 89). He refused a drink of water from the contaminated Sterling well in January 1978 by telling plaintiff Nancy Sterling: "No way. I probably wouldn't live until I got back to Memphis" (Tr. 2136; see also Ex. 393, p. 215).

30. Mr. Barney Raines, a safety supervisor (Tr. 240; 581).

31. Mr. John Pounders, a maintenance engineer at the plant who was in charge of the farm dump and its maintenance (Tr. 523; 3590–91). He reported directly to Marvin Lissner (Tr. 3591)

### 3. *Velsicol's Farm Workers*

32. In addition, the hauling, trenching, dumping, covering, backfilling, growing cotton and other operations concerning the farm were contracted out first to a Mr. Edwin Agee and his employees and then to Mr. Clyde Thomas and his employees.

33. Although these two individuals were called independent contractors, the question of responsibility for the operation of the farm is not an issue in this case because such responsibility could not be contested. During almost the entire period that the dump was in existence except for the last two years (1964–1970), Mr. Edwin Agee, owned and operated the trucks which were on lease to Velsicol (Tr. 3967), operated the bulldozers, cut the trenches and did the dumping subject to Mr. Pounders' instructions (Tr. 263–64; 278). His successor for the last one to two years was Clyde Thomas (Tr. 264; 1335). Everything that both Mr. Agee and Mr. Thomas or their employees ever did was at the direction of Mr. Pounders. (Tr. 263). In fact, Mr. Agee referred to Mr. Pounders as "my superintendent" (Tr. 263), "my foreman" (Tr. 3967) and "my boss" (Tr. 3968; 3980).

34. The individuals involved were:

a. Mr. Edwin L. Agee, described above, who testified at trial on behalf of plaintiffs (Tr. 259);

b. Mr. L.J. Dean who worked on the farm and at the time of trial was on a dialysis machine (Tr. 287) testified on behalf of plaintiffs. He recently died of renal (kidney) failure;

c. Mr. Roy A. Wilson whose deposition was read at trial because he was deceased (Tr. 261; 309);

d. Mr. Humphrey who was deceased (Tr. 261);

e. Mr. Clyde P. Thomas who was deceased at the time of trial;

f. Mr. Curry A. Ivy who testified on behalf of plaintiffs; and

g. Mr. Milton Armstrong who testified on behalf of plaintiffs.

### C. Local, State and Federal Authorities

35. For convenience, a brief identification of the relevant local, state and federal authorities is made. At all times, however, the State of Tennessee was the coordinating authority for other agencies concerned about maintaining the integrity of the water supplies under Velsicol's farm dump.

a. The State of Tennessee, Department of Public Health

(1) Mr. S. Leary Jones, Director of the Division of Stream Pollution Control which was later named the Water Quality Division;

(2) Mr. Robert S. Hunt, employee;

(3) Mr. Terry Cothron, employee of the Water Quality Division;

(4) Mr. Wilton W. Burnett, employee of the Water Quality Division;

(5) Mr. Bobby M. Morrison, employee of the Solid Waste Management Division.

b. The Hardeman County, Tennessee Health Department

(1) Dr. B.D. Hale, Health Officer;

(2) Mr. George Wallace, Health Officer.

c. The City of Memphis and Shelby County Health Department

(1) Mr. Everett C. Handorf. In 1964 and 1965 he was the Chief Sanitary engineer with a staff of 80 to 100 individuals. (Tr. 819–20).

d. The United States Geological Survey

(1) Mr. Donald Rima;

(2) Mr. Craig Sprinkle.

## III. VELSICOL'S POISONING OF THE EARTH, WATER AND AIR

### A. The Memphis, Tennessee Chemical Plant Prior to 1964

36. Velsicol has owned and operated a chemical manufacturing facility located in Memphis, Tennessee for many years. (Am. Comp't para. 3; Answer para. 3). This facility was purchased by Velsicol in 1950 (Tr. 3669) and operated since 1952 (Ex. 77). It consisted prior to 1975 of a number of smaller plants or manufacturing units, (Tr. 886), namely the heptachlor plant (Tr. 367; 878; 4001), the chlorendic anhydride plant (Tr. 368; 887; 4001), the endrin plant (Tr. 368; 887; 4001), the PCL plant (Tr. 369; 886; 4301), and the caustic chlorine plant (Tr. 369; 4001). A "formulation" plant was later added after 1975.

37. As a result of chemical manufacturing, the generation of hazardous chemical wastes and by-products occur which must be disposed of in some other manner than sale to the public. (Am. Comp't para. 3; Answer para. 3).

38. Where the manufacturing consists of pesticides or includes in some part their manufacturer, wastes or by-products from such operations can be even more hazardous than general chemical manufacture and the duty of care is correspondingly higher. As Velsicol's own chemistry expert, Dr. Weber, testified:

"Technically [a pesticide is] any chemical that kills pests, and it could be a herbicide or a chemical that kills an herb or a plant, or an insecticide, a chemical that will kill an insect, and so on. And many chemicals kill these, but economic pesticides are chemicals that do it in small doses and are much more effective." (Tr. 5134–35).

39. Prior to 1964, waste material generated by Velsicol in its Memphis facility was either (or in combination):

a. Dumped into city owned and operated dumps such as the one known as the Hollywood Dump, a dump on the shores of the Wolfe River; or

b. Discharged into the municipal sewer system; or

c. Discharged into Cypress Creek, a tributary of the Wolfe and Mississippi Rivers (Tr. 3594)

### B. The Mississippi River Fish Kills and the Memphis, Tennessee Sewer Clogging

40. In or about 1963, two events occurred that caused Velsicol to consider alternative measures to dispose of its hazardous chemical wastes away from the City of Memphis:

a. First a major fish kill, believed to be caused by a pesticide called "Endrin" and manufactured in the United States only by Velsicol, occurred in the Mississippi River below Baton Rouge, Louisiana. (Tr., 663; 3671, 3673). The resultant investigation eventually led to a tracing of the chemical involved up the Mississippi River "and came up essentially to the [Velsicol] plant doorstep, passing along the way on the Wolf [sic] River the Bellevue dump and the Holloway [ (sic: Hollywood] dump". (Tr. 3674).

In other words, Velsicol wastes had been placed in the Hollywood or other city dumps in Memphis, from there washed into the Wolfe River and hence into the Mississippi (Ex. 146; Tr. 1531–52)

b. Second, during this same period of time, it was discovered by the City of Memphis that large amounts of endrin were being discharged into the Mississippi River by the municipal sewer system. (Tr. 663) After investigation, the City of Memphis found that the sewer pipe into which Velsicol had discharged its chemical waste for years was partially clogged with endrin (Tr. 840). A new 48–inch interconnector sewer eventually had to be built to by-pass the old sewer which was abandoned. (Tr. 850; 859) and Velsicol was ordered not to dump endrin or other pesticides into the municipal sewer system again.

41. Velsicol immediately began a search for alternative means of disposal as the result of the City of Memphis' order not to dump any more chemical waste at its dumps, including the Hollywood dump, the Bellevue dump, or in the new interceptor (Tr. 85; 815; 3595; 3671). Velsicol just didn't want any more controversy about the chemicals polluting the streams and rivers. (Tr. 3595).

**C. The Acquisition of the Hardeman County Farm by Velsicol and the Farm's Purpose**

42. Velsicol set out to find a dump in a quiet rural area where its wastes were unlikely to ever attract attention again. The site selected was believed to be sparsely populated and was located in the pastoral wooded hills of Hardeman County, Tennessee, about seventy miles east of Memphis.

43. On July 17, 1964, the owners of the 242–acre farm in question sold to Wilson G. Keyes the property. Mr. Keyes was then the vice president for manufacturing for defendant Velsicol in Chicago. (Tr. 3713) Six weeks later and on August 24, 1964,

Mr. Keyes and his wife Geraldine deeded the farm to Mr. Keyes' employer Velsicol. (Tr. 3713).

44. Velsicol acquired the farm for the express purpose of burying its chemical wastes (Tr. 3567; 3675) being generated by the Memphis Velsicol plant which could no longer be placed in the Memphis municipal dumps or the sewer system (Tr. 48; 372; 3568).

45. If Velsicol had not purchased the property in Hardeman County for the purpose of bringing its chemical waste, "[w]e would be forced to shut the entire plant down, heptachlor plant down, from that standpoint without an outlet of some kind." (Tr. 3675).

46. The desire by Velsicol to dispose of its chemical wastes in the cheapest way possible (and therefore by necessity in secret) was later evidenced in an internal memorandum from the plant manager on May 6, 1970 (Ex. 21). There Mr. Anthony stated:

"We have a disposal area on the farm which should last us approximately another five years provided the area doesn't become so populated and the complaints from the neighbors so heated that the location will become untenable. We are constantly looking for cheap land at more remote locations in the event we must abandon this present site." (Ex. 21, p. 2)

47. Moreover, after discussing the matter with Neil R. Mitchell, the Velsicol General Counsel, it was decided to replace the "DANGER—NO TRESPASSING" signs with "POSTED—NO TRESPASSING" because Velsicol didn't want to "alarm some of our neighbors." (Ex. 21, p. 2)

**D. The Well-Known Hydrogeological Conditions in West Tennessee**

48. The farm is an area that was and is well known for its abundance of water aquifers (supplies) and sandy soils. In fact, one commonly known and unique feature in West Tennessee is the excellent groundwater aquifers which serve the

area. With one exception, every water supply originates from the various sands located below West Tennessee. The water in these aquifers is of a very high quality (Tr. 1402–03). In West Tennessee, most of the water tables or aquifers are near the surface "almost anywhere" (Tr. 936).

49. Beneath the farm are nearly horizontal beds of unconsolidated sand, silt and clay. These deposits are non-homogeneous and consist primarily of sand, with thin interbedded silt and clay lenses down to approximately a depth of 90–115 feet. As pointed out below, it is this level that the local or water-table aquifer exists. (Ex. 3, p. 5). Dr. Jerome B. Weber, Velsicol's own soil chemistry expert at trial, referred to the dump as "a very sandy soil" (Tr. 5155).

50. Below a depth of about 115 feet, silt and clay predominate with the sand occurring as lenses on beds. (Ex. 3, p. 5).

51. There were three groundwater zones beneath the farm. A perched water zone is present seasonally when water accumulates above one of the silt-clay lenses in the sand of the Claiborne Formation. The perched water zone develops because the downward percolation of water is slowed by the low permeability of the silt-clay lens. Fluids in the perched water zone tend to migrate laterally to the margin of the retarding lens, although some downward migration (leakage) of fluid through the lens does occur. (Ex. 3, p. 7)

52. About 90–100 feet beneath the land surface, a water-table or local aquifer is found in sand near the base of the Claiborne Formation or in the top of the Wilcox Formation. It is this aquifer from whence plaintiffs' water came. This aquifer is recharged by leakage through the perched water zone and by direct infiltration of rainfall in areas where the perched water zone is absent. All domestic wells owned by plaintiffs received the water from this aquifer. (Ex. 3, p. 7).

53. A third groundwater zone, an artesian aquifer, occurs deeper with the Wilcox Formation at a depth of about 230 feet. Between the water-table or local aquifer and the artesian aquifer are approximately 100 feet of silt and clay that act as an upper confining layer of the artesian aquifer. Although water levels in the artesian aquifer are lower than those in the water-table aquifer it is believed that the intervening clay-risk layer retards recharge of the water-table or local aquifer. This artesian aquifer is the aquifer from which the City of Memphis and many West Tennessee communities obtain their water. (Ex. 3, p. 7).

54. These findings are visually displayed by Exhibit 83. This exhibit has been characterized by Velsicol's attorney as "a fairly decent replica of Mr. Rima's geological sketch contained in the 1967 USGS report." (Tr. 1092).

55. Prior to purchasing the dump site and commencing the dumping into the farm of its chemical wastes, Velsicol conducted no hydrogeologic studies to determine the soil composition and strata, water flow direction and location of the local water aquifer.

56. Yet all of the professional water engineers and public health in the employ of the local, state and federal authorities expressed their concerns for the water supplies as soon as each learned that Velsicol was using the farm as a chemical waste dump. (For example, see Tr. 853; 962–63).

57. Moreover, the propensity for sandy soil and many water bearing strata was common knowledge even among non-professionals. An uneducated foreman employed by Velsicol recognized the danger of burying toxic wastes in West Tennessee, yet was rebuffed by Velsicol. Mr. Albert Holt, a foreman for Velsicol between November 1, 1969 through October 3, 1973 (Tr. 198, 203), had direct supervision over filling the drums and barrels with chemical waste that was ultimately destined for burial at the farm (Tr. 217, 239). As soon as he began his employment with Velsicol, he became aware of the dumping at the farm (Tr. 214). He told Velsicol:

A. And I talked to supervision about it.

Q. Who did you talk to about that?

A. I talked to Ed Maddox and Chuck Hanson.

Q. All right.

A. I told them, I said, 'One of these days, we'll get all that toxic waste back in Memphis.' I said, 'It won't be till ten years, because it will drain down through the ground to the underground streams where we get our water and it will be in Memphis' water within ten years.' I told Chuck that. I told Ed Maddox that. I hate to bring Ed's name up because he's not here.

Q. When you told Chuck Hanson who is here that, what did he tell you about that?

A. 'Forget it. Let somebody else worry about it.' That was the answer I got.

Q. And was Mr.—state whether or not Mr. Chuck Hanson was your direct supervisor at that time when you told him that?

A. Yes, him and Maddox.

Q. All right. So did you ever do anything about trying to stop Velsicol from dumping?

A. No, there was not—

Q. —after Mr. Hanson said that?

A. —nothing I could do. (Tr. 214–15)

58. Moreover, Velsicol dug several ponds on the farm which produced water the day the ponds were dug. (Tr. 348–50).

59. At no time during the operation of the farm dump did Velsicol generate on its own initiative any independent review of potential contamination of ground or surface water as a result of the dump. At no time during the lifetime of the dump did Velsicol ever hire a hydrologist to investigate the consequences of the dump to ground or surface water (Tr. 51).

60. Defendant knew or should have known that it was opening and later operating a dump in an area where it was very likely that the dump would contaminate underground aquifers.

## E. The "Post-Hoc" Rationale For the Selection of the Site

61. Mr. John Pounders had been employed by Velsicol 24½ years at the time he testified. (Tr. 3564–65). For the 8 or 9 years prior to his testimony, he had been a maintenance engineer at the Velsicol Memphis facility. (Tr. 3565).

62. At some point in time, Mr. Pounders testified that Mr. Anthony, the plant manager asked Mr. Pounders to go to the USGS in Memphis and make a hand sketch of the water systems under the farm. Mr. Pounders testified:

Q. Did he ask you to go any place to obtain information concerning aquifers in this part of the state or—

A. Yes, he had me go to the U.S.G.S., in this building somewhere, at exactly what time—sometime between the purchase of the property, which I believe was in July and we started excavating and burying in October, as I remember, and he had me come down and he had talked to someone in U.S.G.S. and to make a sketch, which was just a free hand sketch I made from some drawings they supplied showing the aquifers, as I recall, at two or three, and where they originated up in the—I don't recall exactly, up around Chickasaw Park somewhere. He had me do that and submit them to them or give them to them.

Q. Do you know what use he made of those?

A. No, I don't. (Tr. 3567).

\* \* \* \* \* \*

Q. What was the purpose of the purchase of the property up there, Mr. Pounders?

A. For burying chemical wastes.

Q. What was the thrust of the environmental considerations of that plant back in 1964? What was the main consideration regarding the protection of the environment held by that plant?

A. Stream pollution.

Q. Why was that? Was there some reason for that?

A. Well, there was, I guess, at that time probably that was the thing that, you know, was getting more attention, and so forth.

Q. When you say stream pollution you are speaking of surface water?

A. Yes, surface water getting into the streams. (Tr. 3568).

63. Mr. Pounders stated however, that Mr. Anthony's mind was already made-up that the farm would be used as a dump, *viz:*

Q. Okay. Now, so you were called in by Mr. Anthony and told that this farm had been purchased for the purpose of dumping your chemical wastes, is that right?

A. Right.

Q. And he had already made that decision and purchased the farm at that time?

A. Right.

Q. And then, as you said yesterday, he sent you to see the U.S.G.S.?

A. Yes, down in the Federal Building.

Q. Here in Memphis?

A. Right.

Q. What did he tell you to do insofar as the U.S.G.S.?

A. He had talked to someone in the U.S.G.S. and he asked me to come down and get some data, it's on the aquifers feeding the water system in this area, the Memphis area, and that I did. As I recall, I made just a sketch of it, it was one simple drawing, water tables, distances below grade, and where it began and terminated, and I gave him that. (Tr. 3598).

64. Mr. Pounders further testified that the only water aquifer he sketched was the Memphis aquifer:

Q. I guess it depends on how important it is. So you don't recall what your conversation was with them except that you did—did you get the sketch from them or did you get the information and you draw the sketch or what?

A. I drew the sketch, yes.

Q. What did you draw the sketch from?

A. It was what would amount to a cross-section map showing as if you would cut a line down through the earth from here east and then the aquifers had different—you know, where it originated, and I—I don't remember exactly where it originated, but—

Q. They didn't give you a drawing to take with you?

A. No. Huh-uh.

Q. How big was this drawing you were looking at? Was it a big thing or small?

A. As I recall, it wasn't real big, but the one I made from it was on just an eight and a half by eleven legal pad. I do remember it was just a pencil sketch.

Q. Have you seen that sketch—excuse me. I didn't mean to interrupt you.

A. It was just a pencil sketch.

Q. Have you seen that sketch since this litigation started and this case has started?

A. No, I haven't.

Q. Did you then take—go to Mr. Anthony and describe to him the aquifers that were in this area?

A. Briefly, yes. I mean it was pretty—not too difficult for him to understand.

Q. So he knew, then, before you started dumping how many aquifers were in the area where the dumps are?

A. The ones which feed this area. Now, the local aquifers, I don't suppose he did.

Q. Why wouldn't he know that?

A. They were not—well, on this particular sketch, except for these main ones, there was nothing on it concerning the immediate area, the way that is. Am I making sense to you?

Q. No.

A. I don't know myself what the local aquifers are in that area, and as I'm saying, this sketch that I made was of the aquifers which feed all the way from wherever of the underground under the Memphis area and terminated across the river over here somewhere.

Q. Was he concerned about that aquifer insofar as the dumpsite was concerned?

A. Yes.

Q. And possible contamination of it or lack of it?

A. Right.

Q. That's the reason he had you go do that?

A. So far as I know, yes. I mean, I can think of no other reason. (Tr. 3601–03).

65. However, even then Mr. Pounders stated:

Q. ".... Before that well was dug, did you know or did Mr. Anthony know that there was a local aquifer up there that supplied the water to these people that lived in the area?

A. I did not know, and as to what Anthony did, I couldn't answer that question. (Tr. 3605).

66. Although Mr. Pounders testified that he had not seen the sketch since he gave it to Mr. Anthony, Dr. Ziegler, Velsicol's expert water modeler testified that he spent much time in 1981 with Mr. Pounders reviewing the history of the dump. Dr. Ziegler testified:

"We reviewed together the fact that he, through his boss, who was the plant manager at the time, asked him to gain whatever information he could, and that included basic geological data that was available in the early 60's on groundwater movement in southwest Tennessee. There wasn't any information during that early phase, of course, on the site. In fact, our technology had not developed that far yet. But in general there was information that said that the groundwater moved from east to west, from the areas around Hardeman County and west toward Memphis. (Tr.6026).

Q. Is that information which he reviewed still available to look at?

A. Yes, it is.

67. And Velsicol's chief chemist Dr. Marks agreed. He stated:

"Q. Well, it would be easy enough to go out there and find out where the local neighbors were getting their water— that would be easy to do, wouldn't it?

A. I assume the information would have been publicly available." (Tr. 801)

68. As pointed out *infra*, most of the experts in the fields of waste landfills and waste management including Velsicol's own witnesses, believed that before a site were chosen for a landfill, certain basic steps concerning a survey of the site and its geology had to be initiated and completed. Indeed, one of Velsicol's own expert witnesses (Mr. Frank Bowerman) believed that the "state of the art" in 1964 included a duty to hire professional experts to review the results of such surveys if there were any reasonable possibility of groundwater contamination.

69. As pointed out above, Velsicol faces a Hobson's choice. Under either theory however, Velsicol engaged in the grossest type of negligence in selecting the farm as a hazardous waste dump.

70. First, it is difficult to give little, if any, credence to Mr. Pounder's testimony that he approached USGS pursuant to Mr. Anthony's instructions. Mr. Anthony had made up his mind to use the farm as a dump prior to the time Mr. Pounders was even sent to the USGS. (Tr. 3598) Thus a trip there by Mr. Pounders would have been to merely confirm what Mr. Anthony had been told. Moreover, Mr. Pounders is still an employee of Velsicol and very much involved in Velsicol's responsibilities for the dump in this case. The Court therefore gives his testimony no weight. In any event, Mr. Pounders and Mr. Anthony were

interested solely in the Memphis aquifer and not the local aquifer. Otherwise, a simple check of the neighborhood or a local driller would have revealed the existence of local water aquifer (Tr. 801; 8900–01).

71. On the other hand, Velsicol argues that Mr. Pounders did give Mr. Anthony some information. It does not follow, however, that Velsicol is still not grossly negligent. Mr. Rademacher testified about Mr. Anthony and his background in petroleum engineering, viz:

"... the fact that they looked at the geology, that a man with geological training evaluated it, was good, and I know that in industry it wasn't a common practice for a man to go get registration, because it wasn't needed from the standpoint of the work that they did. Registration as a professional engineer was usually a need for a consultant who was doing work for somebody else. So I characterized Mr. Anthony's credentials that he was a professional, and he made a judgment on the basis of well borings or the geology that he saw ...". (Tr. 4328–29).

72. In sum, if Mr. Anthony didn't look at anything, he was grossly negligent. And if he did, with his credentials, as Velsicol wants the Court to believe they were, Mr. Anthony would also have been grossly negligent in his misuse of the information, his failure to hire a professional water consultant and the exercise of his professional judgment. The existence of the local water aquifer was either known to him or "publicly available." (Tr. 801; 8900–01) Thus, Velsicol was grossly negligent in selecting the site under any theory of the facts.

## F. The Operation of the Plant, the Trucks, and the Farm Dump

73. Velsicol began dumping its chemical waste two months after the farm was purchased on October 21, 1964. (Ex. 114). In the first five months, 5,000 barrels of solids, liquids, and mixed waste were sent to the farm (Ex. 114).

74. In a memorandum dated the day before, October 20, 1964, Mr. Anthony, plant manager wrote a handwritten memorandum to the file. That memorandum stated, inter alia, that the farm had been purchased "for experimental land disposal purposes" and that "because of a situation existing which cannot be discussed at this time, all waste material in the plant must be moved to the farm as quickly as possible." (Ex. 19; Tr. 395–401). No witness was presented by Velsicol during the trial to explain this memorandum or what it meant.

75. While Mr. Anthony had the overall responsibility for operation of the farm, Mr. John Pounders was appointed by Mr. Anthony to be responsible for maintaining the farm and dump site, building a fence around part of the farm, keeping the site prepared to dump, planning ahead, contracting with the excavator and bulldozer people, checking on the inevitable cave-ins of the trenches, backfilling, fertilizing and seeding, and preventing erosion. (Tr. 3590–91; 3566). In other words, Mr. Pounders was responsible for the maintenance of the farm site and was in charge from the day it opened in 1964 to the day it closed in 1973 (Tr. 3591; 60).

76. Mr. Pounders however never attended any type of safety meeting at the plant that involved the handling of the chemical wastes (Tr. 3636). Mr. Anthony, in consultation with Mr. Pounders as to the suitability, made the decisions to change the burial sites from point to point (Tr. 3578). And the trenches at the farm, trenches which he chose, were the only trenches he had ever been around (Tr. 3630), he had never been on a chemical dump before the one which he had been put in charge of by Velsicol (Tr. 3630); he had never even seen a chemical dump before this one that Velsicol had put him in charge of (Tr. 3630) and he had never had any experience with a chemical dump before this one or since. (Tr. 3630).

77. At no time, did any of the drivers ever know what was in the drums and barrels. (Tr. 267; 344; 997–98).

78. The farm was fenced to keep the wild animals away. This was done because Velsicol was aware that the local citizenry would hunt them and use them as a source of domestic food supply. (Tr. 1187). Moreover, because the trenches were open, Velsicol considered them dangerous from the hunters' point of view. (Tr. 3596).

79. No one other than Velsicol employees or agents ever put wastes in the dump nor was anyone else ever authorized to do so. (Tr. 99).

80. The dumping on the farm commenced with the shipment by truck to the farm. Ultimately, during the period when the dump was in use, over 16.5 million gallons of concentrated chemical waste was buried in the equivalent of 300,000 fifty-five gallon drums covering 45 acres on the farm. (Ex. 3, p. 2). The trucks used could carry from 16 to 25 barrels on one load. (Tr. 261). The average load was about 20 barrels (Tr. 262) with an average of four loads a day, two for each of the two trucks. (Tr. 262).

81. The materials would be placed in 55–gallon steel drums or cardboard containers and put in an area of the plant named the "farm staging area," or "staging area." (Tr. 216, 240). Sometimes they were put on pallets and sometimes they were not. (Tr. 240; 279).

82. The trucks were loaded by employees of Velsicol operating fork-lift trucks. (Tr. 216, 265; 989–88; 1340–41). Sometimes, the fork-lift trucks would "knock holes, in the drum." (Tr. 989).

83. At no time were these barrels or drums ever intended by Velsicol to encapsulate or store the chemical waste but only to provide a means of transportation from the plant to the farm dump. (Tr. 5304; 5311)

84. Sometimes the drums and barrels would leak their contents into the trucks and onto the ground at the plant and on the road to the dump. (Tr. 320; 988; 8965–66) For example, Albert Holt, the foreman in charge of filling the barrels testified:

"A. And I know one time we had a—I don't know, 150, 200 drums that started leaking. Acid had eat holes in them. So they got these trucks out there real quick, started loading them and this forklift, instead of having them on pallets which would be normal, would just run up and grab a drum and squeeze the forks together and set them on a truck and all this waste was streaming out, down the truck bed and everywhere else.

"Q. State whether or not, Mr. Holt, you ever saw a forklift operator actually puncturing any drums—

"A. Oh, yes.

"Q. —in the loading process?

"A. Uh-huh. (Tr. 217)

\* \* \* \* \* \*

"Q. Mr. Holt, did you ever see the trucks actually leaving the loading or staging area with drums actually leaking off the rear?

"A. Oh, I've seen them streaming out the back. In fact, one of the truck drivers told me, said, 'I hope the highway patrol don't stop me and ask me what the hell this is I'm hauling.' (Tr. 218)

\* \* \* \* \* \*

"Q. Let's go back and talk about the condition of these drums. Tell us about the condition of these drums again that you observed.

"A. Well, that day that they got all these trucks in, they had, oh, about 150, 200 drums stacked in the drumming area and they had already ate holes through some of them.

"Q. The chemicals had?

"A. The chemicals had, acid, and this and that. So they got those trucks our there and I mean they started hauling fast. And that's when I seen the waste running out the back-end of the trucks that was leaving there.

"Q. All right. Did you see this waste more than once—

"A. Oh, yeah.

"Q. —running off the back of the trucks?

"A. Yeah, just about every time that they loaded any trucks it was always one or two drums leaking. (Tr. 221–22)

\* \* \* \* \* \*

85. There was conflict in the testimony as to the quantity of such leakage (Tr. 281; 293; 320; 988; 8965). It is clear however, from the heavy preponderance of the evidence, that there was sufficient leakage of liquid from the drums in transport to be noticed, for the uncontroverted proof discussed below shows that the local and state authorities first became aware of this dump *because* of the liquid spillage coming from the trucks on the way to the farm dump. In fact, one driver (Curry A. Ivy) was stopped three times in one day, twice by City Police in the City of Memphis and once in Somerville by the State Highway Patrol (Tr. 989). He testified that the spillage would occur "[m]ight near every load" (Tr. 988). Moreover, even in 1973, the Tennessee Pesticide Study Project investigated citizen complaints concerning spillage and found "evidence of spillage" on the roads (Ex. 100).

86. Upon arriving at the farm dump, the trucks would turn into the farm through a gate. This turn would often create a spillage of some of the contents of the loads on to the road. (Tr. 990). One driver testified that "we would spill a lot there." (Tr. 990). In fact, where the trucks "turned off of the highway, it got so slick and bad down there the county had to go in there and put sand on it where it turned off up a hill." (Tr. 8968–69).

87. Pits or trenches were cut into the ground. The pits were quite long (such as 500 feet long) (Tr. 262) and not covered until completely full. They were 15 feet in depth. (Ex. 393, p. 212) During that time, water accumulated in the trenches (Tr. 270; 905; Ex. 57, p. 18) causing a pooling or ponding effect enhancing percolation by the waste into the ground. Mr. Pounders instructed Mr. Agee and the other farm workers as to the way the trenches were to be dug. (Tr. 266)

88. The trucks, filled with the 55–gallon steel drums and fiber cartons of chemical waste, would back up to the edge of the trenches or pits ten to fifteen feet deep and wide and dump their loads (Tr. 318; 991; 3118). Almost invariably, some of the barrels and drums would be broken or leak their contents as they were heaped in the pits "kind of helter-skelter" (Tr. 295; 320; 348; 390–91; 1447). The contents would look like black oil (Tr. 292; 294). And there was no question that there were pools of chemicals in the trenches (Tr. 995). Sometimes the barrels had no top or bungs and the liquids would flow out (Tr. 1345; 1354). Mr. Pounders instructed Mr. Agee and the other farm workers as to how to place the barrels into the trenches. (Tr. 262)

89. At the time the dump was opened in 1964 and through 1967, the barrels were dumped on a northern part of the farm. Later, barrels were to be buried in the other plots, one designated as the middle site and the other the southern site. However, at the time that the United States Geologic Survey conducted its 1965 and 1966 investigation and monitoring, only portions of this northern site had been developed (Tr. 409).

90. After the barrels and drums were dumped into the trenches, some earth would be put on top and a bulldozer would then drive over the barrels and drums crushing them down. This process would be repeated and more barrels and drums dumped on top until the trenches were almost filled to the surface. Two or three feet of dirt were then placed on top of the barrels and drums filling the trench. (Tr. 4426).

91. No care was taken to insure against bursting barrels and drums at any time during the operation of the dump and the trenches were not lined with any impermeable material to prevent the chemical wastes

from leaching into the soil. (Ex. 10; Tr. 1447).

92. Once the trenches were finally filled and covered, they would periodically cave in and dirt would be hauled in to fill these trenches. (Tr. 299; 4426) This caving or sinking would occur in four to five months to a depth of two to three feet (Tr. 1345). The backfilling would be done once a year and take about two months to complete (Tr. 300). During this period of time, additional ponding of water would occur in the trenches.

93. Periodically, Mr. Pounders would check the farm and according to Mr. Agee, Mr. Pounders "saw that we was doing it right" (Tr. 268). Mr. Pounders testified:

Q. How would the filling on the trench occur?

A. The filling?

Q. Yes, sir.

A. By pushing the dirt back in over the material as it was buried. the dirt was stockpiled when the trench was opened. Then the specifications were for a minimum of three feet of earth over the top of the drums in the trench and over the trench area to mound it up some foot, fifteen inches to allow for settling. That's the method.

Q. Was there any attempt to impact that particular mound?

A. By running the—as you fill it, the weight of the bulldozer over it.

Q. What was the purpose of mounding it again, sir?

A. Well, it would settle, the earth would settle after rains over a period of time, as any ditch or opening.

Q. Did you in your own mind come to any conclusion about how long it took the trenches to more or less completely settle?

A. Oh, probably we would have to go back periodically and add dirt for over a period of four or five years before they would completely settle. (Tr. 4426–27).

94. In 1983, the Memphis facility generated approximately 12,000 gallons of liquid waste *per* month (Tr. 911). This is less than what the plant produced in the later 1960s and early 1970s when even more waste was produced (Tr. 913). Moreover, in 1971, approximately 2000 drums per month or 110,000 gallons per month were being buried on the farm (Ex. 35), hardly the 100 barrels per month referred to by Velsicol in 1965. (Ex. 81).

95. The farm's conversion into a dump in 1964 required no permits, licenses, or public announcements. Velsicol has stated that Tennessee law, at that time, allowed a landowner to do anything with his own land, as long as he didn't bother anyone else. Velsicol did not inform any state or local agency that it had established the dump or what it was dumping. No laws specifically prohibited the dumping of any materials on private land, nor had state and local officials any authority to check on the operation.

### G. Velsicol's "Monitoring Program"

96. Velsicol drilled a well near the gate to the farm which was the entrance to the farm from the Toone-Teague Road on April 3, 1965 (Ex. 106). That well passed through the perched-water and water-table aquifer zones and into the Memphis artesian aquifer (Tr. 415; 796). This is the Velsicol or deep well.

97. Velsicol and its witnesses took the position at trial that throughout the lifetime of the dump, it had a "monitoring" system to detect any contamination. For that proposition, Velsicol pointed to this deep well it had drilled into the Memphis aquifer and its monitoring, together with samples of water taken from Pugh Creek. This position was important for Velsicol to sustain, both because it goes to the issues as to whether the farm dump complied with the state of the art when the site was selected and whether the dump was operated in a safe manner. In fact, Velsicol's proof failed on all accounts.

98. The Court finds that:

(a) The Velsicol well was never intended to be a monitoring well to monitor any aquifer, much less the local aquifer. (Tr. 415). Dr. Marks testified:

Q. That was not a monitoring well?

A. It was not originally installed primarily as a monitoring well. It was later used as a monitoring well.

Q. Right, but originally it was not installed as a monitoring well?

A. Right. It was installed just like running the electricity in the area was done for utilitarian purposes, the water well was put in.

Q. So at that time they did not have a monitoring well as such, did they?

A. What time are you—

Q. At the time that this deep well was drilled and used?

A. No, there were no other wells at that time, to my knowledge. (Tr. 415–16)

(b) At some time later, the "monitoring program" consisted of Dr. Marks' laboratory at the Memphis plant testing water samples taken by the truck drivers (Tr. 387; 729; 783) from Pugh creek (Tr. 728; 783; 3715) and the Velsicol "deep aquifer" well (Tr. 728; 783; 3714). However, since the Velsicol well did not draw from the drinking water aquifer and the creeks were not used for drinking water, this monitoring program would not have informed Velsicol or anyone else of any insult being made to the drinking water aquifer.

(c) Moreover, because the laboratory was at the Memphis plant it "meant that you had an essentially contaminated laboratory, if you were looking for residue quantities of those same materials" (Tr. 749).

(d) Finally, no record of any results from any program to monitor the local aquifer were admitted because no such records were ever kept and no program was ever instituted. (Ex. 57, p. 31).

(e) The "monitoring" of Pugh Creek and the Deep Well ended in 1973 when the dump was full except on special trips (Tr. 3719). The monitoring program started again in 1978 when the groundwater contamination was found by the authorities (Tr. 747; 803)

99. Dr. Marks, who was in charge of the monitoring program, did not know the purpose in monitoring the Velsicol Well (Tr. 795). He testified:

Q. Can you tell us why Velsicol would be monitoring the artesian aquifer as opposed to the local aquifer, water table aquifer?

A. I really don't know what the purpose in the monitoring of that well was. I was just asked to monitor it and we did and reported the results.

Q. You don't know whose decision it was to monitor that artesian aquifer?

A. Well, Mr. Anthony told me to monitor it is setting up this monitoring program with him.

Q. But at the time that you put in this well, you went through the local aquifer to get to the artesian aquifer, didn't you, the well did?

A. Well, assuming that the water table aquifer covered the entire area there, I guess that possibly is true. I'm not a geologist. (Tr. 794–95)

100. However, Dr. Marks admitted that "a well that was monitoring the artesian aquifer would not be very good to monitor what's going to happen in the local aquifer" (Tr. 796) and "would not be monitoring the local aquifer" (Tr. 796).

101. Although a well was drilled to the deep artesian aquifer by Velsicol, there was a plan to drill another well which was originally planned but aborted after being approved. Dr. Marks when asked about it stated that "I have no knowledge of it" (Tr. 798).

102. Exhibit 106 consisted of five pages. Two pages are a December 30, 1964 memo to Marvin Lissner from John Pounders justifying the deep well which was drilled on April 3, 1965. It's authorization number was # 3-65-8. A third page

consists of an "Authorization for Expenditure" for No. 3–65–8 in the sum of $1,000 and is also dated December 30, 1964. A fourth document consists of the daily log for that well and signed by the driller on April 3, 1965.

103. The fifth sheet is the one that Dr. Marks knew nothing about. It is also an "Authorization for Expenditure," is dated September 10, 1965 and signed by Mr. Nesselson (Tr. 797). It requests permission to spend $2,000 for a:

"Disposal Farm Monitor Well to monitor groundwater in a direction other than that currently monitored by an existing well." (Ex. 106).

104. This Authorization for Expenditure bears the No. at the top right of 3–65–51, not the 3–65–8 which was the authorization number for the original deep well.

105. If this were all that existed, Exhibit 106 would be at best unclear. However, the parties stipulated at the first day of trial the admission of Exhibit 9 which included Velsicol's "monitoring" of the farm well and creek test results. (Tr. 83). Mr. Gentry, however, more familiar with the Exhibit because it came from Velsicol, stated:

"MR. GENTRY: Actually Your Honor, I believe that particular file has more than just that in it. I think it deals with even the drilling of the wells, but I believe that designation is sufficient" (Tr. 83).

106. Exhibit 9 makes it clear that Exhibit 106 was incomplete. There is a copy of a teletype dated October 20, 1965 to Gene Nesselson from Mr. Lissner. The teletype stated:

"What are your instructions for Project 3–65–51. Understand it was approved but I have not seen authorization, etc."

107. A reply teletype is also in the file to Marvin Lissner from Gene Nesselson in reference to the Telex "This [sic] AM about AFE. These letters mean the response was made the same day and concerned the Authorization for Expenditure. It stated:

"We have the word from accounting that they have received C7: approved and it if [sic—is] Marked Budgeted."

108. The Authorization for Expenditure then was written across it in handwriting however:

"Cancel, 7–66, per G. Nesselson, 7/25/66"

109. While there is no evidence in the record as to why this work order was first approved and later cancelled, the Court finds that it was Velsicol's duty to make such explanation. It did not and the Court assumes that such an explanation would therefore be at conflict with defendant's position taken in this lawsuit that there was a meaningful "monitoring" program. What is clear however is that someone at Velsicol—at some period of time—did see the need to monitor the local water aquifer but for some reason the authorization was cancelled after approval had been given.

110. The Court finds that there was *never* any monitoring of the local water aquifer by Velsicol nor was there any intent to do so. The Velsicol deep well was drilled for a water supply on the farm (Tr. 415; 442). The second well which was never drilled would possibly have monitored the proper aquifer. The Court does not believe that the argument that Velsicol had a monitoring well is raised in good faith. It was an attempt to mislead the Court and the Velsicol expert "state of the art" witnesses as described *infra.* And, the failure to have such a monitoring well in the relevant groundwater aquifer violated the state of the art in operating such a dump in 1964 through 1973.

**H. The immediate outcry from the Citizenry, the concerns of the County, State and Federal Authorities and Velsicol's "Cover-Up" of the Identity and the Liquid Nature of the Materials Dumped**

111. When the local residents first learned that a chemical company had purchased the farm, they were pleased, thinking that a plant would be built that would provide jobs for local people. The resi-

dents were almost immediately disillusioned. As trucks rumbled down the narrow road into the farm every day, it became clear that the land was instead being used as a dump. The community became aware that pesticides were being dumped there when the spills from the trucks appeared on the road creating odors. (Tr. 293; 638–39)

112. This dumping might have gone unquestioned for years had it not been for the complaints from the alert citizenry and the State Highway Patrol. Both spotted the leakage from the trucks on the roads and complained to the pertinent county and state authorities. (Tr. 638). These authorities also notified the public health authorities for the City of Memphis and Shelby County and the federal authorities who were then investigating the fish kills in the Mississippi River.

113. The individuals employed by the State Department of Public Health and the City of Memphis were professional experienced water engineers with a knowledge of and a long history in guaranteeing and protecting the water supplies and the aquifers in West Tennessee.

114. Matters progressed on a parallel local and state level with help from the federal government.

115. First, Velsicol was contacted by letter dated November 17, 1964, from Dr. B.D. Hale of the Hardeman County Health Department. (Ex. 78). It stated that the citizens of Hardeman County didn't know what was going on and they wanted to know (Tr. 377). Prophetically, that letter, *inter alia*, stated that the Hardeman County Health Department had:

.... "been asked about the industrial waste disposal operation northeast of Toone. People in the area are quite concerned and do not know (nor do I) whether this may be potentially dangerous to their health by way of water supply contamination by whatever substances may be buried.

"Could you supply [us] with data about this operation, so that I may intelligently

answer citizens questions and help control rumors]" (Ex. 78)

116. Mr. Anthony, the plant manager did not directly answer the Hardeman County letter. Instead, Velsicol referred it to Mr. Eugene Nesselson, the person at Velsicol's Chicago corporate headquarters in charge of the dump. Mr. Nesselson answered the letter on November 24, 1964. (Ex. 79; Tr. 380–81) as part of Mr. Nesselson's responsibility as Velsicol's environmental engineer (Tr. 381).

117. Mr. Nesselson stated in this letter, in pertinent part:

"... with respect to the activity northeast of Toone, Tennessee, [the substances] consists of drums of solid and semi-solid non-combustible residues from chemical manufacturing. Virtually all of the material is insoluble and it is packaged in corrosion-resistant 55–gallon containers" (Ex. 79; Tr. 389)

118. The Court finds that at this point on, with an inquiry specifically concerning water supply contamination, Velsicol was clearly under an obligation to have obtained professional hydrological advice. In fact, such an obligation was the "state of the art" as testified to by Velsicol's own witness Mr. Bowerman if for no other reason that Mr. Anthony supposedly knew that the Memphis aquifer was under the farm. However, Velsicol's gross negligence also rests upon its disregard of the warning found in Dr. Hale's letter and its ultimately false response to Dr. Hale and the State of Tennessee.

119. The receipt of this letter did nothing to assure the recipients' fears because they knew that their attention had been directed to the dump *in the first instance* by citizens who saw leakage on the roads through the City of Memphis and the Town of Somerville towards the dump.

120. Second, the State of Tennessee had also learned from reports from the State Highway Patrol or the County Health Department that there was material being hauled from Velsicol's plant that had been leaking on the highway and which had been followed to the farm (Tr. 638–39).

121. Being the lead agency, the Tennessee Stream Pollution Control Board of the State Department of Health wrote Velsicol on January 26, 1965 informing Velsicol of the local health officials and now of the State's expression of "considerable concern regarding the underground disposal ... of liquid and solid wastes from the Memphis plant...." The State asked for the following information in order to properly evaluate the situation, *viz:*

"1. The sources and character of each waste material hauled to the dump.

"2. An estimation of the volume.

"3. A description of operation procedures at the dump.

"4. A discussion of the criteria used in determining the suitability of underground disposal of the wastes" (Ex. 80).

122. The letter as had the earlier letter from the Hardeman County Health Department (Ex. 78) further emphasized that the State and other interested parties were primarily concerned with the protection of underground water supplies. (Ex. 80).

123. Mr. Nesselson of Velsicol responded on February 8, 1965 (Ex. 81). As to the four questions posed by the State, Velsicol stated as follows:

"Dear Mr. Hunt:

"I have received your letter of January 26, 1965, requesting information about our landfill practices in Hardeman County.

"The data supplied below are per the numbered questions you posed:

"1. The wastes hauled to the dump are solid and semi-solid residues from the manufacture of organic products in our Memphis plant—specifically Endrin, Chlorendic Anhydride, Heptachlor, and Bandane. The residues that are packaged and dumped on the Hardeman County site can be characterized as asphalt-like materials, dried innocuous catalysts, and spent activated carbon.

"2. These materials are packaged in 55-gallon drums. They accumulate at the rate of about a hundred drums per week, and hauling by truck takes place about two days per work week.

"3. This dump is operated by the 'trench' method. A pit is excavated along a 'trench line' to a depth and width of ten to twelve feet. Scalloped cells along the trench line are sized to hold about 200 drums. The drums are covered with a soil seal coat after each dumping. When a cell is full, the contents are compressed by driving the bulldozer back and forth over it, and then moving and compacting a four to five-foot cover of soil over the filled area.

"The actual working portion of the property is a substantial distance from a county road, and the property perimeter is enclosed with a four-strand barbed wire fence. The cells and trenches are 'finished' so that surface drainage is away from the workings.

"4. The criteria governing suitability for disposal are principally combustibility, economics, and convenience. If a waste material will sustain its own combustion, we incinerate it at our Memphis plant. If it is combustible, but does not sustain its own firing, we either supplement and/or slurry it with fuel oil and then incinerate it at Memphis or elect to drum it. If it's hard to burn, and relatively easy to handle and has a high solids content, we drum it, transport, and bury it. Estimated in simple terms, if it flows we pump it to the burner. If it is dry or near-dry, we drum it, dump the drums in a dry hole, and cover the drums to keep them dry. The soil on the dump site is extremely tight. It is a challenge for the bulldozer operator to excavate in it, and its impervious characteristics would seem to offer a similar challenge to any liquid that might percolate through or beneath the fill section. We have established an environmental monitoring program to keep abreast of any insult that might occur. Periodically, mud and water samples are taken from a surface drainage pond on the property. Water is sampled at the same frequency from the Hatchie River, a surface watercourse a few miles to the west of the

dump. A site had been selected on the property to drill a well. The well should be operable before the month is over. The location was chosen to be downstream of the prevailing groundwater flow from the dump area. The water table is estimated to be between 100 and 200 feet. Aside from the convenience of a water supply on the property, this will affordus a chance to monitor groundwater quality whenever it seems warranted; and in the unlikely event that its quality deteriorates, there will be ample time to take corrective measures before anyone else is affected.

"Dr. Hale, Hardeman County Health Officer, has made a previous inquiry regarding our operations. Copies of this correspondence are attached. I have taken the liberty of forwarding a copy of this letter to Dr. Hale so that he too may be aware of our increased monitoring efforts.

"Sincerely, Velsicol Chemical Corporation, Eugene J. Nesselson, Waste Control Engineer."

124. At the time the letters of response from Velsicol to the Hardeman County and state authorities were sent (Exhibit 79 and 81), Velsicol knew or should have known that those responses contained false assertions. In fact, almost the entire letter is false.

125. First, the materials being transported were not just "asphalt—like materials, dried innocuous catalysts and spent activated carbon." Velsicol had kept a log of what it had sent to the dump from October 21, 1964 through the end of 1964. This log was kept by Mr. Anthony (Exhibit 114). Exhibit 114 shows that many drums sent to the farm during 1964 contained "liquid" substances as distinct from "solid" or "mixed." In fact, 68% of all of the barrels sent to the farm were designated "liquid" and 7% were designated "mixed." Thus less than one third of those barrels contained purely solid material. Yet over two thirds of those barrels were pure liquid as shown by Exhibit 114. Velsicol knew or should have known than the letter to the

Hardeman County Health Department (Exhibit 79) and the State (Exhibit 81), were misleading and false, at least as to the question of liquids being placed in the dump.

126. Later facts bear out the conclusion that liquids were placed in the dump in large quantity and that much of it leaked out of the barrels containing heptachlor catalyst. On April 28, 1973, Jim Sanford, Production Supervisor at the Velsicol plant (Tr. 615), wrote a memorandum to Ed Maddox, a chemical engineer who worked for Dr. Marks (Tr. 615). This memorandum, admitted as Exhibit 169, stated in pertinent part:

"HEPTACHLOR CATALYST"

"*Problem:* There is [sic] at present approximately 1,800 drums of spent catalyst in the area. Many of these drums have been leaking for quite some time and more leakers are encountered each day. The heptachlor leaking from these drums presents a serious stream pollution problem due to the fact that each rainfall washes more and more heptachlor into Cypress Creek.

\* \* \* \* \* \*

LIQUID WASTE

"*Problem:* At present there are about 900 drums of liquid waste in the farm area." (Ex. 169)

127. In fact, Velsicol ordered carbon tetrachloride in 20,000 gallon tank cars (Tr. 4068) which was then stored on the plant premises in a storage tank 20 feet tall that holds 40,000 gallons (Tr. 4070). As is found below, at some point in time, the failure of Velsicol to notify the authorities that carbon tetrachloride was being dumped at the farm was intentional or grossly negligent and hampered the federal and state efforts to identify the contaminants in the plaintiffs' wells at the earliest possible time. Important here however is the fact that this spent heptachlor catalysts was up to 60% carbon tetrachloride as Dr. Marks so testified (Tr. 7095). This is why the cardboard barrels containing such catalyst had to be sent to the dump immediately or their sides would soon become wet

and weak. (Tr. 3653). We also now know that the PCL wastes *also* contained carbon tetrachloride and chloroform, further adding to the amounts of these materials dumped on the farm (Interrogatory Answer 2).

128. Moreover, while there was a question as to how much spillage of the liquid occurred in transporting the barrels from the plant, there was *no* disagreement in the testimony or between the witnesses that material dumped at the farm was in liquid form. No witness testified that liquids *were not* dumped at the farm. In fact, every witness who was asked agreed that liquids *had* been dumped there:

| Name | Liquids were Dumped on the Farm |
|---|---|
| a. Mr. Leroy Agee, truck driver and bulldozer operator on farm | Tr. 280–81 |
| b. Mr. Dean, who worked on farm and drove | Tr. 292–93 |
| c. Mr. Roy Wilson, driver and bulldozer operator on farm | Tr. 320 "You could tell it wasn't no perfume bottle, partner (Tr. 320) |
| d. Mr. Bobby W. Morrison, State employee | Tr. 930 |
| e. Mr. Curry A. Ivy, driver | Tr. 988, 995; 2267 |
| f. Mr. Milton Armstrong, driver | Tr. 1345 |
| g. Mr. Wilson, driller | Tr. 8936; 8941–42 |
| h. Mr. Charles Hanson, former plant manager | Tr. 1734 |
| i. Mr. Donald Rima, former USGS employee | Tr. 5305–06 |
| j. Mr. John A. Wilson, property owner abutting Velsicol's farm | Tr. 8965–66 |

129. The Court also notes the perplexity of Dr. Robert Harris, an expert on the state-of-the-art in sanitary and industrial landfills. He believed that because there was so much carbon tetrachloride being found in the wells that it might have been dumped in massive liquid quantities (Tr. 1161; 1169–70). This supposition, which the Court finds as a fact, was also supported by Dr. Weber, Velsicol's own agronomist who was "surprised at the high levels seen so soon in the wells.

130. Dr. Harris testified:

A. Well, you just described diatomaceous earth with carbon tetrachloride absorbed to it that's not in liquid form. If that's what was put in as part of the waste, then that was not putting liquid waste in the landfill. I would find it hard to believe, I would say, that that was the only form in which carbon tetrachloride was put into the landfill. (Tr. 1161)

\* \* \*

Q. Dr. Harris, you made the statement in response to one of Mr. Mitchell's questions that you do not feel that carbon tetrachloride was only put in the dump as a part of the diatomaceous earth. Did you make that statement?

A. (Witness nodded.)

Q. Why do you feel that?

A. Well, the monitoring data that I have reviewed indicates now that the groundwater contamination has resulted in concentrations of carbon tetrachloride in the vicinities of 200,000 micrograms per liter or 200,000 parts per billion. That is getting up into the range that is approaching the solubility of carbon tetrachloride in groundwater. Given the aerial extent of the contamination, it would appear to me that either an enormous, enormous amount of adsorbed carbon tetrachloride was added or liquid carbon tetrachloride was added because of the very high concentration that has ensued.

This is not based on detailed calculations. This is based on a judgment that I have made looking at the evidence.

In other words, it would be consistent with, and I'm not saying that I have evidence to this effect, but it would be consistent with a pure carbon tetrachloride sitting somewhere in the landfill or at the bottom of the aquifer, which is where it would go if it were added in liquid form, and being dissolved by the water or the water in the groundwater aquifer above it as it passed over top of the liquid carbon tetrachloride. (Tr. 1169–70)

\* \* \* \* \* \*

Q. Is it your recollection that you saw this level of—was it 200 parts per—

A. Well, I said the concentration trend was to that level, that is, as I recall, the highest concentration of carbon tet was in the neighborhood of 160,000 parts per billion, which is the same thing as micrograms per liter, which is approaching the 200,000. That's what I meant to say. (Tr. 1172)

131. The Court finds that the existence of carbon tetrachloride and chloroform were deliberately kept hidden by Velsicol particularly by the omission of such compounds from lists periodically given the authorities by Velsicol. At no time until EPA identified carbon tetrachloride and chloroform in plaintiff's wells in 1978, did Velsicol ever inform the state or local authorities that those substances had been placed in the dump (Tr. 973–74). Indeed, it was only in January 1979 did Velsicol admit to EPA that it had dumped carbon tetrachloride (Ex. 11) and the State in July 1980 (Ex. 12). Chloroform wasn't admitted until 1982 in an answer to an interrogatory (see Interrogatory Answer 2).

132. The Court finds that the reason Velsicol concealed both the liquid nature of the chemical waste and the identity of the carbon tetrachloride and chloroform is that without knowing what to look for, the State or federal authorities would have had a difficult job in the 1960s and early 1970s in identifying them by gas liquid chromatograph techniques. This is in fact what happened in 1966 when, during the course of the USGS survey, certain chemicals appeared, but their identity "eluded" the investigators. This in turn would have prevented them from identifying these chemicals in plaintiff's wells in 1969 and the early 1970s which plaintiffs' water models predicted actually did occur.

133. For example, Dr. Marks testified: "What I am saying, Mr. Gilreath, is if one knew a priori what the possible contaminant would be, one might change his analytical protocol to try to separate the compounds if he could. But if you do not know, then the avenue is not available to you.

Q. And the State of Tennessee, when they were looking at these chemicals, when they were analyzing this water, they didn't know, did they, what they were looking for?

A. I couldn't speak for them. I don't know whether they—what knowledge they went into the analysis beforehand trying to determine. (Tr. 786–87)

\*　　\*　　\*

Q. What I'm asking is, the State of Tennessee did not analyze for carbon tetrachloride, did they?

A. I don't know. They didn't report it. I don't know whether they analyzed for it or not.

Q. You haven't seen any document or any evidence where they analyzed for it, have you?

A. No.

Q. They didn't come to you and tell you they were looking for it, did they?

A. No, they didn't come to me and tell me they were looking for anything.

Q. And you didn't tell them that carbon tetrachloride was in the dump, did you, specifically?

A. I don't know that I told them, you know, anything other than what's shown on the documents.

Q. I mean the company didn't—

A. Right.

Q. And they weren't analyzing for chloroform, were they, specifically? They weren't looking for it?

A. Well, I don't know. They didn't—as far as I know, they didn't report any.

Q. Because they didn't know it was in the dump, did they?

A. I don't know whether it was because they didn't know it was in the dump or they didn't have a method for it, have the equipment to run it.

Q. Well, can you not analyze for carbon tetrachloride with a gas chromatograph?

A. Yes, under the proper conditions.

Q. Well, they had a gas chromatograph or at least Velsicol did, didn't they?

A. Yes.

Q. Beginning since when?

A. Oh, I guess we got the first gas chromatograph back in the early Sixties. But there's something that I haven't told you. You run volatile organics with the addition of another piece of equipment other than a gas chromatograph is the analyzer, but there's another piece of equipment that goes with it. Now, if you had that equipment after it was developed—the original EPA paper I believe was published in '74; it took some while to get commercial instrument manufacturers to make these—then you could routinely run them, but up until then it would have been quite a problem, I think.

MR. GENTRY: I didn't hear that last.

THE WITNESS: I say up until then it would have been quite a problem, I think.

Q. (By Mr. Gilreath) So let me see if I understand you. Are you saying that it would be difficult to analyze the water and determine if carbon tetrachloride was in it before '74 or would not be difficult?

A. I'm saying it would probably be difficult to do it accurately, yes.

Q. Then why were you taking water samples from the wells, then, if you couldn't analyze what was in the water? What would be the purpose of taking the water samples?

A. Well, we could analyze for heptachlor and endrin, what's known as the extractables as opposed to the volatiles.

Q. So would you say, then, in 1964 and '65 up until '74 that at the time you dumped all of these chemicals on Exhibit 13 in the dump that you knew you couldn't analyze for those in the water? Would that be a fair statement?

A. No, I don't think it would. Most of those are—some of those are volatiles; I guess most of them presently would be classed as volatiles. It depends on the boiling points as to—

Q. Then you say you could analyze for these chemicals—

A. There's one of them that's an extractable.

Q. Pardon?

A. There's one of them that's an extractable.

Q. Which one?

A. Two of them that's extractable. Well, hexachloronoroboradiene and napthalene you would not run as a volatile. Napthalene possibly. Hexachloronorbornadiene would be an extractable—

Q. So the rest of them, other than hexachloronoroboradiene and napthalene, are volatile and they would—you could read those on the gas chromatograph?

A. Yes, if you had a proper method for first preparing it and getting it into the gas chromatograph.

Q. Well, did Velsicol have that method?

A. No, we didn't. We did not—the method was not developed until later, that's what I'm telling you.

Q. Well, my question is, then at the time these were put in the dump you didn't have a method for testing to determine if they were in the water then, is that correct?

A. Very likely. I don't know whether under some circumstances we could have devised a method or not. It would have been almost a research project in the Nineteen early Sixties to do something like this.

Q. Then when these chemicals went in the dump, you didn't have a method to detect them in the water and neither did the State, is that true?

A. I would think that our capabilities and the State's were probably comparable, I'm not sure. It was the state of the art at the time.

THE COURT: What is your answer? Were both comparable?

A. I would say that both the State's and Velsicol's capabilities were comparable because they were essentially—

THE COURT: What is your answer?

A. In analytical chemistry with gas chromatography it was the state of the art. Whether we could analyze everything that there is I'm not sure. Some compounds are more difficult to analyze than others and—

THE COURT: I'm simply asking him what the specific answer was to the question. I didn't understand.

Mr. Gilreath: I didn't either.

Q. (By Mr. Gilreath) You are saying that the State, insofar as being able to analyze these chemicals from the water, the well water, had the same capability as Velsicol?

A. I would say essentially so.

Q. And in 1964 and '65 when you first started monitoring you did not have the capability of finding these chemicals, is that true, assuming they were there?

A. We didn't have the capability of monitoring the validated volatile organic methods. We would have had to devise a method.

Q. Did you have the capability of devising a method?

A. Perhaps if we had been a research laboratory rather than a quality control laboratory. (Tr. 787–92)

134. Although there had been half-hearted attempts to keep lists of what was sent to the farm (see Ex. 114), by 1972 there were no longer any records kept as to what went to the dump site (Tr. 1189). The Court can and does conclude that Exhibit 114 therefore is an accurate picture of the nature of what was put in the dump, namely that well over 68% of such substances were in liquid form. Moreover, it was common knowledge to any Velsicol employee familiar with the operation of the plant, that carbon tetrachloride *was* a large component of the heptachlor catalyst dumped on the farm. Both Dr. Marks and Mr. Charles Hanson testified in effect (Tr. 387; 4194–95) that because heptachlor catalyst was being put into the dump, anyone that knew the operations of the plant would know that carbon tetrachloride was also being put into the dump as well (Tr. 387; 4194–95). In other words, reference to the

heptachlor catalyst as "dried innocuous catalysts" was just not true and an attempt to hide the fact that a great majority of waste going to the farm was liquid and that it was carbon tetrachloride and chloroform.

135. Mr. Charles R. Hanson, presently Director of Velsicol's Environmental Center pointed out:

"Q. And [Mr. Nesselson] was asked by the State what's going on in the dump. Could the Velsicol Chemical Company at that time have provided him with a list of these things that your went through yesterday, all these different compounds [where Mr. Hanson identified carbon tetrachloride as a by-product of heptachlor manufacture], and given that to the State of Tennessee?

A. I could have duplicated this same exercise in 1965 or '66 or at any time during the time that it was involved in it" (Tr. 4194–95)

17. And Dr. Marks testified:

"Q. ... carbon tetrachloride was being put in the landfill, was it not?

A. In some quantity, I don't know how much.

Q. But it *was* being put in there is my question.

A. With heptachlor catalyst, that would have been some carbon tetrachloride." (Tr. 387)

136. The Court finds that Velsicol's concealment of carbon tetrachloride was as deliberate as was the concealment of the liquid nature of the wastes.

137. Third, Mr. Nesselson's claim that Velsicol had "established an environmental monitoring program to keep abreast of any insult that might occur" and "to monitor groundwater quality" (Ex. 81) was not true, as pointed out elsewhere. In fact, the Velsicol deep well was not drilled until April 1965, two months after the letter was written and seven months after dumping at the farm began. (Ex. *106*).

138. Fourth, Velsicol attempted to mislead the reader that at most 100 barrels a week were dumped on the farm. Exhibit

114 makes it clear that more than an average of 300 barrels per week were being dumped on the farm during the period between October 21, 1964 and March 5, 1965.

139. Finally, Velsicol's own attorney attempted to disown Mr. Nesselson and that part of the letter that stated: "It is a challenge for the bulldozer operator to excavate in it [the soil], and its impervious characteristics would seem to offer a similar challenge to any liquid that might percolate through or beneath the fill section." The soil was sandy and not impervious as Mr. Gentry had come to realize. In objecting to questions to Mr. Malcolm Bishop, Jr., a Velsicol farm worker, concerning the type of soil into which the trenches were cut, the following occurred:

THE COURT: Mr. Garrety, what is the area of rebuttal, you are concerned with?

MR. GARRETY: If the Court please, Mr. Pounders and other witnesses testified to a condition existing in that soil that made bulldozing nearly impossible, that they had to come in and take the front of that bulldozer and chop up that ground, and this man is going to rebut that testimony.

MR. GENTRY: Your Honor, that was not Mr. Pounder's statement, nor was any other witness heard from that particular stand to make that statement. That particular statement came from a letter that was put into evidence by the plaintiffs, a letter written by a man by the name of Nesselson who never sat before this court and testified, and he was an official from Chicago of Velsicol Chemical Corporation. That is the only place in this entire ten thousand pages and five hundred and fourteen exhibits that that statement is made, and it has been—and I think it's been refuted time after time. (Tr. 9990–92)

I. **The Growing Alarm as to the Farm and the 1965–66 meetings with Velsicol**

140. At the same time that the State and Hardeman County officials were attempting to get data from Velsicol, other activities went apace investigating the farm in relation to the fish kills in the Mississippi.

141. The Federal Water Pollution Control Administration ("FWPCA") had the responsibility to determine the cause of such poisonings. To do so, that FWPCA had created the lower Mississippi River Technical Assistance Project. The authority of the Agency however extended only to "interstate waters" however.

142. At a meeting of the Technical Advisory Committee for the project, held on March 31, 1965, the FWPCA expressed an interest in identifying areas in which disposal of chlorinated hydrocarbons had been in the past to determine whether the disposal methods would eventually result in pollution of interstate water.

143. Because of this interest, the State informed FWPCA of the Hardeman County dump. FWPCA informed the United States Geologic Survey and representatives from both agencies and the Hardeman County Health Department visited the premises.

144. As a result of a letter on July 9, 1965, it was determined that "based on the scanty geologic and hydrologic knowledge of the pit area" that there was little chance for contamination of the Memphis aquifer (Ex. 84). However the USGS concluded that in their review:

"It is probable that the pesticides will never reach Memphis by underground travel but might reach Bolivar, Toone, Western State Hospital and other nearby water uses."

145. Moreover, the FWPCA concluded: "In summary there is the probability of groundwater contamination within the radius of a few miles of the waste disposal pits near Teague, Tennessee in the foreseeable future. Probably there is immediate danger of contaminating streams, although the extent or severity of contamination cannot be determined. We would require a few weeks to a few months of field work, including augering test holes and constructing wells to give you more accurate information." (Ex. 84)

146. On July 27, 1965, FWPCA wrote Mr. S. Leroy Jones to inform him that while FWPCA would not conduct a ground water study in Hardeman County due to the probability that no interstate waters would become polluted, the samples of water taken from the site were as follows (Ex. 85):

### VELSICOL FARM WELL *

| DATE | ENDRIN | DIELDRIN | HEPTACHLOR | HEPT. EPOXIDE |
|------|--------|----------|------------|---------------|
| 6/9/65 | 8.04 ppb | 1.12 ppb | 0.23 ppb | 0.74 ppb |
| 7/8/65 | 0.04 ppb | 0.03 ppb | — | — |

### STERLING'S WELL

### STATION NO. 6

| | | | | |
|------|--------|----------|------------|---------------|
| 6/29/65 | 0.50 ppb | 0.33 ppb | — | — |
| 7/8/65 | 0.23 ppb | 0.12 ppb | — | — |

### POND LOCATED ON VELSICOL'S FARM

### STATION NO. 5

| | | | | |
|------|--------|----------|------------|---------------|
| 6/9/65 | 2.43 ppb | 0.29 ppb | (D) | 0.51 ppb |
| 6/29/65 | 1.57 ppb | 0.21 ppb | — | — |

### WATER IN DISPOSAL PIT AT VELSICOL'S FARM

### STATION NO. 3

| | | | | |
|------|--------|----------|------------|---------------|
| 6/9/65 | N.D. | 46.9 ppb | 0.08 ppb | 0.27 ppb |
| 7/8/65 | 160 ppb | 513 ppb | — | — |

* The term "ppb" means parts per billion. In other words, 1 ppb means 1 part of the chemical to every billion parts of water.

147. Because of the concern of the State concerning the potential problems of the dump and its relationship to the safety of the water aquifers known to underlie West Tennessee, the State Stream Pollution Control Division called two meetings, the first on December 18, 1965 (Ex. 3, p. 2; Tr. 5208; 854).

148. The first meeting was attended by the State, representatives of the Federal Water Pollution Control Administration, health officials from Hardeman County, Mr. Handorf from the City of Memphis, the United States Geological Survey (Tr. 5208, 5207), and representatives of defendant Velsicol. Those representatives included Eugene Nesselson from Chicago headquarters and Dan Marks. (Tr. 5211)

149. At this December meeting, Eugene Handorf representing the City of Memphis objected to any further dumping by Velsicol in the Hollywood dump, in the municipal sewer or anywhere in West Tennessee including Hardeman County. (Tr. 854). Moreover, Mr. Handorf also objected to the determination by the FWPCA that it would take 1,500 years for the Velsicol chemicals to get to Memphis. He stated:

"When you have an area draw-down, like you have in Memphis, the water table is dropping about a foot a year, and it is a known fact when you have a draw-down, your rate of flow increases to fill up that void. Now, I don't know what the U.S. Geological Survey people would say now, but it certainly wouldn't be any prehistoric data like that. It would be maybe as an estimate, maybe fifty or sixty or eighty years would be more reasonable on measurement of the distance of underground flow per year. Now, it could be determined, but I am not privy to that information right now. (Tr. 858)

150. The second meeting took place on May 17, 1966 and was held in Nashville

(Ex. 3, p. 31). Included were representatives of the state, FWPCA, USGS, Tennessee Department of Agriculture, Velsicol, Game and Fish, Water Resources and the Hardeman County Health Department (Ex. 3, p. 31).

151. One result of this May 17, 1966 meeting was to ask Mr. Donald Rima of the USGS to devise a project proposal to answer four questions (Ex. 3, p. 31; Tr. 5208). These questions are presently found in Exhibit 2 and were:

"I. Is there now contamination of the environment from disposal pits; if so, what portion is now contaminated and to what degree?" (Tr. 5211)

"II. What is the potential contamination hazard to local groundwater from percolation?" (Tr. 5212)

"III. What is the potential contamination hazard to contiguous groundwaters?" (Tr. 5212)

"IV. Are there other hydrologic factors related to contamination hazard that have become evident directly or indirectly from this study, such as topography, drainage or runoff intensity." (Tr. 5212)

152. As a result of the meeting, Mr. Rima prepared a written project proposal, which was reviewed by his peers and supervisors, Velsicol representatives, the State, and other federal agencies. (Tr. 5209). Finally everybody was satisfied with the program, including the representatives from Velsicol (Tr. 5210–11).

153. Because of the continuing pressure from individuals such as Mr. Handorf who argued navigable waters could be threatened, FWPCA agreed to provide the funding for the investigation (Tr. 5209) and work began by drilling of test wells in June and October of 1966. (Tr. 5225, 5226). At no time did Velsicol pay for any part of this study.

154. The 1967 report was intended by the USGS to be the first of several reports and intended to look only at what had happened, not what might happen (Tr. 5315–16). In other words, the 1967 Report was written on the premise that there would be no further dumping and the area would not be enlarged. (Tr. 5316).

## J. The 1967 Report of the United States Geological Survey (Ex. 2) and Velsicol's Defiance

155. The survey, undertaken from 1966 to 1967, found that contamination of surface waters and of the shallowest groundwaters—the perched water zone—had already taken place and that this contamination "was recognized all the way to the watertable" aquifer, (Tr. 5227) 90 feet down. The survey also pointed out that the contamination was likely to persist, in view of the permeability of the soil under the disposal trenches.

156. The 1967 report included in a paragraph entitled "Potential Contamination of Groundwater Supplies" the following language:

"Having established the existence of a subsurface zone of contamination from the disposal pits, it is imperative that the potential contamination hazard to local and contiguous ground waters be thoroughly evaluated. In view of the severity of the risks involved, it must be assumed that any ground water originating in or passing through the contaminated zone is susceptible to contamination and therefore becomes a serious threat to any water supplies down gradient from the disposal area. Thus far, evidence has been presented to indicate that ground water in both the perched water zone and the watertable acquifer is susceptible to contamination from the disposal pits.

\* \* \* \* \* \*

"Hence, the most immediate, and for all practical purposes, the sole threat to ground water supplies is the entrainment of contaminants in the flow systems of the perched water zone and the water-table acquifer."

157. The Sterlings and several other homeowners, who lived only about a quarter of a mile west of the dump, had wells sunk into the local water table. It was

**374**

from this acquifer that the people in the area got their water supply (Tr. 423).

158. It is also true that the USGS concluded that there was "no possibility" that these wells could be contaminated, as the prevailing movement of local groundwaters was believed to be easterly. These conclusions were in fact erroneous. Moreover, expert testimony at trial proved that had the factual data been properly and professionally analyzed, they would have shown that the water flowed in a northwesterly direction. The USGS also concluded that there was no chance that the contamination could reach 200 feet down to the deep water-table artesian aquifer. However, Velsicol did nothing in response to the USGS observation that it was "imperative that the potential contamination hazard to local and contiguous ground waters be thoroughly evaluated." (Ex. 2, p. 19) This thorough evaluation was not the purpose of the 1967 Report.

159. The USGS had difficulty in identifying all of the organic materials found in the core samples taken in its investigation. All that was described later was that these were "chlorinated hydrocarbons" (Tr. 5227) and that the USGS could not specifically identify the materials that were eluding them in the attempts to identify them. (Tr. 5228).

160. After the 1967 report was completed, it was sent to FWPCA, the funding agency (Tr. 5232) and not made public or given to plaintiffs. However, there was a "post-mortem" (Tr. 5300), prior to the completion of the final report where the original participants including Velsicol "all got back together and went over this study together" (Tr. 5233; 5300–01). Thus, Velsicol was informed in August 1967 or earlier "that the local aquifer was about to be adulterated" (Defendant's Briefs renewing Motions for Directed Verdicts as to Plaintiffs' Wilbanks and Ivy, p. 8 and p. 7 respectively). At no time did Velsicol ever inform plaintiffs of this fact nor did Velsicol ever determine who was drinking water from that aquifer.

161. At this "post-mortem," Mr. Rima and others involved with the 1967 report repeated some of the reservations and assumptions made in the 1967 report:

a. For example, the limited amounts of water that could be drawn from the two existing wells (the Sterling and King Wells) were discussed (Tr. 5230; 5231).

b. The need for maintenance of the groundcover and trees were discussed; and

c. The use or nonuse of what later became the south site on the farm was discussed.

162. Velsicol claims to have relied very heavily upon the 1967 report (Tr. 421). In fact, Velsicol took the position that the report "should be a license for continued use of our Hardeman County disposal area" (Ex. 165).

163. Almost every professional water geologist or health official who read the 1967 Report found it alarming and none found it to be a report upon which a reasonable person would rely to continue or to expand the dumping at the farm. Velsicol did. These included Mr. Handorf, Mr. Jones, Mr. Burnett and Mr. Morrison. And Mr. Rima, the man responsible for the 1967 USGS report, testified:

" ... I personally had an impression that the dump should be closed...." (Tr. 5327).

164. Instead, Velsicol expanded its dumping operations (Tr. 404) from twenty to forty-five acres. No study was done to investigate whether such expansion was safe. Trucks carrying waste to the site continued to spill pesticides on the roads almost daily. The dump's oozing trenches allowed chemical fumes to drift over into the surrounding residential areas. "A lot of times you could hardly stay outside at night because when the wind was in the right direction it was a very noticeable odor," one local resident remarked.

165. Velsicol admitted in this trial that during the period of 1967 to 1973, it more

than doubled the size of the disposal site at the farm. (Comp't para 8; Answer para 8)

166. Velsicol also admitted that between 1964 through 1973, it cleared the farm of trees, and the surface soil texture was disturbed by excavation and backfilling of numerous trenches. Further, Velsicol has admitted that the site cleaning and trenching have brought about both a decrease in the rate of transportation from the site and an increase in the rate of infiltration of precipitation through the disturbed soil. In addition, Velsicol admitted that depressions formed over the disposal trenches due to the compaction and soil subsidence around the drums and that these depressions tended to increase infiltration either by allowing ponding of rain water on the surface or by providing ready access to the subsurface by water flow through tension cracks. Velsicol admitted that these factors contributed to the contamination of the water and land that exists today (Comp't para 8, Answer para 8).

### K. The Ultimate Charade—the Argument that Velsicol was developing an Alternative Means of Disposal

167. In 1970, Mr. Anthony wrote (Ex. 21) that:

It is our intent to make plans for the eventual disposal of all our wastes at the plant location. This would fit into our overall air and stream pollution program but, of course, will take a number of years to develop methods." (Tr. 428)

168. Dr. Marks was asked and he testified concerning that memo:

Q. Now, this is 1970. You have been dumping for six years at this point, correct?

A. Approximately six years, yes.

Q. And at this point in time had you started on a plan to dispose of this waste at the plant here in Memphis?

A. It says here that that's so, and I don't recall when the overall plans to do this were developed, but there were such plans that came into existence.

Q. And you had a part in those plans, didn't you?

A. From the technical standpoint, yes.

Q. And from the economic standpoint?

A. No.

Q. You did not?

A. Only so far as making economic estimates of the probable costs of various alternatives. The use of the economic information was not within my province.

Q. But you made an economic estimate on what it would cost to do this at the plant?

A. I may have. At different times I have done such.

Q. And how much was that?

A. Oh, I have no idea about this. Going back and seeing what was involved in this particular plan, I wouldn't have any idea particularly.

Q. Well, wasn't the determination made by you that this waste all could have been disposed of at the plant site for a cost of $500,000? Did you make that economic determination?

A. I may have made an estimate of that sort at some time.

Q. Would it be fair to say that one of the reasons you were taking this waste out to the dump was because of economic reasons as opposed to disposing of it at the plant?

A. Well, basically, one tries to dispose of one's waste in a safe manner as economically as possible. One doesn't just go out and spend extra money to dispose of waste.

Q. So economic factors did play a part?

A. They do enter into the situation. They are not the controlling factor or factors always. (Tr. 429–30)

169. During the 1970 and 1971, Dr. Marks was in charge of developing alternatives to the farm as a means of disposal (Ex. 23; Ex. 24; Ex. 27). In fact, Mr. Anthony told his superiors in Chicago on July 20, 1970 that:

"In my opinion within five years we will be prohibited from disposing of industrial wastes at the farm. Dr. Marks is planning a program and estimating costs for

handling all wastes at the plant site. It will most likely require six to eight months to develop the program." (Ex. 23)

170. On October 20, 1970, Dr. Marks informed Mr. Anthony in a status report:

3. *Solid Waste Disposal*—To prepare for the eventuality that landfill disposal of toxic materials may be stopped or drastically curtailed within the next 4–5 years, there have been projected expenditures to increase liquid waste incineration capacity in 1972 and provide facilities for solid waste disposal in 1974. This is intended to provide for complete "in-plant" disposal of toxic wastes. It has already been suggested by state Stream Pollution Control Board personnel that we being to consider phasing out our present wasted disposal activities at the farm in the next few years. (Ex. 24)

171. In a January 5, 1971 memo to Mr. Anthony, Dr. Marks informed him of his research, *viz:*

1. We are presently investigating the feasibility and cost of increasing the capacity of our existing liquid waste incinerator from the existing 9.3 million BTU/HR rate to the burner design capacity of 12 million BTU/HR. This will allow more waste to be burned and reduce cost and volume of waste to the farm. An item was submitted for the 1971 capital budget in the amount of $20,000 to cover the necessary modifications. The item was also included in the Pollution Control Forecast—1971–1974 dated 7/7/70.

2. Complete elimination of the disposal farm will require facilities for incineration of both solid and liquid wastes on plant property. Looking toward the eventual elimination of the farm we included in the Pollution Control Forecast —1971–1974 an item of $250,000 to provide a new burner to handle all liquid wastes (1972) and another $250,000 in 1974 to provide a facility for solid wastes. Present thinking envisages a solid waste incinerator whose off gases enter a liquid waste incinerator venting through a water scrubber as at present. Fiber drums and other combustible solid wastes can be handled in an ordinary approved type of open fire incinerator. Heptachlor catalyst will require a furnace type operation.

3. Based on the above rough estimate, we believe the following costs would be necessary to abandon the farm:

| | | |
|---|---|---|
| Capital cost | | $500,000 |
| Operating Cost/YR— | Labor $8,000/Yr | |
| | Utilities 16,000 | |
| | Sewer Fee 20,000 | 44,000 |

(Ex. 27)

172. As is pointed out below, two months later, at the March 7, 1971 meeting with local, state and federal authorities, Velsicol represented that it had not looked into alternative means of disposal of the liquid chemical wastes then being dumped on the farm.

## L. The March 4, 1971 Meeting

173. While Velsicol's dumping continued to concern Tennessee officials, they had no authority to stop it at that time. However, the Tennessee Solid Wastes Management Act was enacted in 1969. For all new sites, state regulations were to go into effect on January 15, 1971. Because of an amendment, regulations for existing sites went into effect on July 1, 1972 although they were originally scheduled to go into effect on July 1, 1971. (Tr. 926). The enactment of this law, however, gave the state officials more interest in the dump and Velsicol's premises as 1972 approached.

174. In 1970, the public concern for the safety of the dump was again heard. The United States Congressman in whose district the farm existed, requested the USGS to again look at the farm and its potential hazards to the local water tables and streams (Ex. 20). This request was known to Velsicol in May 1970 (Ex. 21). Again Velsicol did nothing to check on the validity of such charges concerning the hazards to plaintiffs' underground water supply even though the changes had been made and no

monitoring wells of Velsicol were drilled (Tr. 426–27).

175. In December 1970, Velsicol was informed by Mr. Wilton Burnett, Jr. of the Tennessee Stream Pollution Control Board that the State did not believe that "the state people are technically knowledgeable enough to make a decision on the hazard of ground water contamination, rate of pesticide degradation, etc." (Ex. 25; Tr. 444; Tr. 458) This was interpreted by Velsicol to mean that Mr. Burnett did not believe the state had the technical ability to determine all the groundwater hydrology (Tr. 458). Mr. Jones, Mr. Burnett's superior, also agreed as to the lack of sufficient technical individuals (Tr. 692).

176. This lack of expertise was confirmed by Mr. Morrison (Tr. 935–36; 945–46) except that the state geologists told everybody to watch the water tables in West Tennessee, "they were near the surface about everywhere" (Tr. 936).

177. Because of these concerns, the State decided to ask for a meeting on March 4, 1971 between the same interested parties that had been participants in the 1966 study to see if the results of the 1967 report were still valid. This request was also motivated by the concern about the potential for contamination of the deep artesian aquifer that services Memphis (Tr. 1403). Representatives of the Tennessee Department of Public Health, the USGS and Velsicol were invited and attended (Tr. 1398–99). Neither the press nor the general public was informed or attended. (See Ex. 57 for a list of attendees).

178. This meeting was a manifestation of a continuing concern on the part of the Tennessee Department of Public Health about the safety of the Velsicol dump. (Tr. 1395; 5234). The person who had the most responsibility for calling the meeting was Wilton Burnett and his superior S. Leary Jones, both of whom wanted to discuss the extent of the site and what was going on (Tr. 690; 1397; 5234). As Mr. Jones testified:

"And what was the purpose of this meeting here in Jackson, according to this letter?

A. It was to discuss the Velsicol dump in Hardeman County.

Q. All right, sir. Were there certain questions to be raised at that meeting?

A. We were receiving numerous letters, complaints, calls, how many I do not have any idea, but enough to be significant, and we decided to get everybody involved, federal, anyone else that had any information, and try to make some sense out of the fragmented technical information we were getting. (Tr. 690)

179. The USGS was again asked to provide the factual information developed in 1967 and explain what changes had taken place since 1967 (Tr. 1399; 5234).

180. Mr. Donald Rima revisited the site in preparation for the 1971 meeting and the changes were "quite a shock" to him (Ex. 57, p. 7; Tr. 484, Tr. 5239). He testified that:

a. There were many more homes there now, this increasing the draw upon the aquifer (Tr. 5234, 5239);

b. Mr. Rima learned for the first time that some of the buried substances were liquids heavier than water (Tr. 5240);

c. The farm site had been enlarged for burial purposes (5260);

d. A barroom or tavern had opened across the Toone-Teague Road from the entering gate of the farm (Tr. 5260–61);

e. Goats were pasturing on the resurfaced area of the dump (Tr. 5260–61);

f. The forest area was no longer there (Tr. 5298);

g. Trenches were open and collecting water (Tr. 5299); and

h. The burial of the waste was beginning to occur within the 900 foot zone of the south boundary (Tr. 5317).

181. The meeting with the State and the USGS took place on March 4, 1971. A transcript of the meeting was taken and was admitted as Exhibit 57. Mr. S. Leary Jones chaired the meeting.

182. During the meeting, Dr. Marks was asked and answered:

"*Mr. Burnett:* I'd like to ask you, Mr. Marks, if Velsicol has been carrying out research on means of disposal other than burying?

*Mr. Marks:* No, we have not up to now had any active project on this.

*Mr. Burnett:* Do you, at this time, incinerate a portion of these wastes.

*Mr. Marks:* Yes, there are liquid wastes that we incinerate, strictly liquid materials that we feed into the incinerator. The problem with solid waste, of course, is how do you get them into the incinerator.

*Mr. Burnett:* Could these solids be incinerated? Is it more a problem of economics or is it a problem of the technology?

*Mr. Marks:* Well, there is a problem of technology but there's an economic problem too, because I don't know of any such type of disposal that is presently active. That would be something of a research project." (Ex. 57, p. 17).

183. At the time of trial, Dr. Marks admitted that this is what he said at the meeting (Tr. 503).

184. The Court finds that when Dr. Marks made his statements at the March 4, 1971 meeting, they were not accurate. Dr. Marks and Velsicol had begun their research into alternative means as early as the summer of 1970 and Dr. Marks had informed Mr. Anthony of this by January 15, 1971 (Ex. 27). The Court finds that this was but another attempt by Velsicol to keep from the authorities the nature of Velsicol's activities. In this case, Velsicol did not want the authorities to know that alternative means of disposal *were* available until the capacity at the farm to accept the wastes was expended.

185. If the evasion is not clear, it soon was. Mr. Burnett asked Dr. Marks:

"*Mr. Burnett:* Let me ask you, this in connection to that. What plans, if any, does the company have concerning the future production of chlorinated hydrocarbons and the future use of the dump—if you either run out of room or if you are made to or asked to cease use of the dump? I think you stated that you expected another four or five years out of the dump.

*Mr. Marks:* I would like to find some way to handle solid wastes in another manner. Any such method is going to have to be worked out—how long it would take, I don't know.

*Mr. Burnett:* So at present, there are no plans for another disposal system should your production continue and you run out of—

*Mr. Marks:* Well, obviously, if we run out of capacity of the present dump, we would have to have some means of disposal in order to continue to produce the materials. This I think is obvious, but just what form that would take right now, I couldn't say" (Ex. 57, p. 21).

186. One of the decisions that Mr. Rima believed occurred as the result of this March 4, 1971 meeting was that there would be no further burial in the southern site and that Velsicol consented to this (Tr. 5321). Mr. Rima was wrong and the State employees knew better as evidenced by their actions within the next two months. As Mr. Burnett testified, he had concerns about the continued disposal of toxic wastes in the south site after the March 4, 1971 meeting ended. (Tr. 1410).

187. At no time was there anyone in the employ of Velsicol who was familiar with water hydrology, leaching or chemical dumping (Tr. 495). This is also evidenced by Mr. Anthony's memorandum dated March 5, 1971 denoting the 1971 meeting and Mr. Rima's presentation "that there was at the moment no problem with contamination of the environment by Velsicol's practices" (Ex. 75). In fact, many individuals including Mr. Rima, expressed such concern (Ex. 57).

**M. The Spurning by Velsicol of Suggestions to hire a Water Consultant, The 1972 Order to Stop Dumping and Velsicol's Flagrant Violation of That Order**

188. Because of continued concerns by employees of the State of Tennessee about

the dumping at the southern site on the farm, they investigated the farm site. After investigation, it became apparent that Velsicol was continuing to dump, even after the March 4, 1971 meeting. Thus, two meetings were called.

189. On June 9, 1971, Velsicol met at the farm with Mr. Burnett, Mr. Morrison and George Wallace. (Ex. 28) The State's main concern at that time was the burial of waste on the southern site.

190. Mr. Morrison testified that he visited the farm dump twice in 1971, once on June 9 and once in July. He testified that: "On both occasions there was material in the trench that had not been covered. The drums in many cases were bent out of shape from having been dumped into the trench. Some of them had ruptured. There were also some that seemed to be leaking. There were also some materials that appeared to be filter media or clay-type material that was dumped in the trench without being contained, and there was usually some liquid in the trench (Tr. 930)."

191. Mr. Morrison, in response to the following questions, testified:

Q. Do those photographs, Exhibits 65 through 69, state whether or not they accurately portray the condition of the ditches or trenches and the drums or barrels as you described them earlier in your testimony upon your visitation to the site?

A. Yes, sir. I believe they do except in most cases there was more trench that had not been filled than this.

192. Moreover, Mr. Morrison expressed what he told Velsicol in 1971:

" ... we were concerned at this point, not only because the ground water was shallow at the site, but also that there were three different water tables involved under the site. There was a perch table. There was a local aquifer, and then there was the artesian aquifer, the very deepest one, at that area. We had gained this information from a study that USGS had done on the northern portion of the site, and they had detailed the water tables present there, and

they had detailed the water tables present there, and we had that information available to us, and this gave us an immediate concern about the water. We also knew for a fact that there was contamination in Pugh Creek from this site.

Q. You indicated that—well, let me ask you this: Did you personally look at the 1967 USGS study that Mr. Don Rima from the USGS did?

A. Yes, sir.

Q. And I take it from your earlier testimony that after viewing that study that you personally remained concerned about contamination of the local water aquifer?

A. That's correct. In fact, during the visits—during all the visits that I made to the site, I had recommended that further study be done on the site as far as soils, as far as geology and water were concerned; that the company would be well advised not to put anything there until they had answers to these problems and while I pointed out that I had no authority to stop them at that time, I did point out that we were very concerned about it, and that there was a potential for environmental damage there, and asked them to consider discontinuing putting anything there, or in lieu of that, at least to come up with a means of immobilizing the material, such as putting it in concrete or placing it in plastic drums, or something of this nature. (Tr. 936–37)

193. By registered letter dated June 28, 1971, the Commissioner of Public Health of the State of Tennessee noted that the March 4, 1971 meeting had reached a consensus that no one could assume burying the wastes on the southern site was safe and yet Velsicol had continued dumping. The Commissioner formally concluded that burying on this southern site "represents a potentially serious health hazard." He formally requested of Velsicol that burial on the southern site be stopped immediately and not resumed until the wastes could be buried in adequate containers or in a stabilized controllable state (Ex. 30).

194. On June 30, 1971, Dr. Marks for Velsicol responded to the Commissioner's

letter. He informed the State that Velsicol had ceased burial operations on the southern site of the farm (Ex. 31). In fact, Velsicol did not stop.

195. By letter dated July 6, 1971, Mr. Bobby Morrison of the State informed Velsicol that in order to permit further dumping at the southern site, the safety of such further dumping at the southern site would have to be evaluated and four specific areas for data development were identified. Thus, certain data would be necessary (Ex. 74 and 116; Tr. 538). Mr. Morrison concluded that:

"It is our [the State's] recommendation that a consultant firm be employed to make this study [of the southern site] and consideration should be given to modification of your incinerator to handle this residue as well as the liquid wastes" (Ex. 74, p. 2)

196. In fact, no water consulting firm was ever employed by Velsicol until after the threat of this lawsuit in 1978. (Tr. 539).

197. On July 7, 1971, Mr. Pounders estimated for Dr. Marks that there was space at the farm for only about 18 to 20 more months of dumping (Ex. 34; Tr. 541–42).

198. On July 12, 1971, Velsicol again met with Mr. Morrison and Mr. Burnett at the farm in an attempt to persuade the State to permit continued dumping on the south site, at least for "non-toxic type wastes" (Ex. 29). Mr. Anthony, Mr. Pounders and Dr. Marks were present for Velsicol. The stated objective by Velsicol was "... to be cooperative, but make no commitment whatever" (Ex. 29).

199. Although Velsicol had told the State of Tennessee that it would no longer bury waste on the southern site on June 30, 1971, (Ex. 31), it became clear at the July 12, 1971 meeting at the farm that Velsicol had in effect "kept on trucking." Mr. Morrison testified:

Q. Now, did the Velsicol Chemical Corporation comply with your request and discontinue dumping in the southern and central ridges?

A. No sir. The last visit I made, July 17 of—I want to be sure of the date—July 12, '71, I met Mr. Anthony out there, and at that time the dumping had still continued and again I told him that we thought he should discontinue it.

*He said it would take two years to come up with an alternative, and I discussed the possibility of incineration of this material with him and he said, well, we incinerate our liquids now. And it later turned out that he wasn't referring to an incinerator, but they were injecting them into a boiler that they were using in the plant and burning them in that manner, which was acceptable at the time.*

He said, we can't inject these solids there, though. We have some material that we can't put in there, and we need two years to continue to fill here before we can get the incinerator to burn these.

Q. How many such occasions did you have conversations with Mr. Anthony and/or Dr. Marks about them discontinuing dumping?

A. Probably every time I talked to them. I know on both visits we discussed discontinuing the dumping there, and the last time they were making a proposal that if they couldn't put everything in the southern site they wanted to be allowed to put what they classified as nontoxic materials there. (Emphasis supplied).

200. In July, 1971, Dr. Marks wrote a memorandum to Velsicol Chicago employees setting forth six options for Velsicol concerning the dump (Ex. 35). One option was to "[e]ngage a ground water consultant to design and supervise a program of test wells to determine the ground water characteristics under the remaining central and southern ridges and evaluate the potential for groundwater pollution in the expectation the data will be favorable" (Ex. 35). Velsicol did not implement this suggestion until after the threat of this lawsuit, some seven years later.

201. The other five options were as follows:

2. Use whatever remaining area might be available in the safe northern portion (road, etc.). This will be risky since any previously buried material brought to the surface will certainly increase surface runoff contamination. Such an approach would be stopgap at best.

3. Purchase and install at the Memphis Plant an incinerator large enough to handle all pumpable wastes beyond the capacity of the existing waste incinerator. This would take care of most of the present farm wastes except for heptachlor catalysts.

4. In conjunction with item 3 provide additional equipment as necessary to reduce the volume of wastes involved.

5. Package all wastes in steel jacketed plastic drums and place them in the trench in a manner so as not to rupture the drum and release the contents. This should meet the state requirement for an adequate container to prevent release of toxic materials to the soil but would probably triple cost for disposal.

6. Purchase additional land of suitable character. It is doubtful if the state will consider a permit for another such installation and a ground water survey would certainly be required.

In any event if all presently available land were to become useable through state action or otherwise we have at most four years and probably only two years to develop alternate methods of handling toxic wastes at the Memphis Plant.

202. None of these options were ever adopted. This Exhibit however is important not only because it evidences Velsicol's refusal to hire a water expert but Velsicol's refusal to develop alternative methods of disposal which it later showed it could have done within six months.

203. On December 15, 1971, Mr. Anthony formally requested permission of Commissioner Fowinkle to dispose of certain wastes on the southern site of the farm (Ex. 118). That letter asked the State to:

"Allow us to dispose of PCL bottoms in this south ridge. This is one of the materials that is hauled to the farm for burial. We average approximately 10 to 15 drums of this material per day which must be disposed of.... We consider this material to be innocuous and harmless and, therefore, no problem as far as run-off is concerned" (Ex. 115).

204. Because it was not until the service of Velsicol's answer to Interrogatory 2 on June 4, 1982 that Velsicol even identified carbon tetrachloride and chloroform as components of PCL waste—in addition to being over 60% of the heptachlor waste, there was no way to determine whether the PCL wastes were "innocuous and harmless" (Ex. 118). But the State's instincts were sound. On January 25, 1972, Tennessee Commissioner Fowinkle denied Velsicol's request to bury certain wastes on the south site of the farm. He referred to the July 6, 1971, letter setting forth what would be required to make such a determination and noted that those data hadn't been developed. (Ex. 41).

205. After Commissioner Fowinkle turned down Velsicol's request to dump on the southern site, Mr. Anthony wrote Velsicol in Chicago on January 31, 1972 and accused the Commissioner's assistant in charge, Mr. Burnett of being "a professed member of the Sierra Club [who] would take great delight in going so far as to shut down our plant operations." (Ex. 42).

206. Mr. Anthony concluded:

"The only other practical method to dispose of Heptachlor catalyst would be by incineration. I would estimate that facilities to incinerate catalyst would require 12 to 18 months before such a unit could be designed, built and put into operation (Ex. 42, p. 3)

Mr. Anthony also concluded that:

In some manner, we should delay closing of the Hardeman dump by state officers until we have had time to install equipment which has already been contemplated as being needed" (Ex. 42, p. 3).

207. Because, the Tennessee Department of Public Health had tried without success to persuade Velsicol to stop the

dumping at all sites, the State was forced to file in February, 1972, a formal complaint against Velsicol.

208. Pertinent parts of that complaint (Ex. 10) are quoted here:

1. Velsicol Chemical Corporation, Memphis, Shelby County, Tennessee, owns and has possession of approximately 242 acres of land located in Hardeman County, Tennessee.

\* \* \* \* \* \*

Velsicol Chemical Corporation uses said property as a burial ground for residues, by-products and solid waste materials from the production of chlorinated hydrocarbon pesticides at its plant in Memphis, Shelby County, Tennessee.

2. Velsicol Chemical Corporation has been using the property described in paragraph 1, as a dump for approximately seven (7) years. The Company transports by truck the aforementioned substances, contained in 55 gallon drums, from Memphis, Tennessee, to said property in Hardeman County, and deposits them in trenches 15 feet deep, 12 to 15 feet wide and covered with approximately 3 feet of soil. There is in the ground now, approximately one quarter million, 55 gallon drums of residues. In many instances, the drums burst upon impact with the ground, spilling their contents into the soil. No care is taken to insure against bursting drums and the trenches are not lined with any impermeable material to prevent the chlorinated hydrocarbon compounds from leaching into the soil.

3. The aforementioned substances being buried at the Hardeman County dump site contain significant percentages of chlorinated hydrocarbons. The dangers presented by these compounds are directly related to their high toxicity, and persistent toxicity over long periods time. Among the compounds found at the dump are endrin, dieldrin, aldrin, heptachlor, isodrin, hexachlorocyclopentadiene, and hexachlorobicycloheptadiene. The characteristics of these compounds which create a danger to both man and the environment include extreme toxicity over long periods of time, indicating very slow degradation; near insolubility in water with the tendency to cling or adhere to particulate matter; and the ability to accumulate in the fatty tissues of most animals and to be absorbed by vegetable crops from contaminated soil, thereby, entering man's food chain.

4. In 1966 and 1967, the United States Geological Service (U.S.G.S.) conducted an indepth survey of a portion of the area used by Velsicol as a dump. The northern section of the property was first used by Velsicol and contains almost all the wastes. This northern area comprised most of the survey as shown in Figure 1, attached to this complaint. Figure 4, attached to this complaint, sets forth the position of the wastes in relation to ground water. See also Figure 5, attached hereto. The perched water zone increases and decreases seasonally with rainfall, and discharges to draws and ravines on the sides of ridges. The local or water table aquifer is used by local residents along the road to the west of the dump, and flows northeast, discharging to Pugh Creek and its tributary of the north end of the dump. Below the local aquifer is an artesian aquifer which slopes and flows westward. This aquifer is used as water supply by many West Tennessee cities, including Memphis.

5. The findings of the U.S.G.S. survey are best understood by referring to Figures 2, 3, and 4 attached hereto. U.S.G.S. found that surface and ground contamination had already taken place; and that contamination of the perched zone had taken place, and had almost reached the local aquifer. U.S.G.S. concluded: "The contaminates that are entrained in the flow systems of the perched water zone and the water table aquifer will move laterally

toward the discharging boundaries of those groundwater bodies."

6. With the extension of the burying operations to the middle and southern portions of the property, two major hazards have developed. The first is that the underground conditions and groundwater movement directions are not known in these areas. Contaminated groundwater could move westward and contact water supplies. The second danger is presented by the proximity of the southern boundary of the dump to the headwaters of a stream which flows southwest through the town of Toone, Tennessee. See Figure 5. This factor is significant because this stream probably serves as a recharge for the groundwater supply used by Toone. Therefore, expanded burying activities means: (1) an increase in the amount of potential contaminants: (2) increased hazard for local water supplies near the dump; and (3) a possible hazard to the water supply of Toone, Tennessee.

7. Finally, the immediate dangers of these chlorinated hydrocarbon compounds, as set forth in paragraph three (3), when buried, are directly related to two characteristics: (1) persistence of high toxicity; and (2) insolubility in water. It is common scientific knowledge that chlorinated hydrocarbons remain toxic for long periods of time. This is the quality that makes them desirable as insecticides. The time needed for complete degradation of the compounds buried in Hardeman County by Velsicol is unknown, even by the Company; but it is known that the extremely slow degradation afforded by the surface and aquatic environment is not available to buried wastes, and the breakdown of some chlorinated hydrocarbons creates by-products that are as toxic, if not more toxic, than the original compound. The movement of these compounds into the surface environment would not mean their disappearance. In addition, the compound's insolubility and clinging characteristic

can only mean that water can be, and is, a medium by which contaminated particulate matter is moved. There is every reason to believe that the continuous action of water moving through the contaminated subsurface zones of Velsicol's dump in Hardeman County would slowly move the contaminates along its path.

8. The existence of a pesticide dump in an area using groundwater supplies, and located close to the headwaters of the Hatchie River, Hardeman County, presents grave risks to water quality. The conclusion reached by U.S.G.S. after its 1966–67 study is:

"In view of the severity of the risks involved, it *must* be assumed that any groundwater originating in or passing through the contaminated zone is susceptible to contamination and therefore becomes a serious threat to any water supplies downgradient from the disposal area."

For the reasons stated in the foregoing seven (7) paragraphs, and with the knowledge that the aforementioned contaminants are buried and are being buried in such close proximity with subsurface waters that they will likely cause pollution of such waters, and further, with the knowledge that if such pollution occurs, the harm done to said waters will be irrepairable and irretractable, it is concluded that the burying of chlorinated hydrocarbon compounds and any other contaminated substances on the property described in paragraph one (1) is a violation of T.C.A. Section 70–336 of Chapter 164 of the Public Acts of 1971.

9. In addition to the foregoing data, the Department of Public Health, Division of Water Quality Control has been made aware of feasible, alternate methods of disposal of chlorinated hydrocarbon compounds. The Division has had communications with the Canadian Defense Research Establishment, Sussifville-Ralston, Alberta, Canada, and Dow Chemical Corpora-

tion, Midland, Michigan, both of which presently incinerate solid and liquid pesticide and insecticide residues. In addition, the Division is aware that Dr. Fred Schuman, Professor, Mississippi State University, Starkville, Mississippi, is conducting a study on incineration of pesticides with the aid of a USDA grant. Dr. Schuman has already published some reports, copies of which are filed in the Division of Water Quality Control, and with Dr. Warren C. Shaw, Associate Director, Plant Industries Station, United States Department of Agriculture, Beltsville, Maryland. Communications with these parties, and the Michigan Water Quality Control Division, reveals that incineration does break down chlorinated hydrocarbons to acceptable elements. (Ex. 10, pp. 1–6).

209. Velsicol was ordered therefore to cease by August 21, 1972 *all* dumping at the farm with the sole exception of "non-toxic and/or non-contaminate" wastes and then only with a written request to and written approval by the Health Commissioner.

210. The Tennessee Commissioner of Public Health, Mr. Fowinkle, stated:

"... I personally issued an order to Velsicol the moment we got authority under the law to stop this." (Tr. 9134).

211. And Mr. Bobby W. Morrison of the Department of Health testified:

"[the State] didn't have authority under groundwater portion of that act until 1972 when that order was issued. It's my understanding that the order was issued as soon as they got that authority." (Tr. 973).

212. In settlement of the proceeding, the State and Velsicol agreed that the order should be amended. While the ban on dumping effective August 21, 1972 was reaffirmed and agreed to by Velsicol, the total ban for PCL and J–11 bottoms in the middle site and non-toxic and/or non-contaminate material at any site was extended from August 1972 to June 1, 1973. Moreover, the order was amended to provide

that *all* heptachlor catalyst waste materials was to be stored at the Memphis plant.

213. This stipulated and amended order was soon violated by Velsicol. By the end of 1972, the incinerator at the plant was inoperable (Tr. 1184; 3619). Thus, according to Mr. Lutkewitte, the new plant manager and successor to Mr. Anthony (Tr. 613) as of December 31, 1972, all the chemical wastes from the plant had to be dumped at the farm and this continued for the first five months of 1973, thus confirming Mr. Morrison's observations in 1971. The dumping was done even though Mr. Lutkewitte was aware of the order closing the dump to certain waste, including heptachlor catalyst waste, and that the order would therefore be violated. (Tr. 1184–85). Mr. Lutkewitte testified:

"Q. At the time in 1972 where were the wastes being taken and disposed of?

A. They were taken to the farm area in Hardeman County.

Q. Was this all of the wastes from the plant?

A. All of the chemical wastes, yes.

Q. And this continued until when?

A. This continued for the first five months of the year, through the end of May.

Q. All right, sir. Were you aware of an order closing the dump?

A. Yes, sir, I was.

Q. Did you request an extension of that order?

A. No, sir, I did not.

Q. You stated earlier that you were also responsible for the upkeep of the Hardeman County dump, is that correct?

A. Yes, sir.

Q. What was the condition of the dumpsite when you arrived in late '72?

A. I guess the first time that I visited the dump was early in that first quarter of '73. At that time the only area open for dumping was the—excuse me. What do you refer to the bottom area there, the southern area?

Q. The southern site?

A. Yes. (Tr. 1184–85)

214. He pointed out that at that time, no records were kept:

Q. Were there ever any records kept during your tenure as to what was being taken to the dump site?

A. I would have to say that record keeping in the Memphis plant in general was in a state of disarray. In answer specifically to the question, no, there were no records kept as to what went to the dump site.

Q. Did you change the record keeping when you came on board?

A. As far as the operational records for the operation of the plant, absolutely.

Q. What about what was being taken to the dump?

A. I don't know that we had an accounting of what remained on site or what went to the dump. There were a whole host of concerns when I arrived on site. There were manufacturing problems, personnel problems, et cetera, et cetera. I would say that this was given normal priority and in all likelihood the record keeping for the first three to six months was just as bad as it ever was. (Tr. 1189)

215. Finally, Mr. Lutkewitte reiterated:

Q. To your knowledge was everything in the plant that was considered chemical waste between the time you joined the plant in December '72 until it was closed in June '73, was it taken to Hardeman County?

A. Yes, sir, it was. (Tr. 1190–91)

216. Mr. Lutkewitte believed all of the chemical wastes were buried at the southern site on the farm in 1973 (Tr. 1185; 1190–91) because that was the site that was being used when Mr. Lutkewitte became plant manager. (Tr. 1185). Velsicol introduced testimony of Mr. Pounders however to show that Mr. Lutkewitte was mistaken, viz:

"Mr. Lutkewitte is in error, because we did not bury anything in there on the south area after—I believe it was in '71.

The State stopped the burying on the south side" (Tr. 3577).

217. As pointed out in the context of Mr. Pounders testimony concerning the USGS in 1964, the Court is inclined to give his testimony little, if any, weight. However, here such a finding need not be made for Mr. Pounders testimony actually corroborates the testimony of Mr. Lutkewitte that all the chemical waste was dumped on the farm (including heptachlor) from August 1972 to June 1, 1973. This dumping violated the State order, regardless of the specific site or location on the farm. Mr. Pounders admitted that dumping of "hazardous chemicals" took place on the farm after August 1972:

Q. —which you don't doubt that it was?

A. No, I don't doubt it.

Q. You don't dispute that?

A. Huh-uh.

Q. Then the only place to put the chemicals was in this Hardeman County dump-site?

A. That's correct, up until in June '73 it was stopped. (Tr. 3618–20)

\* \* \*

Q. *So whatever chemicals, all of the chemicals, as Mr. Lutkewitte said, were being taken to the Hardeman County farm, except you say he's wrong about where they were dumped?*

A. *That's right.* (Tr. 3621) (Emphasis supplied)

218. When the dump was closed in June 1973, Mr. Lutkewitte, the new plant manager, had mixed feelings. On the one hand, it created pressure upon him, and through him Velsicol, to keep the incinerator going. However, Mr. Lutkewitte believed that it was the right thing to do because he didn't believe that any dump should be used if it caused other persons problems (Tr. 1188–89).

219. The Hardeman County farm site was officially closed and given a superficial cleanup, alleged by Velsicol to involve "substantial costs." Velsicol spread fresh

dirt over the trenches and seeded the whole site with grass.

## N. The Failure to Keep Up the Farm and the New USGS Survey (1978 Report)

220. In 1974 or 1975, Mr. Morrison was contacted by one of the State environmental engineers who had visited the farm and was concerned by its condition (Tr. 954–55). The engineer told Mr. Morrison that the areas that had been filled in had caved in, that there were places that were holding water and that a lot of drums had washed out of the gravel (Tr. 955).

221. Because of this report, Mr. Morrison and Mr. Burnett met with Mr. Hanson, then plant manager, and Mr. Pounders in May 1975. That meeting was memorialized by letter to Mr. Hanson (Ex. 120) from both Mr. Burnett and Mr. Morrison. In that letter, both Mr. Morrison and Mr. Burnett noted that the water in the depression:

" . . . could result in leachate breaking out of the filled area and contaminating the surface waters of the area or the groundwaters of the area." (Ex. 120, p. 1).

222. Mr. Morrison had not been on this farm prior to 1975 except prior to the dump closure in 1973. He stated that where he came to trenches where the cover had sunken in, "there would be a faint chemical odor still there." (Tr. 962). Mr. Morrison also stated in reference to a question:

Q. Do you, sir, consider the Hardeman County—did you during the 1970's, and do you now consider the Hardeman County Chemical dumpsite, the Velsicol Chemical dumpsite, particularly as it relates to contamination of the water table aquifer, a serious environmental problem?

A. I do. As far as we know now, this site has caused more pollution to the water in Tennessee than any other site in the state. Now, that's not to say that we might not eventually find something worse. But to my knowledge now, it has caused more pollution than any other site in the state. (Tr. 962–63).

223. Because of the continuing State concerns, both Mr. Morrison and Mr. Burnett noted the earlier 1967 USGS report and stated that a new survey might be in order (Ex. 120).

224. In fact, Mr. Morrison testified:

"Then when we talked to them about the further study a meeting was set up, and we had representatives of Velsicol, our staff attorney, Water Quality and Don Rima from USGS come into the meeting, and there we discussed what we felt the problem might be, what we thought was needed to obtain answers to some of these questions we had in the way of monitoring and exploration around the site, and at the time an agreement was reached, that Water Quality and USGS would do part of the work, the drilling, the sampling, and this sort of thing, and that Velsicol would put up some money to pay at least a part of the expense on this, because it was felt by USGS that they could gain knowledge from it, and water quality, from the standpoint that they felt that they needed to be protecting the public, whether they had to pay for it, or whether Velsicol paid for it, and they had to have the answers. So the agreement was basically for in-kind service contributions by Water Quality and USGS and Velsicol put up somewhere around fifteen or twenty thousand dollars, I think, for that investigation.

"The USGS people stayed down there for about a year drilling and sampling, and this sort of thing, and came up with a report that didn't say a whole lot other than an additional study was needed, and after that report came out, I guess this—I guess this would have been about '76. It wasn't long after that until we started getting complaints from the people in the area that their water had a strange taste and smell to it." (Tr. 958–59)

225. And Mr. Burnett testified to the following questions:

Q. Mr. Burnett, it would appear from the record that you, sir, initially had concern over this dump, that you continued to have concern, as evidenced by your asking Mr. Jones to hold this meeting of March of

1971, and your interaction with Mr. Rima in the project proposal that has now been entered in the record as Exhibit No. 142. What prompted these concerns of yours and this activity on your part which generated these various inquiries sir?

A. Well, another source of impetus on this to investigate this site was also the numerous inquiries. We had some complaints originating in the area and interest by the various representatives, holders of political office, but also I was charged with the responsibility in working with the State Health Department to discern and work with and seek to correct various sources of actual or potential pollution.

A. To seek to protect the public health through prevention of contamination of water systems.

Q. Did you consider the Velsicol Chemical dump to present the potential for pollution and contamination?

A. Yes. (Tr. 1439–40)

226. The meeting concerning a new survey was held in September 1975 (Tr. 975) and included representatives from the State, USGS, and Velsicol.

227. In the spring of 1976, Mr. Craig Sprinkle of the USGS was assigned to do a follow-up study on the 1967 report (Tr. 1206; 1210–11). One major concern which gave rise to the new study was the possibility of migration of the heavier-than-water liquids moving along the top of the Wilcox Formation, in a direction different than the water flow (Tr. 1211; 1212).

228. Mr. Sprinkle's supervisor, Donald Rima, was in favor of a second survey because he believed that the 1967 report was incomplete in terms of the heavy contaminants (Tr. 1212–13). Mr. Rima and Mr. Burnett put together a proposal for the USGS, it was funded and Mr. Sprinkle put in charge (Tr. 1211).

229. Mr. Sprinkle drilled new wells (Tr. 1216) and the field work was concluded in 1976. (Tr. 1221) A few samples were taken in 1977. (Tr. 1221). Mr. Sprinkle found that the water table aquifer tended to flow in a northerly and northwesterly direction

(Tr. 1219). This direction was aimed therefore towards plaintiffs' wells.

230. The difference between the conclusions of Mr. Sprinkle and those of Mr. Rima in 1967 was that Mr. Sprinkle was measuring water levels over a much larger area and therefore was able to make a better potentiometric surface map. (Tr. 1219)

231. The study was completed in 1977 and released in 1978 (Tr. 1221). A draft was supplied to the Tennessee Water Quality Division in January 1978 and to the State in handling the complaints concerning the drinking water from the citizenry (Tr. 1221–22). He was never told however, that carbon tetrachloride and chloroform were in the dump (Tr. 1222).

232. The 1978 report made the following specific findings:

(a) Contaminated overland migration of the contaminants to the creeks and ponds (Ex. 3, p. 32; Tr. 1233);

(b) Continued contamination of the perch water zone (Ex. 3, p. 32; Tr. 1233);

(c) Contamination of the water table or local aquifer, as predicted by the 1967 report (Tr. 1243) and that a minimum migration rate of 80 feet per year could be established for some of the leachate substances (Ex. 3, p. 32; Tr. 1233); and

(d) That the water flow and leachate migration goes towards the north and northwest, not the northeast (Ex. 3, p. 32, Tr. 1233).

**O. The State of the Art was violated by the Selection of the Farm and its Operations**

**1. The State of the Art in 1961**

233. There were three experts submitted by plaintiffs concerning the "state of the art" in hazardous waste landfills. They were:

a. Dr. C. Scott Clark who received his Ph.D. from the Department of Sanitary Engineering and Water Resources from Johns Hopkins Univer-

sity (Tr. 1033; 2755). He is presently Associate Professor of Environmental Health at the University of Cincinnati. (Tr. 2755).

b. Dr. Robert H. Harris, who received his Ph.D. in Environmental Sciences and engineering from Harvard University (Tr. 1123–24). Velsicol agreed that Dr. Harris was "an expert on waste disposal sites" (Tr. 1129) and was also described by Velsicol's attorney as "the one single solitary witness that truly was state of the art, and that was a gentleman by the name of Harris" (Tr. 4894).

c. Dr. George Pinder, who received his Ph.D. in geology from Western Ontario (Tr. 1764–65) is presently professor and Chairman of the Department of Civil Engineering at Princeton University. He was also author of the Pinder water-model used by both plaintiffs and defendant, as discussed *infra*.

234. Defendant Velsicol submitted two other experts:

a. Dr. Ross I. McKinney, who is Professor of Environmental Engineering at the University of Kansas (Tr. 4713).

b. Mr. Frank R. Bowerman who received his M.S. from the California Institute of Technology. From 1966–1968, he was employed by Aerojet General Corporation (Ex. 331), the company that was recently in the news concerning the Stringfellow Acid Pits scandal in California. His job at Aerojet-General was to "develop an environmentally orientated division" for Aerojet-General. (Tr. 4766).

c. In addition, although submitted as an "expert sanitary engineer in the area of disposal and waste" (Tr. 4284) over the objection of plaintiff's counsel (Tr. 4291), and not as an expert in "State of the Art," was Velsicol's Vice president for Environmental Health and Regulatory Affairs, Mr. John M. Rademacher.

235. In 1961, the American Public Works Association (APWA), published a manual on municipal refuse disposal practices (Tr. 1046; Ex. 318). This manual, published in 1961, was a compendium of the state of the art as to municipal state waste disposal practices, although the practices even preceded 1961 (Tr. 1046). This manual was referred to by Velsicol's Vice-President Mr. John M. Rademacher as "a definitive document that was used at the time as a reference" (Tr. 4354) and by Velsicol's attorney as "the Bible" (Tr. 1098; 1114) or a "practitioner's manual" (Tr. 1114; see also Tr. 1091). The manual was preceded by a manual published in 1959 by the American Society of Civil Engineers on the same subject (Ex. 319; Tr. 1098) which Mr. Rademacher testified "may not be the definitive work, but it certainly contributes" (Tr. 4289). The Public Health Services also had guidelines at this time (Tr. 1121).

236. By the 1950's, there was a great deal of information that had been amassed about the potential for groundwater contamination and actual groundwater contamination resulting from waste disposal practices, both sanitary and industrial (Tr. 1136).

237. The APWA document specified in 1961 that industrial wastes or hazardous waste, should only be put into what it defined as a Class I landfill.

238. In discussing to the 1961 Manual and the state of the art, Dr Clark testified:

Q. What is your definition of the state of the art, Dr. Clark?

A. Okay. State of the art would be that body of knowledge that is recognized by trained professionals to be feasible, economically and technically, for application or for consideration for application to solve particular problems.

Q. You would not in that definition then include what was actually being done in the real world by people who had the job and the onus of disposing of waste in 1964?

A. On the contrary, the document I refer to was developed by people in the real

world practicing the state of the art. In fact, if I—even the frontispiece for this book has a landfill in Memphis. So there were people locally involved. This was not by practitioners. That's why I try to differentiate this from a theoretical textbook that one might like to do. This was a practitioner's guide as to what they and the best of them were doing, and the rest should be doing if they weren't doing.

It was a guide to show how or to know how they should operate their entire disposal system, as I mentioned, from storage to refuse, collection of it, permits for trucks that go across city streets, so that waste wouldn't leave the truck. This was a practitioner's guide of what people in the real world do.

239. The manual published in 1961 by the APWA was a practitioner's guide as opposed to an academic textbook, although it could be used for both purposes (Tr. 1060).

240. The manual stated in pertinent part:

"A. Classification of disposal sites. From consideration of the geology, hydrology, topography, nature of wastes and other pertinent factors, three general classes of disposal sites are established:

"(A) Class 1 disposal sites. Sites located on nonwater bearing rocks or underlain by isolated bodies of unusable groundwater, which are protected from surface run-off and where surface drainage can be restricted to the site or discharged to a suitable wasteway and where safe limitations exist with respect to the potential radius of percolation.

"(B) Class 2 disposal sites. Sites underlain by usable, confined or free groundwater when the minimum elevation of the dump can be maintained above anticipated high groundwater elevation and which are protected from surface runoff and where a surface drainage can be restricted to a site or discharge to a suitable wasteway."

Then Class 3 sites, which they don't recommend using very much, "Site so located as to afford little or no protection to usable waters of the state." (Tr. 1060–61).

241. Both Dr. Clark and Dr. Harris ultimately took the position that the state of the art was clearly published in 1961 in this manual and that the farm dump violated these principles. Mr. Bowerman, a task group member of the APWA Committee that compiled and published the manual, at no time quarreled with the proposition set forth in the testimony of Drs. Clark and Harris, Dr. Harris' testimony that he had read (Tr. 4762), that the manual reflected the state of the art in 1961. Moreover, Dr. McKinney not only used the manual as a textbook for his classes (Tr. 4751), he considered the manual to be "an authoritative task in the field" of sanitary disposal when it was first published in 1961. (Tr. 4752).

242. Sanitary landfills, which is a method for the land disposal of refuse, have existed for a long time (Tr. 1045). There were principles that governed the operation of a sanitary landfill in 1961 to prevent air and water pollution, nuisances and health and safety hazards to the individuals near the site (Tr. 1045). Industrial or chemical landfills were even more stringent than a sanitary landfill and were referred to as a Class I landfill. The basic requirements for a sanitary landfill nevertheless were applicable to a landfill for toxic wastes as a minimum. Velsicol's dump did not even meet requirements for an ordinary landfill.

243. Hazardous toxic wastes, which can be both liquid, solid or gaseous (Tr. 1054) are different than ordinary sanitary landfill wastes (Tr. 1053) because these toxic wastes cannot be handled by the normal or regular municipal waste treatment process. (Tr. 1054). In other words, those processes would pass the toxic wastes through, in most cases, so there would be hazard to the effluent, stream or lake. These could be hazardous during their actual collection and treatment. (Tr. 1054).

244. Wastes, such as endrin, dieldrin, heptachlor, carbon tetrachloride, chloro-

form, chlorenic anhydride, chlorine, hexachlorocyclopentadiene, heptane would be classified as hazardous industrial wastes (Tr. 1053–54).

245. Moreover, distinction is made between liquid and solid hazardous waste (Tr. 1055). This is because liquid waste has a tendency not to stay where it is placed, because by its nature, it flows and if there is a porous material near such waste, one that the liquid can penetrate, the liquid toxic waste will not stay where it is placed (Tr. 1055–56).

246. In deciding upon a site for a landfill for toxic wastes, and based upon the expert testimony, the Court finds that certain state of the art factors and requirements existed in 1964. These factors included:

 (a) Site selection factors;

 (b) Groundwater monitoring factors; and

 (c) Surface water control.

247. Other subsidiary elements that were included within the state of the art in 1964 were:

 (a) Covering of refuse;

 (b) Transporting the waste safely to the site;

 (c) Continued monitoring of the site; and

 (d) If problems develop, doing something about it (Tr. 1121; 1046).

248. As pointed out and discussed below, Mr. Bowerman added two additional factors to be considered, namely "The Duty to Obtain Professional Advice" and "The Duty to Investigate."

(a) *Site selection*

249. One of the major features of a Class I landfill was that it not be located over useable groundwater and that there should be no potential for surface or groundwater pollution from the dump (Tr. 1048–49). The state of the art in 1961 for site selection for a landfill for industrial waste required a knowledge of what the status was below the surface and particularly the availability of groundwater that was below the surface of the dumpsite, and

the potential for pollution from the waste. (Tr. 1049–50).

250. In assessment of the groundwater availability, one considers the movement, whether you have some impervious strata beneath the site, between it and the groundwater, and one must also consider the potential for surface erosion (Tr. 1050–51). The concern for hydrology, both surface and groundwater, has been a major criteria for site selection since the first time anyone even carefully appraised a site for the disposal of any wastes. (Tr. 1051).

251. Dr. George Pinder, a world renown expert in groundwater hydrology as well as hazardous dump sites, pointed out what site selection entailed in this regard:

Q. You have been talking about principles in hydrogeology, is that right?

A. Yes, sir.

Q. In your opinion, have these principles—were these principles taken into account by Velsicol in the design and utilization of this Velsicol dump site?

MR. GENTRY: I couldn't hear that question, Your Honor.

Q. (By Mr. Gilreath) In your opinion, were these principles of hydrogeology taken into account in any way in the design and utilization of this Velsicol dump site in Hardeman County?

A. I have seen no evidence to indicate that they have been utilized in the design of this dump site.

Q. What factors do you feel were not taken into account insofar as the site selection is concerned?

A. Well, I feel that in a situation such as this where materials potentially hazardous to the public health are being placed in the subsurface that a series of minimal engineering activities should have been undertaken. I think, for example, that one should have done a series of borings to establish the geology of the area, the lithology, to determine whether we have aquifers or aquicoudes present.

I think that a series of wells that could clearly delineate the direction of groundwater flow should have been put inplace. I think pumping tests should have been conducted to determine the hydrologic characteristics of the material so that some forecast of the direction and velocity of contaminants could be established if it were to leak.

And I think some material property determination should have been made, such as porosity. (Tr. 1816–17).

252. Dr. McKinney, Velsicol's own expert, agreed that this requirement was part of the state of the art in 1961. He testified:

Q. Would you agree, as this book suggests, that site selection of a landfill is an important criteria to look at in the beginning?

A. Yes, sir.

Q. Would you agree that in the site selection process that one of the things you would be concerned about would be the potential for groundwater pollution?

A. Yes, sir.

Q. So an engineer in looking at a site selection for a sanitary landfill in 1961, would want to know, for example, if there were any water aquifers in the area of the landfill that were being utilized by households for their water supply?

A. He would want to know that, and what the ultimate effect would be if he put his landfill into that aquifer, yes, sir (Tr. 4752–53).

253. Dr. McKinney further testified:

Q. And another part of your opinion was based on the assumption that there was some geological investigation done prior to the opening of the landfill?

A. The land site, to the best of my knowledge, was selected on a number of factors, and I cannot testify on the full extent of the geological investigation that went on, because I was not involved in that and did not know the people at that time.

Q. But you are assuming that there was some geological investigation done?

A. I would assume that there would be a limited geological evaluation or limited consideration of the geology by the person who selected the site. (Tr. 4753–54).

254. Dr. McKinney added:

Q. Then it would be your idea and your philosophy as an engineer, even back in the 60's even though your ideas weren't being carried out, that in selection of a site for a sanitary—even a sanitary landfill, you should take into consideration the geology and the hydrogeology and apply your discipline of engineering to that.

A. That's right.

Q. Prior to the time the landfill was opened?

A. That's right. (Tr. 4759).

255. He finally testified that the possibility of groundwater contamination from sanitary landfills was not only a potential problem in 1961, "[i]t has always been a problem since the beginning of time" (Tr. 4836).

256. Mr. Bowerman also agreed with the factors one should review in the establishment of a Class I landfill. He stated:
" ... there is a whole host of them. One, access for trucks without invading the local residential neighborhoods, simple things like that.... We looked very much at the questions about relationship to underlying groundwater, realizing the public health and safety required that whatever you do by way of waste management you have to concern yourself about damage to the waters that are on the surface or underground and to that degree we designed our landfills in such a manner as to minimize to the smallest amount possible the infiltration of water into the solid wastes" (Tr. 4786).

\* \* \* \* \* \*

"The cover over industrial or solid wastes from municipalities seals—it sequesters or separates the wastes from the air environment.... chemicals which smell, when they are covered with earth, they no longer release odors to the atmosphere; at least not in such a rate as to

be picked up by the nose. So the immediate covering classes off aid separate that material from the local environment."

"Now, we do complete with a final phase of covering, which initiates a runoff, of rainfall. We don't build landfills flat, because that encourages infiltration. The water won't run. But we put slopes. Usually a minimum of one percent or two or three percent slopes is preferable if it can be built into the design, and that causes the rainfall to run off very rapidly" (Tr. 4787–88).

257. In fact, as found above, this dump met none of Mr. Bowerman's factors for site selection.

258. Because there had been no site study done on the farm before the site was opened, such as the drilling of monitoring wells, this violated the state of the art for a site selection in 1961 (Tr. 1062–63).

259. The same facts arise from the testimony of Mr. Rademacher and supports the conclusion that the selection of the farm as a dump in the first instance violated the state of the art. Mr. Rademacher initially testified that insofar as site selection "state of the art" criteria in 1964 were concerned, his opinion was that one could put an industrial landfill or sanitary landfill anywhere you wanted. (Tr. 4342–43). This testimony is against the weight of the evidence and must be discredited to some extent in light of his later testimony in which he agreed with the 1961 APWA criteria (Ex. 318) which he claimed to be "definitive" (Tr. 4354).

260. Mr. Rademacher also agreed that "the possibility that a sanitary landfill will pollute ground and surface waters in the area of the fill must be considered" (Tr. 4356). Mr. Rademacher's initial position on the state of the art is also discredited by his agreement with the 1959 publication of the American Society of Civil Engineers (Ex. 319), viz:

Q. All right. Now, looking at Exhibit number 319, by the American Society of Civil Engineers, I would like for you to read on page 5 where it says, "Effect on Water Supplies."

A. (Reading) "In choosing a site for the location of a sanitary landfill, consideration must be given to underground and surface water supplies. The danger of polluting water supplies should not be overlooked."

Q. Do you agree with that?

A. Of course.

Q. All right. Under "Survey of Selected Site," would you read that statement?

A. (Reading) "A topographic survey of the proposed site, including original contours and property lines, should be made before operations are started. A map including this information is invaluable in determining the effects of the completed fill on adjacent property. Such important items as the ultimate elevation of the completed fill and drainage can be planned and controlled in an intelligent manner. If there is any question as to the type of soil which may have to be handled during the operation, or if the groundwater elevation is unknown, a sufficient number of borings or test pits should be made to obtain this information."

Q. Do you agree with that statement?

A. Generally, yes. (Tr. 4361–62)

261. As to whether the site selection criteria had been adhered to, Mr. Rademacher testified:

Q. That was one of your assumptions, that the geology of this area was looked at by Velsicol before they decided to put the dump in this location?

A. The evidence indicates to me that this actually was done, that's correct.

Q. If the geology was not looked at before they bought the site to put the—made the decision to put the dump there, then you would change your opinion, I take it, assuming that were a hypothetical set of facts?

A. The purchase of the land really has no bearing on the thing in terms of the location of the site. If it didn't meet the conditions, then it wouldn't have been used, would be my judgment.

Q. Is the investigation of the geology of the land important prior—as a part of the site selection?

A. As part of the site selection in terms of the actual operation of the facility, yes.

Q. And by geology you are talking about the character of the land underneath the surface?

A. That is correct.

Q. This would include the type of soil?

A. That is correct.

Q. Whether or not there were water aquifers under the land?

A. That is correct.

Q. And your opinion is that that was all looked at?

A. On the basis of what I've seen in the record that is the case. (Tr. 4366–67)

262. The Court, as pointed out above, does not believe that the geology of the site was even investigated and, if it had been, it was done with gross negligence. Mr. Rademacher's testimony pointed these inadequacies itself:

Q. In your opinion, was the geology adequately investigated in this case?

A. Insofar at that time looking at the—and I can only say what Mr. Anthony's credentials were with geologic background. He was certainly in a far better position to make that judgment than I would be after the fact, and as I understand it, in his view it was an adequate site from a geologic standpoint.

Q. Well, do you know what he did to investigate the geology, is my question. Do you know what he did?

A. He reviewed information provided to him, as I understand it, by Mr. Pounders that came from the USGS data, as I understand.

Q. Are you assuming that the character of the soil was looked at in some way and, if so, how?

A. I believe in the test boring of the well that certainly was reflected there, the character of the soil.

Q. That would be important?

A. Oh, yes.

Q. And that should be done before the site is ever begun to be used as a landfill?

A. In terms of the location of that site at that time. And again, in that period of time this would have been an unusual situation to have looked at those factors in that degree.

Q. Well, my question is, one of the bases for your opinion that this site was properly selected is that the underground character of the geology was looked at?

A. This was the inference, yes.

Q. All right. And that would be important?

A. Certainly it's important.

Q. I believe you indicated in your answer to Mr. Gentry that the use of the well was highly desirable—

A. As a monitoring device.

Q. —as a monitoring device. So it was important that they use—that they begin to monitor the site from the beginning?

A. There is a time lag, and of course the well would—it's not an immediate kind of thing, would be my judgment, so that the well put down at the time it was was certainly adequate to reflect any change in the aquifer.

Q. And what is your understanding about that well?

A. My understanding is that it was drilled to the first aquifer.

Q. And that would be important?

A. That certainly is important.

Q. Why is that important?

A. Because—the first usable aquifer, let me put it that way. There may be aquifers that may not have a useful amount of water in them, so that this is not a very important thing, but it's the first useful aquifer in terms of production.

Q. In your opinion that's where it should go?

A. That's right.

Q. If a well did not go there, then your opinion would be different, I would take it?

A. Run that by me again.

Q. Well, assuming that the well did not go to the first aquifer, then it would not be adequate to be a monitoring well?

A. Well—

MR. GENTRY: Your Honor, I think Mr. Rademacher used the word "useful."

THE COURT: Well, let him ask the question and let him answer it, Mr. Gentry. Go ahead.

A. The assumption when you—

BY MR. GILREATH:

Q. I'm turning the assumption around and asking it in the negative.

A. Yes. The question—or the answer is this, that when you drill a well you make the assumption that this represents what's under the site. You locate the well, that this is what is under the site and this is the aquifer that is under the site, this is the useful aquifer.

Q. By useful you mean—

A. Being able to be used as a water supply.

Q. By the residents?

A. By whomever, by the people on the site itself or in the neighborhood, yes.

Q. And your opinion is that should be in the useful aquifer?

A. When you drill the well you assume what you have going down there and what is reflected there is what in fact is the situation underground. (Tr. 4368–71)

263. The Court notes that in fact:

a. Neither Mr. Anthony, nor Mr. Pounders ever looked at the soil;

b. That the site was selected and the dump operated for months before the deep well was drilled on April 5, 1965;

c. That the well was not drilled to the first aquifer; and

d. The well is not a monitor of the situation underground at the farm.

264. Other uncontested elements in site selection involved conditions necessary to prevent other types of pollution. For example, Dr. Clark testified and the court adopts as its findings, that the state of the art since 1961 for sanitary landfills required that:

". . . . they must cover their waste daily to prevent blowing of it, prevent water penetration. They must control surface runoff through and around the site by engineering means. They must have proper access, so that trucks can come in and out without leaving some of the waste along the way. The trucks must be properly operated. Even before they start the site they must insure that it is an appropriate site, and of particular concern would be the potential for surface and ground water pollution. (Tr. 1046).

(b) *Groundwater monitoring and Surface Water Control*

265. In addition, to criteria for site selection of a landfill, the state of the art in 1961 required suitable groundwater monitoring and control of surface water. (Tr. 1056).

266. As to control of surface water, which includes rainfall and snowfall melt, the state of the art required that the layout be designed so that one didn't have large amounts of rainwater coming in and washing through and moving wastes by that means. This was one of the reasons why wastes should be covered daily, compacting it, so that you would not have access of the rainwater to the wastes (Tr. 1056). Dr. Harris pointed this out in his testimony:

"The, I think, overwhelming consensus of all those expert committees and individuals and the government agencies that consider design criteria, was that sanitary landfills should not be sited in areas where leachate could be formed, first of all, or with waste where leachate could be formed, and, secondly, that this leachate could migrate into useable groundwater supplies.

I believe also there was a consensus that prior to siting sanitary landfills, there should be soil and subsurface investiga-

tions, which obviously would be needed to determine the potential for such migration and contamination of ground water. (Tr. 1137)

\* \* \*

But that is a long way of saying that most of the criteria developed by these professional societies on landfill design and operation were with respect to sanitary landfills. (Tr. 1138)

\* \* \*

I think it can't be emphasized enough that the criteria developed for landfills, sanitary landfills stressed that they should not be sited and operated in such a manner that leachate would be formed in the first place.

Q. Define leachate. That's what I'm trying to get you to do.

A. Well, leachate is liquid material. (Tr. 1139). (Tr. 4752–53).

267. As to monitoring, the state of the art in 1961 declared that monitoring wells should be established, especially if one is putting in industrial wastes, to ensure that one wasn't having migration of the wastes to the groundwater (Tr. 1057). These wells should eventually be put in before the first load of waste is dumped. These principles of monitoring have been in existence within the state of the art since the 1950's (Tr. 1057).

268. The state of the art in 1964 required that if one were going to dispose of industrial waste where there was a potential for migration, one should know what was happening to the groundwater. Thus, one should monitor that groundwater. (Tr. 1099).

269. In fact, Dr. Scott Clark, an expert on waste disposal, testified:

"In fact, as an engineer I would advise a client to obtain options on the land and do the drilling during the option period, similar to what somebody would do if they were building, say, some building, they would get an option and easements to determine whether the site is suitable before they purchase it. (Tr. 1057).

270. Dr. Pinder carefully explained why the groundwater should have been monitored even after the site was selected: " ... I think a series of outlying monitoring wells that would give early warning of migration would have been appropriate.

Q. Do you feel that the failure to utilize these principles that you have just set out in your opinion have led to the contamination of the area around the dump?

A. I think that the dump site if it were put in place, as it apparently was, would have contaminated the groundwater irrespective of whether we did these things. The difference would be that we would have had warning that it was going to occur and would have conducted some remedial measures to prevent it from damaging anybody's health.

I imagine that if these principles had been properly considered, then other measures may have been taken to either place the site elsewhere or to somehow line it to minimize the impact on the aquifer (Tr. 1817–18).

271. Dr. McKinney, who testified that he believed that the dump was the state of the art did so based on the assumption not only that there had been a geological investigation before the dump began, but upon his assumption that a well monitoring the water supply existed. Neither assumption is based on fact. He stated:

Q. Now, it is your understanding, as I understand it, that Velsicol Chemical Company was utilizing a monitoring well at the dumpsite in Hardeman County?

A. They had a well that was drilled, which was a source of water, and the memorandum indicated that it could be used as a monitoring well to see that the water supply was not contaminated, or was contaminated, either one.

Q. And so far as the opinion that you gave, it was based on that assumption?

A. That's right.

272. Dr. Clark was asked whether the farm dump violated the state of the art, both from the site selection and from

groundwater monitoring and surface water control.

273. Dr. Clark testified:

Q. (By Mr. Gilreath) Do you have some knowledge of the geology of the site? And where did you obtain the knowledge?

A. Yes, I do, and it's from examining the various reports that have been published on the site, those by Mr. Rima, USGS, and other reports, particularly the cross section, very useful, showing the underlying geology of the area. If his description, if his diagram is correct, then in no way does that meet the protection of groundwater requirements of a Class I landfill site.

Q. That's with reference to the geology only?

A. Yes.

Q. Assuming that there had been no site study done on this site before the site was opened, in your opinion would that be a violation of the state of the art insofar as establishing this?

A. Yes, it would, if you did not know that it was a suitable site, then a landfill should not have been opened.

Q. In your opinion does this site meet the criteria for a sanitary landfill, not a landfill that disposes of hazardous wastes, but for a simple sanitary landfill?

A. No, it doesn't, because it still allows for surface and groundwater pollution. (Tr. 1062–63).

**2. Velsicol's Two Expert Witness Opinions are Without Weight Because of Erroneous Assumptions**

274. The Court does not believe it necessary to make any credibility findings concerning the apparent discrepancies between the expert witnesses as to whether the Velsicol farm dump complied with or violated the state of the art in 1964. This is because both Velsicol's experts, Dr. McKinney and Mr. Bowerman, gave opinions based on explicit and erroneous assumptions.

275. However, the Court believes that Dr. McKinney's testimony supports plain-tiffs argument that the farm dump was not "state of the art" in 1964. However, as to Mr. Bowerman, it was clear that he was very much an advocate of Velsicol's defense and his evasion in answering certain questions (e.g. Tr. 4802) would certainly go to the weight of the evidence if a credibility determination had to be made. The Court believes however that Mr. Bowerman's assumptions were also in error and therefore, a credibility determination need not be made at this time. However, even if Mr. Bowerman's opinion were that the farm dump met the state of the art criteria in 1964 (Tr. 4793), the Court finds that such an opinion would fail as against the clear preponderance of evidence that showed that the farm dump was not within the state of the art in 1961, much less 1964 when the dump operation actually began.

(a) *Dr. McKinney's assumptions were erroneous*

276. Dr. McKinney's opinion that the dump represented the state of the art in 1964, was based on certain assumptions (Tr. 4763). These assumptions included:

a. The concept that the dumping was done on the ridges rather than the valleys (Tr. 4732) because of the water from the surface was considered very important" by Velsicol (Tr. 4733);

b. That there was a monitoring well (Tr. 4733) to monitor the underlying waters supply to see if there were any contamination. (Tr. 4753);

c. That some geological investigation had been done prior to the opening of the dump (Tr. 4759);

d. That the farm dump was not used for liquid wastes (Tr. 4757–58);

e. That he could rely upon the testimony of John Pounders (Tr. 4732); and

f. That the "state of the art" uses what the state government might require (Tr. 4750);

277. In fact, Dr. McKinney's assumptions were false.

a. There is absolutely no evidence that anyone at Velsicol ordered burial on the ridges because water drainage was considered important. There was a total lack of evidence from Velsicol as to why the dumping took place on the farm ridges. More important, what evidence there was showed why and the answer is quite simple. The ridges as pointed out were the only places level enough to allow burial or permit access to the trucks. The Court noted that the farm area, while not mountaineous was hilly. (Tr. 4957). Mr. Rima testified: "you know, it was, after all, kind of rough terrain. If we needed to get our auger rig into a certain place to make a hole in that place, the bulldozers were there, to move us around and help us" (Tr. 5213). Mr. Pounders described the farm as having " ... some pretty bad low places there and we had trouble getting in and out with the trucks to dump and get out and so forth" (Tr. 4432). Mr. Hanson stated: "Materials were buried up on the ridge portion, and those ridges are—they vary in height. Some of them must be at least fifty feet tall from the bottom of the gully to the top of the ridge" (Tr. 4143). And Mr. Morrison explained that it was the ridgetops on that farm that "were primarily level." (Tr. 929)

b. There was no monitoring well of the underlying water supply, as pointed out elsewhere;

c. There was no geological investigation of the site prior to opening the dump;

d. The farm dump was used for liquid wastes;

e. Mr. Pounder's testimony has generally been discounted; and

f. The state of the art is not limited to what a state government might require.

(b) *Mr. Bowerman's assumptions were erroneous*

278. Mr. Bowerman's opinion that the dump represented the state of the art in 1964, was based on certain assumptions. These assumptions included:

a. Looking at the USGS 1967 report which he testified "suggests" that there was a separation of the upper levels from the lower levels by relatively tight clay" (Tr. 4793);

b. " ... by the apparently deliberate decision to trench into the ridges rather than to put it down where it might interrupt groundwaters" (Tr. 4793);

c. ".... to place the material in such a manner that it could be readily crowned and the water prevented from penetrating from rainfall" (Tr. 4793);

d. that the groundwater elevations were known in 1964 (Tr. 4800); and

e. that no liquids were put into the dump except for small amounts (Tr. 4823; 4826).

279. In fact, the Court finds:

a. the 1967 report made it clear that the relatively tight clay separation dealt only with protection of the lower Memphis aquifer, not the local water aquifer;

b. There is no proof of any intention on the part of Velsicol to protect groundwater by trenching in the ridges;

c. the trenches were not covered on a daily basis and there is no evidence showing the trenches were ever properly covered;

d. the groundwater elevation at the dump were not known in 1964;

e. liquids in large amounts were indeed placed in the dump.

280. In fact, Mr. Bowerman on his cross-examination provided two other factors involved in the state of the art in 1961 in choosing a landfill site, namely the need for professional advice and the duty to investigate when a warning appeared that there was a reasonable possibility that

the waste might migrate from the dump into the groundwater.

### (i) *The Duty to Obtain Professional Advice*

281. In questioning concerning Exhibit 319, Mr. Bowerman stated:

A. (Reading) "It is axiomatic, of course, that when a waste material is disposed of on land the proximity of water supplies, both underground and surface, should be considered."

Q. Was that the state of the art at that time?

A. Yes.

Q. And then over on page 36, where it says, "In summary," would you read that?

A. The sentence or the paragraph?

Q. That sentence.

A. (Reading) "In summary, under certain geological conditions there is a real potential danger of chemical and bacteriological pollution of groundwater by sanitary landfills."

Q. And the next sentence?

A. (Reading) "Therefore, it is necessary that competent engineering advice be sought in determining the location of the sanitary landfill."

Q. Now, was that the state of the art in 1961?

A. I would say that that was a very well thought out recommendation, and that if read, might alert somebody to be more careful than otherwise. I would not say there were many people that were responding to that type of advise at that point in time.

Q. That certainly would be a good engineering practice at that time?

A. And today.

282. Yet, as Velsicol's counsel admitted, Velsicol "did not hire an hydrologist when we opened this landfill, nor have we ever indicated that we did." (Tr. 50–51)

### (ii) *The Duty to Investigate*

283. Mr. Bowerman further testified that if a company operating a dump, after the dumping began, learned of a possibility or probability that the local water aquifer would be contaminated, Mr. Bowerman believed a duty exists to at least investigate to see if others were contaminated, *viz*:

Q. Now, assume that you as a consulting engineer, civil engineer, were called upon when you were giving advice insofar as a landfill is concerned and after the dumping starts you learn that there is a possibility or probability that the local water aquifer will become contaminated. What would be your advice to the company that is doing the dumping?

A. Let me see if I have your statement correct.

Q. All right.

A. You are suggesting that the situation is such that an industry is operating a landfill disposal site and after some period of operation has suspicions and it is contaminating the groundwater?

Q. Yes.

A. Then my recommendation would be to make investigation and find out if there is contamination.

Q. And if there were?

A. Well, then there are a whole series of things that could be a result of that, depending upon what you find.

Q. Well, what would be your alternatives?

A. One would be to cease the operation. (Tr. 4812–13)

\* \* \*

Q. Assuming there was a suggestion in the [1967] report just for the sake of the question, assuming there was a suggestion that the local water aquifer that the residents were using could or might become contaminated, assuming just for this question that that was in the report, then in your professional opinion as a registered civil engineer should they have ceased dumping at that, with that assumption in the question?

A. I think I would have to say this, that it would depend upon the precise wording in the report. If the report was as it was from an official agency of the government and said, stop dumping, I think that there should—that the company should stop dumping. If the report did not say to stop dumping, I don't think I as their consultant would say stop dumping.

Q. In other words, you think that the responsibility of this company should be that unless the government tells them to stop dumping they shouldn't stop dumping?

A. No, not quite that simple a relationship, but not to stop dumping, perhaps to take and make other investigatory steps such as additional wells. (Tr. 4825–16).

\* \* \*

A. Well, if I remember what I read in the testimony accurately, it seems that Velsicol reacted to those bits of information in the Rima report which resulted in a series, then, of further investigations leading to a substitution of water supply for the local residents and other remedial programs. I think if I had been their consultant I would have told them, don't just quit dumping, let's find out what cause and effect relationships are, but if there are wells which are contaminated provide a substitute source. (Tr. 4817).

\* \* \*

Q. Now, assuming that that statement was made where he said that the local water aquifer is exposed to the hazard of contamination, does that sound like that that should be something that a professional engineer, to you, that there should be a stop-and-let's-see-what's-going-on position?

A. Not a stop-and-let's-see-what's-going-on, but it certainly would suggest to me let's find out more about what's going on.

Q. And when you say let's find out more about what's going on, from the engineer's standpoint what do you mean?

A. Further investigations of groundwaters to find out where contaminants are and in what concentration and, if possible,

to determine what direction and way to travel.

Q. How do you determine the direction of groundwater flow, Professor Bowerman?

A. Well, the quickest and least expensive way is to refer to the USGS charts. In many cases those have sufficient information that you don't have to make your own personal investigation. If there is not sufficient data on that, you can look at wells that have been drilled in the area and if you are lucky there might be some data showing the elevations of water in those wells, and if those wells are so located that they essentially triangulated, from the elevations you can calculate the direction of flow. The rate of flow is something that's very difficult to determine and requires soil borings and elevations in the laboratory of the characteristics of the soil.

Q. On the direction of flow how do you triangulate? Does that take more than one well?

A. Three.

Q. Three wells?

A. It takes three points to determine a plane, and so knowing three points it tells you which way the water is flowing.

Q. You take the three points. Do you have to know the elevation of the water in each of those three points?

A. Yes. (Tr. 4820–22).

284. In fact, Velsicol did no investigation, hired no professional help and intentionally or negligently ignored the 1967 report.

### 3. Conclusions

285. Specifically, the Court finds that:

(a) the "state of the art" site selection factors were not taken into account by Velsicol when it chose the site and opened the dump;

(b) there was no real groundwater monitoring until years after the dump closed;

(c) That days would go by after barrels were dumped at the farm before any

earth covering of the trenches was done;

(d) that whenever the trenches were covered the covers were so insufficient that they soon become concave, thus enhancing water migration;

(e) That the waste was not transported from the plant safely;

(f) that there is no continued monitoring of the farm; and

(g) When problems obviously developed Velsicol did nothing about them until it could no longer deny the fact that the contamination of plaintiffs' wells was its fault.

286. The Court must assume that the 1967 and 1978 USGS reports are accurate in their description of the farm geology, as Velsicol introduced no contrary evidence and therefore the dump did not meet the protection of groundwater requirements of a Class I landfill site in 1961. (Tr. 1062) This is true even if Velsicol had used the farm for a sanitary landfill as distinct from an industrial waste landfill (Tr. 1063).

287. The Court finds that the farm dump violated the state of the art in 1964 when it was started and did so until it was closed in 1973. It adopts the conclusions of Drs. Harris and Clark and rejects any contrary opinions of Dr. McKinney and Mr. Bowerman. In fact, the Court believes that because those opinions were based on erroneous assumptions, that Dr. McKinney and Mr. Bowerman's opinions were in harmony with and not contrary to those expressed by Drs. Clark, Harris or Pinder.

288. The Court finds that the design and the operation of the dump was done in such a manner as to be grossly negligent and a wilful disregard of the available technology in the site selection and maintenance of a hazardous dump. The design and operation of the farm violated established "state of the art" techniques existing in 1964, to which all of plaintiffs' expert witnesses and most of defendant's expert witnesses agreed.

289. Moreover, the Court adopts as its findings the testimony of Dr. Clark and Dr. Harris as quoted here:

(a) In reviewing Exhibit 83, Dr. Scott Clark testified as follows:

"It shows the disposal trenches at the top of the site. It shows several layers of sand and some aquitarde, or something that could retard the movement of the water, probably a clayish shell, and then beneath that it shows water table aquifer, which I understand from the report is one that the local residents were using, and then it shows a confining bed, and beneath that a large artesian aquifer that continues across West Tennessee to the Memphis area. It shows some percolation of waste-down. It shows a pollution zone. It shows a perched water table very close to the dumpsite. But this would not be ordinarily considered a useable water table for wells since it would not be continuous throughout the year—on the vertical scale it showed that. So you get some idea of how far it is between the water table aquifer and the artesian aquifer, about a hundred feet.

Q. (By Mr. Gilreath) Dr. Clark, what is shown in Exhibit 83, does that comply with the state of the art insofar as an industrial landfill for disposal of chemical or toxic wastes?

A. No, it doesn't. You wouldn't want to have those two aquifers below it.

Q. Does it comply with the state of the art insofar as the sanitary landfill?

A. No. If you have got liquid wastes, even from households, even if they were not toxic, you wouldn't want them to get into the aquifer. You wouldn't want pollution of the aquifer, which you would have by liquid wastes that close to groundwater.

Q. Dr. Clark, assume at the time or shortly after this dump was opened a well was installed by the Velsicol Chemical Company on the site, a well that penetrated down to the artesian aquifer.

A. That in itself would be poor engineering practice from the point of view of protection of the groundwater. Once you open up a channel between two points,

even though you make gates at either end to try to restrict anything coming through, you open the possibility of contamination. The well to the artesian aquifer should have been built considerably offsite where there was no danger of it passing through any hazardous wastes or waste migration.

\* \* \*

Q. (By Mr. Gilreath) Assuming the well went through the local aquifer on the farm where the landfill is located, through the local aquifer, to the artesian aquifer, even though it didn't actually go through the dumpsite—would your answer still be the same?

A. Yes, I said it shouldn't go through either the dumpsite or where the waste could be migrating. If you have liquid wastes, they are going to be migrating.

Q. And in your opinion, could such a well or would such a well be adequate within the state of the art for monitoring purposes?

A. No, it wouldn't. You want to protect the water table aquifer as well; not just the artesian aquifer. So you want to have a series of wells into the water table aquifer, so you could determine when pollution occurred. So if it occurred, then you could take some remedying action to prevent further damages and try to minimize existing harm that had been done. (Tr. 1066–69)

(b) Dr. Clark further testified that the dump was insufficient from the point of view of the state of the art in both site selection and site operation. He stated:

Q. (By Mr. Gilreath) Dr. Clark, back to monitoring for a moment, was it within the state of the art in 1964 through '70 to monitor landfills for such chemicals or chemical components as carbon tetrachloride, these chemicals that are shown on Exhibit No. 13?

A. Yes. If one was going to have a landfill with necessary wastes in it, then these should be analyzed in the water samples.

Q. Dr. Clark, based on your knowledge of this landfill in Hardeman County operated by the Velsicol Chemical Company and owned by them, how would you character-ize the setting up and the operation of this landfill insofar as safety is concerned from what you know about the state of the art?

A. Okay. The site was poorly selected, it was an inappropriate site. The surface runoff does not appear to have been covered on a daily basis to prevent surface water—

\* \* \*

A. The landfill material—the waste material does not appear to have been covered on a daily basis from what I can peruse from the information I've seen on the dump, read on the dump.

There was not an adequate system of groundwater monitoring, both the wells were not in place, plus those analyses that were done did not include the most abundant—compound, apparently, has leached out; carbon tetrachloride was not analyzed until well after the site was closed, as far as I know.

So I would classify it as inadequate on all grounds. The wastes were not hauled to the dump properly. As I mentioned, one of the axioms in waste disposal practice is that you consider disposal to start not just at the site, but in the production of waste, the transport of the waste, and disposal of it.

So I would classify it as a totally unsatisfactory practice.

Q. (By Mr. Gilreath) Even in 1964?

A. Yes.

(c) Dr. Harris was asked and he testified:

Q. As a person who would be planning a sanitary landfill in the 60's, what information would you want to have before you decided to dispose of toxic wastes in a landfill?

A. Well, one piece of information would be what is the nature of the waste. Is it solid waste, or is it liquid waste, or is it some combination of these two? Remember, I said that leachate can form either as primary leachate, which is leachate that is formed within the landfill as a result of the kinds of wastes that are disposed of in the

landfill, not by rainwater or precipitation infiltrating the landfill. So one would have to know what form the wastes were in. Next, to site properly a land disposal facility, it would be absolutely necessary to have soil and subsurface investigations to determine the type of soil, the organic content, the porosity of the soil, the depth to groundwater, the permeability of the soil between the landfill and the groundwater table, the direction of the flow of the groundwater, the rate of migration of the groundwater, the quality of the groundwater to determine whether or not it is a usable aquifer, and, of course, many other aspects associated with whether debris will flow and whether surface will be contaminated, whether it is in a flood plain. There are many other aspects of siting that I haven't mentioned, but those are the major ones.

Q. Would the state of the art require that all these things be determined by the person who is putting in the landfill?

A. Or by their contractor. I think that absolutely this would be a requirement, to have some knowledge of this information, and certainly for nonsanitary landfills, that is for hazardous wastes or landfills receiving toxic substances, this would be a requirement.

\* \* \*

Q. (By Mr. Gilreath) To clear that up, Dr. Harris, you mentioned the nature of the waste, the soil and subsurface, the permeability, and direction of flow. Would all of those be required under the state of the art in 1964?

A. Yes.

Q. How would you determine, for example, the direction of flow of the water, subsurface water?

A. You would typically drill wells, observation wells, or use water supply wells in the vicinity if these wells were accessible and one could determine the evaluation of the groundwater table from these wells. In some cases that is the case, on other cases observation wells, preziometer wells as they are called, that is borings into the ground to the groundwater table to determine the depth of the groundwater table and thus the elevation of the groundwater table in a number of locations around the landfill is usually required to establish the direction of groundwater flow.

Q. Could you do that by drilling one well?

A. It's impossible to do using one well.

Q. How about the state of the art insofar as monitoring goes? Was there a state of the art developed in the Sixties as far as monitoring of sanitary landfills?

A. Well, state of the art I define as the most appropriate technology among a number of technologies that one could take off the shelf to address a particular problem. In some waste disposal areas it probably would have been state of the art for certain sanitary landfills, for example, located over certain aquifers that were unusable or where there were no aquifers underneath of it not to have monitoring systems.

But given the attention that the professional societies and the government agencies addressing this question paid to groundwater contamination, I would define state of the art for the land disposal of toxic wastes, pesticide and other organic chemical wastes in particular, to necessitate observation wells as an under the definition of state of the art in the mid-1960's. (Tr. 1140-44).

(d) In summary, Dr. Harris testified that the establishment of the farm dump in 1964 and its subsequent operation did not comply with the state of the art. Dr. Harris testified and the Court adopts as its findings the following:

Q. (By Mr. Gilreath) What is your opinion about whether or not this landfill has complied with the state of the art, how does it measure up in accordance with the state of the art as you understand it?

Mr. Gentry: At what point of time, Your Honor?

Q. (By Mr. Gilreath) From the time it was opened until it was closed, assuming it was opened in 1964 and closed in 1973.

A. Well as far as 1964 goes, the American Society of Civil Engineers and American Public Works Association documents would, I think, very strongly indicate that this landfill in 1964 did violate the state of the art.

Number one, there were no, to my knowledge, subsurface investigations. The groundwater table, direction of flow, porosity, those issues I mentioned before, were not determined prior to siting the landfill or if they were not, then certainly they were not conforming with the state of the art at that time.

Secondly, the American Public Works Association book would disallow these kinds of wastes, liquid wastes in particular, from anything but Class 1 landfills. Class 1 landfills require that there be no usable groundwater aquifer beneath the landfill and that there not be saturated conditions within the landfill that would generate leachate that could migrate into the groundwater. I think on all counts the landfill fails to meet those criteria.

There were also reports later on. In 1970, in particular, there was a task force, a government multi-agency task force, that reviewed the disposal of pesticide wastes and concluded that the pit disposal of wastes, which is what I would categorize this facility, should be discouraged and disallowed and if used, only under extreme conditions of having information about subsurface hydrology and geology that would indicate that groundwater would not be contaminated.

Q. How would you characterize the activity of continuing to carry on a landfill such as this pit method after that period of time?

A. Well, *I think it's outrageous that it would continue, particularly after receiving evidence that contamination of groundwater was occurring as that evidence was developed in 1967.*

Q. Should in your opinion, the Velsicol Chemical Company have established some sort of monitoring for this dump early on?

A. They should, I believe with the available experience and evidence in the literature and certainly with these guidelines for sanitary landfills, which would be much safer landfills in general, should have designed monitoring systems in 1964 when the landfill was constructed.

Q. In your opinion, does this landfill satisfy the requirement of the sanitary landfill that would not be set up to handle toxic waste?

A. I don't believe it would, primarily because of the permeability of the soils underneath the landfill, very sandy soils and very permeable soils, such that leachate formation, both during the construction of the landfill and afterwards, would most certainly migrate to usable groundwater supplies.

So in answer to your question, I don't believe that it would even qualify as a state of the art sanitary landfill, if indeed that was the intention at that site.

Q. Was there anything in the USGS report that would put a company on notice of any potential problems so far as contamination?

A. Well, the 1967 USGS report, in my reading of it, did indicate that there was migration vertically to the water table, that both surface water and groundwater was becoming contaminated. I think most importantly that report was wholly inadequate and it should have been very obvious to any engineer or anyone with any technical understanding even at an elementary level that it was an inadequate report to conclude that the direction of flow of groundwater was away from residences, towards Pugh Creek. It should have been obvious from a reading of that report that the report did not substantiate that, that in—

\* \* \*

A. Could I just indicate that I have had courses in groundwater hydrogeology. I think most civil engineers, particularly those that do work in sanitary environmental engineering, do have to take at least elementary courses. I have over the past

year and a half in particular associated with the risk assessments of hazardous waste disposal sites that I mentioned, had to review all of the groundwater hydrogeology associated with those over 20 sites that I did risk assessments for.

I would say that I'm not qualified nor do not feel qualified to discuss the groundwater modeling, although the elementary aspects of hydrogeology I do feel I am qualified to speak to.

THE COURT: Anyway, in short the objection is overruled.

Q. (By Mr. Gilreath) In your opinion, Dr. Harris would the Velsicol Chemical Company be reasonable in relying on the 1967 U.S. Geological report to say that the water is flowing away from these people's wells or not flowing away from these people's wells?

A. No, absolutely not. If I as not a specialist in groundwater hydrogeology can see the weaknesses in this report and given that the state of the art would be to employ either individuals working for the company or third parties with expertise in groundwater hydrogeology to review site characteristics, I would have to say that this report in no way could be used to justify the assumption or the conclusion that groundwater is flowing away from individual private wells and predominantly in the direction that that report indicated. (Tr. 1146–51).

290. Dr. Harris, in reviewing Exhibit 83 testified:

Q. Well, my question is, Is this disposal site as it was implemented a proper disposal site to put even solid toxic or hazardous wastes?

A. No, it wasn't. It doesn't make any difference to me whether it was liquid carbon tetrachloride or organic material absorbed or in solid form or absorbed to diatomaceous earth or some other medium. These are mobile fairly water soluble compared to their toxicities, in my view, fairly water soluble compounds that, if there are no barriers to the migration of this material into the groundwater aquifer, there would be nothing preventing contamination

of the groundwater aquifer, so that whether or not it was solid hazardous wastes or liquid hazardous wastes, in my view it was inappropriate to site a hazardous waste disposal facility at that location.

Q. In 1964?

A. In 1964. (Tr. 1170–71). (Emphasis supplied).

### 4. Alternative State of the Art Disposal Methods

291. Even if Velsicol's stated concerns as to lack of alternative means to dispose were a valid defense to the poisoning of plaintiffs—which it is not—the concerns are patently in error and evidence a "I don't care" attitude from 1964 through 1973. In 1964, "[t]here were really quite a large variety of ... disposal methods" (Tr. 1140). These alternative methods of disposal within the state of the art as to pesticide industrial waste included:

a) Incineration;

b) A Class I landfill site for disposal of the wastes; and

c) Deep well injection of the liquid portion of the wastes (Tr. 1069; 1104; 1140).

d) Other methods.

#### a. *Incineration*

292. In addition to the testimony and ultimate findings of fact concerning incineration above, incineration in 1964, particularly of a mixed domestic and industrial waste, was practiced on a wide scale in the early 1960s. (Tr. 1069–70; 1135). It was well within the state of the art in 1964 to have incinerated the wastes that Velsicol ultimately dumped on the farm. In fact, in 1972, incinerators were a very popular method of disposal (Tr. 1135).

293. As pointed out, *infra*, Velsicol repaired its incinerator in 1973 and beginning in June 1973, it began to incinerate *all* of its wastes and did so until Mr. Lutkewitte left in 1975. (Tr. 1191). In fact, Mr. Hanson testified in substance that the facility could be used for such purposes as well. (Tr. 4148–52).

294. The reason for the reduction in use of incinerators since the early 1960's was not because of technology nor because their use was not the state of the art. Rather, it was a financial problem whereby the cities could not cope with the cost of maintenance of the facilities and it was cheaper for the Cities not to spend money on the state of the art air pollution control equipment for the control of particulate matter. Thus, the cities would opt for cheaper solutions, although the state of the art showed that incineration would and could work (Tr. 1106).

295. "In 1972, the Federal government did a study which reviewed the disposal of pesticide wastes. That study indicated that incinerators were a very popular method of disposal. In fact. . . . that language was that most operators contacted prefer this method of disposal of pesticide wastes." (Tr. 1135)

296. Incineration is again on the increase with energy recovery for both domestic refuse and for municipal sludges. This is because useful products are now being obtained out of the wastes (Tr. 1106).

297. There were some excellent incinerators with and without afterburners built during the 1950s and 1960s and the technology for controlling particular matter was likewise good (Tr. 1106).

b. *Deep Well Injection*

298. Since the early 1960s, deep well injection was not a theoretical alternative but "very much a reality" (Tr. 1070; 1078; 1135) Some experts even consider that the deep well injection method is a safer alternative for industrial waste disposal than a Class I landfill (Tr. 1070).

299. Deep well injection was capable, within the state of the art, in handling the equivalent of what was dumped at the farm. (Tr. 1071).

300. In fact, Velsicol had two deep well injection points in Illinois and had discharged an estimated 175 million gallons into one of them (Tr. 1071-72) beginning in 1965 (Tr. 1073; 1080). In other words,

Velsicol knew or should have known that deep well injection was and is a viable alteration in 1964 to dumping much of the industrial waste on the farm. It also knew that deep well injection was within the state of the art at the time.

301. The deep well injection method is a more economical method of disposal than incineration and other methods (Tr. 1072).

302. The Deep well injection method was directed towards liquids or wastes that could be put into liquid form, and not solids or even slurries however. (Tr. 1113)

303. Carbon Tetrachloride, chloroform, trichlorethylene and similar substances have been successfully deep well injected (Tr. 1164-65).

c. *Class I Landfill*

304. A Class I landfill site land disposal under the proper circumstances was available as an option. (Tr. 1104; 1140).

d. *Other Methods*

305. In 1964, there were other industrial wastes water processes (Tr. 1114). There were chemical precipitation methods, distillation process, iron exchange and carbon absorption. These were limited however, to liquids or slurries (Tr. 1114). However, if the pesticide waste were a semi-solid or viscous, if it could be blended with other material, there was a potential for treating that waste in waste treatment facilities such as oxidation, activiated carbon treatment and other absorption mechanisms for removing the contaminants from the liquid waste stream. (Tr. 1140)

P. **Properly Examined by a Professional Water Hydrologist, the 1967 Report Showed That the Local Water Aquifer was Flowing Northwest into Plaintiffs' Wells.**

306. One of the most important—and uncontroverted—single pieces of testimony was that if the facts set forth in the 1967 USGS Report had been examined by a trained water hydrologist, it would have shown that the local water aquifer which

the report found was in danger of contamination was headed towards plaintiff's wells, not away from them. The author of that report, Mr. Donald Rima, was not a trained water hydrologist, but a geologist (Tr. 5198).

307. Dr. Pinder first explained how one generally determines the flow of underground water. First, a minimum of three wells is needed.

308. Second, the water levels of the wells are compared with theory in mind that water flows downhill or to the lowest level measured.

309. Once the water levels are determined, a straight line is drawn from the well with the lowest level to the line drawn from the line between the other two wells. This line indicates the flow or direction of the water towards the well with the lowest water level.

310. Dr. Pinder then stated that:

A. It's my opinion, based on the evidence that I have, that the contamination we are seeing in the wells in the area was derived from the Velsicol dump.

Q. Do you feel like that this movement could have been anticipated based on known physical laws before it happened?

A. It's my opinion that a competent hydrologist should have been able to foresee the movement of these contaminants based on information that was available say in the Rima report.

Q. Assuming that the situation exists now as it is at the present time and based on your knowledge of hydrology, will these chemicals move both horizontally and vertically in the future?

A. Yes, sir, I think that there's no question that this will occur. (Tr. 1819).

\* \* \*

Q. Dr. Pinder, you've looked at the USGS study of 1967, have you not?

A. Yes, sir.

Q. And assuming that he testified that up 'til June of '73 that he dumped all the chemicals and the chemical wastes—the incinerator was down, I believe he testified

that the incinerator was down. Do you recall that, the incinerator being down?

A. It probably was. There were periods when it was down for extended times for repairs.

Q. And if the company dumped up until June of '73 in that south area, that would be in violation of that state order, wouldn't it?

A. It would, but they didn't.

Q. How do you know that?

A. Any order—we were given orders, I was given by Anthony, to not to dump any more in the south area, period. Those orders were never rescinded by Lutkewitte or anyone else to me and they were never rescinded to the people who were hauling the wastes, and I am positive that had that been going on of dumping in the south area—first, these people were under contract and they were under direct orders not to dump any more wastes in here and they certainly weren't going to jeopardize their contract by doing this without being told by me to go back to dumping again, and that order was never—once it stopped in the beginning, that order was never rescinded.

And Mr. Lutkewitte, to my knowledge, he was never up to the farm with me. Mr. Lutkewitte delegated much more to his subordinates than Anthony did, and I think, in all honesty—on this map I can show you the north area—the Number 4 ridge was referred to occasionally as the south ridge of the north area and dumping in 1972 or '73 until we stopped, there was some dumping on this south area of the north ridge.

Q. Of hazardous chemicals?

A. Right. But not in the south—not on the south ridge.

Q. Well, if the incinerator was down—

A. Right.

Q. Could Velsicol have determined, in your opinion, within the state of the art that existed at that time, the direction of flow of the water?

A. Yes, sir, information was available for that.

Q. Technology was available.

A. Technology was available, yes, sir.

Q. In 1967?

A. Yes, sir.

Q. What do you—strike that. Is there anything in that conclusion—in that report that you are able to determine the direction of the groundwater flow?

A. Yes, sir, there's enough information available in that report to determine the direction of groundwater flow.

Q. And is that direction consistent with the conclusion of the report or different?

A. Different, sir.

Q. How is it different? (Tr. 1820-21).

\* \* \*

THE WITNESS: I think, sir, that the information Mr. Rima used in drawing his conclusions is not the same information that I used in drawing my opinion. (Tr. 1826).

\* \* \*

THE WITNESS: The information that Mr. Rima used to draw his conclusions is not the same information that I will use to draw my conclusions; although that information does exist, in fact, in my report.

THE COURT: Did you consider that source along with other sources that you had?

THE WITNESS: What I used was the stated water levels in that report, and I simply used information that Mr. Rima was apparently either unaware of or was unable to interpret in coming to my deductions.

\* \* \*

Q. (By Mr. Gilreath) The facts that you are relying on to give your opinion now, are they in this Rima Report?

A. Yes, sir.

Q. What facts were you referring to, what page in the report?

A. The page number in the Rima Report is page 38—also page 39. On page 38 you will note on the left column you have core hold number and a series of core holes that are in fact plotted on the figure that proceeds page 11. If you look at page 11, you will see a series of core holes plotted, and then information above those core holes, that is their depth, and so one, is recorded on page 38. Also, on the page prior to 11, you will see indicated the W wells, particularly W-1, and that information, that is information relative to W-1, is found on page 39. So what I am going to use is the information on the core holes at page 38, and the water level well of W-1 on page 39, all of which are presented in the figure preceding page 11.

Q. All right. Now, does the report establish the location of those wells?

A. Yes. On the figure proceeding page 11, they are plotted.

Q. And what well numbers are you referring to?

A. I used specifically core hole numbers A-5, B-3, D-4, and W-1 at page 39.

Q. Do you know at those points what the level of the water is?

A. Yes, sir.

Q. Are you able to establish the level of—well, how do you arrive at that?

A. Well, you take the ground elevation, which is reported in that table, and the depth of the water, which is also reported in that table, and subtract one from the other, and you have the elevation of the water table at that location.

Q. Above sea level?

A. Yes.

Q. So you have reference points then, I take it?

A. Yes.

Q. As was shown in one of your slides where you had the triangle, is that what you are talking about?

A. Yes, sir.

Q. And based on that information, did you do a diagram of the ground water flow?

A. Yes, sir.

\* \* \*

Q. Now, would you explain what this is and what it shows?

A. All right. What you see here is a pair of triangles. The one on the right consists of the core holes, A–5, D–4 and D–3. Associated with each dot, which represents a core hole, I have written the water table elevation as derived from the Rima Report for those locations. As you see, those three points generate a triangle in the same sense that I indicated earlier in my testimony.

Q. Are you talking about here, here and here?

A. That's correct. The green arrow that I have plotted there is from the Rima report. That represents the direction of the groundwater flow that he established, by whatever means.

Q. This one?

A. The green one, yes.

The red one is the one that is calculated by simply looking at the slope of the water table in that triangular element. The red arrow represents the direction of the groundwater flow based on a simple geometric principle that I presented to you earlier in my testimony.

Q. That's this one here?

A. That's the red one, yes.

As you can see, it's just west of north.

Q. North is shown by this line here?

A. Yes.

Q. Now, going back to, say, this well here, which is 407.6.

A. Yes, sir.

Q. Is that the sea level—above sea level?

A. Yes.

Q. And then this one here is 409, which is a little higher?

A. Yes.

Q. And over here is 405.

A. Yes.

Q. What is the green line here?

A. That represents the dumpsite as described in the Rima Report, and represent-

ed on the page prior to page 11, which has no page number.

Q. And what is that arrow out here?

A. Having calculated that original red arrow, and being surprised that it was so much different than what I have seen elsewhere, I thought that it would be necessary to verify that this was indeed representative of the area. So I took the information from well number 1, which is on the left, the far left.

Q. Over here?

A. Yes. That's elevation 411, and generated another triangle, which involved W–1, D–4 and A–5.

Q. That's here, here and here?

A. Yes. And I calculated once again the direction and magnitude of the groundwater gradient, and as you can see, it's remarkably similar. It's very seldom in hydrology we find that kind of consistency. Based on that, I felt confident that the information available at that time would provide the direction of groundwater flow interpreted by confident hydrologists [sic— competent].

Q. So does this direction of flow that you have indicated here turn out to be the direction of flow that was shown later by the USGS?

A. It's very similar, very similar.

Q. And this is based on the data that you pulled out of the '67 USGS report.

A. Yes, sir.

\* \* \*

311. John M. Hines, an MS in geology (4911), worked for the Tennessee Solid Waste Division from about 1974 until February 1979 (Tr. 4917). He then was employed by EPA for ten months until he became employed by AWARE, Inc., one of the firms hired by Velsicol (Tr. 4918) when the contamination of the well became public knowledge. (Tr. 4918).

312. Mr. Hines was familiar with the 1967 Rima or USGS report and called by Velsicol at trial. Using the data found on page 10 (Ex. 2, Ex. 337), Mr. Hines calculated as did Mr. Pinder that the flow was not

as Mr. Rima had predicted. (Tr. 5000). Mr. Hines admitted that Mr. Rima's own data showed the water flow going north toward plaintiffs' wells.

313. He testified:

A. It would indicate a flow to the north based upon the measurements provided in that report. However, the measurements that are provided in that report—the problem with that is that the water level elevations were taken at different times. The elevations and the borings, as I understand it, were collected, were obtained through an open bore hole, which might affect the water level measurement to some extent. I think when preparing—I don't know the time difference involved between the measurement at each of these stations, and constructing a flow map, in doing that the intent is to obtain the measurements as closely together as possible, so that you can have a flow system representative of the same time interval. So I don't really know when these measurements were made. I think even on some of these if—I don't know if the surface controls were surveyed in, and exactly how they made the water level measurements in these wells, if they were consistent in doing that. But based upon the numbers provided, it does indicate a northerly component of flow. However, the reliability of the measurements is questionable, I believe, and I couldn't address that. I think Mr. Rima would have to address the validity of the measurements and the data presented in that report.

Q. Well, the point I want to make is that in determining the direction of flow—before I forget it, on that exhibit the north arrow is over there on the left, is it not?

A. Yes, I noticed that.

Q. The principle of determining the flow pattern as we just went through is not a new concept, is it?

A. No, sir.

Q. Did you learn that in school?

A. Yes, sir.

Q. At Tennessee Tech?

A. No, sir. When I was at Ohio State—well, a combination. You learn it in different fields, also, the triangulation methods. (Tr. 5000–01).

314. Mr. Hines questioned the accuracy of Mr. Rima's measurements. The Court notes, however, that the same can be said for reliance upon the use of that data by Mr. Rima in the first instance. In fact, because Mr. Rima used it, the questions concerning accuracy raised by Mr. Hines are not of great weight. The Court believes the measurements are accurate as shown by the later contamination of those very wells. In fact, however, Mr. Hines questioning underscores the finding that the 1967 report should not have been treated with complacency by Velsicol. Had a competent hydrogeologist been hired to review the data, Velsicol would have been told that the wells would soon become contaminated or, at least, that more hydrogeological work had to be done before it could validly be predicted that the wells would not become contaminated.

315. In sum, the Court finds that a careful review by a professional hydrologist of the 1967 Rima report would have shown that the groundwater aquifer was flowing towards plaintiffs' wells.

**Q. The "So-Called" Velsicol Incinerator**

316. As of the last day of 1972, when Mr. Lutkewitte became plant manager, the incinerator was in a state of disrepair and was not operable at all (Tr. 1184).

317. Mr. Smith, Manager of the Services Department of Velsicol's Memphis plant testified:

Q. Mr. Smith, the incinerator that was being used at the plant between 1964 and 1973, were you familiar with that particular incinerator?

A. Yes, sir.

Q. Did it ever break down?

A. Yes, like anything mechanical.

Q. Did it actually become inoperable at one period of time?

A. Yes, it did.

Q. What happened to it?

A. If I remember right, some of the packing in the scrubbing tower, I believe, fell in and gave way. It was a ceramic packing and the support plates, I believe, failed and, you know, allowed the packing to drop down inside the scrubber.

Q. Who was the plant manager at that particular time?

A. I think Bill Anthony was still there.

Q. How long did this incinerator stay inoperable?

A. I think, let's see, one time I believe it was down about two months, maybe, and we got it repaired. It was down, you know, two or three times, probably, during the life of the incinerator, and the last time, I forget when it was, but it just wasn't repaired the last time.

Q. It just wasn't ever repaired?

A. Right. (Tr. 917–18)

318. When Mr. Lutkewitte became plant manager in 1972, he found the incinerator at the plant "in a state of disrepair" and not operable (Tr. 1184). It took six months for it to be repaired (Tr. 1184).

319. Once the incinerator went into full operation in June 1973, Mr. Lutkewitte testified that he was able to incinerate at the plant everything in the way of chemical waste that had had to be taken to the farm dump in the past (Tr. 1191). This in fact was done for the next two years while Mr. Lutkewitte was the manager of the plant.

320. Mr. Hanson who became plant manager after Mr. Lutkewitte basically supported the proposition that everything could be incinerated with the exception of the dried, non carbon tetrachloride catalyst which could be sold. Mr. Hanson testified:

What was happening to the waste being generated in the Velsicol processes from June 1, 1973, to January 1976?

A. I believe during that whole-time period there was two things happening. One is that Velsicol was stockpiling waste at the plant site. Stockpiling means that we were storing waste and it was just continuing to accumulate. I believe during that period of time, for example, we accumulated some 6,000 barrels of heptachlor catalyst on the property because we had no way of disposing of heptachlor catalyst

The other thing that was happening was that we were incinerating waste that could be incinerated in our incinerator that we were operating at the plant as well as being able to take care of some of the materials that we had in our boiler system.

Q. Yesterday you told us that the spent heptachlor catalyst, this right here, which is Exhibit 308, is the sole source of carbon tetrachloride in wastes generated by the process—

A. That's correct.

Q. —any process in the plant, is that correct?

A. That's correct.

Q. Is that an example of what you were stockpiling on the Memphis plant property when you say heptachlor catalyst?

A. Yes.

Q. Why couldn't you burn that?

A. Well, we conducted tests on incinerating heptachlor catalyst with some outside consulting firms and we were not able to do an effective job of incinerating this material at that time nor have we been able to find an incinerator that will incinerate this material now. The problem is that the structure material that's here is a refractory, clay materials themselves have refractory capabilities—

Q. Now, just a second. Now, that's a term of art. Let's explain that, if you will, to me. I'm not sure I understand.

A. Well, it's like a fire brick. It's able to withstand high temperatures and it's able to have some insulating capabilities in order to block the passage of heat.

As I explained yesterday about the reaction that takes place in the heptachlor catalyst system, these materials actually find their way inside of the catalyst, into the interstices.

Q. Are you referring to carbon tetrachloride now?

A. I'm referring to carbon tetrachloride, heptachlor, and any of the other impurities that might be there that actually make their way inside of a catalyst particle, and I'm talking about on a microscopic basis also, actually into the pores of the catalyst material. And when you subject this material to heat you do incinerate that material that's on the outside and you can begin to reduce the quantity of heptachlor, carbon tet, whatever may be present, but at some point there is a thermal resistance or a thermal barrier that's built on this particle and it's impossible to destroy all of the heptachlor.

Now, we were able to get this material down to a fairly low level when we incinerate it, but it was now low enough for us to be able to obtain permission from the state or the country to put this into the landfills around the county, so we stockpiled it or stored it on the property until we could find something else to do with this material.

Q. And what did you find to do with that material?

A. Well, as it turns out, we were able to take this material back through the system one drum at a time, through a drier system, where that we flashed off the carbon tetrachloride and packaged the material as a product. The target markets for those products never did develop to the extent that we were able to move all of the heptachlor catalyst out of the plant. Finally, the material that was never sold was put into a landfill in Pinewood, South Carolina, only about maybe one or two years ago.

Q. What are you doing with the heptachlor catalyst now?

A. The same thing.

Q. You referred to the fact that you incinerated other materials during the period of time from June 1, 1973, to the January 1976 date that we have just arbitrarily chosen. What were those materials?

A. Well, we incinerated the hex bottoms, PCL bottoms.

Q. Is this the same thing as the J–11?

A. Yes.

Q. You incinerated those?

A. Yes. (Tr. 4148–52)

321. As to the efficiency of incinerating the waste at the Memphis facility, Mr. Hanson testified:

" ... I would have to assume that the incineration efficiency was fairly high, although the incinerator that we were using at that time was a single stage incinerator. It only had a primary firebox. It was operated at approximately 1800 degrees Fahrenheit and the residence time in that incinerator was about one second maximum and at some points in time it may have been less than that, depending on the through-put rate.

Under those conditions today, in retrospect probably the incineration efficiently was pretty high. We had a scrubber, a water scrubber, absorber on the downstream side of that incinerator that removed any of the acid gases that were formed as a result of the incineration, and on many occasions I climbed to the top of the stack to actually do some personal sniff test of the stack to see if we were passing acid gases and I never was able to detect any acid gas coming out of that scrubber system. (Tr. 4153).

322. The fact is that Velsicol during this entire period of time referred to a converted boiler as its "incinerator." Although Dr. Marks later did research on the purchase of an actual incinerator, it was apparently never installed. Velsicol now contracts out its solid waste disposal to a properly operated secure landfill and a professional incinerator operator.

## R. The Tavern Well

323. Sometimes around 1967, a Club known as the Hickory Ridge Tavern was opened on the Toone-Teague Road. This Club was directly across the road from the gate entrance to the Velsicol farm where all the trucks turned into the farm. (Tr. 1294)

324. The owner of the Tavern who lived there from 1965 until 1973 (Tr. 1286; 1315–

16) testified that he first became aware of the presence of the dump when:

"... we would be out there sitting down under the trees, they would come in there with them trucks, and they'd stop there, you know, to go in to that gate, and that old poison, whatever it was, running out, you would have to get from there; you couldn't stand it, it would be so strong. (Tr. 1290)

325. The owner further testified that: Them trucks would come in there with that old stuff and stop there, some of them would get out and open the gate, and Mr. Wilson, he used to stop there and drink a beer, stop his truck and that stuff was running out there in front of the place.

326. The source of water for the Tavern and the trailer was a well known as the Tavern Well. (Tr. 1299; 2196). It was located across the road from the farm gate (Tr. 1299–31).

327. Mr. Wilbanks testified that he and his family moved to the tavern the last part of 1968. He lived in a house trailer near the Tavern. The trailer was about 100 yards or less from the main gate. He and his family drank water from the Tavern Well.

328. Near the farm gate was the Velsicol well. It was "pretty close to the well" (Tr. 290–91) that the trucks and the bulldozer would be washed off. In fact, Mr. Dean, one of the farm workers testified that "you go up there to get a drink of water, you could smell the stuff all the way around the building there" (Tr. 291).

329. The well water was good water until about 1969 when it started "going bad" (Tr. 2196; 2198). The tavern well was used for drinking, bathing, cooking, and washing (2198).

330. The first thing that the operator of the tavern noticed about the water was that in lathering soap you couldn't wash with it. Then the tea turned black and the beans turned a different color. (Tr. 1318–19). The operator, Mr. Wilbanks, first noticed the soap not lathering in water in

1969 (Tr. 2199). The water then started to smell, particularly the hot water (Tr. 2200). The water started smelling bad about late 1969 and through 1970 (Tr. 2201). He and his partner changed the hot water heaters three times. (Tr. 1303–04; 1303) The heaters were just eaten out (Tr. 1305; 1320).

331. Mr. Wilbanks operated the Tavern until April 1, 1982 (Tr. 2204). At times, when he sat outside of his trailer at night, he could smell the dump and "when the wind was right, you could smell it real bad" (Tr. 2204). When that occurred, Mr. Wilbanks testified:

"It would make you sick, give you the headaches, you know, if you stayed out in it very long, We always went inside the house." (Tr. 2205)

332. The testimony of Steve Larson, cited *infra*, one of plaintiffs' computer water modelers, provided an explanation as to how the Tavern Well became contaminated as early as 1968. Mr. Larson confirmed that it was possible the Tavern Well became contaminated as early as 1968 if one considers the source or sources to be other than from the dispersion of the chemicals in the underground aquifer. Mr. Larson further acknowledged that the spillage on the road and the washing of trucks at the Velsicol deep well could also have been the sources of the contamination of the Tavern Well. (See pp. 1903–1906 of the transcript.)

## S. The Bad Taste Commands State and EPA Analysis

333. Steve Sterling and his wife Nancy had always been healthy, but toward the end of 1977 they began to complain of headaches, nausea, and loss of energy. About the same time, they noticed a strong chemical taste and smell in their drinking water.

334. At first, they thought that the winter's snow had stirred up dirt and materials in their well. But the snow stopped and the problem persisted.

335. The Sterlings soon discovered that they were not the only ones with such complaints in the hilly, backroad, rural area where they lived in Hardeman County, Tennessee, a few miles from the town of Toone.

336. Although there is no proof that Mr. Wilbanks or the owner of the Tavern ever notified the authorities in 1969, in December 1977 the Sterlings did ask Hardeman County Health Department official George Wallace to examine their drinking water. Wallace only tested for bacteria and shrugged off the problem. "Ah, that's fine," he said after drinking a handful of the Sterlings' water. "Go ahead and drink it."

337. In the following weeks, the Sterlings' health and that of their close neighbors deteriorated. Their complaints included nausea, abdominal cramping, vomiting, persistent lethargy, weakness in upper and lower limbs, skin and eye irritation, upper respiratory tract infections, and splitting headaches.

338. These continuing complaints forced Wallace out to the Sterlings' neighborhood several times. He again took water samples to be analyzed for bacterial contamination, a usual cause of bad taste and odor. These tests were negative, so Wallace confidently insisted that the water was fine. The Sterlings reluctantly continued to use their water, although its taste and smell were getting worse. The shoe-polish-like smell of the water permeated everything, even food and washed clothing. Water from the shower, kitchen faucet, and toilet filled the house with nauseating fumes.

339. Searching for an answer, Steve Sterling decided to replace the well pump, which he thought could be leaking gasoline. One winter Sunday, Steve, his son Woodrow, and several neighbors dismantled the pump, which they found clogged with "a gallon of white jello." They didn't know what the material was; it smelled foul, just like the tap water, but stronger. They then spent hours installing a new pump and cleaning out each section of the pipe. But, "after running it [the new pump] for

several twenty-four-hour periods, if anything the taste was worse," Woodrow said.

340. In January, 1978, test for chemical analysis were positive and were confirmed by a third batch three months later. On March 22, 1978, Mr. Terry Cothron, Assistant Director for the Tennessee Division of Water Quality Control, was informed that the State laboratory had shown the presence of some chlorinated organics and solvents in the wells belonging to Mr. John Boyd and Mr. Steve or Mr. Woodrow Sterling (Tr. 1523).

**T. The Shutting of the Wells**

341. Mr. Cathron immediately made plans to put people in the field the next day along the Toone-Teague Road near the dump the very next day to talk to the residents whose wells the State had sampled. (Tr. 1524–25).

342. On March 23, 1978, the State field employees advised the Boyds and the Sterlings it would probably be wise for them not to drink their water or use their water for food preparation until they had learned more about the results that had been found on March 22nd. They also advised other people who they contacted on that date that if their water had an unusual taste or odor that it would be wise for them to refrain from using the water until they could collect samples of their well water and have it analyzed.

343. The State also sampled the wells, on March 23, 1978 and the results were received in early April (Tr. 1525). These results confirmed the initial analysis of March 22, 1978. In addition, the State received verification from EPA of the March 22, 1978 findings (Tr. 1526).

344. The State immediately began to expand the use of investigation among the private wells along the Toone-Teague Road, both to the north and to the south. They also began to make arrangements for a temporary water supply. That supply, arranged with the help of the Tennessee National Guard and the Hardeman County Office of Civil Defense, was a cask,

brought and placed in that area with water from the City of Toone (Tr. 1526).

345. Every day, someone had to haul water to the tank. When the tank ran dry, the residents had to drive twenty miles to an uncontaminated well for water. However, they continued to use their own tap water for cooking, bathing, and washing dishes and clothes.

346. The investigation ultimately identified twelve to fifteen contaminated wells. (Tr. 1526). At this time, neither the state nor the federal authorities knew that carbon tetrachloride or chloroform was in the water (Tr. 1528).

347. With the closing of five wells in the neighborhood, several families abandoned their houses and land and moved out of town. These included Daniel Johnson and his family.

348. The Sterlings found that, although everyone seemed to feel sorry for them, no one really wanted to help. There were no government loans or grant programs for victims of man-made environmental disasters. The Sterlings felt they had suffered as much as many survivors of natural disasters, such as hurricanes and floods, for which there was federal aid available, but they were told that their only recourse was private litigation, which would be very costly and time-consuming.

349. In May, after confirmation of the results by EPA, Mr. Cothron instructed his supervisor of the Jackson, Tennessee office, Wayne Max, to write Velsicol a letter (Exhibit 144). The letter dated May 2, 1978, stated that the identified contaminants appeared to be waste materials produced by Velsicol buried on the farm and requested Velsicol's "intentions as to plans ... to provide both temporary and long term solutions to the water problems for residents of the affected [sic] area" (Ex. 144).

350. On May 8, Mr. Max wrote Velsicol again confirming EPA's results of the monitoring (Ex. 145).

351. Velsicol responded in the negative and did not assume the responsibility to provide a source of potable water for the residents "stating that it was their contention that the chemicals in the dump site were not the same chemicals that were being found in the well" (Tr. 1541). However, in October 1978, Velsicol's attitude changed and Mr. Hanson informed Mr. Cothron that Velsicol was ready to assume some responsibility. (Tr. 1541).

352. A Hardeman County task force was instituted by the State (Tr. 1539). This constituted an effort by USGS, EPA and the State to pull together all of the available resources and expertise of both federal and state agencies that had some jurisdiction in the matter or some professional resources to provide. (Tr. 1539–40).

353. During the meetings in the summer and early fall of 1978, the Task Force on Toxicology, there was some disagreement whether chloroform was in the dump. (Tr. 1551).

354. In the fall of 1978 the State advised the residents not to use the water for any purpose (Tr. 1544). Such advice was also given by EPA to the residents. (Ex. 196).

355. In November 9, 1978, EPA notified Mr. Cothron that EPA had detected 13 ppb of carbon tetrachloride in the Toone water supply. (Ex. 150).

356. On April 5, 1979, the State, USGS and EPA issued a "To Whom It Might Concern" memorandum (Ex. 155) warning that no well drilling should occur within an area of approximately 1,000 acres around the farm because, "a significant portion of the 'local water table aquifer' in the area already [was] contaminated."

357. The conclusions of the Hardeman County Task Force was memorialized in a memorandum dated March 4, 1980 (Ex. 159). The recommendations were sent to Velsicol in a letter dated March 10, 1980 (Ex. 160) asking, *inter alia*, that Velsicol submit its plans and specifications for the remedial work to be done at the farm.

358. On June 27, 1980, Tennessee Commissioner of Health Fowinkle wrote a let-

ter to Mr. Rademacher of Velsicol. (Ex. 161). That letter read in pertinent part:

Dear Mr. Rademacher:

For past several weeks, representatives of this Department have been working with your company to reach an agreement on technical details pertaining to remedial action at the above referenced dumpsite. As of March of this year it was obvious that we were facing a legal confrontation on this matter, with the probable result that litigation would preclude any construction work at the dumpsite for an extended period of time. It was our concern that such action would produce no positive benefits to the residents of Hardeman County nor the environment. Based on this reasoning, we preceded to work with your company in an effort to resolve technical differences and initiate appropriate construction work at the earliest possible date.

As you will remember, our March 10, 1980 letter had requested that plans and specifications for such construction work be submitted by June 1 of 1980 and that construction commence no later than July 1, 1980. It now appears that most of the technical issues have been or can be resolved. It is apparent that your company has expended considerable efforts toward such resolutions and the initiation of construction. However, as of this date we have seen no construction work commenced and we have nothing in hand which outlines a formal agreement or an implementation schedule for such work. Hence, we are apprehensive that all or a major part of the current construction season may elapse before construction can start.

It is absolutely imperative that the agreed upon "cap" be completed during this construction season. If approvable plans and specifications for the "cap," an implementation schedule, and a final draft of the proposed formal agreement complete with monitoring program is [sic] not submitted to this office on or before July 7, 1980, this Department will proceed to initiate legal action to ensure the timely completion of this project.

359. As a result of this letter, the construction of the clay cap began in the first week of August 1980 and was completed in mid-October. (Tr. 1593). This letter was written by Mr. Cothron because he believed that Velsicol had dragged its feet in getting the construction started (Tr. 1629) although there was no way to confirm this (Tr. 1630).

360. The Court does not believe it necessary for the purposes of this lawsuit to go any further at this time in these findings except as discussed below. The Court believes however that it is appropriate and relevant to end this recitation of the historical facts with the question posed Mr. Hanson and his response:

Q. Do you agree that a responsible chemical manufacturer that disposes of chemical wastes would wait until the State of Tennessee tells them to do something before they do something about containing their wastes?

A. No. (Tr. 4218).

361. In fact, however, the Court finds that that is exactly what Velsicol did do and during those years answered through its actions or inactions the question posed to Mr. Hanson with an emphatic "Yes," not "No."

## U. The Intensity and Duration of the Exposures.

### 1. *Plaintiffs' Estimates are Adopted by the Court*

362. Where damage from a toxic chemical or chemicals is important, one essential element of proof is proof that a plaintiff was exposed to such a chemical. Without such an exposure, it is axiomatic that in general there can be no risk. (Tr. 2989). As important, exposure data can help identify, not only an increase in risk, but also the magnitude or size of that risk as well.

363. In this case, there is no question that some plaintiffs were exposed. Velsicol has admitted that but disputes that all members of the class have been exposed. Water computer modeling was introduced

by both plaintiffs and defendant in an attempt to show the intensity (amount) and duration of exposure. These seemingly disparate results are displayed in Exhibits 374 and 375 and reproduced here.

Sterling and Johnson Wells:

| Year | Carbon Tetrachloride | | Chloroform | | Toluene | | Chlorobenzene | | Tetrachlorobenzene | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Plaintiff | Defendant | Plaintiff | Defendant | Plaintiff | Defendant | Plaintiff | Defendant | Plaintiff | Defendant |
| 1969 | 2 | — | — | — | — | — | — | — | — | — |
| 1970 | 4 | — | — | — | — | — | — | — | — | — |
| 1971 | 14 | — | — | — | — | — | — | — | — | — |
| 1972 | 91 | — | — | — | — | — | — | — | — | — |
| 1973 | 440 | — | 3 | — | 2 | — | — | — | — | — |
| 1974 | 1,200 | 9 | 78 | — | 16 | — | 3 | — | 2 | — |
| 1975 | 2,700 | 100 | 210 | 10 | 29 | 1 | 6 | — | 3 | — |
| 1976 | 4,700 | 640 | 410 | 65 | 45 | 5 | 9 | 1 | 5 | — |
| 1977 | 7,000 | 3,000 | 670 | 290 | 61 | 25 | 12 | 5 | 7 | 2 |
| 1978 | 9,400 | 9,600 | 950 | 970 | 77 | 80 | 15 | 15 | 9 | 9 |

Mosier Well:

| Year | Carbon Tetrachloride | | Chloroform | | Toluene | | Chlorobenzene | | Tetrachlorobenzene | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Plaintiff | Defendant | Plaintiff | Defendant | Plaintiff | Defendant | Plaintiff | Defendant | Plaintiff | Defendant |
| 1969 | 3 | — | — | — | — | — | — | — | — | — |
| 1970 | 8 | — | — | — | — | — | — | — | — | — |
| 1971 | 41 | — | 1 | — | 1 | — | — | — | — | — |
| 1972 | 110 | — | 4 | — | 2 | — | — | — | — | — |
| 1973 | 170 | — | 7 | — | 3 | — | — | — | — | — |
| 1974 | 190 | 1 | 8 | — | 4 | — | 1 | — | — | — |
| 1975 | 200 | 2 | 9 | — | 4 | — | 1 | — | — | — |
| 1976 | 260 | 4 | 12 | — | 5 | — | 1 | — | — | — |
| 1977 | 350 | 20 | 17 | 1 | 6 | 1 | 1 | — | 1 | — |
| 1978 | 400 | 95 | 19 | 5 | 7 | 2 | 1 | — | 1 | — |

## AVERAGE ANNUAL CONCENTRATION IN PPB

**Tavern Well:**

| Year | Carbon Tetrachloride Plaintiff | Defendant | Chloroform Plaintiff | Defendant | Toluene Plaintiff | Defendant | Chlorobenzene Plaintiff | Defendant |
|---|---|---|---|---|---|---|---|---|
| 1972 | 18 | — | 1 | — | 1 | — | — | — |
| 1973 | 67 | 25 | 2 | — | 2 | — | — | — |
| 1974 | 120 | 222 | 5 | 9 | 3 | — | 1 | 2 |
| 1975 | 200 | 397 | 8 | 17 | 4 | 7 | 1 | 2 |
| 1976 | 210 | 445 | 9 | 19 | 4 | 8 | 1 | 3 |
| 1977 | 230 | 903 | 10 | 38 | 4 | 17 | 1 | 9 |
| 1978 | 260 | 2,420 | 11 | 102 | 5 | 46 | — | 9 |

**Brooks Well:**

| Year | Carbon Tetrachloride Plaintiff | Defendant | Chloroform Plaintiff | Defendant | Toluene Plaintiff | Defendant | Chlorobenzene Plaintiff | Defendant |
|---|---|---|---|---|---|---|---|---|
| 1972 | — | — | — | — | — | — | — | — |
| 1973 | — | — | — | — | — | — | — | — |
| 1974 | — | — | — | — | — | — | — | — |
| 1975 | — | — | — | — | — | — | — | — |
| 1976 | 5 | 1 | — | — | — | — | — | — |
| 1977 | 8 | 6 | — | — | 1 | — | — | — |
| 1978 | 30 | 31 | 1 | 1 | — | 1 | — | — |

364. Both groups of estimates used the same computer model, namely the Trescott, Pinder and Larson model. (Tr. 1854, 6075) and the Konikow and Bredshoeft model (Tr. 6076).

365. The differences therefore in the results were caused basically by the different loading rate factors that were placed in the computer and the difference in assumed porosity. The factors relied upon by defendant's model however, were based upon Velsicol's representation that very little liquid was placed into the dump. For this reason, the Court believes that the defendant's estimates are faulty, both as to when the wells become contaminated and the amounts of contamination. The Court in fact believes that plaintiffs have proved beyond a preponderance of the evidence that the annual concentrations and duration of years in the wells are as found by plaintiffs' experts and represented by Exhibits 374 and 375.

366. Plaintiffs called three experts in water computer modeling concerning the estimate of exposure to plaintiffs. They were:

 a. Dr. George Pinder, Ph.D., who is professor and chairman of the Department of Civil Engineering at Princeton University. Velsicol's counsel stated that "Dr. Pinder comes highly recommended. I have no objection to his being offered as an expert" (Tr. 1770). He was also referred to by Velsicol as "an preeminent modeler" (Tr. 1772). He acted as "the quality control assurance" (Tr. 1837) on the computer modeling used by plaintiffs and described below.

 b. Dr. Stavros S. Papadopulos, a Ph.D. groundwater hydrologist (Tr. 1843) and a principal in S.S. Papadopulos and Associates.

 c. Mr. Stephen Larson, a groundwater hydrologist with a M.S. in civil engineering. (Tr. 1858). He is a principal in the firm of S.S. Papadopulos and Associates. Velsicol's counsel considered that Mr. Larson's computer/water modeling in this case was "a very professional job" (Tr. 1904) and later congratulated him and Dr. Papadopulos "on a very professional presentation." (Tr. 1907).

367. Plaintiffs' experts developed a groundwater model of the farm based on well established physical laws (Tr. 1854) which have existed since the 1930's "at least." (Tr. 1771).

368. The groundwater flow model used by plaintiffs is the model developed by Trescott, Pinder and Larson for the U.S. Geological Survey in 1976 (Tr. 1854). This is the same model used by defendant's consultants. (Tr. 1854). Plaintiffs also used the method characteristics model which was documented by Konikow & Bredshoeft in 1978 and also by the U.S. Geological Survey (Tr. 1854).

369. The primary purpose of developing plaintiffs' model was to make some predictions of the future extent of contamination and to evaluate the historical extent of contamination in the vicinity of the dumpsite. (Tr. 1855).

370. In developing plaintiffs model, the 1967 and 1978 USGS reports were studied as was the February 1979 and October 1974 Geraghty & Miller reports, the AWARE report of November 1981 and the Conestoga Rovers report on the closure of the dump and the addendum to this report. (Tr. 1855; 1863). Mr. Larson testified:

> From reports we reviewed various kinds of geologic information. This would include the logs of various wells and borings that were made in and around the disposal site to establish the character and type of materials that found the subsurface deposits beneath the disposal site. We also reviewed various kinds of hydrologic information. These would include the water levels measured in wells located at various places in and around the disposal site. We reviewed hydrologic information related to the interconnection between the water table aquifer and surface features in the vicinity of the site, such as Pugh Creek and Clover Creek, and the other surface phenomena, such as the infiltration of water into the surfaces from the water table aquifer.

> We reviewed test results that were presented in these reports that I have cited dealing with the evaluation of the hydrologic properties of the materials that form the water table aquifer underlying the site." (Tr. 1864–65).

371. Mr. Larson stated:

> " ... we followed the standard procedures for preparing our model. I should maybe preface this by saying that the develop—or the analysis of this particular problem was conducted in two stages, the first being the development of a model which simulated the movement of groundwater in the water table aquifer underlying the disposal site. At the completion of the development of this model we proceeded with the analysis of the movement of contaminants in the water aquifer underlying the disposal site. (Tr. 1863–64).

372. Mr. Larson carefully developed the groundwater flow system for the farm dump. He testified:

"Q. All right, sir. What is your opinion as to how your model compares to the actual measured water levels?

A. In my judgment the model very satisfactorily has reproduced the observed water levels in the various wells in the vicinity of the disposal site, and it was our conclusion at this stage that the groundwater flow system was sufficiently defined so that we could proceed with the analysis of the movement of the contaminants in the water table aquifer. (Tr. 1874).

373. Dr. Larson then testified that after the groundwater flow model had been developed, it was necessary to develop a contaminant flow model taking into account convection, dispersion and retardation. He stated:

"To analyze the movement of the contaminants within the water table aquifer, we essentially have to repeat the same process that we conducted in terms of developing our groundwater flow simulation model; that is, we must develop estimates of the various physical parameters which control the movement of these materials within the water table aquifer, make simulations of the historical events that have occurred in and around the disposal site and compare the results of these—compare the results of simulating these events with measurements that are obtained from the wells in and around the disposal site—measurements of contamination obtained from the wells in and around the disposal site. (Tr. 1880).

* * * * * *

In order to determine if our model of the movement of the contaminants in the water table aquifer was adequately representing the actual conditions, we reviewed the information that was available to us in the reports that I outlined earlier with regard to the concentrations of the various contaminants that were measured in the various wells in and around the disposal site. Based on that review, it was our conclusion that carbon tetrachloride concentrations were available in sufficient number and distribution in November of 1978, that is the measurements taken in 1978 were sufficient in number and distribution to form a basis of comparison between our model and the real world. This figure shows the measured values of carbon tetrachloride concentration in parts per billion at various locations in and around the disposal site. All of these samples were collected in November of 1978. Basically what we see is that in the areas immediately down grade to the disposal site, we have concentrations ranging from 1,700 to 18,700 parts per billion. Further downgrade or down gradient from the disposal site, these concentrations are reduced to or occur at levels of twenty to some two hundred parts per billion. This information served as the basis for comparison between our model and the real world. We then proceeded with the same iterative process of adjusting the physical parameters that make up our model in order to achieve a satisfactory comparison between the computed concentrations of carbon tetrachloride in 1978 and the observed concentrations of carbon tetrachloride in 1978. (Tr. 1881–82).

374. Mr. Larson concluded:

In my opinion, this is very satisfactory comparison between the computed results and the model results and it's our conclusion that the model—the adjustments and the physical parameters of the model was completed and that the model could be used to analyze the historical extent of contamination in the water table aquifer and to make projections as to the future extensive contamination under various assumed conditions. (Tr. 1885).

375. As to the Tavern well, Mr. Larson was asked and testified as follows:

Q. Mr. Larson, there has been previous testimony in this trial that the Tavern well was actually closed in late '71 or early '72. Is there any way to explain how contamination reached this well other than the way you have explained it?

A. As I stated earlier, our analysis only considered contamination that would be derived from the areas directly underlying the disposal site as outlined in this green pattern on Exhibit 184. It's quite possible that if there are secondary sources of contamination, that were not included in our analysis, that contamination could have existed in the Tavern well at some earlier time. However, these were not considered in our analysis. (Tr. 1903).

* * *

Q. (By Mr. Wilder) Mr. Larson, as I have said previously, the testimony has been in the past that there was at the Velsicol well located near the gate, which we have marked on the map, that several dump trucks were washed out at that well. Could this source be a secondary source that you were earlier referring to?

A. If contaminants were dissolved into the water that was being washed, and if this water infiltrated into the ground and ultimately reached the water table, the proximity of this washing operation would be sufficient to possibly cause the contamination in the Tavern well.

Q. All right, sir. We have also heard testimony by several witnesses to the effect that as the trucks were turning into the gate of the Velsicol property that there would be chemicals spilled out of the back into the road immediately in front of the tavern site. (Tr. 1905).

* * *

Q. (By Mr. Wilder) Mr. Larson, could this all be such a secondary source of contamination to the Tavern well, assuming that to be a fact?

A. Assuming that to be a fact, if contaminants are entrained or dissolved into the water which seeps into the ground, again the proximity of these locations to the Tavern well makes it a possible source of contamination to that well. (Tr. 1906)

376. In sum, the Court finds that the estimated intensity and duration found by plaintiffs' water model were accurate and the Court adopts those figures as fact. The Court rejects the water model present-

ed by Dr. Ziegler and defendant for at least two basic reasons, one because it didn't take into account the massive amounts of liquid waste that was placed into the dump and because defendant's model did not take into account the drawdown from the wells in the area. In fact, Dr. Weber, defendant's soil column expert, supported the proposition that defendant's model was defective in its failure to assure liquids were placed in the dump.

*2. Defendant's Modeling Results Which the Court Rejects*

377. Defendant's modeling depended heavily if not exclusively upon false, inaccurate representations made by John Pounders and Daniel Marks, as discussed below. In addition, Velsicol relied upon the work of Dr. Jerome Weber, a Ph.D. soil agronomist from the North Carolina State University. The testimony of Dr. Weber as cited below proved why Velsicol's model was inaccurate.

a. *Failure to Recognize and Factor in the Liquid Waste or the Pooling of Water That Occurred*

378. First, Dr. Fred Ziegler, Velsicol's expert water modeler, testified:

" ... I had those discussions with Mr. Pounders, I felt that he was the most knowledgeable individual that I would be able to find as far as what happened on that site." (Tr. 6023).

Dr. Ziegler elaborated:

Q. What information could John Pounders supply you with that would be important for the model?

A. Mr. Pounders, as I said before, provided the general information on the site. He provided us with information on how the site was developed, which trenches were used first, which sites were used, approximate times which they were used—all of which is absolutely necessary in order to provide and tell a computer that information. *The computer itself must be told the loadings, how the material is put into the site, how the material got to the ground-*

*water system.* It does *not predict that.* *It predicts what* happens to *it after it gets there.* (Tr. 6025). (Emphasis supplied).

379. Dr. Ziegler discussed what he had obtained from Mr. Pounders and Dr. Marks that aided him in the development of defendant's computer model. He stated:

"The loading, the general amount of contaminants that gets down to the groundwater system is something that we must tell the computer. It is not something it predicts. It then uses that information to predict the concentrations of contaminants moving downgradient, down the groundwater plume, in this case to the north or slightly to the east or west. It predicts that. But we must tell it how much got there, how much got to the groundwater system down underneath all that dirt. In order to do that, we must tell it not only how much, but in this case, and perhaps most important, the sequence of how it got there.

Q. What do you mean by sequence? (Tr. 6035–36).

\* \* \*

How, we, and primarily through discussions with Mr. Pounders and through review of his testimony, divided the northern site up as was done on this representation, which I believe was his, and these numbers reflect his. (Tr. 6036).

\* \* \*

Now, that sequence is important, because as I said, a particle of contaminated water that happens to go through the site and becomes contaminated and then moves on down through the soil and gets all the way down, which is not always going to happen, but gets all the way down to the groundwater, enters the groundwater system and, therefore, contaminates the groundwater will move differently, depending on which of those subsites in the case of the northern area, or the central or southern site that is located. So it was most important to us to review with Mr. Pounders this information ...". (Tr. 6036–37).

\* \* \*

Also it was important to determine the amount of waste that went into each of the sites.

Now, we obtained that by the same—the discussions with Mr. Pounders and also from obtaining production data from the plant itself, which told us the general quantities of waste produced and the sequence of times over which it was produced, and the dates associated with the quantities of material.

Q. Would the production data show you quantities of wastes produced or products produced?

A. It showed quantities of products produced. In discussions with Mr. Pounders, and discussions with Dr. Marks, we believe that the quantities of wastes were in the same order of magnitude, and, in fact, there was an analysis in that production data which indicated a range of waste generated per pound of products produced. (Tr. 6037).

380. Dr. Ziegler emphasized that:

In using Mr. Pounders' testimony I estimated, based on his amount of loading over a certain period of time, how these different sites would be developed, what dates were the sites used, how long were they used. (Tr. 6038).

381. Dr. Ziegler further added:

A. The estimates of loading into the trenches are based on these data to which I have reference in which we found that then material was taken to the site it was loaded into the site on a fairly consistent basis so that the amount of material that went into each of the different sites, the northern, middle and southern, and with the further definition in the northern site of the five subsites, could be predicted reasonably well based on how long they operated on each of those sites. So we used, confirmed with Mr. Pounders, because we thought he was our best source of information, the time that they were operating on each of the sites. (Tr. 6043–44).

382. Dr. Ziegler made it clear that his computer model depended solely upon the memory of John Pounders and Dr. Marks:

Q. I believe you said that one of those assumptions was the amount of waste that was put in the dumpsite?

A. I said that the loading rates were determined based on my discussions and review of information, what I consider the best information that I could obtain.

Q. And that information was the memory of John Pounders?

A. It also included his testimony.

Q. His testimony insofar as his memory of it—he didn't have any documents to go on.

A. Well, as I indicated earlier, we reviewed the production records from Velsicol, and that plus Mr. Pounders' testimony and my discussions with him, we felt was by far better than any other information available on loadings.

Q. Now, by production records you mean the amount of end products that were produced between 1964 and 1972?

A. That included estimates of quantities of catalyst used, and the spent catalyst, of course, became the waste that went to the site.

Q. How did you arrive at the amount of waste from the production records?

A. It was tabulated on the production records and obtained by me through Velsicol.

Q. And did somebody give you an opinion as to the amount of waste that would come from those production records?

A. Yes.

Q. Who was that?

A. It was a combination of people. I specifically asked Dr. Marks.

Q. Do you recall what those production records showed as to the amount of production?

A. Sir, I don't have that table with me, but if I considered, a fairly thorough table.

Q. Then you said that the other assumptions that you put into the computer was where the waste was passed and at what time?

A. That's correct.

Q. In other words, in the northern site on the east log you got some information that a certain amount of waste was put in that location during a given time?

A. That's right.

Q. You had to assume that a certain amount of waste was put in a specific location at a certain time?

A. That's through my discussions with Mr. Pounders, yes.

Q. And, again, you are relying on his memory of what went where?

A. That's correct. (Tr. 6137–39).

383. Dr. Ziegler continued:

Now, we tried, and this is why I spent so much time yesterday explaining the care that we took in trying to get the best loading rate, the best information we could—the model is only as good as what you tell it, and we felt very strongly after talking with people, reading Mr. Pounders' testimony, that the size and the magnitude of the northern site was so much greater than the two other sites that we had to address that point specifically in the model.

Q. But you were relying purely on Mr. Pounders' memory, no written documents, is that correct?

A. The only written documents were the loadings, the general rate, but primarily on those two facts, that's right. (Tr. 6203).

384. Dr. Ziegler also made it clear that defendant's model did not contemplate that liquid wastes were dumped at the farm. He testified:

Q. Now, were you given any information as to the makeup of these wastes, solid versus liquid or semisolid?

A. I have been told, and I can't recount at this particular time, but on numerous occasions that the carbon tetrachloride was part of the heptachlor catalyst and that's a solid.

Q. All right. Were you ever told that there were any liquids [mixed—sic] with this catalyst?

A. I have asked that I have always been told that the carbon tetrachloride, which has been the compound of my primary interest, was part of the heptachlor catalyst. (Tr. 6215–16).

* * *

Q. All right. My question was, did you consider this pooling effect that Dr. Weber talked about of the water collecting in the trenches during the actual dumping process and did it have anything to do with your model? (Tr. 6216–17).

* * *

A. I will answer them both, if you like, sir. The answer to the first is yes, we considered it, and the answer to the second one is no, we didn't include it in the modeling. And now, if you will, I'll explain that.

Q. You may explain.

A. Thank you, sir. In the discussions with Mr. Pounders—I have to refer back to that because of the way the site was used, the trenches were used—we knew that the materials that were dumped in there were covered often with solids. We also knew that the procedure was to dig—again, to be specific, it was discussions that I had with Mr. Pounders—to dig the entire length of the trench and then fill it from one end to the other. Now, as you fill and cover, which is part of a standard sanitary landfill procedure, to cover and then add more waste and cover that and add more waste and cover that and then when you are finished cover the entire thing, the entire trench, I should say, we felt that the water that accumulated was water that was accumulating and running into the open trench not in through the barrels, and we did not feel that that was indicative of liquids taken to the site. We felt that was part of the natural phenomenon of digging a hole in the ground and having water accumulate in it.

Q. All right, you—

A. So—excuse me, sir, just a final clarifier. And that's my explanation of why we considered it, because of the discussion I just made to you. But the fact that we didn't feel that the ponding effect was anything more than water in trenches, we did not include that as a major—well, we didn't include it in the model.

Q. Well, you have heard testimony, I'm sure, in this trial concerning people who witnessed the dumping and the fact that the liquid wastes sat in the trenches for days and days at a time with water collecting on them. Did you discount all of that?

A. No, sir, from what I heard, and the pictures that I've seen—of course I've seen some of the pictures which showed liquid in the trenches—when I asked about those things, and I talked to Mr. Pounders as I've said already to you about that, he indicated that that was a result of water collecting in trenches. He even showed—he didn't show me, but he told me that he recalled seeing one of the pictures where the men were all in boots and the boots were muddy and things like that, which would indicate certainly that there was a muddy condition occurred at that time. And as a result of those discussions we did not feel that there were large quantities of liquid.

And as I said, I've asked that specifically of Dr. Marks. I may have asked other people, but the one I remember is talking to Dr. Marks about whether liquids went to that site or not that were carbon tetrachloride. His response, by the way, was that it was far too valuable to dispose of that way.

Q. Wait a minute, I lost you there.

A. Well—

Q. What is too valuable?

A. —when I asked about whether liquids, carbon tetrachlorides, would be taken to the site, if that would be a procedure that would be used, the indication was no, that the carbon tetrachloride came from the heptachlor catalyst.

Q. Did he ever mention anything about the carbon tetrachloride that was contaminated and couldn't be reused, liquid?

A. No, sir, he didn't." (Tr. 6217–20).

385. And, Mr. Rovers of Conestoga-Rovers, the firm in charge of remedial actions at the farm underscored the fact that

the experts were told there were little, if any liquid waste dumped at the farm, *viz:*

Was there any liquid waste left at the site to be disposed of, because we know that the liquid waste that's at the site has an ability to travel all by itself. It doesn't need rainwater, it doesn't need groundwater flow, it can move all by itself. We know by the records of the plant small quantities of liquid wastes were only disposed at the site. We know also from the records at the plant that a lot of these liquids would be absorbed in the solid materials that was disposed at the site.

We also know that during landfilling the bulk of the drums, the barrels and everything were broken, cracked and had corroded over time, so that there is very little, if any, liquid waste left in the site. That was concurred by everyone. That was concurred by AWARE, Geraghty and Miller, ourselves, EPA and the state. We all agreed that was an appropriate basis that that's the way the site had been operated, that there is very little liquid waste, so that actually going into the site to try and stop potential migration or migration potential wasn't that useful. (Tr. 4878–79)

386. Although Dr. Ziegler had been told that the heptachlor catalyst as shipped to the dump was 60% carbon tetrachloride, he made two errors in his assumptions that are fatal to the model developed by defendant. First was the assumption that no liquid—or very little liquid—was ever dumped to the farm. Second was Dr. Ziegler's belief that all trenches were filled "every day" so that there was never any ponding of water. He testified:

".... there are a couple of photographs that show water in the bottom of the trenches. And I asked about that specifically. And the indication was that water was water that accumulated, rain water in the trenches, but because they filled those sites every day, it was not in contact with the waste itself.

In other words, as the wastes were put in, then they put dirt on top of it. And the water that was accumulating was the water that was in the trench because of the rainfall.

Q. So in—

A. It wasn't a liquid waste that was put in. That's what I was trying to get to when I asked him about that.

Q. In other words, you assumed then that there were no liquid wastes put into the dump site and that this ponding or pooling effect of this water in the trenches was not a daily or a weekly occurrence?

A. Well, I talked with Mr. Pounders about that at length. And from what he told me, I felt secure that the pictures were the results of rainfall occurring and not of large quantities of liquids stored or dumped into the area which filled up the bottom of the trenches. I thought that was not the case. Dr. Marks also told me that wasn't the case.

Q. All right. So it's based solely on their discussions with you, though? You haven't discussed this with anybody else that might have been on the site?

A. I may have, but those are the two people I believe that would know the most about it.

Q. What about Mr. Agee, the contractor, or any of the truck drivers?

A. I didn't talk to any of them. (Tr. 6363–65).

387. Dr. Ziegler admitted that defendant's model was only as good as the figures that were put into the model. He testified:

".... Dr. Ziegler, does the validity of your model, therefore, depend upon the accuracy of these figures that you have put into it?

A. Yes.

Q. Now, when you were determining or looking at the carbon tet, did you consider all of the carbon tet to be a solid or any part of it to be a liquid?

A. We assume that there were no large quantities of liquid in the site, and that was based on our conversation with Mr. Pounders and Dr. Marks.

Q. You said you assumed no large amounts. Do you assume any parts?

A. We assumed that the carbon tet, in whatever form it was in, was mobilized or moved out of the trenches based on rainfall.

Q. In other words, it was suspended in water?

A. It was attached or involved or associated with a catalyst.

Q. Well, the catalyst is a solid?

A. Right, and it was sorbed on catalyst.

Q. But the catalyst didn't move?

A. No, but when the rainfall moved through it, it picked up some of the carbon tet.

Q. All right, so the carbon tet was moving with the rainwater?

A. Yes, sir.

Q. But you didn't assume that any of the carbon tet that went into the trenches was liquid when it went in?

A. That's correct.

Q. Now, what percent by weight of the catalyst waste was carbon tetrachloride? (Tr. 6379).

\* \* \*

Q. Now, again, when you talked with Dr. Marks, he led you to believe that all of the carbon tetrachloride waste was indeed in a solid form when it was put into the—

A. It was associated with the heptachlor catalyst, yes.

Q. What about the heptachlor catalyst, was it ever in any form other than the form we have seen in this little jar?

A. My understanding was it was in the form that we saw.

Q. Never in any type of liquid form?

A. That's true.

Q. Or semi solid?

A. Well, semi solid is a broad range. My understanding, it was in the form that we have been looking at. (Tr. 6380–81).

388. Boiled down to the essential differences between the models, the key is the way the loading rate was established. As pointed out above, the Court is convinced that a large quantity of carbon tetrachloride was put into the dump in liquid form and done in such a way as to maximize infiltration, however, unintended. For example, the trenches were left open and ponding occurred. As such, I find that the plaintiffs have sustained their burden of proof on this issue. Dr. Weber's testimony supports this finding.

389. Dr. Weber, a professor at North Carolina State University, had a Ph.D. in Chemistry and Soil Chemistry. (Tr. 5116–17; Ex. 340;). He was accepted as an expert in soil chemistry and the movement of chlorinated hydrocarbons in the soil. (Tr. 5124).

390. Dr. Weber explained how much of his research work in investigating pesticides used columns of soil, *viz:*

"In the case of these leaching studies that we do in the laboratory to characterize the movement of pesticides, we construct models, columns of soil, to which we apply the pesticide, and then we add water to these columns over various periods of time. It may be an instantaneous, one or two-day time period, or it may be as long as sixty days.

We then catch all the water that comes out of the bottom of the columns and analyze it for the pesticide to characterize its initial, the initial appearance of the material in the leachate for its ultimate major wave of material coming through. Then we take the columns apart and extract the soil in the column throughout the entire depth, to analyze for, to see where the pesticide is located, and where the metabolites are located. That's how we get a characterization of the mobility of the pesticide in the soil system. (Tr. 5123).

391. At some point, Dr. Weber was contacted by Dr. Ziegler to aid in assessing the movement of some of the chemicals through the soil that had been dumped by Velsicol on the farm. (Tr. 5131). Dr. Weber testified:

A. He asked if it would be possible to evaluate the movement of some of these chemicals through subsoils in the Hardeman County site and I said that it would be very difficult to do it without seeing cores of the soil, of the subsoil, through which the chemicals would have to move and it would be preferable to build some columns and then to apply either the chemicals themselves or some of the actual waste material and the leach it through the soil and in a model way to get some idea of how long it would take for that material to get through soil.

Q. And what did he respond to that suggestion? How did he respond to that suggestion?

A. He said that the engineering department at Vanderbilt had been doing some soil moisture studies and asked me if I would assist them in designing some columns and give them advice on how to put the subsoil into these columns and how to put the waste in and how to add the water and how to evaluate the movement of the chemicals through those systems.

Q. This experiment that you just discussed is the type of thing that you have been doing with reference to pesticides since the early Sixties?

A. True?

Q. Did you in fact assist Dr. Parker at Vanderbilt in setting up these columns and running the experiments?

A. I went to Vanderbilt and showed them how to add the soils. I gave them written instructions on how to build the columns, how to add the water and to catch the water, and then suggestions on analysis, and so on.

Q. Did you eventually see the columns put up as you had directed?

A. Yes. (Tr. 5137).

392. Dr. Weber described how the columns were created:

A. Well, essentially they took glass columns approximately two inches across (drawing) and added a nylon screen and some coarse sand to the bottom and capped the bottom off and tapped it off so that it would not leak water, and then they filled the bottom portion of the columns with the subsoil, a composite subsoil taken from some borings that they had made out in that area of the dump. (Tr. 5137).

393. Dr. Weber testified that he had been informed by Velsicol that the materials placed in the farm dump were "still bottoms." (Tr. 5132). He further explained:

A. If you were to take a solvent, for example pure carbon tetrachloride, and pour it into soil, you could make it move into the soil very readily in the pure state. (Tr. 5159).

\* \* \*

They told me that it was really the materials of the still bottoms, which I understood it to be a very gunky, black, heavy, semisolid material that you would clean out of the bottom of a still. In other words, I have done some work in our lab distilling materials also and I imagined in my mind what it was. It was tarry looking material.

Q. Would it make any difference if these chemicals were in a liquid form rather than a solid or semisolid form when they were deposited in the dump as to their movement?

A. No unless there was an exorbitant amount of solvent with them. (Tr. 5160).

\* \* \*

A. A lot of carbon tetrachloride. It would have be high quantities of pure liquid, because just small amounts again would be absorbed by the soil. (Tr. 5161).

394. Dr. Weber explained why chemical waste in liquid form would change Velsicol's model estimates—the material would get to the water much more quickly. He stated:

Q. Have you investigated or were you advised as to the amounts of carbon tetrachloride that made it to these private wells?

A. No, I had not had any—I was not privy to any of that analysis or anything.

Q. Would it make any difference to you as to the movement of these chemicals if you were given the fact that approximately by the year 1978 that a well that was more than a thousand feet from the dumpsite had concentrations of over 18,000 parts per million of carbon tetrachloride—parts per billion? .

A. 18,000 parts per billion carbon tet in 19 what?

Q. '78.

A. '78. The dump was stared in about '6—

Q. Four.

A. Four. That would be fourteen years. That seems like quite a high concentration to me to have gotten that far down through this material and then to have to move—a thousand feet?

Q. A thousand yards.

A. A thousand yards, three thousand feet. Twelve years is a long time, however, and that is a fairly mobile material. I would not be surprised if you found some, but that high concentration is a little bit surprising to me, but I have no other way—you know, I have no way to judge that. 12,000 is 12 parts per million.

Q. I said 18, Doctor, 18,000. (Tr. 5162–63).

\* \* \*

A. Uh-huh. I would say it's possible. I wouldn't say it's likely. I would say it would surprise me that you would pick up that much. I would think you might get traces of a part per billion or so and perhaps the odor, but 18 part per million, if you are getting that much, then you have got, you know, quite a wave coming behind it.

BY MR. WILDER:

Q. What if I were [sic] to advise you that within the next couple of years that same well would show almost 40,000 part per billion of carbon tet?

A. Now you are up to 40 parts per million. I would say that's possible too.

Q. Would it take a lot of carbon tet to reach that far with that kind of concentration?

A. It wouldn't take a lot, because it is relatively mobile and once it starts to move it will be a continuous process.

Q. Until when?

A. Until the major wave has passed and the concentration begins to decline. (Tr. 5164).

395. Dr. Weber further testified:

Q. Did you note specifically though as to how much of each particular chemical was actually deposited?

A. No, I don't know that.

Q. And I believe you stated earlier you don't know what form it was deposited in; whether solid or liquid or gas? (Tr. 5172).

\* \* \*

A. It was supposedly the still bottom material.

Q. From the heptachlor process?

A. Yes.

Q. Did you look at any other waste?

A. No. That's the only thing I saw.

Q. And you are not saying that that was the only thing that was deposited?

A. I am saying that was my understanding—it was my understanding that that was the major material, and in addition to that, there was some catalyst also. (Tr. 5173).

\* \* \*

Q. Doctor, did they show you any liquid wastes?

A. No. I don't believe I saw any liquid wastes. (Tr. 5174).

396. Dr. Weber was not only misinformed as to the state of the material placed into the dump, he was misinformed about the ponding. He stated:

"With the amount of evapotranspiration occurring here, probably seven to ten inches of water each year actually would infiltrate, unless the pits were left open, and you actually had ponding or something. But from my understanding, the pits were

dug and filled and then backfilled within a short time, a day or a couple of days, and I would assume then that most of the rain that hit the pit and went through it, went through it in normal circumstance; that is of the fifty inches of rain that fell on the top of this covered pit in a year, my best guess is, best judgment is that seven to ten inches of that water probably went through. (Tr. 5177).

\* \* \*

Q. And I will ask you if the ponding which you referred to would be depicted in that picture?

A. I see water in the bottom of a pit, yes. I don't know how deep it is. It looks like it is probably six inches or a foot deep. It must have rained probably that day or the day before or something.

Q. Was this what you were referring to though, as ponding?

A. Yes. If you maintained this condition and caught all the water after every rain, of course, you would be increasing your infiltration.

Q. Which would cause what?

A. Which would cause a somewhat faster movement of the chemical, a more rapid movement of the chemical, because you are adding more water. (Tr. 5179).

397. Velsicol's counsel also elicited from Dr. Weber his "surprise" at finding the high concentrations of carbon tetrachloride in the wells, thus proving that his assumptions concerning the state of the material dumped and the permitted "ponding" were inaccurate. He stated:

Q. Dr. Weber, Mr. Wilder asked you about a well that showed 12,000 parts per million—per billion of carbon tetrachloride in 1978 and asked you if you were advised that it would show that much with the landfill having been started in '64 or '65 and this well being a thousand yards from the landfill. I believe your response was that it's pretty high?

A. Uh-huh.

Q. What if the well, the Boyd well, was just two-thirds of that distance, instead of

3,000 feet was just 2,000 feet from the burial areas. Would this make a difference?

A. In terms of the concentrations?

Q. Yes, in terms of the speed and the concentration.

A. I'd still be a little bit surprised, because I'm—I was assuming that that would take about that long to get into the groundwater, to get into the water table, and when you get to 20,000 parts per billion you have got a fair amount of material moving at that point.

Q. Would the loading factor be an important factor, the loading of the carbon tetrachloride into—

A. Oh, certainly,

Q. You would have to have a fair quantity up there and a fair amount of infiltration to maintain that concentration. (Tr. 5190–91).

398. Finally, Dr. Weber testified:

I believe that's what they told me and I believe that's what I had read also, so I wasn't deceived in any way there. They said that's about what has been buried in there and I said what kind of consistency was this stuff and got the general impression that it was a rather thick, viscus, gummy-type of material that you would get out of a still bottom, and I am somewhat familiar with that.

THE COURT: Were you given any descriptions of the barrels?

THE WITNESS: Just to say that they were 55–gallon steel drums. That was the only thing, I think.

THE COURT: Were you advised that other materials may have been buried in the landfill in other types of containers?

THE WITNESS: Yes. That's relatively common to put in catalysts and in this case they did mention that boxes of fuller's earth material, the dry catalyst, was put in there, and I asked them what the catalyst was and they said that there was some carbon tet and some chloroform on the catalyst, and I had no idea of how many tons or barrels of that was put in and what kind of concentrations of the chloroform

and carbon tet was attached to that. But knowing that those two compounds were there, I then said, well, it would not surprise me that you might find those in the water, because it can become detached from fuller's earth with water relatively easily and it is a mobile compound, it does move in soil.

THE COURT: And were you advised that the earth moving equipment may have broken open some of these barrels or boxes that were buried in the area.

THE WITNESS: Yes, I believe they told me that too, that in the process of pushing the earth over the drums some of the barrels were broken and sometimes they may have broken, fractured, when they were dumped off the truck. So I did get the impression that there was some broken barrels and some liquid, and I would just assume in time anyway that metal barrels standing in moist sandy soil, moderately acid sandy soil, would rust through within a matter of a few years anyway. So whether or not they were broken, they would eventually release the contents.

THE COURT: Does your simulation of rainfall take into account flooding in particular areas that might occur?

THE WITNESS: No, it certainly doesn't. (Tr. 5193–95).

b. *The Failure to take into Account the New Wells and the Resulting Draw Down on the Aquifer*

399. Velsicol's model, in addition to making inaccurate assumptions concerning the state of the materials put into the dump and the ponding effect of the open trenches, failed to take into account the drawdown on the aquifer. Dr. Ziegler stated:

Q. Now, when you were making these calculations and in your model, did you take into consideration the amount of water that was being drawn down by the use of these wells during this period of time?

A. We talked about that. The model itself did not consider that. The calculations, we asked Dr. Remson specifically

about that. In fact, he brought it up himself.

We felt—and this also, by the way, was a discussion that occurred long before the modeling. It occurred, and we considered at that point the influence of wells in the immediate area and decided they were not influential." (Tr. 6407)

400. Mr. William H. Walker, a hydrologist called by Velsicol, emphasized that in his judgment the drawdown was what caused the water to arrive at the plaintiffs' wells. (Tr. 5697–98). He testified:

Q. In spite of all that, it adulterated some wells, didn't it, sir?

A. Yes, unfortunately it would not have, I don't think, had but just one or two wells that were there to start with, would have been the only ones that were kept there, but as I understand it, after this site was constructed a number of houses were built out there and they started to pump. (Tr. 5697–98)

401. Mr. Walker reiterated that:

"I proved in addition ... there was an extra component over here that had not been evidenced or even suspected, because a lot of wells came in there after this site was developed and started pumping. I pointed that out in my—well, where have all the toxic chemicals gone to, that additional wells were developed, which pulled it in a different direction.

Q. Was this opinion shared by Don Rima?

A. Yes; and still is to this day, to my knowledge. (Tr. 5770).

402. Thus, Mr. Walker's testimony explained the powerful nature of the drawdown and how it could even change the flow of an aquifer. Although we now know that the contamination was heading towards plaintiffs' wells in any event, the drawdown is obviously an important factor which Velsicol's water models failed to calculate in estimating the time of arrival of the contamination. If the drawdown in Mr. Walker's judgment could actually change the flow of the aquifer, then it would easily speed up the flow. The failure to factor it in to Velsicol's modeling supports the

Court's findings that the chemicals arrived in plaintiffs' wells years before the time Dr. Ziegler predicted and at a time when plaintiffs' model concludes.

## IV. THE CHEMICALS INVOLVED AND THE EFFECTS OF EXPOSURE

### A. Identification of the Chemicals in General

403. One of the problems exacerbating identification and monitoring the chemicals throughout 1964 through 1980 was the almost total lack of information emanating from Velsicol in identifying all the chemicals dumped on the farm. This absence of information included the most obvious chemical of all and which Velsicol purchased 20,000 gallons at a time, namely carbon tetrachloride. Moreover, it was not until June 4, 1982 that Velsicol finally admitted that chloroform had been deposited in the farm dump. (Interrogatory Answer 2)

404. On or about June 4, 1982 however, Velsicol was forced to reveal some of the chemicals that had been placed in the farm dump. This revelation was in response to plaintiffs' Interrogatory No. 2, *viz:*

"INTERROGATORY No. 2

State all materials, including specific chemical compounds and their specific technical descriptions that Velsicol dumped at the Hardeman County farm from the commencement of dumping in 1964 until the dump was closed and dumping ceased, in 1975.

a. State the basis including laboratory analysis and other testing Velsicol used in compiling said list.

ANSWER:

The defendant in answer to Interrogatory No. 2 (and subject to the agreed modifications) states the following:

a) PCL waste contains hex, hexachlorobenzene, octachlorocyclopentene, chloroform, carbon tetrachloride, AN2K, chlorinated polymers and/or unknown tars.

b) Heptachlor catalysts containing florex, heptachlor, carbon tetrachloride

c) R2 Filter cakes containing residue of endrin, hex BCH, hex VCL as well as cellulose and diatomaceous earth

d) Acetic acid still bottoms containing acetic acid, carbon, residue of endrin, residue of isodrin

e) Chlorendic anhydride still bottoms containing heptaine, hex, toulene, maleic acid

f) Isodrin distillation residue containing residue of isodrin, hex BCH, hex VCL, dicyclopentadiene and cyclopentadiene.

"Velsicol used the knowledge of Dr. Dan Marks to compile the foregoing." (Interrogatory Answer 2).

405. If, of course, carbon tetrachloride or chloroform had been identified by Velsicol early in the lifetime of the dump, careful gas liquid chromatographic techniques might have identified carbon tetrachloride and chloroform as migrating from the dump. (Exs. 4 and 5). Instead, as early as 1967, the USGS could only identify chlorinated hydrocarbons, the identity of which "eluded" the agency. (Ex. 2). Moreover, it was the first time that Velsicol identified chloroform and carbon tetrachloride as components of PCL waste.

406. Even Velsicol's answer to Interrogatory 2 was incomplete for several other compounds were identified by analysis as having been present in plaintiffs wells in measurable concentrations. These substances as identified by chemical analysis were (Ex. 13):

Carbon Tetrachloride

Chlorobenzene

Chloroform

Hexachlorobutadiene

Hexachloroethane

Hexachloronorbornadiene

Naphthalene

Tetrachloroethylene

Toluene

Hexachlorocyclopentadiene

Benzene

**B. The Reported Effects of These Chemicals as Found in the Scientific Literature or as Testified to by the Experts.**

407. Dr. Joseph V. Rodricks, a Ph.D. biochemist and an expert toxicologist who had spent 15 years at the United States Food and Drug Administration (Tr. 109) was asked to review the research and experimental literature that has appeared in scientific articles and journals over the past several decades for those substances reported to occur in the Sterling and Johnson wells in measurable concentrations (Tr. 114; 118; 122; 149–50) except in one case, hexachlorocylopentadiene, which had been reported as an air contaminant in the University of Cincinnati study discussed below (Tr. 114; 118; 148–49). A list of some of those substances, their molecular structure and their chemical stability in the dump were part of Exhibit 13.

408. Of the eleven substances, Dr. Rodricks reviewed the exposure data and chose four chemicals which, together with the exposure data, gave a "very high probability of adverse health effects" other than cancer, particularly to the liver, kidney, blood, nervous system and eyes. (Ex 236). These four chemicals were carbon tetrachloride, chloroform, chlorobenzene and tetrachloroethylene.

409. As to chemical exposure "with a very high probability of producing cancer" (Ex. 237) Dr. Rodricks again identified carbon tetrachloride, chloroform and tetrachloroethylene and added hexachlorobutadiene and hexachloroethane which had also been found in plaintiffs' wells in relatively high concentrations, as will be discussed below. Dr. Rodricks testified as to the possible synergistic effect of these five substances: (Tr. 2000)

"There are five chemicals in a mixture that are well-documented carcinogens. Carbon tetrachloride is clearly the best documented, and as I said, I mentioned eleven and possibly a twelfth study in which cancer has been seen. Chloroform is quite well documented. The other three are limited to one or two studies. I wouldn't discount them entirely. Chloroform, tetrachloroethylene, hexachlorobutadiene, and hexachloroethane make some contribution to risk. But relative to carbon tetrachloride, it is small. Carbon tetrachloride I reviewed all the available experimental information and found this Eschenbenner & Miller study we have gone over in certain detail seemed to me to have, although some limitations, notably the number of animals used in the study, altogether I think a rather good study and useful for assessing risk, which is projected to be in the range of ten percent—somewhat higher, if you add some exposures from the other chemicals. I think there was one more point, and then I will be quiet—well, maybe there wasn't."

Q. How many different studies did you rely on other than the Eschenbenner & Miller study?

A. The basic finding of carcinogenicity is based on seven papers, one of which contains five independent studies, so there is a total of twelve studies for carbon tet. There are four concerning the carcinogenicity of chloroform. The others, I believe, just one each. Was your question about cancer only?

Q. Yes. (Tr. 2689–90)

410. Some of the literature reviewed by Dr. Rodricks involved evidence both in animals (Tr. 122–23; 164) as well as humans (Tr. 123–24; 164). The evaluation was based on the basic inherent toxic properties of these substances (Tr. 123). The Court believes that a brief synopsis of the evidence here however should be made for those substances.

1. *Carbon Tetrachloride* (Ex. 241)

411. Numerous cases of poisoning from carbon tetrachloride have occurred in humans by ingestion and inhalation. The principal *acute* effects are liver and kidney necrosis and dysfunction, and depression of the central nervous system. If the acute exposures are not too massive, centrilobular necrosis may be reversible and repair complete in 3 weeks. Liver and kidney

damage are also the principal effects of *chronic* exposure to carbon tetrachloride. In (sic) case reports, exposure to low doses of carbon tetrachloride produces alterations in the activity of the liver microsomal enzyme system, development of fatty liver, liver enlargement, and changes in blood enzymes (serum glutamic pyruvic transaminase and alkaline phosphatase). In one study of factory workers exposed to carbon tetrachloride (Ex. 241, Barnes &. Jones), the authors noted *inter alia* that there was evidence of kidney damage as well as liver damage in workmen exposed to carbon tetrachloride.

412. Carbon tetrachloride is a potent liver carcinogen in rats, mice, hamsters, and dogs when administered by injection and oral administration. (Ex. 241). It also produced in a National Cancer Institute study, a significant increase in adrenal tumors in mice as well.

413. Dr. Rodricks testified that:

"Carbon tetrachloride listed at the top has probably been the subject of more toxicologic investigations than any other chemical you can think of. There may be one or two that range a little higher, but it has been studied since the 19th century, and most of its basic potential to cause these kinds of damage were established in the period of 1900 to 1950. The carcinogenic or cancer causing potential was well established in the 1940's repeatedly in several different laboratories. So carbon tetrachloride, as I say, is very, very well documented, those kinds of effects. (Tr. 131).

414. Dr. Rodricks further testified:

"Animal studies and human studies which have been summarized. In the case of carbon tetrachloride there are a very large number of review articles where scientists have accumulated information from primary sources, and it has been done over and over again. So that you could find, for example, in the National Academy of Science reports, or those of the Environmental Protection Agency or the World Health Organization documentations to these effects, and in that documentation you can find the conditions of exposure which led to these effects and how those vary from animal species to another—that sort of thing.

Q. Not being conversant with those articles or the type of articles to which you are referring, would an article on carbon tetrachloride cover the—generally cover the full range of what you have up here, or are they more segmented?

A. They vary considerably. It depends on the purpose of the author. There are, for example, people who specialize in liver injury, and there are more studies on carbon tetrachloride and liver injury than almost any other chemical. So that if you see reviews by, for example, pathologists or toxicologists on liver injury, there is frequent reference to carbon tetrachloride. And other cases, if you go to an Environmental Protection Agency health review document, you will find usually all effects covered.

Q. I believe I understood you to say in your testimony yesterday that the bulk of the work done on carbon tetrachloride occurred from 1900 to 1950. Does that mean that there are not widely reported articles with regard to this particular compound now? (Tr. 164–60)

\* \* \*

A. There was a great deal of work done during 1900 to 1950. There is still a lot going on because people are still trying to understand the so-called biochemical mechanisms by which carbon tetrachloride produces these specific various kinds of effects it can produce. (Tr. 166)

\* \* \*

415. And Dr. Philip Landrigan, M.D., Director of Surveillance Hazard Evaluation and Field Studies for the United States Center for Disease Control (Tr. 2707) testified:

Q. "Doctor, has your training, your medical training and experience, particularly with the Center For Disease Control, given you a basic knowledge and understanding from a medical standpoint of the health effects of toxic chemicals when human beings are exposed to them?

By toxic chemicals I refer to, as an example, carbon tetrachloride and chloroform.

A. Yes, it has.

Q. Are either of those two chemical agents cancer causing agents?

A. There is evidence from the animal studies that both of those are cancer causing agents.

Q. What clinical term or medical term is used to define a cancer causing agent?

A. It's probably referred to as a carcinogen.

Q. And state whether or not those two chemical compounds, carbon tetrachloride and chloroform, are generally recognized by the medical profession and scientific community as carcinogenic in nature.

A. Both of them are recognized as causing cancer in laboratory animals. (Tr. 2711–12).

416. Dr. Landrigan also testified:

Q. What would be the principal toxic effect from a chronic exposure, a fairly low level of carbon tetrachloride and chloroform over a very long period of time? What would be the principal health effect?

A. Most of the information on that is derived from animal studies, and the animal studies indicate that chronic exposure to carbon tetrachloride and to chloroform can cause damage to the livers of the exposed animals, such as cirrhosis of the liver, and can cause a development of tumors and cancers in the exposed animals. (Tr. 2724)

2. *Chloroform* (Ex. 241)

417. Inhalation of high doses of chloroform by humans can result in narcosis, anesthesia, gastrointestinal upset, cardiac sensitization, and damage to the kidney and liver. Chronic exposure to chloroform most typically results in liver damage. Ex. 241).

418. Inhalation studies in rats, rabbits, guinea pigs, and dogs show that repeated exposures of up to 6 months produce adverse effects on the kidneys and liver. Chloroform vapor is somewhat teratogenic and highly embryotoxic in rats and mice. (Ex. 241).

419. The carcinogenicity of chloroform has been evaluated in rats and mice. In a National Cancer Institute bioassay and other studies, oral administration of chloroform resulted in a significant increase in kidney epithelial tissue in male rats, thyroid tumors in females and liver cancer in male and female mice and rats. (Ex. 241).

420. Dr. Rodricks testified:

Q. As far as chloroform is concerned, which is the next compound on Exhibit 18, am I correct in saying that it has received almost as much attention in the scientific arena as carbon tetrachloride?

A. It's hard—I will grant you that, yes. I'm not sure. I haven't—

Q. Maybe a little less?

A. Certainly less, yes.

Q. Is there still work being done on chloroform?

A. Oh, sure. What I meant by my statement about the bulk of work is that the basic information about these effects I think was established certainly by the 1940's, maybe 1950's. What's—

Q. I probably misunderstood you. I believe that is what you said.

A. Okay. But since then there's a great deal of work where people interested in the precise molecular mechanisms by which these work, a lot of that work continues to this day. (Tr. 166–67)

3. *Chlorobenzene* (Ex. 241)

421. Chlorobenzene is a central nervous system depressant which causes symptoms typical of its anesthetic effect. Exposure to monochlorobenzene may cause headache, upper respiratory tract irritation, eye irritation, numbness and eventual loss of consciousness. No reports on the chronic toxicity of chlorobenzene to humans were found or introduced. (Ex. 241).

422. Rats, rabbits, and guinea pigs exposed to chlorobenzene orally and/or by inhalation show retarded growth, histopathological changes in the liver, kidney,

lungs, and gastrointestinal mucosa; increased liver and kidney weights; and hematologic effects. At high concentrations, exposed animals display narcotic symptoms. (Ex. 241).

423. Gonadal effects, including atrophy of the epithelial tissue in seminiferous tubules decreased spermatogenesis developed in dogs subchronically exposed to monochlorobenzene vapor. No reports on the teratogenic potential of monochlorobenzene were found. No data on the carcinogenic potential of monochlorobenzene were found. (Ex. 241).

### 4. Tetrachloroethylene

424. Human exposure to tetrachloroethene or tetrachloroethylene produces effects primarily on the nervous system, including unconsciousness, dizziness, headache, vertigo or light narcosis. Other effects occur in the liver, mucous membranes, eyes, lungs, kidney, heart and skin.

425. Tests with rats and mice reveal a high incidence of toxic nephropathy (kidney) following oral exposure for 78 weeks. Guinea pigs exposed to TCE by inhalation for 220 days (a total of 158 exposures) show significant effects on liver growth and weight. In addition, histological changes characterized by mild to marked central fatty degeneration also develop in liver tissue.

426. Tetrachloroethene is a potent liver carcinogen in mice. Both male and female mice received TCE 5 days/week for 78 weeks at low dose levels of 536 and 386 mg/kg, respectively. The incidence of heptocellular carcinoma in males was 21/49 for the low dose group compared with 2/20 in the control group. Comparable incidence rates in females are 19/48 in the low dose group and 0/20 in the controls.

### 5. Hexachlorobutadiene (Ex. 241)

427. In a two-year chronic study with rats given hexachlorobutadiene in their diet, a significant increase in renal tubular adenomas and carcinomas was observed in both male and female rats. Slight renal tubular epithelial hyperplasia was also not-

ed. A statistically significant increase in urinary coproporphyrin occurred in both male and female rats. Other effects include a mottled renal cortex and renal tube dilation, degeneration, and regeneration in kidneys from male and female rats given hexachlorobutadiene in their diet for 148 days.

428. Kidney damage is also induced by inhalation of hexachlorobutadiene. Injury to the tubular epithelium developed after 15 daily six-hour exposures to hexachlorobutadiene. Rats, rabbits and guinea pigs exposed by inhalation to hexachlorobutadiene for 7 hours/day over a 143-day period (a total of 100 exposures) show liver and kidney effects.

429. Evidence for the teratogenic potential of hexachlorobutadiene is inconclusive. Increased neonatal mortality, decreased birthweight, kidney damage, and degenerative changes in red blood cells occurred in offspring of female rats given single subcutaneous injections of hexachlorobutadiene before breeding. No effects developed in offspring of male and female rats given hexachlorobutadiene in the diet for 90 days before mating, during mating, and throughout gestation and lactation; at a higher dose level, a slight decrease in weanling body weight was the only observed effect.

### 6. Hexachloroethane

430. Exposure to hexachloroethane causes eye irritation in humans, including the inability to close the eyelid, tearing, inflammation, and visual intolerance to light.

431. Liver degeneration and tubular nephrosis of the kidney developed in rabbits given oral doses of hexachloroethane. Exposure to hexachloroethane also causes liver and kidney damage in cattle, sheep, rats, and mice. Subchronic exposure of dogs, guinea pigs, and rats to hexachloroethane by inhalation causes central nervous system toxicity in rats and dogs, increased liver size in guinea pigs and female rats,

and enlarged kidneys, spleen, and testes in male rats. In a teratology study, rats that received oral doses of hexachloroethane during gestation had higher fetal resorption rates and fewer live fetuses per litter than control rats.

432. A National Cancer Institute (NCI) bioassay of hexachlorethane has been conducted in rats and mice. Liver cancer occurred in mice administered 590 mg/kg/day hexachloroethane by stomach tube for 78 weeks. Both rats and mice exposed to hexachloroethane developed toxic tubular nephropathy, and treated rats exhibited increased mortality rates.

433. The toxic effects in general (Tr. 126) of the eleven substances that were reviewed by Dr. Rodricks were visually summarized and produced in Exhibit 18 which is reproduced here in pertinent part:

SUMMARY OF TOXIC PROPERTIES OF SELECTED CHEMICALS TO WHICH RESIDENTS WERE EXPOSED

| Chemical | Cancer Causing | Liver Damage | Kidney Damage | Damage to Reproductive System | Damage to Nervous System | Other |
|---|---|---|---|---|---|---|
| Carbon Tetrachloride | + | + | + | + | + | Eye Gastric |
| Chloroform | + | + | + | + | + | |
| Chlorobenzene | − | + | + | + | + | Blood |
| Hexachlorobutadiene | + | + | + | NYT | + | Cumulative Toxicity |
| Hexachloroethane | + | + | + | + | + | |
| Tetrachloroethylene | + | + | + | + | + | |

All except hexachlorocyclopentadiene found in water for drinking, cooking, bathing. Carbon tetrachloride and hexachlorocyclopentadiene found in air.

434. Dr. Rodrick's review and the exhibits and testimony of the other witnesses supported the facts as reported in Exhibit 18. Dr. Rodricks made it clear however, that as to Exhibit 18:

"I have listed the chemicals again and I have listed, then, in a fairly conventional way for organizing and systematizing toxicity information, I have just used the general term damage in most cases. The damage can take many different forms depending on the chemical, but damage to critical organs such as the liver, the kidney, critical systems such as the reproductive system or the nervous system, and then a few other miscellaneous systems as well, and then in the first column on the left I have listed information concerning the ability of these chemicals to induce the tumor formation that is cancer.

\* \* \* \* \* \*

Take for example the first line, carbon tetrachloride, I've listed a wide variety of effects known to be associated with carbon tetrachloride. That simplifies something that I would like to explain a little bit, that the particular kind of effect that will occur depends very much on the conditions of exposure, that under some conditions, let's say very intense exposure for a very short period of time, the predominant effect may be on the nervous system. In other cases where you have reduced exposure but for longer periods of time, you don't see any immediate or apparent effect, other systems may be damaged. (Tr. 125–26).

435. Dr. Rodricks explained that he had selected the liver, the kidneys, the reproductive system and the central nervous system because:

"They are fairly standard ways that toxicologists classify or systematize toxicity information, by looking at specific organism and seeing how the chemical may damage that specific organ, and under that conditions. (Tr. 128).

436. He further stated that the terms "Damage to Nervous System" meant:

" ... damage all over the nervous system in one or more ways. That can range just problems of dizziness, unsteady gait that it might bring on in people, perhaps tremors, a little shaking. You can get more serious effects with more prolonged exposure. Like you have listed under carbon tetrachloride, for example, the effect on the eye. That really is a nervous system effect. (Tr. 130–31).

Q. Over here (indicating)?

A. Yes. It really is known to damage the optic nerve, and that has been fairly well established. So there are a variety of nervous system effect that can take many different forms.

Q. And also over under "Other" over here (indicating), gastric.

A. Yes. Carbon tetrachloride—it's well known that ingestion of it can cause nausea and vomiting by some mechanism in the gastric system that we don't fully understand, but it is well documented.

## V. THE EFFECTS FROM THE POISONING THAT ACTUALLY OCCURRED OR WERE OBSERVED WERE CONSISTENT WITH THE REPORTED LITERATURE AND EXPERT TESTIMONY

437. At the outset, it should be pointed out that although Velsicol promised various members of this class that Velsicol would provide a health study of those individuals who were exposed to the contaminated water, such a study was *never* done by Velsicol. (Tr. 6980) Moreover, Velsicol had also promised representatives of EPA and the State of Tennessee that such a study would be done. Again, it never was. (Tr. 6966)

438. This omission is a glaring defect to defendant's claim of good faith and its assertions made even during this trial that if anyone were damaged, Velsicol would reimburse that person for such a loss. In fact, not only was such a study never done, Velsicol attempted to delay EPA funding of the study later done by Drs. Clark and Balistreri of the University of Cincinnati.

439. For purposes of clarity, the Court believes that a synopsis of the health evidence in one place at the beginning would

be helpful for the parties in this case and for any reviewing Court. While the Court adopts as fact the assertions in this compilation, it is a summary that does not necessarily include all the findings set forth herein. This compilation includes what the scientific evidence, as compiled by expert witnesses and their exhibits, indicates about damage arising from human exposure to carbon tetrachloride and chloroform in this case, what the effects were when the exposed individuals were assembled as a group and what the actual manifestations have been so far as to the five individual plaintiffs. The compilation is as follows.

HEALTH EFFECTS PROVEN

| Reported Effects in Humans and Animals | Carbon Tetrachloride | Chloroform | Effects Found in Plaintiffs as a Group |
|---|---|---|---|
| a. Central Nervous System Effects | | | |
| 1. Headaches | Ex. 328, p. 18, p. 20, p. 34, p. 38; Ex. 306; Tr. 8001 | Ex. 525, p. 119, p. 20 | 88% of the group had this effect (Rhamy) |
| 2. Dizziness, vertigo, loss of balance and faintness | Ex. 328, p. 18; Ex. 306; Tr. 8001 | Ex. 525, p. 120, p. 19 | 55% of the group had dizziness, and had loss of balance and 55% of them suffered from faintness (Rhamy) |
| 3. Lassitude | Ex. 328, p. 18, p. 19, p. 20, 22, 34; Ex. 306; Tr. 8001 | Ex. 525, p. 114, 119, p. 20 | 94% of the group had this effect (Rhamy) 59% had muscular weakness |
| 4. Nausea and vomiting | Ex. 328, p. 19, p. 20, p. 21, p. 22, p. 29, p. 34, p. 35, p. 38; Ex. 306; Tr. 8001 | Ex. 525, p. 119, 120 | 52% of the group had nausea while 38% of this group also had vomiting (Rhamy) |
| 5. Numbness | Ex. 328, p. 19 | | 51% of the group had tingling and poresthesise (numbness). See also Ex. |
| 6. Irritability | Ex. 328, p. 22 | Ex. 525, p. 119 | Yes |
| b. Eye effects | | | |
| 1. Optic atrophy, blurred vision, restricted visual fields and reduced corneal sensitivity; restricted visual fields | Ex. 328, p. 21, 22, 37, Table XI5 and Table X1–10 | | Over 32% had "significant eye problems with 64% experiencing burning of the eye, 26% decrease in vision, 56% bloodshot eyes and 53% photophobia. (Rhamy) |
| c. Liver and Kidney Effects | | | |
| 1. Liver damage as evidenced by abnormal liver enzyme levels and enlargement of liver | Ex. 328, p. 22, 23–24, 25–27, p. 41 et seq. | Ex. 525, p. 119, 120, p. 23–24, 113, 22 | All of the five plaintiffs were treated by plaintiffs' experts as having evidence of some degree of liver damage 1. Rhamy finds 8% of group has enlarged livers. |

HEALTH EFFECTS PROVEN

c. Liver and Kidney Effects—Continued

 2. Renal injury such as nephrosis and nephritis | Ex. 328, p. 23, p. 41 et seq. | Ex. 528, p. 113 | 2. Drs. Scott Clark and Balistreri fear an increased risk to liver disease insofar as each of the exposed persons life is concerned.

d. Cancer

 (positive in 6 strains of mice, at least 3 strains of rats and hamsters) and some evidence in humans | Ex. 328, p. 29, p. 50 et seq. | Ex. 525, p. 43–44

 1. Rhamy found 7 cancers so far, one of the liver and one of the kidney. There was one renal failure who has now died.

 2. Dr. Rodricks, based on "very conservative" estimates figures each of the 5 plaintiffs to be at a 10% increased risk of cancer over their lifetime when they are already at 25% increased risk.

 3. Dr. Bingham figures a 49% increased risk but recognizes the figure may be between 10–50% depending upon how you estimate exposures and doses.

 4. Dr. Marvin Schneiderman charts an increased risk of 15–50% of contacting cancer.

e. Immune surveillance system

f. Psychiatric damage

HEALTH EFFECTS SEEN SO FAR

| Steve Sterling | James E. Wilbanks | Curry A. Ivy | Daniel Johnson | James O. Maness, Jr. |
|---|---|---|---|---|
| Mr. Sterling has had headaches (Tr. 2067) which he never had before 1977 (Tr. 20067–68). His wife's headaches started in 1974 (Tr. 2119) | Mr. Wilbanks has had headaches for several years (Tr. 2212) | "Severe" headaches (Tr. 3012; 7525) | Mr. Johnson got headaches (Tr. 2302; 3120; 6749) | Jimmy Maness has "frequent headaches (Tr. 3005) and "bad" (Tr. 2168), severe allergies and seizures |
| | Mr. Wilbanks gets dizzy (Tr. 2210; 3019) | Dizziness (Tr. 3132; 3012) | Mr. Johnson could not walk properly, he was off balance, had balance spells (Tr. 3120; 6750) | Dizziness and seizures (Tr. 3005) |
| Easy fatigue, "too weak to go fishing" (Tr. 3038) | Easy fatigue (Tr. 3129, 3130) very weak (Tr. 3019) | | Mr. Johnson would become fatigued (Tr. 2306) | He had general lassitude |
| Nausea in 1977 and 1978 which improved by the time of his medical examination | Mr. Wilbanks would get sick from the water (Tr. 2212) | Nausea and vomiting (Tr. 3013; 7526) | Mr. Johnson got nausea (Tr. 2302, 6749, 9579). Mr. Johnson would vomit (Tr. 2302, 9579) | Had nausea and vomiting (Tr. 3005) |
| Mr. Sterling has a "deadness in his arms and legs" (Tr. 2067) | Mr. Wilbanks had numbness (Tr. 3125) | Mr. Ivy has a numbness on the left side of his face, arm and on down left side of his body (Tr. 2274, 3129, 7528) | Mr. Johnson has "a lot of numbness in his left hand and arm" (Tr. 2315, 3121, 9580) | |
| Mr. Sterling is nervous (Tr. 2067). "My nerves, I mean they are real bad" (Tr. 2067) | Considerable nervousness and marital conflicts (Tr. 3019) | Nerves were "very bad" (Tr. 3012) | Mr. Johnson became nervous (Tr. 2306) | |

HEALTH EFFECTS SEEN SO FAR

| Steve Sterling | James Wilbanks | Curry Ivy | Daniel Johnson | James O. Maness, Jr. |
|---|---|---|---|---|
| Loss of visual acuity and restricted peripheral vision (Tr. 7908) | Mr. Wilbanks' eyesight is "getting bad" (Tr. 2212, 3125) | Mr. Ivy's eyes would burn very badly (Tr. 2269) and he has optic atrophy indicating damage to the nervous system | Mr. Johnson had problems with his eyesight (Tr. 2306; 6750). Restriction of peripheral fields. (Tr. 7907) Blurred vision (Tr. 1978) | Bloodshot and photophobia (Tr. 3006) |
| He has an enlarged liver (Tr. 3041) | | Elevated enzyme levels indicating liver cell injury (Tr. 246–47) Increased crestinine (Tr. 7549) Upper right quadrant tenderness (Tr. 7548) | Elevated biliburin and bile acids (Tr. 2898) Upper right quadrant tenderness (Tr. 7548) | Abnormally enlarged liver (Tr. 2994; 3005) Elevated liver enzymes (Tr. 3006) |
| His BUN for kidney function was increased. He has only about 20% kidney function and was hospitalized for kidney infection in 1974–75. | One kidney already gone | Bun for kidney increased | BUN for kidney decreased | |
| | Mr. Wilbanks has already lost one kidney to cancer. | | | |
| Destroyed or impaired | Destroyed or impaired | Destroyed or impaired | Destroyed or impaired | Destroyed or impaired |
| Post-traumatic stress disorder (moderate) (Tr. 6586, 6594) | Post-traumatic stress disorder (mild) (Tr. 6586, 6594) | Post-traumatic stress disorder | Severe trauma and severe post-traumatic stress disorder (Tr. 6586, 6594) | Post-traumatic stress disorder |

440. In addition to this compilation, there is evidence that the five flagship plaintiffs' normal immuno-surveillance system has been compromised or destroyed as a result of the exposures to these chemicals. Moreover, substantial evidence exists showing psychiatric damage to these five plaintiffs. A discussion of these two effects occurs below for the five plaintiffs.

441. The Court believes that on the basis of the expert testimony concerning causation and the fact that the observed effects in the group were consistent with the reported literature that the injuries to the five flagship plaintiffs were the result of the chemical wastes dumped on the farm Velsicol which contaminated their drinking water wells. This is as true for the more subjective effects such as the splitting headaches experienced by almost all plaintiffs as well as the more clinical and chronic effects such as the kidney cancer already suffered by Mr. Wilbanks, the optical atrophy suffered by Mr. Ivy and Mr. Johnson, the liver dysfunctions of Mr. Sterling, the seizures of Jimmy Maness or the post-traumatic stress disorder suffered by all.

## A. The Clark/Balistreri Studies Confirm that there was Liver Damage That was Caused by Velsicol's Chemicals

### 1. The Study and its Background

442. For several years the University of Cincinnati had been investigating various aspects of the health risks associated with the treatment and land application of waste products. (Ex. 258, p. 1).

443. In 1977, the University of Cincinnati, under a grant from the United States Environmental Protection Agency (EPA), was in the process of conducting such an epidemiologic research study of wastewater treatment plant personnel in Memphis, Tennessee (Ex. 253, p. 36).

444. One of the two Memphis treatment plants involved in the study (the North Treatment plant) served an area which included Velsicol's Memphis facility. (Ex. 253, p. 36) Chemical wastes from the Velsicol plant had been routinely discharged into the Memphis sewers and flowed into the Memphis North treatment plant begin-

ning with the plant's operation in August 1977. (Ex. 253, p. 36).

445. A portion of the wastes became airborne at the treatment plant because of the aeration process utilized and because of the open drains (Ex. 253, p. 30–37).

446. Workers at the North Plant began complaining of eye irritation and respiratory distress in the spring of 1978 during periods of time when chemical odors at the treatment plant were unusually intense. (Ex. 253, p. 37). In conjunction with the ongoing study of the treatment plant, a urine screening study of the workers was conducted in May and June 1978 and samples were collected at various locations in the treatment plant (Ex. 253, p. 37).

447. Hexachlorocyclopentadiene (HEX) and hexachlorobicycloheptadiene (HEX-BCH), two compounds produced by Velsicol, were detected in air, wastewater and urine specimens obtained at the time (Ex. 253, p. 37; 2783). These two substances effect livers in test animals and in brains one of the acute effects is eye irritation and respiratory distress (Tr. 2783).

448. During that time the study was being conducted, Dr. Clark noted an odor from the plant "that was not characteristic of domestic waste water treatment plants. (Tr. 2762–63).

449. On May 11, 1978, an article appeared in Memphis newspaper entitled "Well Pollution Laid to Chemical Dump." Sometime in July 1978, the article came to Dr. Clark's attention during the course of his investigation of Memphis Sewage Treatment Plant Personnel. (Tr. 2785) Since Velsicol was involved in both the well pollution (Hardeman County) and treatment plant situations, Dr. Clark decided that health effects information from the ground water community would be possible to use in interpreting data collected from his Memphis study. (Ex. 253; Ex. 255; Tr. 2785–86).

450. On August 23, 1978, Dr. Clark met with Christine Sterling, Dr. Hale and Mr. Wallace. Two air samples were collected at the Sterling residence at that time (Ex. 255). Dr. Clark was told that the only health-related data collected up to that time

was pesticide analysis of several blood specimens obtained by Dr. Hale several months prior (Ex. 255).

451. As a result of that first visit in August 1978, Dr. Clark and his colleagues made a judgmental decision "that a health study was warranted and, indeed overdue" (Tr. 2791). He explained:

A. Well, most—the largest single group stopped using the water for drinking in May of that year. Some had stopped in the fall of '77 and some had stopped and started again, but basically all were using it for toilet uses still, quite a few for bathing still, in August.

Q. Of what year, 197—

A. '78. (Tr. 2791–92).

\* \* \*

Q. Doctor, you said that this study was overdue. What do you mean by being overdue?

A. Okay. Well, the exposure, the drinking exposure, which was certainly one of the most important ones, had stopped, and that the health effects of exposure would be in an acute phase where if it was during the time of the exposure something was happening you could document that, and then years later there may be a chronic effect appear, but in between there may be nothing that is evident by most studies. So it would be important to try to have a study going on somewhere near the phase and that appeared to have been past, although they still were using the water. (Tr. 2792–93).

452. On October 2, 1978, Dr. Clark, Sandra Russell, RN and Ms. Kathy Hunninen visited the affected community. A history was obtained from some of the residents and five water samples were obtained for chemical analysis and cell toxicity studies.

453. On October 3, 1978, Dr. Clark met at the EPA Atlanta offices with Dr. Ken Powell of CDC and Mr. John Moebes, Ms. K. Taimi and Mr. Bruce Ingersoll of EPA to discuss his urine screening and interviewing planned for Hardeman County and a nearby control group. Dr. Powell suggested collecting a blood specimen for hepatic profile at the same time as urine collection rather than to await the results of the urine analysis. (Ex. 255)

454. On October 13, 1978, the EPA Atlanta office asked Dr. Clark to postpone his study for 10 days because a Velsicol-backed comprehensive health study was imminent. Dr. Clark then cancelled a meeting planned for the following week in Nashville with personnel in the Tennessee Public Health Department and Water Quality Office. (Ex. 255)

455. On November 3, 1978, Dr. Clark informed U.S. EPA Atlanta that he was going to visit the Hardeman County community next week regarding proposed health study whether or not EPA would fund the study.

456. On November 6, 1978, Dr. Clark, Sandra Russell, R.N., Virginia Boyle, R.N. and Ms. Kathy Hunninen visited the affected community. They were informed that no health study had been conducted by Velsicol and that they had in fact received registered letters that day from U.S. EPA Atlanta advising them to immediately cease *all* water use because carbon tetrachloride in high concentrations had been found in the water. Dr. Clark informed the residents that blood and urine collected and analyzed at this time would be of use in an eventual comprehensive health evaluation because of the closeness in time to the actual period of exposure. The residents asked Dr. Clark to proceed with the evaluation.

457. Limited health and environmental monitoring was carried out. The environmental monitoring consisted of five air samples and 2 water samples.

458. The health monitoring consisted of:

(i) a short health questionnaire administered;

(ii) about 40 blood specimens collected for hepatic profile; and

(iii) about 50 urine specimens collected for chemical analyses.

459. In effect, EPA asked CDC and Dr. Landrigan in particular to be acting as medical consultants to the proposed Clark/Balistreri Study (Tr. 2732). Dr. Landrigan and his staff reviewed the proposed protocols. He testified:

"A. Our general sense was that short term testing was not likely to be productive, because the levels of the exposure

that according to our best information, the levels of exposures there were probably not high enough to have produced short term acute effects in the exposed people. We were concerned, therefore, that if short term testing were done, that it could provide results, would provide false reassurance to the people who lived there. That is to say, we were concerned that tests might be done, blood might be drawn, laboratory examinations might be carried out, and we could conceive of a scenario in which all of these results would be normal, or at least within normal limits. The persons who conduct the tests would then, of course, need to report their findings back to the residents of Hardeman County, and quite properly, they would say to the people living in Hardeman County, 'Well, we have done tests on you, and the results of those tests are all normal.' Which would be a perfectly accurate statement. We are concerned, though, that such a statement might falsely reassure people in that the existence of normal tests at one time on liver function tests provide no guarantee at all that a chronic effect is not insidiously developing in the liver, something which will be come evident only five, ten, fifteen, twenty years hence. We were particularly concerned in that regard about the possible threat of future cancer.

"Long experience in screening for chemical carcinogens has shown that people can be exposed to a chemical carcinogen, they can have medical tests performed on multiple occasions in succeeding years and have perfectly normal results in those tests. And then after a period of many years silence, a so-called latency if you will, a liver tumor finally erupts many years later.

"We were concerned that if we did acute testing on the people of Hardeman County and found nothing, and told them that everything was okay, that that might be falsely reassuring information. We advised, therefore, that if acute testing were done at all that it be done with full cognizance of that context.

Q. Would the latent nature that you described in the liver cancer, liver tumor, also apply as well, Doctor, to the renal carcinoma, kidney tumor?

A. That concept of long latency applies to almost any cancer that's caused by exposure to a chemical agent. (Tr. 2732–34)

460. On November 8, 1978, Virginia Boyle, R.N. and Sandra Russell, R.N. visited the affected community to collect specimens not obtained on November 6–7 and to administer the questionnaire to people for whom it was not given on November 6–7. (Ex. 255)

461. On November 22, 1978, Dr. Clark informed Dr. Powell of CDC by telephone of the preliminary results of the hepatic profile testing giving him the ratio of "abnormal" to total tested for each of the analyses, divided according to adults and children. He said that he would relay the information to Dr. Phil Landrigan who was now monitoring the Hardeman County situation for the State of Tennessee. (Ex. 255).

462. On November 29, 1978, Dr. Clark met with Drs. Fred Such and William Balistreri of the Children's Hospital to discuss his data. This occurred because the results of these November 1978 tests were so positive, and because there was a chance of obtaining the world renowned liver expert Dr. Balistreri for any future study. A decision was made to do further testing which occurred in January 1979. (Ex. 255).

463. On December 19, 1978, Clark, Channing Meyer, M.D., Fred Such, M.D., William Balistreri, M.D., James Lucas, M.D., Peter Gartside, Ph.D., Victor Elia, Ph.D., Mr. Herb Pahren, Virginia Boyle, RN, and Sandra Russell, RN met in Cincinnati to review the available data from air and water samples, blood and urine screening. Everyone agreed that the medical and environmental screening should be repeated. The need for a control group from the same area was also discussed. (Ex. 255).

464. As a result of this meeting, an extensive survey was conducted in January 1979 and a follow up was performed in March 1979. Ultimately, about 150 people from the Toone-Teague Road area and elsewhere in the surrounding communities participated in this more detailed investigation. (Ex. 255).

465. On January 9, 1979, Dr. Clark met in Nashville with Dr. Phil Landrigan of CDC and Dr. Hutcheson and others from

the Tennessee Department of Public Health to discuss the protocols for the upcoming health screening. (Ex. 255).

466. On January 12, 1979, Drs. Clark, C. Meyer and W. Balistreri, Ms. D. Alexander, Ms. K. Hunninen, Ms. C. Spence, Ms. V. Boyle, RN, Ms. S. Russell, RN, and Ms. M. Davey, RN arrived at the study site to prepare facilities for specimen collection on January 13-14, 1979. (Ex. 255).

467. On January 13-14, 1979, Drs. Clark, Meyer and Balistreri, Ms. Alexander, Boyle, RN, Russell, RN, Davey, RN. Hunninen and Spence conducted environmental and medical screening.

468. The environmental monitoring consisted of air and water samples obtained in selected homes.

469. The medical monitoring consisted of:

(i) a health questionnaire administered;
(ii) blood specimens (fasting and postfasting) on approximately 60 subjects and 90 controls were obtained for:
—bile acids (fasting, nonfasting)
—hepatic profile
—hepatitis serology
—blood clots (for EPA);
(iii) urine specimens (fasting and postfasting) on approximately 60 subjects and 90 controls obtained for":
—organic chemical monitoring
—creatinine
—urinalysis
—bile acid (fasting and nonfasting); and
(iv) a brief physical examination performed.

470. Based on the results of the medical histories and the air and water sampling data, the people who participated in this study were divided into 3 categories.

High 1) Those whose water supply had been contaminated.

Inter 2) Those who were frequent visitors and/or neighbors of those in Group 1 and those with a lesser level of water contamination

Low or 0 3) Those with no known exposures to contaminated water or other chemicals.

471. Data collected in this study were adjusted by appropriate statistical methods for age and sex, and alcohol consumption and those with known occupational exposure to a variety of substances were excluded. (Ex. 258)

472. Dr. Clark testified:
"Doctor, you have the date, November '78 and January '79. There were actually two testing periods?
A. Yes. As I mentioned, when we had the visit in August, we decided that a study should be done, and we would try to put one together, and we did do a study in November, 1978, which included, it says here, the liver function tests, the biochemical testing, the health questionnaire and chemical and air and water analysis. Based upon those results, and bringing in an expanded research team, to include Dr. Balistreri, we decided—by "we" I mean other people at the university as well looking over the data that a second testing was warranted, and one was that more detailed and would involve a physical examination and we felt very strongly about this. As you can see, that's a two-month period, and a difficult two-month period to do anything new, the holiday period. But we organized a new study and expanded and got a local control group, and repeated what we did in November, plus did more. (Tr. 2795-96).

473. Dr. Clark testified how the study protocols were developed, including the definition of the control group (Tr. 2797) and an attempt to exclude those who might have other disease states (Tr. 2819). Dr. Clark also stressed that:

We had two physicians on our research team who participated in the hands-on physical examination of the participants in January '79.

Q. Who actually examined the people there?

A. Dr. William Balistreri and Dr. Channing Meyer.

Q. All right, sir. And how many times did they do a physical examination?

A. They did it one time.

Q. What were the results of this physical examination?

A. Okay. The main result of that examination was that they detected seven individuals in whom there was a slightly enlarged liver. Six of those were in the exposed group, and that difference was statistically significant. (Tr. 2806).

## 2. How Liver Damage is Assessed

474. The results of the Clark/Balistreri studies can best be understood in the context of liver functioning in general. Insofar as the human liver and effects on that organ from chemicals are concerned, Dr. William Balistreri, M.D. was the one true expert on the human liver presented by either party in this action (Tr. 2878).

475. As pointed out above, Dr. Balistreri became involved in the study of the Hardeman County residents after Dr. Clark asked him to interpret the liver function tests that had been performed in November of 1978. (Tr. 2881). This led to the additional testing in January 1979 (Tr. 2881).

476. Dr. Balistreri explained that the liver fulfills three basic roles:

"Well, the liver has several functions. It has a clearance function, a detoxification function, which is, of course, of major concern. It removes the compounds that the body makes each day, which are of no value, and these are altered chemically and then excreted in the bile to be lost in the stool each day. It also will detoxify compounds that are brought to the liver through contact of the organism or the individual with these compounds. It also serves the function of synthesis. It makes various proteins which are needed by the body, whether they are enzymes needed to carry out vital functions or whether they be proteins needed to aid in our blood coagulation or muscle function, for example. In addition, [it] serves a storage function. It will store certain compounds which may be needed later by the organisms. The classic example would be the storage of glucose for energy at a time of need, or fat as a source of energy. (Tr. 2881–82).

477. Dr. Balistreri pointed out that when the liver sustains an injury, three methods are available to evaluate the existence and extent of the injury. (Tr. 2882–83; 2913). He stated that these three methods were:

(a) Biochemical, namely "biochemical measures of liver functions [which] are to assess certain blood tests, which might reflect that the liver is not carrying out the functions that it was meant to do" (Tr. 2882–83). It would include tests such as the bilirubin test (Tr. 2913).

(b) Histological, namely "[a] more direct measure of liver integrity would be to actually obtain a piece of tissue to examine it under a microscope" (Tr. 2883). This involves a biopsy and is confirmatory of the biochemical method. (Tr. 2883; 21913).

(c) The third method is the clinical examination (Tr. 2913). This would include the physical examination, the palpitation of the liver and perhaps even a liver scan (Tr. 2913).

478. In testing for liver damage, it is always important to do it as close to when the damage occurred as possible because the liver regenerates itself and the clinical effects dissipate over time. (Tr. 2884).

479. In general, to evaluate the status of the human liver, its ability to carry out its many functions and any damage thereto, a variety of biochemical tests concerning liver function are performed. These routine tests, called liver function tests, are tests that measure the activity of enzymes that are either found in the blood at low concentrations or are normally absent from the blood.

480. These tests are considered diagnostic of liver injury because any kind of chemical injury causes liver cells to be damaged and permeable (leaky), which in turn causes the release of internal enzymes of the cell. Because cells are continually being replaced and the old or injured one destroyed, some of these enzymes are released in low concentrations in the blood under normal conditions. Normal values for liver enzymes in the blood are controlled both by the release of the enzymes and the ability to clear them from blood.

481. Because these enzymes are normally released by healthy livers during the

process of renewal, the values obtained from liver functions tests must always be compared to expected normal values for the laboratory during the test. In other words, altered function of the liver is demonstrated by the presence in the blood of excessive levels of certain enzymes that are released by damaged or dying liver cells. The alteration of these serum enzymes and functions indicates that liver damage or death has occurred.

482. Dr. Balistreri described the general biochemical liver function tests:

A. "The tests..... were the standard tests of liver function—alkaline phosphatase, bilirubin and transaminases.

Q. Are those what is known as liver function tests, or is one of them liver function and the other something else?

A. I think the terminology is somewhat confusing. Liver function tests are any blood biochemical measures which would measure a specific function of the liver. Of course, the list is very long and new tests are being developed at very frequent intervals. So these that I have mentioned are in that category of liver function tests. They are some of the ones that are more commonly used.

Q. By liver function—explain in lay terms what that means?

A. By liver function we mean any of the processes that the liver will carry out during the day in terms of synthesis, as I mentioned, in terms of clearance or detoxification, as well as in some of the other storage functions that it may do. So any blood test that would reflect any of the specific functions of the liver can be considered a liver function test. (Tr. 2884–85).

\* \* \*

Q. Now, you mentioned liver function tests, and you mentioned alkaline phosphatase. Alkaline phosphatase—is that a liver function test?

A. Yes, sir.

Q. SGOT—is that a liver function test?

A. Yes, sir.

Q. Well, first, tell us what the alkaline phosphatase test is and what it is designed to do, and so forth?

A. Both of the tests that you mentioned can be explained in relatively simple terms. These are enzymes that are normally inside a liver cell. Therefore, their appearance in the blood would reflect the fact that that liver cell has been damaged. (Tr. 2885–86).

\* \* \*

Is the bile acid test a liver function test?

A. Yes.

Q. And what is a bile acid test designed to do, and what is it?

A. Bile acids appeal to many investigators in liver disease, because they should very accurately reflect liver injury. Therefore, any abnormality should reflect an aberration in liver functions, i.e., synthesis. Number two, bile acids are then excreted by the liver. So again, an abnormality might reflect that specific function being deranged, and finally, bile acids are removed from the blood. In other words, they are cleared from the blood by the liver. So once again an abnormality in the blood test might reflect the derangement in hepatic function. So it's a multi-faceted approach to the diagnosis of liver disease. (Tr. 2887–2888).

483. Dr. Balistreri was careful to point out however that:

".... if you have a patient, does the fact that the liver function tests themselves improve, as some of them have in this case, I believe, from one time of testing to another, mean that the liver is completely healthy?

A. No, sir, not in my opinion.

Q. If you have a patient with an abnormal function test, in your opinion, would this indicate liver scarring?

A. It doesn't necessarily indicate liver scarring. It indicates liver cell damage. The degree of such really needs to be assessed by a combination of the methods that I mentioned. (Tr. 2899).

484. Dr. Balistreri further explained that:

An injury to the liver cell may be associated with a setup of a focus which may later cause trouble, whether this be silent scarring, which will later contract, or whether it be the development of an abnormal cell, i.e. a cell which has a

potential to become cancerous, is totally unknown. (Tr. 2901).

485. As to the palpation of the liver, Dr. Balistreri described it as including:

" ... standard methods of examination. The method that I personally use, and that I teach, is to first with the patient lying prone, to palpate the entire abdomen, starting well into the pelvis, in case the liver is so enlarged that you don't want to come into the middle of it. That's one of the common errors, for people to start right at the rib cage and miss a very large liver. So, to start at the pelvis with your right hand, and being on the patient's right side, and to slowly advance your fingers, so that you will eventually reach the rib cage. Obviously, you can't palpate through the rib cage. If there is any gross enlargement or any masses, or an enlarged gall bladder, that should be felt as you advance. The next maneuver would be to start in the exact same location and to have the patient take a very deep breath. Since the liver is right underneath the diaphragm, a deep breath with the diaphragm moving down may push the liver down into the abdomen. That might give you an idea. The next maneuver would be to percuss the liver, using the standard carpenter's maneuver of one finger, percussing over the other and look for signs of dullness. Since the contents of the chest cavity are basically air, any change that you denote from dullness to resonance should indicate something underneath it. In terms of consistency of the liver, if you are able to palpate the liver, you would them make a comment as to whether it was felt to have a sharp edge, firm edge, et cetera. These are basically the standard methods of physical examination. In terms of ancillary findings, you might look for signs of liver disease in other areas of the body. (Tr. 2914–15).

486. As to doing liver biopsies, Dr. Balistreri explained:

There are two methods of obtaining liver biopsy. Of course, the most reliable is to actually perform an operation, or during an operation for an incidental problem, such as gall bladder surgery, to take a small, what we call, a wedge, which is actually just a sliver, a piece of the liver. The other method, which is done very commonly in clinical practice, is to use a needle, a hollow needle, which is introduced through the rib cage into the bed of the hepatic tissue, and very similar, if I may use an analogy, to coring an apple, the liver tissue will remain in the hollow core of the needle. This is then sent for examination. (Tr. 2917).

487. Finally, Dr. Balistreri pointed out that liver damage can run the gamut between subcellular damage on the one hand and frank liver cell necrosis on the other. He testified:

Organ injury is simply the destruction of one or more components of the liver. This may be a gross level. Obviously, if we were to open up an animal and remove part of the liver surgically, I guess that would qualify as an injury.

We may, on the other hand, selectively injure certain cells, and on an even more finite basis we might injure certain subparticles of the cell, and since there are several cell types within the liver we could injure various cell types. I would call each of these lesions hepatic organ injury. (Tr. 2927–28).

Q. Let me see if I can put this in a context that I might understand. Are you saying that injury can be as low or as high as, well, let's take the upper level, necrosis—am I saying that correctly? What does that mean? What does the liver—

A. That implies the death of a cell or cells.

Q. Are you saying that there has to be a death of cells before there's an injury to the liver?

A. Well, as I just explained, it can be a simple paralysis of function of a certain particle of the liver, and there is models for that, so an injury can be anything, I guess, even in a more simplistic manner, anything that impairs the normal functioning of that liver.

Q. All right, sir.

A. It doesn't necessarily imply cell death, but certainly when you get down to the basic, that usually is a concomitant. (Tr. 2927–28).

### 3. *The Results of the Clark/Balistreri Study*

488. The results of the two examinations, one in 1978 and the other in 1979 were published in the January/February 1982 issue of the Archives of Environmental Health. This publication was peer-reviewed as pointed out by Dr. Clark in his testimony (Tr. 2817–18) and entered into evidence as Exhibit 251.

489. Specifically, the results of the study relied *inter alia*, upon the results of the testing performed in November 1978. About 25% of the blood tests indicated that liver functions were above the normal limit in the 39 people who were tested. In comparing these results with a population of Memphis utility workers and their families, the number of the abnormal test results presented in the Toone-Teague Road area was found to be significantly higher than those of the Memphis group. (Ex. 258).

490. In addition, to the abnormal blood tests, medical histories revealed that there were a number of illnesses and a variety of symptoms that had occurred in the population of the Toone-Teague area in the preceding 12 months including 6 hospitalizations. (Ex. 258)

491. Although these symptoms and hospitalizations were difficult to relate to the contamination of the well water supplies, it was noted in the study that the acute symptoms diminished rapidly when the drinking of the contaminated waste was stopped. Air and water sampling performed during the time of this study confirmed the presence of several organic chemicals with carbon tetrachloride being present in the greatest concentration. (Ex. 258).

492. In comparing the high, intermediate and no exposure categories, no significant differences were found in the liver function profiles, hepatitis tests, bile acid levels or illness rates during the January study. Persons who had abnormal liver function tests in November had improved by the January testing although there were still a few who were still abnormal. Those who demonstrated persistent elevations in the January test were retested in March and were found either to be in the normal range or to have experienced a general drop in the liver function test values and were moving toward normal. During the physical examination 7 individuals were found to have borderline enlargement of their livers, 6 being in the exposed group and 1 in the nonexposed group. The difference was statistically significant. (Ex. 258)

493. A comparison of the results from the exposed group tested in November 1978 with those from the January 1979 nonexposed group showed the exposed individuals to have a higher prevalence of liver function test abnormalities.

494. The study concluded:

"Exposure to many agents, including drugs, alcohol, and a variety of chemicals, as well as disease states including viral hepatitis can cause liver damage. This study, which excluded these potential causes, indicated the presence of a subclinical and transitory liver injury that appears to be associated with the water consumption from wells contaminated by the leaching of material from the pesticide waste dump located in that area. The acute symptomatology and abnormal liver function tests have in all but a few cases returned to normal. However, it is impossible at this time to predict whether there will be any future chronic effects as a result of this exposure. Six of the seven individuals found to have enlarged livers were the exposed group. A medical follow-up of those studied in this investigation is warranted." (Ex. 251, p. 17).

495. Dr. Clark restated these conclusions in his testimony:.

A. There were several [conclusions]. I mentioned earlier the liver enlargements were significantly higher, there were more of them in the exposed group. Other conclusions were, in November there were several liver function tests that were statistically higher in the exposed than in the control group. Individuals that we saw both in November and January, we saw a significant decrease in several of their liver functions tests and in one of the bile acid tests. These differences could not be accounted for by differences in age or sex, alcohol consumption or hepatitis exposure. So we concluded that the most probable cause of those was their exposure to the water. (Tr. 2816-17).

".... there was an excess of elevated liver function tests in November and that we didn't find that in January, and in comparing people with themselves their tests went more toward normal from November to January; that on the bile acid tests, again, there was a significant decrease in one of the test results, which means an improvement, from November to January; that on one of the other bile acid tests when we had the data compared from the fasting samples to the nonfasting sample, generally there's an increase and in this one case there was a decrease in the group, which was statistically significant, and one of the statements in the report that Dr. Balistreri authored was that he could—I can read it as his statement or wait for him to read it.

\* \* \*

Exposure to many agents, including drugs, alcohol, and a variety of chemicals as well as disease states, including hepatitis, can cause liver disease—liver damage; excuse me. However, based upon the results of our study, which excluded many of these potential causes, it is our opinion that the most likely reason for the presence of liver abnormalities discovered in the inhabitants of the Toone-Teague area was the consumption of water from wells contaminated by the leaching of material from the chemical land dump located in that area. The acute symptomatology and the abnormal liver function tests have in all but a few isolated cases returned to normal and with no further contamination should remain normal. However, it is impossible at this time to predict whether there will be any future chronic effects as a result of this exposure. We believe that medical followup of the people studied in this investigation is warranted and we offer our help in performing these follow-up. A repeat testing in early 1980 would be a possible initial step in such a follow-up investigation. (Tr. 2819-20).

496. In addition to the testimony concerning the increased risk of contracting cancer as found below, the Court finds that a preponderance of the expert evidence and expert testimony as given proves that there was an increased risk of liver disease in the future to the exposed group as a whole. This, plus the expert testimony, convinced the Court that the five flagship plaintiffs are at increased risk of having all types of health problems in the future.

497. In referring to the exposed individuals as a group, Dr. Clark testified:

Q. Doctor, in your opinion do you believe this population, because of their exposure, is at increased risk of having health problems in the future?

A. Yes, I do.

Q. Why?

A. Why—because these exposures were to multiple compounds in very high doses. Some of the doses were at the level where effects are seen in very small animal studies. So when you have substances at these high levels, there is some increased risk. The difficulty is knowing whether the population size is always great enough to see the risk and how long you have to follow a population to find the actual effect (Tr. 2825).

498. Dr. Balistreri testified:

Q. As a result of the injury to these people, in your opinion, are they at an increased risk of developing liver disease in the future as a result of this injury from the toxic chemicals?

A. Yes, sir. (Tr. 2892).

499. He explained further:

Q. I guess the question is, has the injury resolved meaning that there will be no more problems with liver disease?

A. No, I can't say that.

Q. In your opinion has it not resolved?

A. Yes.

Q. State whether or not the potential for developing liver disease in the future in this group is high.

A. In my opinion, yes.

Q. Why?

A. If we draw an analogy to other forms of liver injury, say viral hepatitis due to hepatitis B, we know that a baby who is exposed to hepatitis B in early life may lead a relatively normal existence for thirty, forty years and then up with a cancer of the liver at age thirty or forty. This is well known in many countries. We unfortunately saw several instances of this in the Orient and it's been well documented in Africa and some of the other countries where the risk of hepatitis is very, very high, viral hepatitis.

In a similar manner diseases of liver function, some of the metabolic diseases, which for simplicity I won't specify, have been known after years of chronicity to have developed a liver cancer. That's the end stage. Certainly there are all intermediate grades of illness, such as scarring, in other words liver cirrhosis, and one may lead into the other. And it was on this basis that I had that opinion of the potential for further damage or further disease. (Tr. 2894–95).

**B. The Rhamy Study Confirms that There was Liver and Other Types of Damage That was Caused by Velsicol's Chemicals**

500. In addition to the study by Drs. Clark and Balistreri from the University of Cincinnati, Dr. Rhamy, a physician and expert urologist (Tr. 2979), investigated possible urinary tract disease among plaintiffs. (Tr. 2979). Dr. Rhamy approached the problem as a research problem to try to compliment it with what possibly had already been studied (Tr. 2980). He made it clear that he obtained no information from the Clark/Balistreri study until after he had submitted his own report to plaintiffs' counsel. (Tr. 2982).

501. Dr. Rhamy's study consisted of 112 persons who came in for history and evaluation over a three week period of time in March, 1979. (Tr. 2983). Ten were dropped as individuals who could not possibly have been exposed to the chemicals. (Tr. 2989).

502. A study form was developed (Exhibit 264) for each person examined. (Tr. 2982). It was a comprehensive and fair form because as Dr. Rhamy explained:

A. Well, I knew nothing of the nature of the chemicals and, therefore, it would have been inappropriate for me to focus on one organ system, and the purpose of this was to look and see what was present in this population and see what the health inventory, so to speak, was of that group of individuals. So that meant that we had to look at anywhere from the top of the head to the tip of the toes in an effort to try to be as objective as we could concerning what was present in these people. (Tr. 2984).

503. In addition to the individual history, thorough physical examinations were given to all individuals. (Tr. 2987). Then, a summary of the results were made from the histories and physical examinations. (Tr. 2988). This summary was admitted into evidence as Exhibit 265.

504. The summary, among other things found as to symptoms a remarkable correlation between the exposed individuals as a result of the historical questionnaire. The report stated:

"SYMPTOMS

| "Head | Headache | 88% |
|---|---|---|
| | Faintiness | ·55% |
| | Dizziness | 55% |
| | Decrease in vision | 26% |
| "Eyes | Burning of the eyes | 69% |
| | Bloodshot eyes | 56% |
| | Photophobia | 53% |
| Ears | Ringing in the ears | 35% |
| Nose | Burning in the nose | 52% |
| Throat | Soreness of the throat | 48% |
| | Burning of the throat | 64% |
| Mouth | Loss of taste | 23% |
| Heart and | Cough | 26% |
| Lungs | Shortness of breath | 52% |
| GI Tract | Nausea | 52% |
| | Vomiting | 38% |
| | Diarrhea | 16% |
| Urinary | Urgency and frequency | 34% |
| Skin | Skin rash | 40% |
| CNS | Tingling and paresthesias | 51% |
| | Loss of balance | 21% |
| | Muscular weakness | 59% |
| General | Lassitude | 94%" |

(Ex. 265, p. 1).

505. Dr. Rhamy explained what these percentages meant:

Q. And I notice that in headaches you have eighty-eight percent. What does that percentage figure mean?

A. Eighty-eight percent of the individuals who were examined complained of headaches. Now, I did not break that down in this summary. Most of those individuals that complained of headaches complained of headache at the time, particularly of showering when the odor in the air was pungent, and many of those symptoms, such as headache, had disappeared in that population with the passage of time.

Q. All right. Now, which of those percentage figures there are significant, or are they all significant?

A. Well, those were symptoms which were higher than what you would anticipate from general population—Eighty-eight percent having severe bilateral temporal headaches. That is certainly a very high figure. They are also symptoms which are compatible, at least, with acute exposure to an irritant in the air. It could almost—it could be almost any irritant, and it doesn't define what the nature of the irritant was.

Q. I notice under "lassitude" at the bottom you have ninety-four percent.

A. Throughout the examinations there was a recurrent story that they just didn't feel like doing anything, and one of the examples was that one of the parents of the children said that the kids would come home from school and would lie down. They were not active as they normally were, and that she didn't notice them getting into fights like normal kids until after they started drinking the water, and for a period of time after that, they became what she considered more normal.

Q. You show insofar as burning of the eyes, sixty-nine percent, and burning of the throat, sixty-four percent. Is that significant?

A. Well, these are examples of the mucous membrane irritation. So it is inhalation or exposure to toxic materials in the air. (Tr. 2991–92).

506. The summary further found as a result of the physical examination that:

"The physical examinations on the 112 persons from the Toone-Teague Road revealed the following findings:

| "Diastolic hypertension | 28% | |
|---|---|---|
| Increased Liver size | 8% | |
| Hepatomegaly, borderline | 2% | |
| Optic Atrophy | 7% | (11% total) |
| Optic Atrophy, borderline | 4% | |
| Peripheral Neurological changes | 10% | (18% total) |
| Peripheral Neurological, borderline | 8% | |
| Significant eye problems | 32%" | |

(Ex. 265, p. 2).

507. Additional findings found by Dr. Rhamy were as follows:

"112 persons were examined and the records from 16 persons from the Toone-Teague Road area.

DEATHS — 5

| Unknown | 1 |
|---|---|
| Drowning | 1 |
| Heart failure | 1 |
| Melanoma of the vulva | 1 |
| Ca of the Liver | 1 |

OTHER FINDINGS

| Cancer of the kidney | 1 |
|---|---|
| Cancer of the bladder | 1 |

| | | |
|---|---|---|
| Cancer of the larynx | 1 | |
| Cancer of the cervix | 1 | |
| Cancer of the skin | 1 | |
| Cancer causing death mentioned above of the Vulva and Ca of liver). | 2 | (melanoma |
| Allergies | 30 | |
| Psychiatric problems | 22 | |
| Back or disc problems | 14 | |
| Diabetes Mellitus | 7 | |
| Kidney stones | 7 | |
| Stomach ulcers | 4 | |
| Gall bladder disease | 4 | |
| Unexplained hyperbilirubinemia | 4 | |
| Cirrhosis | 4 | |
| Miscarriages | 34 | |
| Gastroschisis | 1 | |
| Abdominal aortic aneurysm | 1 | |
| Renal cyst | 1 | |
| Renal failure | 1" | |

508. Dr. Rhamy elaborated on these results:

"These are taken from the medical history that we received, that we obtained during our history, as well as hospital records which were supplied to me from the attorneys concerning members of the families that were examined. In the death group there were five who had died. One of those had died of unknown cause. One had died of drowning. One had died of heart failure. One had died of a malignant melanoma of the vulva, which had metastasized extensively, and one had died of cancer of the liver. As far as the medical histories were concerned, the other findings in this group were that one patient had cancer of the kidney, one had cancer of the bladder, one had cancer of the larnyx, one had cancer of the cervix, one had cancer of the—I presume basil cell cancer of the skin, and those are in addition to the two individuals who died of cancer, melanoma of the vulva, and cancer of the liver. In addition to that, there were thirty individuals who described significant problems with allergies. There were twenty-two individuals who described problems with their nerves, shall I say. Not all of these had seen psychiatrists. But they were individuals who were very concerned about their emotional stability. There were fourteen who described back or disc problems. I believe there were three of those who had had back operations for disc surgery. There were seven who had the diagnosis of diabetes mellitus made. There were seven who had had kidney stones diagnosed, four had had stomach ulcers, four had had gall bladder disease, there were four who had had the diagnosis of cirrhosis made. There had been three miscarriages in the group. There was one that had gastroschisis made, which is the opening of the anterior abdominal wall that was present in the Benjamin Boyd child. There was one abdominal aortic aneurysm, which had been repaired. There was one cyst of the kidney, and there was one individual who had—who was not a part of the suit directly, but who presented himself for examination who had renal disease, and who was being dialyzed on the artificial kidney. (Tr. 2995–97).

509. Dr. Rhamy also found:

"There were 13 people who demonstrated B U N's that were lower than the lower limits of normal. Those were included as a separate category, because in liver disease —(Tr. 3001–02).

\* \* \*

That in liver disease the ability of the liver to produce urea is markedly impaired, and so one of the indications for liver disease is a low B U N. There were four individuals who had elevated B U N's. There were a certain number, there were actually 24 percent of those who had the laboratory values obtained had elevated alkaline phosphatase and 14 percent had high levels of LDH in their serum.

Q. What does high levels of LDH—explain that to us in lay terms.

A. LDH is an enzyme which indicates at least cellular damage or cellular injury. It is not specific for liver disease, but is only indicative of some alteration in cell function of either the liver, the spleen, or kidneys." (Tr. 3002)

510. The symptoms were taken from individuals when they noticed an odor emanating from their drinking water. (Tr.

3058–59). An attempt was made to delineate those symptoms thought to be due to exposure. In other words, the results of this study were very conservative. For example, as to headaches, Dr. Rhamy testified:

> "The attempt was made to try to delineate those headaches which were thought to be due to exposure and that classically was a bilateral temporal headache which ranged in severity, but for the most part was rather severe. It was a headache which they mostly described as being worse while in the shower or immediately the few hours after a shower. It seemed to be worse with inhalation rather than with drinking water. And in most instances it has gotten better or had disappeared since cessation of exposure to water from the well. (Tr. 3059–60).

### C. The Assessment of Risk (Non-Cancer) to the Plaintiffs as the Result of Exposures to Velsicol's Chemicals

#### 1. The Presently Observable Damages Other Than Eye

511. In addition to the overwhelming and consistent results in terms of symptoms of the exposed group, expert testimony was introduced that confirmed the exposures and the causation as to effects other than cancer. Dr. Rodricks testified in general:

> "First of all, that series of subjective experiences that people had, the feeling of irritation in the eyes when the shower when on, for example, the effects on the skin, the feeling of tiredness, and there was a whole long list of those, some dizziness, and they were consistent with, and I thought given the circumstances of exposure certainly caused by the exposure to these materials, because that has been documented well in other studies. Those are sort of immediate and short term effects. That's further confirmation of the exposure." (Tr. 2592)

#### (a) *Steve Sterling*

512. Dr. Rodricks stated his conclusions:

"On Steve Sterling, assuming that there is evidence in the record, and that he so testified, or you have heard him testify, or at least read his testimony, that he had such things as skin being dry, itching and flaking, that he had an irritated throat, when he breathed the air in his home in the bathroom, that he had coughing, that he had a raw feeling in his lungs, that he had burning of the eyes, that he had nervousness, headaches and numbness of the arm and leg. Assuming those facts to be true, do you have an opinion based upon reasonable medical certainty as to whether or not there is a cause and effect relationship between those symptoms and exposure to these chemicals?

\* \* \*

A. I do have an opinion. For those effects which people have described as immediately following exposure, the feeling of fatigue or lassitude or some anxiety, of headaches, of burning in the eye, perhaps blurring of vision in some cases—those are all, and several others, are quite characteristic of exposure to carbon tetrachloride, and, in fact, some of the other chemicals as well. Considering the circumstances here in which we had a demonstration of exposure and those symptoms which people have described, there is reason to believe—I forget exactly the phrase you asked—is there reasonable medical certainty? Yes, there is—that these immediate effects were a consequence of this exposure.

Q. I used the term reasonable medical certainty. Would you also answer that question the same way if I used the term reasonable toxicological certainty. Is that a better phrase or not?

A. I don't think it makes much difference. I am not a physician, and perhaps I feel more comfortable talking about the relationship between exposure and an effect based on toxicology information, yes.

Q. So is it your opinion that there is a cause and effect relationship?

A. For those effects, but I would not limit it to those effects. (Tr. 2540–42)

513. Although Dr. Balistreri found the liver function tests taken in November 1978 and January 1979 to be within normal ranges for Steve Sterling, Dr. Balistreri found that all the results of all the tests "suggest a mild abnormality in the hepatic function" (Tr. 2849).

514. Moreover, as for renal testing, Dr. Balistreri found that Steve Sterling's BUN tests were above the normal, thus indicating a renal dysfunction (Tr. 2900).

(b) *Daniel Johnson*

515. Dr. Rodricks likewise testified as to Dan Johnson that:

"Insofar as Dan Johnson is concerned, assuming that he had headaches, nausea, nervousness, eyesight problems, fatigue, numbness in the left hand and arm, what would be your opinion about the cause and effect there? (Tr. 2582–83)

\* \* \*

THE WITNESS: I have the same opinion considering the conditions of his exposure and the known effects of these chemicals and those symptoms—it matches almost perfect, and I would say there is reasonable medical certainty, yes.

Q. Let me ask you this about Steve Sterling: Assuming that now, assuming for the sake of the question he has an enlarged liver. State whether or not you have an opinion as to whether or not that, based upon a reasonable degree of scientific or medical certainty, is a result of his exposure to these chemicals?

A. Yes.

Q. What is your opinion?

A. Yes, it is.

516. As to Dan Johnson, The Scott/Balistreri study found some evidence of elevated bilirubin as well as elevated bile acids. (Tr. 2898). Dr. Balistreri also found an increase over normal levels in Mr. Johnson's renal tests (Tr. 2900).

(c) *James O. Maness, Jr.*

517. Dr. Rodricks also expressed his opinion as to James O. Maness, Jr.:

Q. Now, insofar as Jimmy Maness is concerned, assuming that the testimony is that he immediately and during this time had symptoms of dryness of the skin, flaking, allergies, rash, fever, breathing problems, headaches, and assuming that he at this time has an enlarged liver, do you have an opinion, based upon a reasonable degree of certainty as to whether or not there is a cause and effect relationship there between those symptoms and his exposure to these chemicals?

Q. In my questions are you taking into consideration what you know about the exposure we have just been through of these individuals?

A. Yes. I considered the nature of the chemicals, what is known in the scientific literature, and has been known for some time about them, the kinds of short term effects they can cause, and exposure, and the nature of these people's exposure. I am taking that into account, yes.

Q. Insofar as Jimmy Maness is concerned, do you have an opinion, and I will use the words reasonable medical certainty, as to whether or not there is a cause and effect between his exposure to the chemicals and the symptoms?

A. I do have an opinion. the only part of that that causes me—that I don't have an opinion on, I should say, is what you call allergies. I am not sure what that encompasses.

Q. I will use the term rash and fever, then.

A. Well, fever, as far a I know, has not been associated with these chemicals. Certainly most of the other things you described have been. But I don't know about fever.

Q. Eliminating the fever, then, what is your opinion?

A. That there is a reasonable medical certainty they were caused by exposures to

carbon tet and perhaps some of the others that I have mentioned. (Tr. 2543-45)

518. As to James Maness, Dr. Rhamy found that he had been exposed to the contaminated water by various routes, first *in utero* and then as an infant. He had frequent headaches with some dizziness and one episode of a seizure during which he passed out. (Tr. 3005). He had an enlarged liver (Tr. 3005). Dr. Rhamy concluded:

Q. Dr. Rhamy, in your opinion, and based upon a reasonable degree of medical certainty, which of these acute symptoms or the symptoms that you are talking about are related to exposure to toxic chemicals?

A. Well, the description of headaches, the description of bloodshot eyes, the description of nosebleeds, the upper respiratory irritation are symptoms which are associated with breathing of some of these chemicals in significant concentrations.

Q. In your opinion, is the enlarged liver related to the exposure by ingestion or otherwise of contaminated chemicals?

A. This boy's liver is abnormally large and he has on examination an elevated alkaline phosphatase, which is approximately three times the upper limits of normal. That may be due to the fact that he is a child and he is growing, but he also has elevation of the SGGT as well as the SGOT and as well as the LDH. It's particularly the SGGT is a little bit hard to ascribe to anything other than possible liver damage.

I know of no other origin for this boy's liver problems other than the history that he had exposure to chemicals during his early infancy and during the time that he was being carried by his mother.

Q. I guess that may answer my question, but I guess what I'm asking you is, is it more probable that these conditions are related to the exposure to chemicals or that they are not related if you are dealing in probabilities?

A. I think the probability is that they are related to the exposure to chemicals.

Q. In your opinion, does this person, James Maness, have an increased risk of getting cancer as a result of his exposure?

\* \* \*

Q. Doctor, as a physician do you feel like you are qualified to make—to give an opinion on this?

A. I have done no original research work in this area and do not pretend to be a toxicologist. I can only answer as a person who has spent many years reading the literature and quoting merely what I have seen in the literature, which would indicate that this individual is at increased risk. What that risk is I don't know.

\* \* \*

A. I do not know the magnitude of that increased risk.

THE COURT: But what is your specific answer again, please?

A. That individual is at increased risk for future cancer, neoplasia, of that liver. What that magnitude of risk is, I do not know. (Tr. 3006-09).

\* \* \*

(d) *Curry A. Ivy*

519. As to Curry Ivy, Dr. Rodricks testified:

Q. Now, insofar as Mr. Ivy is concerned, I am asking you to assume the same facts that I have asked you before, that is your knowledge of the exposure, and assuming that he had the conditions following the symptoms of burning of the eyes and throat, blurred eyesight, shortness of breath, numbness of the left side, face and arm and nervousness.

A. Well, again, it all fits—

\* \* \*

Q. (By Mr. Gilreath) What is your opinion, Doctor?

A. All of those symptoms again that I heard him describe, and that you have just listed some of, are fully consistent with the conditions of exposure here, and I would say, yes, there is a reasonable medical certainty that they were due to exposure to

these chemicals, some of them. (Tr. 2545–46)

520. Of the seven liver function tests given to Mr. Ivy, Dr. Balistreri found four of them to have abnormal results (Tr. 2896). Dr. Balistreri's opinion was that: I would be concerned that the patient had liver disease and pursue that.

Q. In your opinion, does this patient have liver disease, the probability?

A. Based on these numbers, yes.

Q. And state whether of not in your opinion that is as a result, from what you know about this case, of the toxic chemicals.

A. I'm sorry, I don't know Mr. Ivy specifically. If he is in the exposed—if he is one of the individuals who was exposed to the chemicals, I would say that that's a very likely cause for the injury. I base this not only on the elevation of the numbers, but on the pattern of elevation of the numbers.

Q. The pattern? What do you mean by the pattern?

A. The ratio between OT and PT in Line 6 and Line 7 is different than the ratio we would expect in viral heptatitis. In viral hepatitis both values would be elevated, but the SGPT would be a much more significant level.

Q. What is the SGPT and the SGOT, what are those?

A. Those are transaminases. These are not enzymes that are stored in the cell that should not appear in the blood unless the cell or parts of the cell are specifically injured.

Q. Does that mean that a part of the liver cells have been injured?

A. Yes, sir. (Tr. 2846–97).

521. Dr. Balistreri also found that Mr. Ivy's BUN tests were higher than normal (Tr. 2900).

(e) *James E. Wilbanks*

522. As to plaintiff Wilbanks Dr. Rodricks testified:

Q. All right. Insofar as Mr. James Wilbanks is concerned, I will ask you the same question based upon his exposure, and that there is evidence of symptomatology as follows: Dryness of the skin, shortness of breath, irritation of the throat, burning of the eyes, eyesight deficiency, headaches, dizzy spells, blackouts, legs aching, pain below waist, bleeding from the kidneys, weight loss and removal of a kidney as a result of renal cell carcinoma. Assuming those facts, do you have an opinion based upon a reasonable degree of medical certainty, as to whether or not there is a cause and effect relationship between those conditions and his exposure?

\* \* \*

A. Well, again, for most of the symptoms that you described, including the lower back pain, which he described, plus the other immediate effects, they are also fully consistent with what is known in the medical and scientific literature about carbon tetrachloride exposure, and perhaps exposure to some of the others as well. On the question · of the cause for the removal of kidney and if indeed—I am assuming he had carcinoma.

Q. I am asking you to assume that for purposes of the question.

A. Well, there I feel less certain about the immediate cause of that. Certainly as he described his exposure in the late '60's and early '70's, the time between that exposure and the appearance of this, which was ten years later, is consistent with exposure, if he had exposure to these chemicals. I don't think I could go beyond more than "is consistent with" in the case of kidney cancer. (Tr. 2546–47)

2. The Damage to the Eyesight of Mr. Curry

A. Ivy and Mr. Daniel Johnson.

523. Dr. Rhamy testified that when he examined Mr. Ivy, he noted a possible optic atrophy with a decrease in his color vision, his optic fields and his peripheral vision (Tr. 3014). He therefore referred Mr. Ivy to Dr. Drewry (Tr. 3016).

524. Dr. Rhamy also testified that when he examined Mr. Johnson, he noticed some

decreased optic fields as he had with Mr. Ivy. He referred Mr. Johnson to Dr. Drewry as he had with Mr. Ivy. (Tr. 3033). After discussion with Dr. Drewry at a later date, Dr. Rhamy believed that Mr. Johnson had optic nerve dysfunction "most probably due to the chemicals." (Tr. 3033).

525. Dr. Richard D. Drewry is a practising physician in Tennessee with an expertise in neuro-ophthamology (1957–58; 20006–07). In fact he is a professor at the University of Tennessee in Ophthalmology (Tr. 1959).

526. Dr. Drewry examined Mr. Johnson on May 27, 1982 and Mr. Ivy on June 2, 1982 (Tr. 1965–66). In conjunction with these examinations, he had earlier (May 7, 1981) examined one James E. Cupples who had also been referred by Dr. Rhamy to him (Tr. 1965).

527. Dr. Drewry diagnosed Mr. Cupples as having early optic atrophy. (Tr. 1968). Dr. Drewry defined optic atrophy thusly:

> "Optic atrophy means that you have some nerve fibers in the main nerve leading from the eye back to the brain that gradually begin to die off, and by looking into the eye, we can see where the nerve leaves the eye; and that part of it is referred to as the disc of the eye. We see that that becomes pale. It loses what is ordinarily described as a pink color, and when we look to the inside of the eye, it becomes white in color as the nerve fibers and the blood vessels wither away. (Tr. 1958)

528. In August of 1981, Mr. Cupples visual acuity failed to the legal blindness level. (Tr. 1970). No basis for this condition could initially be found (Tr. 1972). However, before the examinations of Mr. Johnson or Mr. Ivy occurred, Mr. Cupples asked if his problem could have resulted from the contamination (Tr. 1974) and Dr. Drewry investigated.

529. Dr. Drewry did his research and found that in addition to his own recollection:

> "there are articles that list that optic atrophy can occur secondary to ... toxic

exposure to carbon tetrachloride" (Tr. 1976).

530. Two of the articles were introduced through Dr. Drewry, one by Wirtschafter published in the American Journal of Public Health (Tr. 2008–09) and one from the Archives of Industrial Hygiene published in 1950 (Tr. 2009–10).

531. Dr. Drewry testified however that there were "several articles" in the literature concerning carbon tetrachloride and visual effects. (Tr. 2015). Dr. Drewry stated most of this literature dealt with eye effects from inhalation rather than ingestion (Tr. 2016). The Court notes that such a fact supports Mr. Ivy's claims concerning optic atrophy and neuritis for he was occupationally exposed to these chemicals and to fumes by way of inhalation in more massive amounts than the other flagship plaintiffs.

532. Dr. Drewry found that Mr. Johnson had a decrease in his peripheral vision. He explained:

"When you have a problem with the visual field—that is, they don't see as well in one area, or in general—it usually indicates a retinal problem or an optic nerve problem, considering that the remainder of the eye is within normal limits, which we had determined from a previous examination of him. (Tr. 1980)

\* \* \*

"Q. Doctor, were there any other positive findings on your physical examination of his eyes or during the examination?

A. Well, no, no positives. His color vision was within normal limits. Looking into his eyes, the optic nerve looked okay. We did not see any evidence of any abnormality just by looking at the nerve. (Tr. 1981).

\* \* \*

Q. Doctor, based upon the physical examination, did you arrive at a diagnosis of Mr. Johnson's condition?

A. Well, he had his reduction of visual acuity and a reduction in the total amount of peripheral field. Both of those were decreased more than we expect, to be normal.

There was no other eye condition that I found. For example, there was no glaucoma or increased pressure in the eye, there was no cataract, there were no cornea opacities, the cornea being the clear window in front of the eye, so there was nothing else to explain the decrease in vision that he had.

Dr. Rhamy asked me specifically to look at the optic nerve to see if there was any clinical evidence of optic atrophy. I did not find any clinical evidence of optic atrophy; that is, by looking into the eye, the nerve looked normal.

He is one of the patients that does not see as well. Of course, his peripheral field is not as full as you would expect it to be, and the suspicion, of course, is that he has either retinal or optic nerve disease, one of the two. Considering the toxic exposure, that is a possibility.

Q. Which one, Doctor?

A. Or both. Specifically, carbon tetrachloride is what was under discussion.

Q. Doctor, based upon your examination to rule out other causes, is there any other medically probable cause or explanation, in your opinion, than the carbon tetrachloride exposure?

A. No, not from my examination. I did not uncover anything.

Before we could say a hundred percent, you would have to carry it through an exhaustive series of x-rays and other things, to be sure that the patient had no tumor in his head, or things like this, but there was no history to indicate that that would be such, and I found no findings to substantiate that. (Tr. 1982–84).

533. Dr. Drewry then defined the symptoms of optic atrophy as containing three elements, two of which Mr. Johnson had:

Q. What are the classical signs of optic atrophy, Doctor?

A. Well, optic atrophy is based upon a clinical triad, we call it. Number one, reduction in visual acuity. they do not read the chart as well as they should.

Q. Did Mr. Johnson have the second corner of the triad?

A. Yes, sir, he had the reduction in visual acuity and the abnormality of the visual fields, but no observable atrophy by looking into the eye. He had two of the three criteria. (Tr. 1984).

534. Dr. Drewry then ruled out other causes than exposure to toxic substances, *viz:*

A. Well, he gave a history of a slow decrease in vision, beginning in about 1978, which he felt had gradually increased up to the time that I saw him.

Q. Is it important to you as a physician to determine whether the onset of the visual decrease is in one particular eye or is bilateral?

A. Yes. Well, it is, because if you are talking specifically about toxic exposure or vascular problems, those are usually in both eyes. You know, they are in both eyes and have a fairly similar clinical course between the two eyes.

Optic neuritis, which is an inflammation of the nerve that we talked about beyond the eye, that is usually in one eye, and a small percentage of people may have the other eye at some time during their lifetime involved, but very rarely is it simultaneously bilateral; that is, in both eyes at the same time to an equal degree. (Tr. 1986–87).

\* \* \*

Q. Doctor, is bilateral onset the usual course or the unusual course of this type of condition?

A. Toxic exposure, you are referring to?

Q. Yes, sir.

A. It is usual. Most of the time, if a patient has a systemic exposure, either from medication or whatever, however way they are exposed, both eyes will react fairly similarly between the two, so there will be a reduction in both eyes and fairly similar findings in visual acuity between the two.

Q. What is the usual nature or the usual cause of optic atrophy or optic atrophy-type symptoms in Mr. Johnson's age group?

A. Let me see. Mr. Johnson, I believe, is 44.

Q. Yes, sir.

A. Well, let's say in the younger age group, in the teens and in the twenties and thirties, the most common cause is an inflammatory optic neuritis, maybe associated with diseases such as multiple sclerosis, diseases like that.

When you get into the forties and fifties and sixties, the most common cause would be of a vascular nature, blood vessel problems in general.

Q. Would his age then support the relationship to the toxic exposure, as opposed to a vascular onset of his condition?

A. Well, that's right, he is in the forties and we didn't find any objective evidence of vascular disease in him, so that would make you think about toxic exposure, certainly. (Tr. 1988–90).

\* \* \*

Q. Doctor, was there any other medically probable explanation for Mr. Johnson's bilateral, simultaneous decrease in the size of his visual field and decrease in his vision, in your opinion, than the carbon tetrachloride exposure?"

\* \* \*

A. From my examination, I did not detect any other cause for his findings. (Tr. 1993–94).

535. Finally, as to Mr. Johnson, Dr. Drewry stated:

Q. Is this a permanent condition, in your opinion, doctor?

A. I would not expect that it would improve at this stage. I don't have any records regarding what his visual acuity was, say, two years ago, but by his history, the vision has been decreased since about 1978, which would be more than two years ago; it would be four years, but at least by his history, things have not gone down drastically, have not improved drastically, and based upon that, plus the findings that we have, I would not think that it would improve.

I would think if this is toxic exposure that he has, he has withdrawn from this and he should remain at this level. (Tr. 1991).

536. Dr. Drewry examined Mr. Ivy and found a decreased visual field of about 50% (Tr. 1996). In fact, the visual fields and history of Mr. Ivy were similar to Mr. Johnson. Dr. Drewry testified:

Q. Doctor, you stated earlier the classical signs of optic atrophy and you mentioned that you did not notice any paleness or observe any problem with the nerve in his eye where you could visualize it, is that correct?

A. Right.

Q. Did he have any of the other classical signs?

A. Very similar to Mr. Johnson, he had a reduction in visual acuity. He did not see 20/20. He was two to three lines off in each eye from seeing 20/20, and he had the smaller peripheral field. He did not see as well to the outside as he should.

Q. He had two of the three signs?

A. That's right.

Q. Of optic atrophy?

A. Yes. (Tr. 1997).

537. Dr. Drewry concluded by giving his opinion as to Mr. Ivy's eye condition and whether it was related to toxic exposure:

Q. Doctor, did you arrive at an opinion with respect to the relationship or possible relationship between Mr. Ivy's exposure to toxic chemicals and the loss of vision and loss of visual field which you found on examination?"

\* \* \*

A. Those findings which he had, the reduction of visual acuity and reduction of visual field, are compatible with toxic exposure, and I found nothing else in my examination to explain those findings, so obviously, we are suspicious that that could be the cause of it.

Q. Doctor, for the benefit of the Court and based upon the past objection, what was your opinion of the relationship between Mr. Ivy's eye problems which you

found on examination and the possibility of exposure to carbon tetrachloride?

A. My opinion was probably that they were causally related; that is, that the toxic exposure to the chemicals gave him the reduction in visual acuity, but I had no objective proof that that was the case. (Tr. 1998–99).

\* \* \*

Q. Doctor, do you know of any other medically probable explanation for Mr. Ivy's visual problems than the chemical exposure?

A. No, from my examination, I did not uncover any.

Q. Doctor, so that there will be no misunderstanding, did your examination include a check for the other possible causes?

A. The examination did, yes. As I say, always in cases like this, you could do exhaustive testing, you know, which we have already stated, x-rays, et cetera, which would be done outside an office setting.

My examination was based strictly on a history taken from the patient and the examination which was done in the office setting, with the exception of the visual-evoked response, which we have already commented on, which was done at the Baptist Hospital on all of these patients.

Q. These people were seen and worked up by someone other than your office staff here, as well?

A. You mean outside the—are you talking about the VER, or the eye examination proper?

Q. When you mentioned that they went to the Baptist Hospital—

A. That was for the visual-evoked response test and that was done by a technician in the Baptist Hospital.

Q. Do you regularly rely upon those technicians and the results of those tests which were provided to you in the practice of your profession?

A. Yes, that is used rather routinely on patients with optic nerve disease.

Q. Was there anything in those tests or the reports which you received from them which would suggest any other causation for his problem, other than the toxic exposure.

A. No. Those tests, as a matter of fact, were interpreted as normal. (Tr. 2000–01).

538. As to Mr. Ivy, Dr. Drewry also pointed out that:

Q. Doctor, was Mr. Ivy's onset of visual problems bilateral, as well?

A. Yes. I think both eyes were about the same, as far as I could tell; and by history, they were much the same.

Q. With respect to the onset of symptoms of loss of vision, was it a bilateral onset?

A. Yes.

Q. Doctor, did your history include a family history for eye problems?

A. Yes, that is routinely asked on eye histories. Mr. Ivy did not give a family history of any problem, neither did Mr. Johnson. We classify these as negative. (Tr. 2003).

539. Finally, although Dr. Drewry could find no optic atrophy at that time, he testified that there was a "dysfunction some place." (Tr. 2029). He explained:

"Particularly referrable to these patients, we can say that as far as my testing, they do not have optic atrophy, but on the other hand, talking about Mr. Ivy and Mr. Johnson now—not Mr. Cupples—that they do not see as well as they should, and that was the reason for my term, 'suspicious,' that there is something going on, that he did have toxic exposure, entirely based on the history, of course, the history of exposure to chemicals which was given to me by the patients.

Q. Doctor, do we agree then that medical diagnosis is based in the most often case on medical probabilities, as opposed to certainties?

A. That's correct.

Q. And in the case of Mr. Ivy or Mr. Johnson, did you find any other medically probable explanation for the conditions

which you found on examination than toxic carbon tetrachloride exposure?

A. No, I found no other evidence. (Tr. 2030-31)

\* \* \*

... they have a dysfunction of the eye; and given a history, a history to me of chemical exposure, that is suspicious for the diagnosis.

Q. That may be the cause if they had sufficient exposure over a long enough period of time; that's all you can say?

A. That's all that I can say, right, and there is no other cause that I can define to be responsible for the vision loss. (Tr. 2032).

540. Velsicol called Onur Melen, an MD who was an assistant professor of Neurology and Ophthalmology at Northwestern University (Tr. 7586-87) to refute the findings of Dr. Rhamy and Dr. Drewry concerning Mr. Johnson and Mr. Ivy. He was not however a certified ophthalmologist (Tr. 7604).

541. As in the case of some of the other doctors called by Velsicol, Dr. Melen did not examine or even try to examine the two plaintiffs Mr. Ivy or Mr. Johnson (Tr. 7616). As such, the Court places little weight on his testimony. Moreover, Dr. Melen's opinions were based on his initial impression that "there is no scientific evidence that carbon tetrachloride causes optic atrophy" (Tr. 7591). He later proved this assumption wrong himself, as pointed out below. And in some respects Dr. Melen's testimony supports plaintiffs' claims of optic damage and atrophy. The Court places no weight on Dr. Melen's testimony for these reasons.

542. Dr. Melen testified he did not believe that the optic atrophy and neuritis of Mr. Johnson and Mr. ivy could "be ascribed to exposure to carbon tetrachloride" (Tr. 7591). He based that opinion on two reasons. He testified:

One, the criteria used to make the diagnosis of optic atrophy in both cases are not sufficient to substantiate that diagnosis and number two, there is no scien-

tific evidence that carbon tetrachloride causes optic atrophy. (Tr. 7591)

543. As to the lack of scientific evidence Dr. Melen stated:

Q. In Dr. Drewry's testimony did he cite any articles for the proposition that carbon tetrachloride—

A. I believe he cited that article which was published in 1933 by Wirtschafter, I believe, and I believe he also mentioned an article by Smith. I don't remember the whole entire authors, the rest of the authors.

Q. Do you have an opinion with regard to that medical basis for his diagnosis?

A. Based upon his findings?

Q. Yes, on those two articles that he cites.

A. Well, those articles do not prove there is a cause and effect relationship between carbon tetrachloride and optic atrophy, in my mind. (Tr. 7591-92).

\* \* \*

Well, the literature is devoid of proof that carbon tetrachloride is a cause of optic atrophy. There is no paper proving that carbon tetrachloride is a toxic substance to the optic nerves.

Q. What is the paper that I've just given you? Can you describe that to the Court.

A. This was taken from the textbook of Clinical Neuro-ophthalmology, edited by Dr. Miller. It's the fourth edition of the main textbook of Clinical Neuro-ophthalmology, the first volume and it came about last year, so it's up-to-date information and it's taken from the chapter Toxic Optic Neuropathies.

Q. Is this text book normally relied upon by experts in neurology and neuro-ophthalmology?

A. It's the major reference textbook in clinical neuro-ophthalmology.

Q. If you would, please, Doctor, would you read the last two sentences of the carbon tetrachloride paragraph for us.

A. The last two sentences?

Q. Starting with "Franceschetti and"—

A. "Franceschetti and Rickli (1952) and Lyle and Zavon (1961) have reported similar cases, and the latter authors have concluded that 'careful review of the cases of similar nature presented in the literature indicates an association, but in no instance do they prove a cause and effect relationship.' On the basis of this case and similar case presentations in the literature, it is impossible to say that carbon tetrachloride causes blindness." (Tr. 7592–94).

544. It became clear on cross-examination however that there were at least five additional articles linking carbon tetrachloride exposures to optic atrophy and neuropathy (Tr. 7611–13). Moreover, it also became apparent that Dr. Melen drew a distinction between clear "proof" and "association," a distinction the Court finds in this case to be without a difference. Dr. Melen testified:

Q. So you've got five articles that all report associated clinical findings similar to those found by Dr. Drewry after exposure to carbon tetrachloride, correct?

A. Yes.

Q. And then we get down to just the last two sentences that you stated you were relying on. In the first sentence it says an ophthalmologist found irregular visual field constriction and optic atrophy which—excuse me. "Franceschetti and Rickli and Lyle and Zavon (1961) have reported similar cases." So in all of these cases that are recited there's reported an association between visual problems, including visual field problems, and carbon tetrachloride exposure, is that correct?

A. In those individuals they were presumably exposed to carbon tetrachloride, yes. (Tr. 7613–14)

\*　　\*　　\*

Q. It does not say that there's no cause and effect relationship, [it] even goes on and says that there is an association between visual problems and exposure to carbon tetrachloride.

A. No. It indicates or suggests there may be an association. Nobody disputes that. As a physician I cannot come and say there is—it's impossible that carbon tetrachloride does not cause optic atrophy. What I'm saying is, there's absolutely no proof that it does.

Q. Well—

A. Association is different, cause and effect is different.

Q. Doctor, you didn't go back and start with Wirtschafter, then the 1933 Department of Public Health report and the Smith article and the Gocher article and the Gray article and the Teleky and all those individuals and read those in preparation for this?

A. I read the Wirtschafter article and the Smith article and Gray's article. The other ones I didn't. I can comment about those two major articles as a neuro-ophthalmologist, if you'd like me to do so.

Q. The last two articles?

A. Smith's and Wirtschafter's article.

Q. I thought you said you didn't read those.

A. I read the Wirtschafter and the Smith's article, yes.

Q. But these last two articles or the articles by Lyle and Zavon whose conclusion you adopted on your direct testimony, you've not read that article, have you?

A. I didn't read that article. I didn't find some of the articles in the library, though, and I looked for them. (Tr. 7615–16)

545. As to the second basis for quarrelling with Drs. Rhamy and Drewry, Dr. Melen testified:

A. Well, as I mentioned earlier, I do not think that the criteria used to make the diagnosis of optic atrophy was enough to substantiate that diagnosis.

Q. What are the criteria that you would use to make a diagnosis of optic atrophy?

A. Well, there are clinically two cardinal criteria—one, the vision is reduced, and reduction of vision cannot be attributed to any other cause than optic nervous function; two, the appearance of the optic nerve by examining the fundus, that is the eyegrounds, and in the atrophic optic nerve they will just look paler, or I should say

**464**

just pale compared to the normal pink color as a result of loss of tissue. These are the essential criteria, and there are also ancillary criteria that you can base your diagnosis of optic atrophy on; that is examination of the color vision, examination of the pupils, examination of the visual fields, examination of the eyegrounds by different techniques. (Tr. 7596–97).

546. Dr. Melen may or may not be correct but Dr. Rhamy found that Mr. Ivy and Mr. Johnson's optic nerves *were* paler than normal. (Tr. 3016) And Dr. Melen did not examine them himself. (Tr. 7616). Where such an observation is so important, the Court gives Dr. Melen's testimony little, if any, weight.

547. Dr. Melen's own testimony supports this conclusion:

Q. Well, Doctor, in treating and making a diagnosis, that's why it's hard to say in—well, first of all, medicine is not an exact science, is it?

A. Uh-huh, that's right.

Q. And it's an art in clinical evaluation and clinical evaluating ability plays a great part?

A. That's absolutely correct.

Q. And not being an exact science, there's very few things that are ever one hundred percent, correct?

A. That's right.

Q. So that's why medical judgment and clinical evaluations and diagnoses are arrived at on the basis of what's more likely and more probable?

A. That's right.

Q. And that's just what Dr. Drewry did in this case in ruling out the other factors, is it not?

A. He did absolutely the right thing, that's true. (Tr. 7620–21).

548. Finally, Dr. Melen admitted that:

Q. Have you ever had a patient present to your clinic with a history of long-term exposure to carbon tetrachloride or other chlorinated hydro carbons?

A. Have I had experience? No. (Tr. 7618).

549. Dr. Drewry found Mr. Johnson and Mr. Ivy to have two of the three indices for optic atrophy. Dr. Rhamy who examined them found "The discs looked pale to me" (Tr. 3016), thus supplying evidence of the third criteria. Velsicol's Dr. Melen on the other hand never looked. The Court finds that Mr. Ivy and Mr. Johnson are suffering from optic atrophy and damage which was caused by exposure to Velsicol's chemicals.

3. *The Future Chronic Adverse Health Effects Other Than Cancer, the Eye and Immuno-Surveillance*

550. The effects that are chronic and thus not easily seen clinically were liver damage, kidney damage, eye damage and central nervous system damage. These effects were described as "medically detectable effects [which] may not appear for many years." (Ex. 236). Dr. Rodricks testified concerning the probability of these effects occurring "over the long haul" (Tr. 2557). He testified:

"There is, for example, for the liver and kidney effects of carbon tetrachloride essentially no margin of safety in this population of people. That is, they are effectively exposed at a level known to produce serious long-term effects, especially on the kidney, degenerative disease on the kidney, et cetera, not enough to cause immediate and massive injury, I would say, but something more insidious than that. That's—

THE COURT: You are saying et cetera. Will you go ahead and—

THE WITNESS: I'm sorry.

THE COURT: —state specifically what you are talking about, rather than use et cetera, please.

THE WITNESS: Yes.

A. I think I was saying that if you look at the experimental information on liver and kidney effects from carbon tetrachloride and then compare the doses needed to do that with the doses that these three people I've talked about received, there is no mar-

gin of safety. It's far less than ten, in these cases.

That would, I think, lead me to conclude that carbon tetrachloride exposure here is highly likely to cause damage to the liver and the kidney, that damage would probably not be massive, the kind of thing that would immediately lead to death of the organ, let's say, massive destruction of the tissue, but something that over a year's exposure of this type, daily insult to the chemical of this type, is likely to start a process that is probably irreversible and may continue until some day there is some kind of damage realized which would cause failure.

That's probably most significant in the kidney because the liver has a fair amount of regenerative power, but long-term exposure to carbon tet, months or years, has already been shown in people to lead to most serious effects on the kidney and I think that is likely to happen here as well.

Q. (By Mr. Gilreath) And when you say "here," you are referring to— .

A. Yes.

Q. —the people, the three people—

A. Yes.

Q. Maness-

A. Yes.

Q. —Sterling and Johnson?

A. Because all this is based on the doses that I've estimated that they got and the dose is known from the scientific literature to produce these specific effects. They have no margin of safety to protect them from this effect at all.

Now, the nervous system, and I suppose the eye would be considered part of that because it's the eye nerves that I thinking would be effected here, here we would be talking in short term about the things you've already described, that is, a feeling of fatigue, lassitude, some anxiety, headaches, irritation in the eyes, the mucous membranes, blurred vision. Those are effects that would appear and that it would assume that as a person went away from the exposure most of those would subside.

However, if they had reached a point of damage to some of the nerves, let's say the nerves in the eye, then they may progress at a later time to other more serious end points and that has been observed, again, with carbon tetrachloride in connection with the eye.

With chloroform, that's my most uncertain thing on the chart here. I almost put that in quotes. The margin of safety here is over a hundred in the case of chloroform and it's a borderline case and I'm not sure I'd really feel strongly about putting it as a serious contributor to adverse health effects. Some contribution, but clearly much less than carbon tetrachloride.

\* \* \*

Q. All right. Now, Dr. Rodricks, let me see if I can clear something up. You say in your chart Exhibit 236 "A very high probability of adverse health effects" and you've listed these four chemical components, carbon tetrachloride being at the top, and then over at the right you've listed systems affected. Are you talking about probability of adverse health effects, future adverse health effects over the long haul?

A. Yes. (Tr. 2553–57)

551. Dr. Rodricks reiterated:

The margin of safety is the difference between doses capable of causing at least minimal effects, experimental concerns, and the actual human exposure level, human dose. That margin of safety has long been incorporated in toxicology risk assessment. I consider this a risk assessment, although we can't put a firm probability estimate on these numbers, because we know for sure that people, the population at large, is likely to be far more sensitive to these effects than experimental animals. So that the margin of safety has long been used, not invented by me.

And I'm saying for effects of this type and the information upon which they are based the usual procedure is to put a thousand-fold margin of safety. If you have to say how much carbon tet shall I let someone be exposed to through the drinking water inadvertently, if it happens to be a contami-

nant, the usual is a thousand. That's to protect the large population where you have a broad range of sensitivities. That's another factor and the reason for using the margin of safety is that people, human population, will have a much broader range of sensitivities than a very small group of laboratory animals. So some people will be clearly more sensitive than others.

I reduced that to a hundred. I think I was more conservative for my selection criterion here on the grounds that we have a much smaller population, so there is probably a less range of—a smaller range of susceptibilities in that population. So I used a more demanding criterion for my selection than most people would with data of this type.

And the smaller the margin of safety gets the more dangerous the situation. And as I said, in the case of carbon tet there is essentially none as far as I can estimate, even using what I think to be fairly conservative estimates of exposure here.

Is that clear?

THE COURT: yes. (Tr. 2557)

552. Dr. Rodricks admitted his opinions were quite conservative in that they didn't take into account possible interactions with other chemicals (Tr. 2559). This is true although these other chemicals would "no doubt add to these risks" (Ex. 236). He testified:

"As I say, I listed the systems affected and I think I mentioned and described fully last time that I don't give these all equal weights in the terms of the certainty with which we know them, except perhaps for carbon tetrachloride. And I think that's a fairly cautious assumption in that if you look carefully at my exposure calculation, I have been in every instance more conservative, that is assumed less exposure than the people described, because some of the descriptions seemed a bit extreme. People talked about drinking two gallons of iced tea a day or something. The average consumption is around two liters of any liquid,

so I stuck with that sort of analysis to play it, I think, somewhat cautiously. (Tr. 2594)

\* \* \*

I've looked at carbon tetrachloride in other instances. I have never seen an exposure this high for such a long period of time and I've never seen one before this high for such a long period of time directly through drinking water. Most of the data, of course, is inhalation, because most of the people that had been exposed were workers exposed and that's by inhalation, perhaps skin penetration.

That does not include what I've just said about the potential carcinogenic effects, which I treated separately. (Tr. 2595–96)

\* \* \*

The ones that I've described here on the chart shown, basic kinds of toxic injury to the liver, kidney, nervous system, blood, that I described—I think I described all these in great detail the very first time I was up here, qualitatively, the types of effects.

Q. All right. Now, how about—

A. I exclude cancer and I looked at cancer first of all on cumulative exposure. (Tr. 2597)

553. In reiteration, Dr. Rodricks stated that as to the serious short term and long term effects, other than cancer, he:

"First of all, reviewed information on signs and symptoms of the effects that people—subjective signs and symptoms of effects people reported as recorded by Dr. Rhamy, and I guess others as well, perhaps Dr. Clark, and based on the experimental information it seemed to me quite convincing that those effects were due to these exposures.

But the more serious longer term effects had to be analyzed in a quite different way and there we had to bring dose into account and that was my next step. I then looked at all of the effects summarized on Exhibit 18 for each of the chemicals and I went to the experimental information and dug out of there the dose information, the experimental dose information needed to identify the dose at

which effects of these types could be occurred—would occur and the conditions under which they would have occurred.

I then compared those doses with the doses calculated for these plaintiffs. I eliminated six chemicals from this chart as probably individually unimportant in this case, because—either because they are relatively non-toxic—toluene, for example, it takes a rather high dose to produce any kind of liver, very, very high dose, relative to the others, to produce any liver effect, and the exposure is low. In some cases, even though you had fairly high toxicity, I think, of tetrachloroethylene there, for some of them, the adults, as far as I can determine, their exposure, their dose was very, very much lower, perhaps much more than a thousand or five thousand below doses. known to cause effects, and because most of these effects are threshold effects, one would, I think, feel comfortable in eliminating some of those chemicals as individually of concern. I then narrowed the list down to four, which I presented on Exhibit 236, again without reference to potential carcinogenesis, and as I explained this morning, those are the four, I believe, with high certainty to either have initiated a process of damage that may or may not yet be realized in these people, of a type that may lead to, for example, in the case of a kidney failure by collapse of certain parts of the kidney at some times—things that have been observed in other people. I don't give each of these chemicals, these four chemicals on Exhibit 236 and the effects equal weight. Carbon tetrachloride, as we have said, several dozen times, is clearly the most important. The others should not be discounted, but I think they should be given—well, the likelihood of their cause and effect is somewhat less, because of the exposure, primarily. Chlorobenzene is rather toxic in some instances, but exposure is pretty low. So, it is not—the three, chloroform, chlorobenzene, and tetrachloroethylene are not quite as important as carbon tetra-

chloride. I also had a discussion about interaction—first of all, carbon tetrachloride's interaction with alcohol, as something that would tend to make any given dose of carbon tet more effective at causing liver damage than in the absence of alcohol consumption. I noted that one ought to add some concern, and I can't quantitate that at all, about possible interactions among these chemicals. These people were exposed to a real chemical mixture, and that's something that would add some degree of concern. I don't know how much. Hexachloronorbornadiene, was also pointed out as one, even though we don't have toxicity information, it is one that I feel highly confident is likely to accumulate in bodily tissues over a long period of time. What the effect of it is, I don't know. But it is something, with any chemical that accumulates like that, one would add an additional degree of concern." (Tr. 2685–89)

554. Dr. Clark testified:

Q. Doctor, in your opinion do you believe this population, because of their exposure, is at an increased risk of having health problems in the future?

A. Yes, I do.

Q. Why?

A. Why—because these exposures were to multiple compounds in very high doses. Some of the doses were at the level where effects are seen in very small animal studies. So when you have substances at these high levels, there is some increased risk. The difficulty is knowing whether the population size is always great enough to see the risk and how long you have to follow a population to find the actual effect.

\* \* \*

Q. (By Mr. Wilder) Do you believe because of this that this population should be continually monitored in the future for any health effects?

\* \* \*

THE WITNESS: Yes, I feel they definitely warrant follow-ups for the rest of their

lives, depending upon the results of studies then, maybe future generations.

Q. Do you have an opinion as to what these health studies should involve? (Tr. 2825–16).

\* \* \*

They should be comprehensive in nature, and including the liver system, Ophthalmologic, kidney, looking for tumors, obviously, and nervous disorders. Those would be some of the main ones.

Q. Doctor, how long should these health studies and examinations be continued?

A. Well, they should be continued throughout the lives of the individuals, and depending upon the results of those studies, past and future generations.

555. Dr. Clark further elaborated:

"But as an epidemiologist, I would say this entire population was worthy of health foll-up-up.

Q. No matter what type of dose they had received as a result of carbon tetrachloride?

A. Well, I think drinking the water—in drinking the water they did all have substantial doses that warrants a follow-up. I would not rule out five percent or ten percent that might not have as much of an exposure. I am sure there is a variation of exposure, but I think I would choose the whole group for follow-up. (Tr. 2854).

556. Dr. Rhamy, the examining physician of the five flagship plaintiffs and an epidemiologist also found increased risk in the future. He stated:

Q. (By Mr. Gilreath) Dr. Rhamy, in your opinion these five people that we have talked about today, will they need future medical care for screening and that sort of thing?

A. I don't feel that there is any question that these individuals are going to need continuing medical evaluation. Whatever the potential is for the development of future neoplasm, the problems that we have in this group is that we already have some physical problems, which are going to need attention, as well as any screening procedures for the possibility of any future development of other problems.

Q. Will any of these injuries that you now see that you attributed to exposure to chemicals from this dump require future medical treatment?

A. I think the optic atrophy requires continued follow-up to see whether or not there is any progression of this evidence of some optic nerve dysfunction. I think we need to follow-up the enlarged liver. We certainly need to follow-up Mr. Wilbanks and see whether or not his tumor has been hopefully cured. We need to continue to follow the Maness child who—well, not only from the standpoint of the allergies, but what this enlarged liver and these altered enzymes mean. So that, yes, there are needs of these individuals for follow-up and hopefully no further future problems will arise. (Tr. 3044–45).

**D. The Assessment of Risk of Contracting Cancer to the Flagship Plaintiffs as the Result of Exposures to Velsicol's Chemicals**

557. Basically, the evidence showed that five of the substances to which plaintiffs were exposed in their water cause cancer in experimental animals, namely carbon tetrachloride, chloroform, tetrachloroethylene, hexachlorobutadiene and hexachloroethane (Tr. 2000). Because of the differing estimates of exposure, plaintiffs' estimated increased risk of cancer was based mainly upon plaintiff's exposures to carbon tetrachloride and to a lesser extent chloroform.

558. Plaintiffs called three internationally known experts in the field of carcinogenicity. The disciplines of the three overlapped the areas of toxicology, epidemiology, occupational and environmental health and biostatistics. These experts were:

a. Dr. Joseph V. Rodricks, Ph.D., an expert in toxicology in general and carcinogenicity specifically. He was employed by the United States Food and Drug Administration for 15 years and for the last several of

these years he was Deputy Associate Commissioner for Science. That position was the highest ranking federal officer for science in FDA;

b. Dr. Eula Bingham, Ph.D., now Vice President and University Dean for Graduate Studies and Research at the University of Cincinnati (Tr. 9645) and Professor of Environmental Health (Tr. 9649). She was from 1977 to 1981 the Assistant Secretary of Labor in charge of the United States Occupational Safety and Health Administration. She literally spent her entire career, except during her tenure as administrator of OSHA, at the "on-hands, at the bench" position that very few experts in the field of carcinogenicity ever achieve; and

c. Dr. Marvin A. Schneiderman, a Ph.D. in statistics and retired from the United States National Cancer Institute after 32 years. Prior to his retirement, Dr. Schneiderman had been in charge of NCI's epidemiology and statistics research group (Tr. 9829).

559. Dr. Rodricks was careful to point out at the outset that exposures to cancer causing chemicals called "carcinogens" involved different considerations of toxicology than do chemicals exhibiting toxicity of other kinds. He testified:

Q. .... When we talk about the toxicity for causing cancer, is that different from the toxicity, say, for doing kidney damage? Are we talking about the same thing?

A. Well, they are determined by different kinds of testing. There are a couple of things that perhaps distinguish cancer causation from the other kinds of toxicity." (Tr. 126–27).

560. In addition to the testimony of the three eminent scientists, Drs. Rodricks, Bingham and Schneiderman, plaintiffs introduced three documents published by the federal government, namely the OSHA Cancer Policy (Ex. 467); a report concerning Risk Assessment for Cancer and published by the Interagency Regulatory Liaison Group (Ex. 468) and the Toxic Substances Strategy Committee Report to the President (Ex. 469). These documents show a unanimity of opinion shared by the federal regulatory and research agencies on how one identifies a cancer risk and how one attempts to quantify such a risk. These documents were reaffirmed by Dr. Bingham at trial as being state of the art even today. (Tr. 9658; 9666)

561. Dr. Rodricks conducted a risk assessment for cancer concerning the five flagship plaintiffs. He relied upon the water modeling data of Mr. Larson, the experimental data and his "conservative" assumptions concerning dosage of the five plaintiffs to estimate the increased risk of cancer in the future for three of the plaintiffs namely Steve Sterling, Dan Johnson and James O. Maness, Jr. (Tr. 2512). He believed that Mr. Wilbank's exposure was the same as those here and that Mr. Ivy's exposures were probably even higher. In that regard, he did not calculate any dermal exposure for the adults although it is clear that exposure to the water cracked and opened the skin, thus enhancing absorption.

562. Specifically, as to Mr. Sterling, he assumed he drank only two liters of water a day. He testified:

"I looked at the Sterling-Johnson well data from 1964, and assumed that those levels reported there were the average concentrations in the water during each year, and the calculation was very simple. I then assumed that Mr. Sterling consumed, drank, two liters of water per day. Now, that's a fairly, I think, conservative estimate. I heard and read testimony by people there who said that they drank a gallon or two gallons of water a day. I think that may happen on occasion, but according to sort of national averages, that's a very high consumption. So I think I was somewhat cautious and assumed two liters, which is about two quarts, and that would include drinking water and all the other drinking uses." (Tr. 2515–16)

\* \* \*

Then I looked at the inhalation, and here it is somewhat more complex. I considered here, and I think I was also somewhat cautious perhaps in that I considered only exposure during showering or bathing in the bathroom, and my assumptions on this were that first of all—first of all, I looked at the physical properties of carbon tetrachloride, and that would tell you, if you knew how much was in the water coming into the shower or the bathtub, and estimating the temperature of that water, you would know how much carbon tetrachloride would likely leave the water and get into the air, and our estimates, and I have all the calculations on this if anyone would like to see them—it's really rather straightforward physical chemistry, and that is that carbon tetrachloride rather quickly, about seventy percent of the amount found in the water would get into the air in a fairly short period of time. (Tr. 2517)

\* \* \*

But anyway, then I assumed that Mr. Sterling spent one hour per week in the bathroom during the whole time he had this exposure—one hour per week, and that would include showering, bathing and also shaving and other things that same time— one total hour per week. So from that you can then estimate how much air he would have breathed during that time, and we also know what when you breathe air containing carbon tetrachloride not all of it gets to the lung. There is some fairly good data on how much gets through the lung and into the body. That figure is about forty percent. So not all of it that you breathe in would get into the body. Some of it gets exhaled immediately. So I used that forty percent figure. From all of that I estimate, again, the cumulative dose in milligrams per kilogram body weight. You see, it's less here by inhalation, and the average daily dose, and again, that applies to the year of his highest exposure. I will be using the average daily dose in my risk calculations a little bit differently than the cumulative dose.

One footnote on the inhalation exposure. I considered only the bathroom. I listened

to other testimony here that water of course was used for washing dishes and clothes. I heard Mrs. Johnson talk about boiling water. All of that would contribute additionally to airborne concentrations of not only carbon tet, but the others. I didn't consider any of that exposure. I don't know how to quantitate that at all. I think my estimate is on the conservative side, in fact.

Q. So your inhalation exposure was only in the bathroom. (Tr. 2518–19)

563. Dr. Rodricks also made it clear that there was no way to factor in the risks from the other chemicals to which Mr. Sterling was exposed. (Tr. 2520)

564. His exposure calculations for Steve Sterling were admitted as Exhibit 232. (Tr. 2523) He did similar estimates for Dan Johnson and for James O. Maness, Jr. (Tr. 2523) which are Exhibits 233 and 234.

565. As to Mr. Ivy, Dr. Rodricks assumed even a greater risk in terms of exposure. He testified as to Mr. Ivy as well as Mr. Wilbanks:

"Did you do an estimate of the dosage insofar as Mr. Ivy and Mr. Wilbanks are concerned?

A. Mr. Ivy and Mr. Wilbanks are more complicated. Mr. Ivy, I think all one can say is based on his description of the kind of exposure he experienced. From that one assumes—I would assume two things, that the intensity of exposure was at least as great as what I have described here. He probably had—since some of these chemicals very easily pass the skin barrier, spills on the skin or clothing would be another significant route of entry, I think. Perhaps—I don't know what was in the well he drank from, so that perhaps inhalation and skin penetration for him might be more important than drinking, I don't know.

But I should think it would be reasonable to assume that the intensity of his exposure was at least as high and the more significant thing is the number of chemicals. Since he was handling all of the waste, as I understand it, the number of

chemicals would exceed what I have shown here on the chart.

But I'm afraid we cannot put a number on in the same way that I can, I think, here with a fair degree of confidence on his exposure. Perhaps just characterize it as probably worse.

Q. Is that your opinion?

A. Yes.

Q. How about insofar as Mr. Wilbanks?

A. I would have the same general characterization of Mr. Wilbanks. He did not appear to have the direct contact with the materials, so—in fact, it may have been less. (Tr. 2534–35)

566. Dr. Rodricks explained that once exposures of the individual flagship plaintiffs were calculated or estimated, these levels of exposures were compared to those levels based on animal and human data that cause cancer. Exhibit 237 was the framework for this analysis.

567. Dr. Rodricks testified:

"Would you explain what you did and what the chart is?

A. Well, these are five chemicals present in the drinking water, all of which are known to be carcinogens from studies in experimental animals.

Q. By carcinogen, you mean what?

A. Material which will result in formation of tumors in experimental animals or humans. That formation usually requires a fairly long part of the lifetime exposure over a fairly long part of the lifetime or a very long period between initial exposure and the appearance of a tumor. (Tr. 2567–68)

\* \* \*

A. I would like to explain the bottom four first, chloroform, tetrachloroethylene, hexachlorobutadiene and hexachlorethane. I said they are all carcinogens. They are all present in the water. With chloroform and tetrachlorethylene, we have a cumulative exposure estimate. With hexachlorobutadiene and hexachloroethane we do not have that, because they were not part of the model. All we have is the final year's

exposure. So I don't know what happened before 1978. But with those four, based on the animal data and cumulative exposure, one finds perhaps a contribution to risk, but I think relative to carbon tetrachloride, again, it's very small. So I would only consider those in a qualitative way and say they add something to risk, although the main risk appears to come from carbon tetrachloride. So I think one should not ignore the possibility that the others contribute, but the highest risk again is clearly from carbon tetrachloride. So again, the chemicals should not all be seen, I think, on this chart in the same light.

The cumulative exposure to carbon tetrachloride is really quite high relative to amounts known to be capable of inducing cancer. There are, as I counted them, eight studies—perhaps ten. There are two that I think are of bordering quality. But at least eight studies of the carcinogenicity of carbon tetrachloride, dating back to 1941. I don't think there is any question about its carcinogenic properties. It primarily seems to affect animals in the liver.

I looked among the studies for information on dose required to produce certain effect. The reason I separated cancer is that in this case—well, in the other cases I mentioned as one increases the dose of a chemical, it's the severity of the effect that increases—the severity of the effect.

Q You are talking about the other health effects?

A. The other health effects, yes. If you increase the dose of carbon tet, you will reach a range of where you get severe damage to the kidney, say, immediately, and then you drop the dose, and it gets less severe, and so and so forth. With cancer it's not really quite the same, and that's why I separated it, because here what one measures when one does an experiment is the incidents of cancer, that is of a certain group of animals and people exposed at a certain dose only a certain fraction will acquire the disease. It will be equally severe in all those people or animals, but only a certain fraction. So one measures that

fraction, and that's the risk that—that fraction acquiring cancer. And when one drops the dose, ordinarily, the fraction decreases. That's what we mean when we say the risk decreases.

Q. But not the severity?

A. Not the severity. You may be only one chance in a thousand of getting cancer, let's say, hypothetically, but once you get it, it's as severe as someone who is at much higher risk. It's just that the likelihood of your getting it is much lower. If your likelihood of getting cancer is one in a thousand from a given exposure, and someone else's is one in a hundred, then it is just—well, you have different probabilities of getting it, but when you get it, it's just as bad. So that's what we mean by risk in a sense, and it's a little bit different than in the other sense.

Q. You are talking here about excess risk—when you are talking about that, are you talking about excess risk over and above the risk that all of us have for other types of cancer?

A. Yes.

Q. The general population has that certain risk, I take it?

A. Yes, sir. We all have a risk of getting cancer in our lifetimes.

Q. Here you are talking about risk over and above that?

A. Yes. The normal chance, and this is based on statistics, and it is different type of estimate, just knowing the number of people who get cancer—the normal probabilities of getting cancer in the United States now are about one in five for females and about one in four for males. But females are catching up, because they are smoking more. But that's a different kind of risk estimate.

Q. Let me ask this question: In your opinion, are the plaintiffs in this case, the ones that we have mentioned, presently at an excess risk of getting cancer from these chemicals?

A. Well, I believe from carbon tetrachloride with some small addition from the others, yes.

I started to say I looked through several studies of carbon tetrachloride, and one of the problems with quantifying this is that the more modern studies, those run by our National Cancer Institute in recent years— they gave such high doses that at several doses they gave during the study there was a one hundred percent incidence of cancer. So you don't know the relationship between the dose and the incidence. It's not really useful for risk assessment.

I returned to an old study to make an approximate risk estimate, if you need to put a number here, one done by Eschenbenner & Miller, in 1946. It's limited in some ways, and I will describe that, but in other ways it's a very nice study. They did several things that I think are appropriate to this particular case. One is they gave animals doses of carbon tetrachloride that are fairly low and avoided the—as I said, carbon tetrachloride can damage the liver fairly severely if you give a high enough dose in a fairly short time. They tried to keep the doses down below the level where it would clearly damage the liver, produce death to the cells in the liver. Some people have said that that kind of damage is necessary to get cancer from carbon tetrachloride. Well, they went below that and found liver cancer anyway, without any sign of liver injury. So that was a nice aspect of the experiment. They gave exposures only over a fraction of the animal's lifetime, thirty exposures over a period of several months. Now, the mice would ordinarily live about two years. So it's a fraction of the lifetime of exposure—again very much like the people here in Hardeman County, very much like they had. So I selected that study just to give a crude range of risk. The cumulative dose in that study needed to produce approximately a forty percent incidence of cancer in those animals was about twelve hundred milligrams per kg, cumulative dose, distributed in time over about thirty exposures, and they doubled that cumulative dose to about twenty-four hundred milligrams per kg in

the mice, and the risk went up to eighty percent.

Just a crude extrapolation here. We are talking here about exposures over a small fraction of these people's lifetime in the range of two to three hundred milligrams per kg, which is only one-fourth that needed to produce a forty percent incidence of cancer in those animals. So we are not really talking about, if we rely on that study, and I don't see any reason not to, we are not talking about a great extrapolation here, but a fairly narrow range. Their exposure is really quite high.

That would lead, just as a crude estimate, to something like a ten percent excess risk of cancer. (Tr. 2568–74)

 \* \* \*

Q (By Mr. Gilreath) Dr. Rodricks, the estimate that you gave, state whether or not that is your opinion in his case based upon a reasonable degree of medical certainty as to the increased risk.

 \* \* \*

A. Yes, Yes, it is. I hope I have, if I haven't already I will, clarified there is some uncertainty in that estimate. That's the nature of the subject. But here in this case, because the cumulative exposure is really quite high and in the range where we have direct observation, almost, I would say the uncertainty here is less than in other cases I've seen.

Q. (By Mr. Gilreath) Have you done risk assessments for excess risk of cancer in other cases involving chemicals?

A. Oh, yes. (Tr. 2575–76)

 \* \* \*

Q. When you say the exposure here is quite high—is that the terminology you used?

A. The cumulative exposure here of carbon tetrachloride, yes, is really quite high.

Q. When you say quite high you are comparing it—

A. Relative—I mean I quoted figures from the Eschenbenner & Miller study, who were two authors of one of, as I said, eight studies on carbon tetrachloride,

where there's fairly good information on dose and response. There are limitations in that, but since we are talking about exposures very close to the range where they observed the facts, this perhaps has less uncertainty than I have seen in other cases. (Tr. 2576)

568. Dr. Rodricks explained that insofar as the 10% increased risk of cancer is concerned, such a risk was an average over the five flagship plaintiffs. He stated:

Q. Well, as a matter of fact, when you assume a risk and you assume a risk for a 60–year old man, that risk may occur, but it may occur long after he's deceased from other—for other reasons, isn't that fair?

A. You mean the tumor?

Q. Yes.

A. Because the process, I would state, is already underway. Whether it will result in a specific tumor in his lifetime, there is a finite probability. It is probably less for an older man like that than for a very young child. So the ten percent is kind of an average over a lifetime. (Tr. 2701)

569. Dr. Rodricks made it clear that the 10% increased risk was to be added on top of the already 25% risk the American population has. He testified:

Q. Now, are you telling me that his exposure to carbon tetrachloride and the risk—the increased risk of cancer that you perceive is added on top of the risk that he has already created for himself with smoking?

A. If it makes sense to talk about the risks from all different types of cancers combined, yes, it would add on top of that. When you start separating them out by different sites, you know, body sites, then it gets more complex, because we don't know in what body site they are at risk from carbon tetrachloride and these others." (Tr. 2628)

570. Dr. Rodricks further testified how he calculated a 10% increased risk of cancer. He stated:

"A. These five being carbon tetrachloride, chloroform, tetrachloroethylene, hexachlorobutadiene and hexachloroethane.

They've all been documented as carcinogens in studies in experimental animals, carbon tetrachloride most extensively. I counted—

Q. So all of these were found in the—

A. Yes.

Q. —modeling data to be chemicals that these people were exposed to, is that right?

A. Yes, that's correct.

Q. Okay.

A. And we do not have the cumulative exposure, that is over the whole period of time, on the bottom two, that is hexachlorobutadiene or hexachlorethane. All we have is some measurements in the last year of exposure from the AWARE report. So one cannot get cumulative exposure to those.

The others, carbon tetrachloride, chloroform and tetrachloroethylene, we have the cumulative exposure and we saw those on the charts I presented.

If—carbon tetrachloride, again, stands out simply because the exposure is so high. It's carcinogenicity has been documented in I counted eleven, maybe twelve if you count one of sort of dubious merit, of eleven studies in animals, quite reproducible.

Q. Now, are you talking about acute exposure or—

A. No, no, this is exposures for extended periods of time. And cancer takes a very long time to develop. In the earlier studies back in the Forties by Eschenbenner and Miller, two scientists at the National Cancer Institute, they looked at exposures in very interesting ways, things that people don't do any more and they should. They looked at, for example, the effect of giving a certain dose but spreading that dose over very long periods of time at very low levels or giving it at higher doses, but over a shorter period of time, and they found that lower doses over a longer period of time is more effective at producing cancer. By more effective I mean that it increases the risk or the incidence of cancer in animals. I used those studies to give an approximate range of risk here, the Eschenbenner and Miller studies, and carbon tetrachloride

stands out as high. They observed risks of forty percent or so at a cumulative dose given over a fairly short period of the animal's lifetime, only four times higher than the cumulative doses these people got. So that's not a big difference in response is what I'm saying and it looks to me like quite a high risk, roughly in the range of ten percent.

The others by themselves, the other four, based on other experimental data and other risk analysis, you have to extrapolate quite a bit away from the region where we have data.

Q. You say the increased risk of cancer at ten percent, are you just talking about one of these—

A. The carbon tetrachloride, yes. The others, the best I can say is that they may increase slightly beyond that, but their exposures are such and the potencies are such that relative to carbon tetrachloride, they are individually small. But they add something so I put in that range.

Q. How about when you add them all together, what do you get?

A. That's what I'm talking about. That is, you have something in the range of ten percent and statistically they would probably be bound on that. I'm not sure what they would be. (Tr. 2600–02)

571. Dr. Rodricks also reiterated that he had not considered interactions between the chemicals, *viz:*

"I have not considered interactions in these twelve. I don't know how to do that. The potential for some kind of interaction is still there. It's documented in other cases, but I find no documentation in this specific case, but it is a potential. But I considered them just individually when I eliminated some and selected others as significant. That would be another qualitative concern—I think I might add, but I can only make it a qualitative one. It is something else to keep in mind. Generally the whole science of toxicology is very bad on that. It has been very poorly studied, the interac-

tions. But where it has been, it gives you pause." (Tr. 2612)

572. Dr. Bingham reviewed the testimony of plaintiffs as had Dr. Rodricks. Instead of relying upon the water modeling figures, however, to estimate the amounts of chemicals to which plaintiffs had been exposed, she dealt with developing the risk estimate from another direction. She was able to estimate their biological dose or exposure by determining what dose it took in workers to produce certain symptoms. Of course, women, children and old individuals would be even more susceptible than the workers. She testified:

"Q. (By Mr. Wilder) Now, Dr. Bingham, you said that these symptoms were indicative of exposure to carbon tetrachloride. On what basis do you base that?

A. Well, if you look at the NIOSH criteria documents, you see these exposures of workers described, and you see what level of exposure they received and what kinds of effects that you have as a result of that—let's see—for example, symptoms such as headaches, tiredness, giddiness, dizziness, are associated with various levels of exposure. In one experiment that is reported here, and there are a number of other case reports—

MR. GENTRY: (INTERPOSING) Your Honor, she is reading from something here. May I ask her to give us a page number?

THE COURT: Yes.

THE WITNESS: It's the carbon tetrachloride document, Exhibit 328. The symptoms are described and responses are described on page 20, and actually you can move through the whole series of case reports, and up to page 30, and then further on there is a discussion of various groups of workers. It's entitled "Epidemiologic Studies." They describe the kind of effects, symptoms that they have as a result of exposure to carbon tetrachloride.

To give you an example of just one, dizziness and vertigo occur after ten minutes of exposure at concentrations of 600 parts per million, which is four milligrams per liter, and I can go through and read you other excerpts beginning on page 20.

Q. (By Mr. Wilder) Doctor, did you in fact do this for each of the symptoms that these people have that related to carbon tetrachloride?

A. Not for each one separately. I looked at the kind of symptoms that you got with various exposures. To tell you the truth, I wanted to see what kinds of doses these people were receiving, and it seems to me that they were receiving doses that were substantial—doses that at least in some instances have been associated with liver damage and that are what I will call substantial biological doses. Now, I can only—may I continue?

Q. Yes.

A. I can only say that if these symptoms occurred that somehow these individuals must have received a fair amount of carbon tetrachloride, either by inhalation or by ingestion or perhaps through their skin.

Q. Did you also consider chloroform?

A. To some extent. Although I didn't make as extensive a search there. Certainly some of the symptoms are consistent with overexposure to chloroform—the tiredness, the achiness in the legs, et cetera, and if you look at the levels that are required to produce those effects, you have to say that there was a biological—assume that there was a biological dose that was substantial. I have actually calculated the dose for carbon tetrachloride. (Tr. 9719–21)

573. Dr. Bingham further testified:

"Well, I think there were in some instances, from what I saw, and I would have to go back, some elevated liver enzymes, and in addition, even though the enzymes might not be elevated,—you know those enzymes do go back to normal from all I have read in the literature. In addition to that, if I can believe, and I do believe the individuals whose testimony I read the plaintiffs also—it was brought out by Dr. Rhamy that a number of these individuals suffered symptoms, head symptoms that are consistent

with what I would call acute and even some chronic poisoning as a result of the carbon tetrachloride—tiredness, dizziness, and a number of other complaints that they had." (Tr. 9716–17)

574. She further testified:

"Well, this is the dose that people got under experimental conditions to produce dizziness and vertigo and what I am saying is that individuals who have described their symptoms had to get a biological dose that was comparable to that to have the symptoms that they had. Now, they may not have been exposed to 600 parts per million. they probably were not. But the point is they got this kind of a biological dose from someplace or they wouldn't have had symptoms of the kind that have been described. Now, you know, if you were dizzy once a week, then maybe that's what you got once a week, and that was your biological dose. That's, you know, one way to look at it. If you were dizzy once a week, well, take 52 times that to calculate what their biological dose would be in a year. That would be the cumulative biological dose for one year. If you had that dizziness and vertigo for a year, two years, three years, you would just multiply it by the number of years. I think I did that and came out with a number like 1784.6 milligrams per kilogram in cumulative dose in three years. That's assuming that you got dizzy once a week, had the symptoms once a week for three years. It's another way to estimate actual dose in an animal, human or whatever. (Tr. 9723–24)

575. Dr. Bingham was asked about whether she could quantify the increased risk of cancer to the five flagship plaintiffs. She testified:

But I think that what you can say is that the people got a substantial dose and if you want to—

Are you asking me for a risk estimate or what I think the people—

Q. Yes.

A. —might have suffered in excess risk? I don't really understand.

Q. Well, Doctor, the testimony, again, of several of these witnesses, including Dr. Louria, feels that these five plaintiffs in this lawsuit are not at increased risk. Do you agree with that statement?

A. No, I do not. I think they are at increased risk and if I, you know, look at the kinds of biological doses that they must have had to have to get the symptoms and look at some of the risk estimation models, and I worked with—looked at this cumulative kind of dose that one can suspect that they may have received over a period of years, why, we are looking at increased risk over a lifetime of increased probability of developing cancer on the order of 40, 50 percent. My number came out 49, but, you know, I can't argue which one it is because I don't know specifically how much they received, but I think it was substantial and they are at increased risk. (Tr. 9756–57)

\* \* \*

Q. Now, Dr. Bingham, what is the basis for your opinion that these people are at increased risk as much as a fifty percent increase?

A. Well, it's based on the kind of doses that I have estimated that they've got. If you review their symptoms, they are consistent with receiving a biological dose of a certain magnitude or you don't get those symptoms with carbon tetrachloride. It's based on that and what you might—some speculation of how many—you know, whether or not this was repeated over a period of time, and then this—one of the models was used and I worked with Dr. Snyderman to come up with what kind of an increased risk there would be with using a model comparable to the one that Dr. Rodricks used, the kind of, well, model. And this is the number. If you have that kind of exposure, that's the kind of increased risk you come up with. (Tr. 9758)

\* \* \*

Q. Dr. Bingham, you mentioned the fact that you used the model that Dr. Rodricks used—

A. Yes.

Q. —to calculate this. Would you explain that?

A. Well, to estimate risk, I used his model, I should say I worked with Dr. Snyderman [sic] and we used Dr. Rodrick's model for estimating risk. I used my own model, which I've explained to you, for estimating the kinds of exposures and cumulative dose, and I think that was on the other exhibit, I don't recall that number, that we put up here. I just went about calculating dose in a different manner.

It's my feeling that from what I know of Dr. Rodrick's testimony, and I read it, what he did—and I can get out his estimations. I think I have them here.

Well, what he did with the adults was estimate ingestion, which might have been the biological dose as the result of ingestion, and what might have been the biological dose as a result of inhalation. Now, he used a little bit different number than I did. I base my number on data obtained on workers, actually they were people in an experiment, using sixty percent absorption from inhalation, but, you know, we could use forty percent. I don't think it's going to throw the numbers off that far.

I also believe that he failed to take into account for the adults percutaneous absorption, and I think that that percutaneous absorption could have been substantial from what we know about these materials and how they are absorbed through the skin. (Tr. 9756–60)

\* \* \*

MR. WILDER: Your Honor, in response to that, I don't believe Dr. Bingham is disagreeing with Dr. Rodricks. I believe if Your Honor remembers when Dr. Rodricks testified, he said that he would be an ultra-conservative and was not taking into con-

sideration the skin absorption. The mere fact of what Dr. Bingham has done is to take this into consideration. But the point being that the rebuttal here is the fact that these witnesses for Velsicol, Dr. Louria and others, have testified that there was no risk, and Dr. Bingham has testified here that there is a substantial increase in risk of cancer, and she has explained how she determined in her own mind that these plaintiffs were at an increased risk of cancer. (Tr. 9761–62)

\* \* \*

THE WITNESS: Dr. Rodricks used a different method for estimating the exposure than I did. What we tried to do in the field of toxicology, chemical carcinogenesis is to estimate exposures in any way we can if we don't have solid data. He went about it one way. I am coming about it from another way. Actually, we are not that far apart. But he did say that he was being conservative, and I just think I am using a different method. That's all. (Tr. 9762–63)

\* \* \*

Q. (By Mr. Wilder) Dr. Bingham, leaving Dr. Rodricks totally aside at this point, would you tell us how you arrived at your figure of a fifty percent increase?

A. I arrived at it by making calculations about what are the levels that produced the symptoms that were described by certain individuals. One of them is Mr. Wilbanks, and you read the names of other people, and I made those calculations based on some experimental observations. Actually, I have made a number of calculations, and then I used those calculations to arrive at a biological dose that these individuals must have received to have had these symptoms. I then made some assumptions about how often they might have had these symptoms, and for what period of time, and then worked with Dr. Snyderman [sic] to convert that using the same model that Dr. Rodricks used for a risk estimation in

terms of whether they were at increased risk of developing cancer.

Q. And your opinion is in regard to risk—your opinion in regard to their risk is what?

A. They are at increased risk. (Tr. 9763–64)

576. Stated another way, Dr. Bingham's approach to exposure was based on the NIOSH studies, *viz:*

"My calculation is based upon the symptoms and signs that workers develop after a biological dose of carbon tetrachloride of a certain magnitude, and what I'm saying is that these individuals to have experienced dizziness, headache, the nausea, et cetera, had to have biological doses that were substantial. Whether they were precisely this number or not, whether they were somewhat lower over longer periods of time, apparently there was something they were doing that probably triggered the dizziness, like washing their hands or triggered the falling out, as Mr. Wilbanks described it, by putting his hands in dishwater and absorbing, I would suspect, the material. (Tr. 9797)

* * *

What I did was look at the NIOSH criteria document at experiments that had been done. I don't think you can use a minimum biological dose. What you can do is look in the NIOSH criteria document at experiments they have done and observations with workers. For example, I could have used a different dose, like—

Q. Well, when you say a different dose, different from what?

A. For different periods of time. I'm sorry, a different exposure for different periods of time and come up with a different biological dose. There is a range and different people have different, I would say, susceptibilities. It may have not taken as much carbon tetrachloride to bring on the problems of dizziness, headache, and so forth, in Mr. Wilbanks as it did, let's say, in

Mr. Ivy. It does vary, there's no question about it. (Tr. 9798–99)

577. Finally, being the cautious scientist that she is, Dr. Bingham was careful to point out that an estimate of risk is just that—an estimate which might be 10% with conservative assumptions as to dose or as high as 49% with less conservative assumptions which might be albeit more accurate. She testified:

A. I think that this is in the range of the biological dose that these people had to receive. It may have been somewhat more, or it may have been somewhat less to produce the symptoms. I don't know whether the cumulative dose for one year that is at the bottom of Exhibit 528 is actually how frequently the individuals were dizzy. I don't know whether this occurred over three years or five years or one year or six months. I was just trying to come up with some estimates. It could be a ten percent increased risk. It could be twenty, thirty, forty, fifty. I just know that they had to have a substantial dose of chemical to have the kinds of symptoms that they exhibited. I think risk estimates are just what the term estimate implies, estimate. That's all I can say. I mean they are at increased risk. How great the increased risk is, I don't know. Probably ten percent may be correct, or it may be fifty percent. It's a range, and I can't put my—

Q. (Interposing) Put your finger on it?

A. That's right.

* * *

Q. (By Mr. Gentry) Doctor, you have been very patient. I have one other question to ask.

With regard to the 49 percent you made one other assumption, I believe, and that is you excluded any other possible cause for these symptoms other than exposure to carbon tetrachloride?

Is that a fair statement?

A. In these calculations I only dealt with carbon tetrachloride, even though I know

there was in the water some other chemicals that could have contributed and altered the risk estimate up or down.

Q. And you also excluded any other causes, such as illnesses or the like that were not caused by exposure to carbon tetrachloride?

A. You mean that caused the symptoms?

Q. Yes.

A. Yes, I did. (Tr. 9817–18)

578. Dr. Schneiderman addressed the increased incidence of risks of cancer to the five flagship plaintiffs. (Tr. 9814). It should be remembered that he was in charge of epidemiology and statistics at the National Cancer Institute for many years.

579. In explaining his risk assessment which showed an increased risk of 16% to the five flagship plaintiffs of contacting cancer, Dr. Schneiderman used the most conservative assumptions as to dosage as had Dr. Rodricks. However, he factored in skin absorption from the data provided by Dr. Bingham that Dr. Rodricks had not factored in. Dr. Schneiderman testified:

Q. All right. Now, if you go back to the figures that Dr. Bingham—or Mr. Gentry put on the board here of 600 ppm for ten minutes, adopting those as her figures, how would that compare to the exposures on the front page here of 160 parts per million and 320 parts per million?

A. Well, let me do it here on this page where we can still see it.

Q. All right.

A. We had 600 parts per million times ten minutes or a total of 6,000 units cumulative exposure. As I remeber, the 600 was 160 times 30 minutes—and that was the lowest level that produced, that produced rather mild symptoms of the type that Dr. Bingham was talking about, quite mild symptoms, as I recall—that's 4,800. 4,800 is about 80 percent of 6,000. The risk that you get is almost directly proportional to those numbers, those particular dose num-

bers, because that goes up into that equation up there that is in dose. This is about 80 percent of that.

If Dr. Bingham got, I think it was, roughly 50 percent with that dose, this dose is 80 percent of the other dose, that's the lowest level that produced those biological symptoms, 80 percent of 50 percent is 40 percent. So if we took the lowest exposure levels that produced those symptoms, you wouldn't have gotten the 50 percent that Dr. Bingham got, you would have gotten 40 percent. If I—yes.

Q. 40 percent increased—

A. 40 percent lifetime probability of developing this disease.

Q. What is your opinion as to the risk assessment of these exposed individuals in this case?

A. Well, I did a little more arithmetic in addition to this. I said suppose Dr. Bingham—suppose the 60 percent of absorption that Dr. Bingham talked about was inappropriate and wants you to have used the 40 percent that Dr. Rodricks talked about. That brought me down to, oh, about somewhere in the vicinity of, let's say, 40 percent absorption versus 60 percent, taking you back to what Rodricks had rather than what Bingham had—(Tr. 9886–87)

\* \* \*

A. So if I take 40 percent absorption rather than 60, that reduces—that would reduce my risk by—I get two thirds of what I've got there. Two thirds of forty is what? That's eighty divided by three, about 27. That would take me down to about 27 percent.

So if I do down to the sort of lowest—I made some—I did one other computation. I can't remember what it was now. I did one other computation which brought me down to—the lowest I could get out of this was of the order of 16 to 20 percent, and that's making all—the most conservative assumptions, the least exposure type assumptions, and least absorption of the ma-

terial, the least effect. And this is 16 to 20 percent additional probability of developing cancer compared—as one must put it in context, this is compared to a lifetime probability of developing cancer for all reasons from all causes, from everything over a total lifetime, of about 25 percent.

In other words, this is 20 percent compared to—that low number, 20 percent or 16 percent, compared to 25 percent, is an increase in risk for an individual—16 is an increase in risk for an individual of 64 percent the probability, given the base probability that the rest of the population has.

BY MR. GILREATH:

Q. In other words, this is over and above the general risk?

A. Oh, yes, yes, this is over and above the general risk.

Q. It's added to that?

A. It's added to that, assuming you don't die of something else earlier. (Tr. 9888–89)

580. The Court finds that the increased risk of contacting cancer to these five flagship plaintiffs lies somewhere between the 10% increased risk estimated by Dr. Rodricks and the 49% increased risk estimated by Dr. Bingham. Relying upon these estimates and the estimate of Dr. Schneiderman which is between 16–40%, the Court finds that the increased risk is substantial and at least 25% to 30%, particularly because the lowest increase risk estimate did not take into account dermal exposure through cracked, dry skin caused by the carbon tetrachloride to the adults. (Tr. 2584) It is now clear however that "carbon tetrachloride [is] likely to be absorbed through the skin in toxic quantities when in contact with the skin of the hand and forearms (Ex. 241, Barnes & Jones).

581. Velsicol raised some 10 questions concerning plaintiffs' risk assessment for cancer introduced through Drs. Butler, Harbison, Kolby, Louria, Roe and Woodward. Much of this testimony was contradictory and all was against the weight of the evidence except where noted. These issues were:

a. That experimental data is not extrapolatable to humans;

b. That in any event, the cancer caused in mice and rats by chloroform and carbon tetrachloride first caused liver damage and necrosis and the regeneration process caused the cancer. Since there was no liver damage to plaintiffs in the first place there can be no risk of cancer to plaintiffs.

c. That the Eschenbenner and Miller studies that show no need for liver damage but observed "hepatomas" cannot be relied upon because the tumor may mean only benign tumors;

d. That chloroform had been used in medicine and toothpaste and swimming pools without any adverse effect for years; and

e. Studies by Shindell show that exposures to carbon tetrachloride are nonharmful.

582. For the reasons set out below, the Court rejects these arguments and finds a substantial increased risk of cancer to the five exposed flagship plaintiffs exists as a result of their exposures to the chemicals dumped by Velsicol on the farm.

a. *The Use of Animals*

583. The Court finds that the use of animals is a valid and scientific basis to identify potential human carcinogens and to attempt to quantify such a risk.

584. Dr. Rodricks described why animal studies are important in the testing of toxic substances. He testified:

"Well, toxicologists have always relied on animal experiments. They first came into use when during the early part of the century people became concerned that we really should be testing chemicals before we permit human exposure,

things like drugs or food additives or pesticides, and animal experiments then were adopted as the means to test chemicals and they have since been extended to test chemicals for all other kinds of reasons.

"The reason we resort to animal experiments is that you can do very carefully controlled studies in animals that obviously you can't do in people. You can't deliberately expose people to toxic chemicals, at least those of high toxicity. So we get much of our information about the toxicity of chemicals from animals.

585. Dr. Rodricks further testified:

Q. Do you feel fairly comfortable with extrapolating the results of a rat study on carbon tetrachloride to human beings?

A. With certain qualifications.

Q. What are those qualifications, sir?

A. Well, they primarily concern—well, you would first want to make sure that the study was well conducted, that it followed good procedures of science for these kinds of studies, and that it was adequately reported. You then want to look at the doses or the range of doses and the time, the duration of exposure, and you make sure that those are adequately documented in the animal study. (Tr. 168–69)

586. Dr. Bingham also testified concerning the use of data generated by animal experiments. She stated:

"Yes, I've used animals in a number of experiments and I think we generally in the field of toxicology take animal experiments and extrapolate them to humans. After all, the Food and Drug Administration always tests new drugs on animals before they—well, almost always, I suppose there could be a rare case, but I doubt it—before they are tried out on human beings. Even when people are, let's say, dying of cancer, they test the animals on drugs first.

"Our whole toxicological system is based upon this in this country. In European countries and the world health organization it's based on the fact that there is what I will call and what others have called a universality of biological processes that—for example, DNA replication is pretty similar as you go up the phylogenetic tree to man from lower animals. Actually we use bacteria to make certain—to do certain tests that teach you how genetic mechanism works in man and there have been great inroads in that. As a matter of fact, we have taken the data that have been obtained on the giant squid axon, not even a mammal, and used it to understand how nerves actually work, how nerve impulses are propagated. The work that was done on fish, on dogs, on rodents, has formed the basis of how we understand the mechanism of renal function in man and we've based our management of—some of our management of hypertension on this.

My point is that we have been using extrapolations from animals to man for the better part of a century and all our safety testing is really based on that. At its beginning we may do some drug trials in man, but that usually comes later. So I mean everything we do in this—the whole health field is predicated on extrapolating information from one animal to another and to man, and, after all, man is high up in the phylogenetic tree but is another animal. (Tr. 9733–34)

\* \* \*

Q. Now, is it possible to study man for cancer?

A. Well, in some situations you can, but we have—experimentally, the whole field of cancer research has grown up using experimental animals as surrogates. I think it's important to note that we first found cancer in man and then we went out and were able to reproduce it in experimental animals. And once again I would have to say that from what we know we can use man as a surrogate. The results aren't always exactly the same in terms of target organs, but the potential of chemicals to induce the carcinogenic response can be

determined by work in experimental animals. (Tr. 9735)

587. Dr. Bingham further testified:

Q. Do you agree with that statement that you cannot extrapolate animal data on carbon tetrachloride to man?

A. No, I don't agree.

Q. Why do you not agree?

A. Well, I don't agree, because I think that you can in general extrapolate experimental data derived from experimental animals to man. I have gone over it before; that this is the basis of all our toxicology chemical carcinogenics testing. You determine whether or not the chemical has carcinogenic potential using one, two, three species, looking at the target organs, and then you relate those tests to man. I don't know why else we would do all this bioassay in the federal government if we didn't intend to do that sort of thing. (Tr. 9740–41)

588. Moreover, as Dr. Harbison, Velsicol's own toxicologist testified in *U.S. v. Price:*

13. Carcinogens have been identified either by observation of tumors occurring in human populations (epidemiology) or by controlled experiments using test animals or other organisms (toxicology).

14. Evidence of cancer in humans is not prerequisite to a chemical being labelled a carcinogen. First, epidemiological methods are insensitive and may only detect extremely large increases in cancer risk. The lower limit of detection by these methods has been approximately a 30% increase in cancer. Even a 10% increase in cancer would be unacceptable, although it would be undetectable in a study of human populations. Second, clinical cancers only appear in humans exposed to carcinogens after substantial lag periods; typically on the order of 15 to 30 years. For many substances, significant population exposures are too recent for any effect, no matter how powerful, to be seen. In the event a carcinogen can be detected by epidemiological study, either because it causes a very unusual tumor such as asbestos or vinyl chloride, or because the exposures are very high, as with cigarette smoke, immediate cessation of exposure will not prevent new cancers resulting from past exposures from appearing for the entire length of the lag period, i.e., another 15 to 30 years.

15. For the reasons stated, animal tests have become our principal source of information about which chemicals pose a cancer risk in humans. The animals most often used as models are rodents, usually rats and mice. These animals are good predictors of human cancer risk, although arguments can be made that they are in fact not as sensitive to carcinogens as humans.

16. Animal test models are used for two purposes. The first is to identify chemicals which are capable of causing cancer, regardless of the dose. Properly designed animal studies use as their highest dose the maximally tolerated dose, defined as a dose which causes no observable lethal or sublethal issue damage and results in no more than 10% weight loss in the exposed versus unexposed groups. High doses are used in order to produce cancers at a rate high enough to be detected with animal populations of practicable size. If the substance is not a carcinogen, and most are not, it will not increase tumor risk at any dose. The only serious question presented in such modeling is whether a chemical can be a carcinogen at a high dose but not at a low dose, i.e., whether a "safe" threshold exists. A great deal of independent biologic

evidence suggests that there is no such safe threshold. The presumed mechanism of cellular transformation discussed above supports the same view and measurement of tumor risk at low dose levels is statistically inaccessible to practical determination. Second, these tests aid in estimating the extent of the increased risk of cancer at low doses, given high-dose data. These estimates are made on the basis of mathematical extrapolations of the high doses which have been shown to cause cancer. None of the several competing models of low-dose extrapolation in use assume a "safe" threshold. Disagreements on the proper model to use do not involve whether the chemical can cause cancer at low doses; such disagreements rather pertain to how much cancer it can cause. All the models fit the high-dose data equally well but give varying estimates for what happens at low-dose. Since all the models have been generated by biologically convincing arguments, and since it is impossible to "prove" which model is the more accurate predictor of cancer, public health professionals tend to use more conservative models. (Ex. 504, pp. 5–6).

589. The Court finds that the arguments that the animals used in the positive cancer studies are not reflective of the human to be against the weight of the evidence. In fact, the evidence shows that the other effects found in animals exposed to carbon tetrachloride and chloroform such as liver and kidney effects actually occurred in this group of plaintiffs. And, because the Court believes that Mr. Wilbank's kidney cancer was the result of his exposure to Velsicol's chemicals as well, these animal tests are found to be relevant and predictive of events to come.

b. *That Liver Necrosis is Necessary Before a Risk of Cancer Occurs*

590. Velsicol's arguments concerning the need for liver necrosis or damage be-

fore the risk of cancer arises is against the weight of the evidence.

591. First, these plaintiffs did suffer massive liver damage as the testing indicated. The fact that such testing took place subsequent to the event is not the fault of the plaintiffs. The delay however may be the responsibility of Velsicol however as it delayed EPA approval of the Clark/Balistreri study for some period of time, as pointed out above.

592. Second, it is clear that plaintiffs as a class and these five plaintiffs not only suffered severe liver damage, the arguments that liver necrosis or severe damage to the liver has to occur before any risk of cancer could arise is erroneous. The Eschenbenner & Miller studies themselves were directed specifically towards that issue. These authors concluded that one may need such damage before the test animals contacted cancer. The Court therefore rejects such a theory.

593. Dr. Rodricks pointed out.

"One of the nice features of [Eschenbenner and Miller] that I found useful for analysis was that, first of all—I suppose there are two features—one, their duration of exposure in the animals was about the same fraction of a lifetime as the people at Hardeman. It wasn't the full lifetime they were exposed. They were also exposed to doses below those that killed cells, and the cancer was still found. So in that sense you are not confounding the observation by also seeing other forms of toxicity. (Tr. 2031)

594. Dr. Rodricks further addressed this issue by explaining that whatever other chronic effects might be necessary before the development of cancer caused by some agents, it was not true in the case of carbon tetrachloride. He testified:

"Now, I think that's just incorrect, and the Eschenbenner Miller study shows that that is incorrect. The implication there is that if you are at a dose which will not produce those other kinds of toxicity, then no cancer will follow. I neither understand the

logic—and I also think it is not correct based on conclusion from this study which shows quite clearly the absence of necrosis or any form of liver damage at doses which were producing cancer quite unequivocally. So I think that's just wrong and their ignoring the cancer data I think is a serious deficiency in this TLV. Those are my four points.

Q. Would you explain from a toxicology standpoint how an agent can produce cancer and not produce damage to the liver cell first?

A. Oh, different kinds of damage. Some toxicologists will argue, and I'm sure you will hear some in this case, that for some— one of the—there are several threshold theories of carcinogens. One of them says that the material must cause a certain kind of damage, regular toxic damage, to a cell and that if that damage occurs over and over again in an organ, the liver or the kidney, then eventually out of that, cancer will develop. But if you drop the dose that produces that toxic damage, assume it's a threshold type, the toxic damage itself, not the ultimate cancer, drop the dose below that so you don't get that kind of toxic damage, then the cancer will never have a chance to develop. It's a different kind of mechanism of cancer development than you'd apply to a nonthreshold carcinogen.

That may be the case in some cases. I think in the case of carbon tetrachloride, the evidence is in the other direction based on the Eschenbenner Miller study, and there's also a study by Glover where they looked at cirrhosis, another form of chronic liver injury, and cancer and they were independent phenomena. They weren't related. So I just don't accept this analysis. (Tr. 2679-80)

595. As to Velsicol's argument that liver necrosis is necessary before test animals get liver cancer from exposure to carbon tetrachloride, Dr. Bingham as did Dr. Rodricks reviewed the Eschenbenner and Miller Studies. She testified:

"I think that some of the early experiments of Eschenbenner separates those two processes and it's my opinion that it's not necessary to have liver damage.

Q. While we are on the subject of—

A. Bad damage, if you want to call it that.

Q. Excuse me.

A. Excuse me. Bad damage I think is the term you used. (Tr. 2728-29)

596. She further stated:

Q. Is your opinion based upon this particular study?

A. Yes, and from what we know about carcinogenesis. I think that it's not necessary that we have necrosis. (Tr. 9731)

597. Dr. Bingham further elaborated that although necrosis or liver damage was not required to produce a risk of cancer, that such damage had in fact occurred:

Q. Dr. Bingham, regarding our five flagship plaintiffs, is there any way you or anyone else could tell that there was no necrosis to the liver of any of the five flagship plaintiffs?

A. I think not, because as far as I know, biopsies were not taken, and unless it comes to autopsy, I don't know how you could say that there was not liver damage.

Q. Do you believe that there was liver damage?

A. I believe it is highly likely that there was liver damage in some individuals. For example, it seems to me that when you had the kind of complaints that some of those persons had that you must have had some liver damage. (Tr. 9742-43)

* * *

A. Well, Mr. Wilbanks testified that he became dizzy, and I think he used the words "Fell out," which I hadn't heard before. I think he became dizzy when he was washing dishes. I would be very sur-

prised if he didn't have substantial liver damage.

So what I am saying is that by the symptoms that he described, and the kind of information that we have from the occupational safety and health literature, I would say that it is likely. I can't be a hundred percent positive, you know, without the data, but his symptoms would be consistent with substantial exposure.

Q. Is it more likely than not that his liver suffered damage?

A. Yes. (Tr. 9743–44)

\* \* \*

Q (By Mr. Wilder) Dr. Bingham, just assume that Mr. Steve Sterling made the statement that he had suffered headaches and nausea while being exposed to the vapors in the shower and around the hot water. What would this do?

A. Well, they tell me that he had a biological dose of these contaminants as a result of skin absorption, inhalation, et cetera that was substantial and is consistent with those kinds of symptoms that we see reported in the literature, and I think there would be some liver damage. Whether there would actually be cells dying and sloughed off, I am not prepared to say, but I think there would be damage, leakage of the enzymes, and the other things that go along with carbon tetrachloride's effect on the liver. (Tr. 9744–45)

\* \* \*

Q. Dr. Bingham, assume for this discussion that Mr. Curry Ivy testified to the effect that he suffered headaches and nausea and some dizziness when he came in contact with fumes either from the water or from the truck that he was driving with chemicals on them. Would this be consistent with what you have just said also?

A. Yes. I think, as a matter of fact, that probably the more symptoms of this type

that you get, the more likely it would be that you would have a substantial exposure. You know, if you just had a headache, you might not think as much about it. But if it persisted, and if you had dizziness every time you were in certain kinds of situations, which apparently some of these people had, and the feeling of nausea—yes, I think that they got substantial exposures from what we know about carbon tetrachloride and the kinds of symptoms it produces, and they are consistent with producing injury to the liver. (Tr. 9745–46)

598. Dr. Bingham also testified concerning Patsy Johnson's testimony that:

A. "I would say that they had a substantial exposure to carbon tetrachloride and/or chloroform, also from what I have seen, the carbon tetrachloride is in much larger concentrations in the water, and somehow this vaporized and they had a dose by inhalation, these individuals. They had it on their skin. Probably this woman when she picked up her wash—I mean a washer does a lot of things, but you still have to pick up your wash, and I am sure she rinsed out some things. I think they had substantial biological doses in their bodies to have the symptoms of dizziness, and certainly the skin, from what she says, showed signs of defatting and the other kinds of effects you get from chlorinated hydrocarbon solvents. I would assume with that kind of damaged skin, it really formed the—made the skin perhaps even more susceptible, from what we know, to the movement of these solvents through the skin into the body. Yes, I believe they received substantial biological doses or they wouldn't have had these symptoms. (Tr. 9748)

599. She further answered as to the necrosis issue:

Q. And it doesn't make any difference to you, then, if these people were suffering from necrosis of the liver, you think they have an increased risk of cancer of the liver whether they had necrosis or not, is that a fair statement?

A. I think they had an increased risk of cancer—I think they have an increased risk of cancer of the liver whether or not they have necrosis. (Tr. 9802)

* * *

A. I think some people do believe you have to have necrosis. I happen to be one of those who think it is not a necessary ingredient. (Tr. 9803)

600. Third, the liver is not the only organ at risk. Dr. Rodricks stated that:

"One, with cancer we are talking about the process of tumor formation and it could be in any organ system of the body. It could be the liver, the kidney, the brain, et cetera, et cetera, whereas in the other cases we are talking about specific organs or systems of the body. So there's a difference there." (Tr. 127).

601. Dr. Rodricks elaborated:

"There are differences among species, animal species, and between animals and humans, and the particular site of the body at which cancer occurs. There are many examples where you have tumors found at one site, the liver for example in rats, for certain dyes, so-called benzidine dyes where in humans the site is the bladder. That's well documented, and there are other examples of that. So I wouldn't predict the specific site of occurrence." (Tr. 2603)

602. Dr. Rodricks further testified that: "When you start separating [different types of cancers] out by different sites, you know, body sites, then it gets more complex, because we don't know in what body site they are at risk from carbon tetrachloride and these others." (Tr. 2628).

603. Dr. Bingham fully supported Dr. Rodricks on this issue of lack of specificity in predicting target organs in humans. She testified:

"Q. Let me ask you—on exposure to carbon tetrachloride, is the liver the only site that may be damaged or contract the cancer at that point?

A. Well, I went through some of the literature, not exhaustively, and looked at the kinds of data that are available from experimental animals mice and rats, several experiments, and I think that what we see as a result of this tabulation is that there is a possibility that other sites could be affected. It may be the same sites as in these animals. It could be different sites, really depending on how this material is metabolized, and the same thing would go for chloroform.

Q. In other words, the site of cancer could be most anywhere in the human?

A. Well, I wouldn't say most anywhere. But I think the kidneys are a likely site, based on the results in animals, male animals. There are some experiments where lymphoma have been induced. If you look at the literature that is available, you will see—I think there is a chart in this cancer policy that shows various organ sites. I had it here. I will give you the page in just a minute.

Q. I believe that's page 5095.

A. Yes. 5095.

MR. GENTRY: What exhibit?

MR. WILDER: Exhibit Number 467, page 5095.

THE WITNESS: If you look at a list of chemicals and their target organs in humans and how the humans are exposed to these materials, and look at the species that has been tested, animal species, other than humans, you see that it is possible to have tumors at other sites. One of the best examples, of course, is benzidine, which is a chemical that I am very familiar with. Benzidine causes bladder cancer in humans. We have referred to one of those papers. It enters the human by ingestion, inhalation or by skin absorption.

Now, if you turn to the experimental animals that have been tested with benzidine, and I think it's very interesting, because if you look at the rats—let's see—if you look at the hamster, which has been given benzidine orally, you got liver tumors, not bladder tumors. If you look at the rat which has been given this compound orally, you have subcutaneous injection, you can get colon, liver or zymbals gland tumors. If you give it subcutaneously in a mouse, you get liver tumors.

The point is we found benzidine to be a carcinogen, I believe our best evidence was, first in man. We turned around and did these experiments in experimental animals and found that you got liver tumors. Had we done animals first we might have just looked for liver tumors in man, but, you know, the evidence said we should have looked for bladder tumors.

And there are a number of examples that are the same. In other words, it's a carcinogenic potential we are talking about and the target organ may vary from one species to another, I think depending on metabolic systems that you have in various animals, but what you are really measuring is the potential to induce the carcinogenic process, a neoplastic response, if you will. (Tr. 9749–52)

604. The reference of Dr. Bingham was a table in OSHA's Cancer Policy which is reproduced here.

| Chemical | Target Organs and (route) in humans | Animal Species | |
|---|---|---|---|
| Aflatoxins | Liver (oral, inhalation) | Rat | Liver, stomach, colon, kidney (oral); liver, trachea (intratracheal) |
| | | Mouse | Lung (i.p. injection) |
| 4-aminobiphenyl | Bladder (skin, inhalation, oral) | Mouse (newborn) | Liver (s.c. injection) |
| | | Rat | Mammary gland, intestine (s.c. injection) |
| Auramine (manufacture of) | Bladder (skin, inhalation, oral) | Mouse, rat | Liver (oral) |
| | | Rat | Local, liver, intestine (s.c. injection) |
| Benzidine | Bladder (skin, inhalation, oral) | Mouse | Liver (s.c. injection) |
| | | Rat | Liver (oral); Zymbal gland, liver, colon (s.c. injection) |
| | | Hamster | Liver (oral) |
| Cadmium using industries | Prostrate, lung (inhalation, oral) | Rat | Local, testis (s.c. or i.m. injection) |
| Cyclophosphamide | Bladder (oral, injection) | Mouse | Hemopoietic system, lung (i.p., s.c. injection); various sites (oral); bladder (i.p. injection) |
| | | Rat | Mammary gland (i.p. injection); various sites (i.v. injection) |
| Diethystilbestrol | Uterus, vagina (oral) | Mouse | Mammary gland (oral); mammary, lymphoreticular, testis (s.c. injection, s.c. implantation) |
| | | Rat | Mammary, hypothysis, bladder (s.c. implantation) |
| | | Hamster | Kidney (s.c. injection, s.c. implantation) |
| | | Squirrel monkey | Uterine serosa (s.c. implantation) |
| Melphalan | Hemopoietic system (oral, injection) | Mouse | Initiator (skin); lung, lymphosarcoma (i.p. injection) |
| Mustard gas | Lung, larynx (inhalation) | Mouse | Lung (inhalation, i.v. injection); local, mammary (s.c. injection) |
| 2-naphthylamine | Bladder (skin, inhalation, oral) | Mouse | Liver, lung (s.c. injection) |
| N'Nbis(2-chloroethyl)-2-naphthylamine | Bladder (oral) | Mouse | Lung (i.p. injection) |
| Vinyl chloride | Liver, brain, lung (skin, inhalation) | Mouse, rat | Lung, liver, blood vessels, mammary, Zymbal gland, kidney (inhalation) |

605. The Court therefore finds that just because the liver appears to be the target organ in test animals for carbon tetrachloride and chloroform, it is not necessarily so for these five flagship plaintiffs. Therefore, whether damage is necessary to the liver before the risk of cancer arises, and such damage the Court finds did occur, the other organs of the body are at increased risk of cancer regardless of the issue of liver damage.

### c. That Only Hepatomas were Found in the Animal Studies

606. Velsicol attempted to explain away the positive animal testing on the basis that benign tumors are not an indicia of cancer potential in test animals and therefore because the older tests relied upon by plaintiffs did not distinguish between benign and malignant tumors, they were worthless studies. Both arguments are erroneous.

607. First, Dr. Rodricks testified:

Q. Is there any way of telling from looking at the Eschenbenner & Miller report whether the tumors noted were benign or otherwise?

A. I believe he called them all hepatomas. They had perhaps a different system in those days of describing these. May I look at the paper one second?

Q. Certainly, by all means.

A. They called them all hepatomas, which I think most would call carcinoma nowadays. I don't see any other discussion of that.

Q. All right. Thank you, sir.

A. They didn't make any discrimination between different histological types there. (Tr. 2637)

608. As to benign tumors, Dr. Bingham testified:

Do you agree that when the word hepatoma is used that it is a cancer?

A. Yes, I agree that it's either a cancer or one of the stages on the way to cancer.

Q. All right. Has there been a change in the usage of this word throughout the years?

A. Yes, and it's—if you look at one of the modern textbooks of pathology that's used you will see that they note that for the students, and I have that here.

Q. What textbook is that?

A. It's Pathologic Basis of Disease by Robbins and Cothran. I can submit this to you. When they talk about cancer of the liver and biliary tract, because of a long standing and misleading precedent hepatocarcinomas and chloangiocarcinomas have been known respectively as hepatomas and chloangiomas, terms that imply a benign process.

Of course this author indicates they are not and they are really a—have been misnamed, and I think that there are a number of experimentalists that would agree with me on that point. There are others who still don't see it as a malignant tumor, but I believe it is.

Q. Are you able to tell when you read an article how that particular term is used?

A. Well, not in the older literature, unless they go into it in detail. Hepatoma is the whole gamut all the way up to a malignancy. (Tr. 9727–28)

609. Second, it is clear that not only have the studies found malignant tumors in the test animals, the increase of benign tumors would be just as troublesome. See Exhibits 468 and 469. In OSHA's Cancer Policy (Ex. 468) the issue was discussed:

OSHA makes two general conclusions based on substantial evidence in the Record:

1. Despite the range of opinions expressed on the issue, comparatively few well documented studies of the progression of tumors were presented in the Record. Where such studies were presented (e.g., those of Reuber (1977a,b) on liver tumors in mice and rats, of Stewart (Stewart, Tr. 634–635) on lung tumors in mice, or of Trump (Trump, S. 6–7) on kidney tumors in rats), they indicate that tumors often classified as "benign" are in fact merely stages in the progression to malignancy or are "malignant from the start."

2. No documented case was presented in the Record in which a substance was demonstrated to induce only benign tumors in animals.

Thus, OSHA concludes that the general principle enunciated in its proposed regulation, that a substance which induces benign tumors in an animal test should be regarded as a potential occupational carcinogen, was well supported by the

scientific evidence presented at the hearing. (Ex. 468, p. 5104).

d. *Thresholds*

610. Velsicol witnesses argue that chloroform has been used for years in medicine and toothpaste and swimming pools without adverse effects. There were no scientific studies submitted to prove this proposition, but Dr. Butler was sure there would have been an "epidemic" if it were a human carcinogen.

611. The Court finds that this unscientific approach carries no weight. It is clear that in this case there are either no thresholds that can be shown or that they have been far exceeded.

612. Dr. Rodricks testified:

"Is there what they call a safe level of carbon tetrachloride in drinking water?

A. Well, for all the carcinogens there is no generally acceptable method for establishing their safety; that is the carcinogens seem to produce their effects by means different from the way other forms of toxicity do.

Q. You are talking about toxicity insofar as cancer causing chemicals?

A. Yes.

Q. How about non-cancer causing chemicals?

A. Let me just make the distinction that it is common in toxicology to classify chemicals that cause toxic effects in two ways— those that have apparent thresholds, that in some dose below which they don't seem to produce an effect in either animals or people. Other chemicals, and particularly carcinogens, appear to be in a class where that threshold doesn't exist. We are not absolutely sure of that. But every major government body or public health agency accepts that position for carcinogens.

The other thing that you must take into account in analyzing risks for both threshold and non-threshold type agents is that we can't tell for an individual person where that threshold might be, and that has to be taken into account. Thresholds for specific effects vary quite widely. It will be different for me than it is for you, and different for you than somebody else, and there are no ways we can tell exactly where that threshold will be for an individual. We have developed means for taking that into account in evaluating the safety of chemicals. But it always has to be considered. (Tr. 136–37).

613. Dr. Rodricks further elaborated as to thresholds for carcinogens:

Q. Now, when you talk about the cancer-producing effects—

A. Yes.

Q. —do you have a threshold there as opposed to the liver damage and the other aspects?

A. Cancer is controversial in that regard. Some scientists hold that because of the way they act any exposure will increase the risk, somewhat, maybe very small, but some increase. Other toxicologists say, well maybe that's true for some carcinogens, but not for all of them. You have to look at the way they act and behave and that there may be some that are very much like other toxic agents and do display a threshold, in which case a very wide safety margin ought to be enough to protect you.

Q. Which view do you—which philosophy do you adhere to?

A. In philosophy the latter. I believe there are some that certainly display thresholds.

Q. Some cancer-producing agents that do—

A. Sure.

Q. —display thresholds?

A. Sure.

Q. Does that mean that there are some that do not?

A. Some that do not, sure. The problem comes in identifying which is which, what kind of experimental information one needs to decide which is which. There are a lot of theories around on that question. I think my mind is open on it. I've never seen one fully worked out. The usual notion is that we assume no threshold unless

proven otherwise. That's been the standard, almost standard practice.

I also believe that even with some that have no threshold, there are probably levels of exposure that pose risks so low that most reasonable people would say that's not significant. I don't find that case here, however. (Tr. 2598–99)

\* \* \*

But I think Mr. Gentry asked me if I am one of those who believes that there's no threshold and I said no, I said that I'm not in that class that I believe the possibility exists theoretically. The problem becomes how to decide what carcinogen is of the type that might have a threshold and what type is not and how to identify that threshold. I don't reject theoretically the possibility at all.

MR. GENTRY: If the Court pleases, I believe that was his testimony, because I reviewed it last night.

THE WITNESS: Okay.

THE COURT: All right, sir.

BY MR. GILREATH:

Q. Now, what we are trying to get to here, the, is carbon tetrachloride one of those that has a threshold or not?

A. I think in this case it's irrelevant in that their exposure is sufficiently high that if there is a threshold I'm sure they are over it. I don't know the answer to the question. I've reviewed evidence of the type that some scientists would say indicate materials is of the threshold or nonthreshold type and I don't know where the weight of that evidence goes. I's say fifty-fifty. Some might argue yes, certainly the threshold type, others not.

But it seems to me that in this case, because of the relatively high exposure and the information available from the Eschenbenner and Miller studies, I think it's largely irrelevant. It may become, may I add to that, relevant to some of the other four where their exposure is in a very low range. It may be argued that, well, there is a threshold there for some of those others. (Tr. 2604–05)

614. Finally, Dr. Rodricks discussed the lack of scientific methods at the present time to determine thresholds for carcinogens. He testified:

For reasons I just said, I don't think we could define a threshold for a carcinogen. I didn't really finish. May I finish my description.

Q. Certainly. I am puzzled by why we can't call that a threshold.

\* \* \*

A. With a test of that size, with those small numbers of animals, one cannot detect a cancer incidence rate of say, five percent or less. Experiment does not have enough detection power. That's just a matter of numbers. Let me use an example, if you don't understand that. If I had a pill that made one out of every hundred persons' hair fall out, one out of every hundred persons, then I gave the pill only to ten people, and I didn't see an effect. Then what can I conclude? That it would not cause one in one hundred persons' hair to fall out? No. I can't conclude that. There is a limit to the test. There is a limit to the test of cancer incidence detection of around five percent.

That is a very high rate of cancer. It is not a threshold effect. (Tr. 179)

\* \* \*

Q. Are you one of the school that really does not believe there is such a thing as a threshold limit for carcinogen?

A. For carcinogen?

Q. Yes.

A. No, I don't believe that absolutely. I believe for some carcinogens it is theoretically possible by the mechanism by which they act that there is some dose below which they won't produce cancer. My problem is finding the evidence for that in particular cases, and I have never seen a case proved yet. I certainly believe it is theoretically possible.

THE COURT: Well, you used the word incidence rather than threshold?

A. Well, a threshold would mean absolutely no response. There is some confu-

sion in these terms. Some people refer to the term threshold when they are talking about a toxic response where you need a certain amount of the material to get to, let's say, the liver, before some damage is done, and unless that amount gets to the liver, there is going to be no damage whatsoever. Let's say cirrhosis caused by carbon tetrachloride. Time has to be considered too—how long you are exposed. But leave that out, and that complicates things. There would be usually in those cases biological reasons for believing that you need a certain number of molecules to get to that site to cause an effect.

That's a true threshold, and I think that it is widely accepted, and I accept it, although it is not easy to demonstrate for most kinds of toxicity follow that pattern. The additional problem though you have, is when you find that in an animal experiment, deciding how that threshold relates to humans—that problem of assessing where that might be in a human population, and that's a problem, a central problem of risk assessment. In the case of carcinogens, you have the two problems of the detection power of the experiment; that is these experiments are really, because they deal with such small numbers of animals, you can't detect more than about a five percent incidence of disease, and that's a very high disease incidence. That's an epidemic. People talk in the case of saccharine that you need to—I guess the equivalent saccharine dose in some of those rat studies was 800 cans of diet soda, or something. But what was not said, what was failed to be said is that that produced nearly a twenty percent incidence of cancer. Now, that's equivalent to all the cancer we have in the United States. It's a very high rate of cancer. The question is, if you drop the dose down to lower levels, what rate of cancer, what incidence do you expect. The federal public health agencies get concerned about cancer risks of one in one million. That's the risk level that most agencies have said—well, if it gets downrisk they begin to worry. Now, you can't detect one in one million in an experiment. Now, that would require an experiment with two million rats, and no one can do that. So that requires some kind of extrapolation of inference as well.

THE COURT: So when the legal mind looks for a fixed point at which you can say this is a threshold, the scientific inquiry is that that's not a valid way to look at it?

THE WITNESS: I believe so, yes. The best we can do is talk about probability. High probabilities you are at or near the threshold, and low probabilities, you have something in between.

Q. (By Mr. Gentry) There are some scientists that believe in the threshold?

A. In the same sense that I described my belief in it, yes.

Q. Or maybe a little bit stronger?

A. I believe so. There are some who believe the evidence on some chemicals is sufficient, yes. (Tr. 180–83)

615. Moreover, Dr. Rodricks also pointed out the possible synergistic effects that multiple exposures to multiple chemicals can create, *viz:*

"Considering a single chemical is an awful lot easier than considering a mixture of chemicals, because it's known that chemicals can interact with each other, and although it's almost never possible to say exactly how that will happen, especially in quantitative terms, our systems for assessing risk take that into account, it must be considered, that is, that the mixture of chemicals could behave differently in an individual than an individual chemical might behave." (Tr. 139).

616. Dr. Bingham also discussed synergism or the multiplicative effects of more than one carcinogen. She testified:

" ... I think that we don't have specific data on these two compounds [carbon tetrachloride and chloroform], but we do have data on other carcinogens. Perhaps one of the best studied carcinogens is asbestos and cigarette smoking, and the data from that are what I believe to be clear cut. And if we look at the data on cigarette smoking and asbestos exposure, two carci-

nogens, we find that if in populations that have been studied there is a—you look at the mortality ratio for a group that has not smoked and not been exposed to asbestos, will have a mortality ratio of one. Now, if you are an asbestos worker you have a mortality ratio of five. If you are a cigarette smoker you have a mortality ratio of ten point eight five. If you are a cigarette smoker and an asbestos worker, your mortality ratio is 53.24. This says to me that the effects of these two carcinogens are multiplicative.

So I think that it is possible for the carcinogenic processes to be multiplied by the various carcinogens that are present in a mixture. Those are the data that I have. I think there are similar data for some other materials. I would point out cigarette smoking and radiation, but these data I have in a form that are out of a standard Public Health textbook.

Q. Doctor, when you use the term multiplicity, what do you mean by that?

A. Well, you multiply the effect that you would get with one by the effect that you would get by the other one in terms of the death rate or mortality rate or mortality ratio instead of adding them up. If you added them up here, for asbestos workers and asbestos workers who smoke, you would say ten plus five would be fifteen, but that is not the kind of mortality ratio you get. It's essentially a multiplier effect.

Q. Would you multiply the ten by the five?

A. That's correct.

Q. And that would give you in excess of fifty?

A. That's correct (Tr. 9785–87)

e. *Shindell Studies*

617. Velsicol called as a witness Dr. Shidney Shindell, M.D. He had earlier studied FMC workers who had been exposed to carbon tetrachloride. He also studied workers at the Velsicol Memphis facility. It is difficult to know exactly what Dr. Shindell's studies mean. Dr. Shindel concluded that there were no increased risk of disease at either facility.

618. Dr. Schneiderman reviewed the Shindell Studies at both Velsicol's Memphis plant and the FMC plant (Tr. 9842). His comments were directed towards the power of the studies to detect anything except a massive increase in cancer and their failure to factor in latency periods and other considerations.

619. Dr. Schneiderman testified:

Q. In reviewing these studies as an epidemiologist, do you have any criticism of these studies?

A. Well, my major concern with both the studies—my major concern, not my only concern,—my major concern with both these studies is that they are essentially very small. They are so very small that they have little or no power to find anything. They have little or no power to find any increases in risk. I did some power competition [computation—sic] on each of these studies, and as I remarked, I can reproduce those for you if you would like me to.

Q. Before you get to that, let me ask you this: Did they involve short term workers?

A. They involved some short term workers. I am really concerned about very short term workers. I think we ought to be paying—the epidemiologist ought to be paying much more attention to the very short term workers than they have been paying. Somebody has characterized the very short term workers as industrial canaries, and by that he was referring to the World War I canaries that were in the trenches that gave the early signals that poison gas was coming over. The canary was the first affected. What he meant by calling very short term workers industrial canaries was his perception that persons who are working at a job which they find uncomfortable or distasteful or causes them some illness or unhappiness or something will want to get out of the job quickly. Persons who respond to those very low levels—who very early or very quickly respond to some chemical exposure are very

likely to be more sensitive, or obviously more sensitive to the material than persons who don't respond. So a lot of people take themselves out of exposure very quickly. This by the way, in contrast to—and, therefore, and if we were looking at the comparable animal data, laboratory experimentation data, we assign animals to a dose. No animal is allowed to opt out. We don't give them a choice. If the animal doesn't feel well, we don't say yes, you can go find another job. You know, I didn't raise my mouse to be a guinea pig, kind of thing. He can't go out and find another job. Whereas, a human who finds himself uncomfortable will, if he has any sense, and it isn't very hard times, and jobs aren't too hard to find, will go and find, if he possibly can, find another job. That means we take out of most of the industrial population—we very quickly take out the more sensitive persons, or they take themselves out, and that's a real problem, and I do wish that epidemiologists would pay more attention to the short term workers than they have in the past.

Q. Why?

A. Well, because of the fact that that would give them more information on relatively low levels of exposures. One of the things that happens is that in an industrial exposure we generally assume the level of exposure is high, as compared to ambient exposures, and here we have some low level persons exposed to low levels much closer to the ambient exposures who might give you a response that was closer to what you really wanted to look for in the general population. I have seen some industrial studies in which the surprising thing is, if you look at the data and you look at the results, and you draw a dose response curve, and the response goes up almost as a nice straight line with increasing dose except for a few low level points. The persons least exposed for the shortest time are up above that line. Their risk is higher than it ought to be. Sometimes two or threefold higher than it ought to be. The asbestos case is one in particular, the uranium miners show this kind of thing. The lowest exposed uranium miners

showed substantially higher risk than one would get by normally fitting a dose response curve.

So that says to me that there are sensitive subpopulations that are sometimes lost when the epidemiologists cut out looking at the short term employee.

Q. Is that a shortcoming of all industrial epidemiology studies that you know of?

A. It's a shortcoming of most of them, yes; not all of them, because I have just cited a couple, the asbestos and the uranium miner studies, and quite obviously they must have had some short term employees or persons at very low levels of exposure, or otherwise we wouldn't have had those data.

Q. Now, when you say risk; you are talking about cancer risk?

A. I am talking about cancer risk, yes. I must apologize. I spent so much time in the National Cancer Institute, so much of my professional life, that I sometimes behave as if cancer is the only disease in the world. It is not. I am sorry about doing that. (Tr. 9843–46)

620. Dr. Schneiderman also addressed Dr. Shindell's failure to factor in latency periods. He testified:

Q. How about insofar as the Memphis plant study and the FMC study is concerned, how about the latency consideration. Is that a consideration?

A. Yes, cancer is a disease which most people accept has some latent—some time between the initial exposure and the eventual clinical appearance of the disease, and after clinical appearance of the disease, some time before mortality ensues. The average survival after cancer is diagnosed is the order of about two years. So it takes some time for the disease to develop, and then it takes some time for a person to die, on the average, from this disease.

You then want to allow that much time to go back and—you want to allow yourself that much time for the event to have occurred. If you don't allow yourself that much time, you will be putting into the

population that you are following or you are examining or you are looking at persons who can't possibly have developed or are extremely unlikely to have developed the disease. What you do there is, if the disease is in the numerator, the number of persons with the disease actually observed are in the numerator, and you put down in the denominator your expectation based on the number of persons you have in the population and how long you observed them, you are going to overstate your denominator, you are going to overstate your expectation unless you make an allowance for this latent period plus the time from diagnosis to death.

Again I remarked earlier, I have been working on some material on asbestos in which we made these dose response calculations and we prepared a report, I was part of a group that prepared a report for the Consumer Products Safety Commission, and in that report the model that we used to give us our risk assessments allows for a minimal ten-year latent period, that is we would expect to see—from the time of first exposure we had expected to see essentially no additional cases due to this exposure. You get some cases of persons who would normally have gotten the disease due to other reasons, but due to the asbestos exposure, we expected no additional cases in the first ten years after the initial exposure to the asbestos and that kind of model fits the data extremely well.

For other materials I think there are different latent periods. For some of them I think the latent period is very much longer, for some of them, although I have not seen very much, it ought to be shorter, it possibly is shorter. I said I have never seen many. I think for the estrogens in the postmenopausal estrogens the latent period may have been shorter than ten years, although the only group of women who showed excess disease were those who had been taking the material for ten years or more.

Q. How has this latency—how does this fit into these two studies?

A. It doesn't appear to me that Dr. Shindell has taken into account latency at all. It looks to me as though he has followed everybody and put them all into the denominator, as I was talking about before, without cutting off, saying if I haven't had an opportunity—if a person hasn't had an opportunity to be exposed for at least ten years since his first employment he's not going to have an opportunity to develop this at all. He's included everybody.

Q. What is the result of the failure to take this latency into account?

A. You overstate expectations, you understate the risks. You've got a bigger denominator than you ought to have. You've got a fraction, and the denominator part of the fraction is too big and, therefore, the fraction itself turns out to be too small. (Tr. 9846–49)

621. Because Dr. Shindell had described the results of his study of the Velsicol Memphis plant to show that the workers were healthier than the general population, Dr. Schneiderman reviewed the study. Dr. Schneiderman testified that Dr. Shindell's study of the Memphis plant actually showed the Velsicol workers might not be as healthy as they should be.

622. First Dr. Schneiderman described a standard mortality ratio or an "SMR." He testified:

"SMR stands for standard mortality ratio. So what we are talking about is mortality, which is death, and ratio, and I will show you about ratio, what it is the ratio of, and standard—I will show you what standard is about.

It is defined as the number of deaths in an observed population—the one you are interested in, the one you are concerned with, the one you are looking at—against the number of deaths in some controlled population, generally a so-called standard population, background population, and in the particular case that we are talking about, it is the number of deaths expected, considering the death rate by age, sex, weight, time period of an equivalent United States population.

Q. Now, you used two terms. You used a term of the number of deaths observed.

A. Yes.

Q. And the number of deaths expected?

A. Yes.

Q. Now, there is a difference, is that right?

A. That's right. Observed is what you see in the particular population that you have got, that you are working with. I am working with a population, let's say, of World War II veterans, and I am going to follow them over time, and I am going to see how many deaths occur due to various causes in this population of United States veterans. That would be observed.

Q. Now, do you apply the observed and expected to any group?

A. You take the observed overall. You see the observed that you have got across the whole population, with an appropriate group as if the appropriate group consisted of the same proportion of young men, middle-aged men, old men, and the same proportion of white men, black men, and that sort of thing, and done at the same time.

Q. In this case we have a study here of workers.

A. Yes. (Tr. 9853–55)

623. Dr. Schneiderman then applied the SMR to the Velsicol Memphis plant study:

Q. Now, bring that down to the expected deaths in the Memphis study. You notice that Dr. Shindell said we expected so many deaths.

A. Okay. Let's see what I have got. I have copied off Dr. Shindell's material. In the Memphis study, and again I apologize because I am concerned with issues of cancer, and I know more about that than I know about some other diseases, in the Memphis study, the material that I have copied off from Dr. Shindell—(Tr. 9857)

\* \* \*

" . . . what you have to recognize, and what epidemiologists do know is that when you use that kind of thing, the SMR that you usually will get when you look at an industrial population will be less than one.

If you have exactly the same number of observed deaths as expected deaths you have a ratio of one. In a working population, in which most people are well, almost everybody is well in a working population, you will get fewer deaths than you will get by using the United States data as a whole, because the United States data includes people who are ill, who are not working, and people who are not working, among other reasons, people who are not working, some of them are ill.

So what you would expect, what you would anticipate—I don't want to use the word expect twice, because here I mean the expected number of deaths—what one would anticipate is that this ratio would come out to less than one. Generally you would expect this ratio for an industrial population to come out between about .8 and .85. In other words, you would have anticipated that the observed number of deaths you would have had if this were the usual kind of working population probably would have been in the order of eleven, twelve, thirteen. So you would have gotten a standard mortality ratio of about .80 or .85.

Q. All right. But we have an SMR in this study—

A. Well, we have got an SMR in this particular study. There were actually fifteen observed and in this particular study that SMR—I didn't compute—oh, I see I didn't compute that one particularly. I computed the SMR for the overall study. Overall this was just cancer.

For total deaths, going through the same processes, the identical process, except now considering all deaths instead of just cancer deaths, 76 were observed and 80.8 were expected.

MR. MITCHELL: Excuse me. Can we get the page number again? I have got the exhibit, but I can't find the page.

THE WITNESS: You won't find this, because Dr. Shindell didn't give this. I did it. That is, these numbers are from Table 3 in his papers, but I don't think he computed

this particular—I don't think he computed this particular number.

A. And that's .94. Now, I would have expected less. I would have anticipated that this number would have been lower.

BY MR. GILREATH:

Q. What does it mean? The fact that it's higher, what does that mean?

A. Well, one of the things it says to me is, maybe this working population which gave me 76 deaths, maybe at a little higher risk than an average working population, maybe there are some problems with this working population. That's not terribly much larger than .80 or .84 or .85, but it's larger, and being larger it says to me that maybe this population—overall this working population is at somewhat elevated risk. I didn't do any arithmetic, but .94— let's say .84, that's a very common number that you get, that's about one point—that's about a ten—1.12. That's a twelve percent excess over what I might have expected, what I might have anticipated for an average working population. (Tr. 9859–62)

 * * *

Q. All right. Is this—in your opinion, then, does this demonstrate some lack of— some infirmity in this study?

A. Well, what it says to me is that I would want to watch this particular working population very carefully over a substantial period of time to make sure that my workers weren't at this ten or twelve percent excess risk. Maybe this is just an accident over the number of cases that we've got. It's a relatively small number of cases. There are some—the time that these people have been followed has not been terribly long. There are all sorts of problems of that sort.

But what it says to me if I were involved, directly involved, in watching the health of the workers in this particular factory, I'd say, let me keep following them, let me keep paying attention to this kind of thing, let me see if I can find out why this number is a little bit higher, ten percent higher, perhaps, than it ought to be. That's what it says to me.

Now, that doesn't make it a deficiency in the study. The study has shown these particular data. That's the result that's come out. What it says to me is, what conclusions do I draw from such a study. I don't draw the conclusion that there's something devastating going on, because that's not a very big difference. On the other hand, I'm not sanguine about the fact that I've gotten a standard mortality ratio higher than most people get when they look at an industrial study, an industrial population. (Tr. 9863–64)

624. Dr. Schneiderman was then asked to define the "power" of a study. He testified:

Q. What do you mean by the power of the study?

A. Power is a semi-technical epidemiologic and statistical term. It means the ability— power is the probability of finding an effect of a given size, and you have to specify the size, finding an effect if the effect actually exists. Given a study the size that you have, however many people you followed, what is the probability that you can find, given that study, what is the probability you would find a twelve percent increase, what's the probability you would find a twofold increase, or what's the probability you would find a threefold increase.

By the way, the larger the difference that really exists in the world, the greater the probability is that you will find it.

Q. Say that again.

A. The larger the true difference there is that exists in the world the greater the probability is that you will find it. Let me give you an example. Cigarette smokers are at roughly ten times the risk of developing lung cancer than are noncigarette smokers. If I went and did a study, follow-up study, cohort student, to find out if cigarette smokers were at a higher risk than nonsmokers, I wouldn't have to do a very large study to demonstrate that, because that risk is tenfold greater. That's a very large risk and I can then do a relatively small study and find it.

Q. So conversely, if you are trying to pick up a smaller increased risk, you have to do—

A. A very much bigger study.

Q. A bigger study?

A. The smaller the risk you look for the bigger the study you've got to do. (Tr. 9864–65)

625. He then testified about Dr. Shindell's Memphis study and the FMC study:

Q. All right. How good is the—in your opinion, how good are the Shindell studies in picking up the increased risk of cancer?

A. Well, they have low power, they have quite low power. I did some computations on the subdivisions in some of these studies. That is, I wanted to know what the power was of finding a liver cancer or what the power was of finding an increase in liver cancers or an increase in kidney cancers, an increase in bladder cancers. Liver cancers are rather rare in this country, and although they are going up as I look at the trend data, there's been an increase in liver cancers, in men at least, over the last decade, nevertheless liver cancers are quite rare.

Someplace I did the arithmetic to find out what proportion of all cancers were—I've got it here someplace—the proportion of all cancers that were liver cancers in terms of new cases. That's probably inappropriate. We are talking about mortality, so we want to talk about deaths.

In terms of deaths, liver cancers in white males constitute about two and a half percent of all cancer deaths. And that means —that's a fairly small number of cases.

Let me show you what I've done by way of computations for the two studies that I've looked at. I looked at—I'm going to have to do this on the board again. I looked at the FMC plant data—

THE WITNESS: You are going to ask me what exhibit number that is, aren't you? That's 346.

MR. MITCHELL: I'm doing it for the record as well as for me so that it will show.

THE WITNESS: Okay. My apologies for having made my notes in a different way so I have to do that.

A. I would have expected in that population, given the other information that Dr. Shindell gave me, I would have expected in that population for liver cancers, I would have expected—that's the thing down in that denominator in the standard mortality ratio that I'm working with—I would have expected 1.07, and I will tell you how I got these, for kidney cancers, which are a little more common than liver cancers—and by the way, also increasing in males in this country—1.86, and for bladder cancers I would have expected 3.03.

I then asked, given these expected numbers—because that's the key to the power computation, depends on the expected numbers—given these expected numbers what was the probability that I would find a relative increase of twofold, threefold, fivefold. And the probability that I could have found relative increase of twofold, a doubling, in other words that I would have found two or more—if two or more cancers actually occurred in the population, what was the probability that a study of this size could have found it for me, and that probability turns out to be .2, actually .215. I didn't compute it for threefold and fivefold.

BY MR. GILREATH:

Q. That's the chance of that study finding—

A. A doubling of that particular form of cancer, that's right. And as these expected numbers go up, that probability will go up a little bit too, by the way.

Q. You would call that low power, is that right?

A. Oh, that's—oh, yes, that's very low power. That's less than tossing a coin. Tossing a coin would at least give you fifty-fifty. You have less than fifty-fifty. You are tossing a dishonest coin when you are doing it this way. It always comes up head more often than it comes up tail.

As I said, when the expected number increases, the power also increases. This

was—for kidney cancers the power of finding a twofold increase was .303 and for bladder cancers it was .42, finding a doubling in the bladder cancers. If there's a doubling or more in the population, it was still less than fifty-fifty.

I find I did do one computation for fivefold and that was 0.82 for liver cancers. If in the true population there was true increase in the population, there was a true increase of fivefold in the number of liver cancers, this study still would have had only an eighty percent chance of picking it up. That's quite weak. When we design control clinical trials to develop new drugs to find a new treatment for cancer, find new treatment for leukemia, for example, doing some work here with St. Jude's, we generally aim for at least ninety percent power or higher.

So this is—and we are not asking for a fivefold increase in—generally asking for a fivefold increase in the number of cures that we get.

Q. All right. Let's go back to one point I forgot to have you do. Go back to the SMR a moment. You did the SMR for the Memphis study. Did you also do it for the FMC study?

A. Yes, I did it for the FMC study too. Let's see if I can find that.

The FMC study was a larger study and there were many more deaths, and again doing it overall, the total number of deaths I need observed and expected, and this is total deaths of all the men involved in this. There were 424 deaths actually observed, there were 464.3 expected, and the observed over the expected, the SMR in this case, it was .913, again a little bit higher than what I would have anticipated for the usual kind of industrial population, not terribly much higher, but higher. So it leaves me with the same kinds of concerns that I had from the other study, that I may have a population here that may be at some slightly increased risk.

Q. Dr. Schneiderman, if you had been asked to do this risk—this study of the

Memphis workers to determine an increased risk, what would you have said?

A. I think I would have said to the Velsicol people, save your money, don't pay me to do this, because you don't have a study that's going to give you any power to do anything. It's premature to attempt to do this with so few deaths, particularly in the Memphis study. (Tr. 9865–70)

626. Dr. Schneiderman further criticized Dr. Shindell's studies because the underlying raw data appeared to be changed and therefore useless for other researchers or even Dr. Shindell himself.

"One of the things that struck me was a lot of these forms had been changed. There was originally a code number put in there, and then the code number was crossed out, and another code number was put in there. So I tabulated those. I found out of the first 100 that I looked at there were 12 that I couldn't make out, that I just couldn't read them, the reproduction was so poor. So that left me 88.

There were twelve that were unreadable by me, and that left me 88 out of 100. Of this 88 I found that 42 of these 88, the code was changed from one number to another.

Q. Can you give us an example?

A. Yes. For example, Code 00 was no illness, and I found that in four of these or three of these, that was changed to a renal disorder, and another one was changed to arthritis. Another was changed to hypertension. I would call that changing from a lesser condition to a more serious condition.

On the other hand, there were other codes that were changed in what seemed to be in the opposite direction—direction from a more serious illness to a less serious illness. For example, there were—Code 28, for example, is a hearing disorder. Now, this may or may not be a serious illness. It's a hearing disorder. But of the Code 28 persons, 12 of those were changed to Code 00, which is no illness, or Code 22 with hypertension. The people listed under hypertension were changed to Code 00, no illness. So when I looked at the 42 that were changed, and this is my own classifi-

cation, and I would have to go over this and work with some other people as to whether this was an appropriate classification for changing to a more serious illness from a less serious illness in the changes that were made on the code forms, and I found that 33 out of 42 were changed to what I might consider a less serious condition. Some of these are marginal and perhaps are not as serious. Some that I considered not in among the 33, someone else might consider less serious. So 33 were changed to a less serious illness.

Well, with those kind of changes on the form with no indication as to why the changes were made, no indication as to what definitions were given for serious illness, and the fact that the early codes were one nature and the other codes were a second nature led me to say to myself two things—I have no way to compare this estimate of how healthy the workers are against any other population or industrial population or anything else, no control population. I have nothing like the U.S. white males death rates to compare it against. Without that number, without an internal control, I don't know whether somebody told me a number—whether that was good or bad. The second thing—when I went through, as I said, these first hundred forms, and I found a fair number that had been changed—well, of those, more than half that were changed were changed to the direction of less serious illness, and I said to myself, you know, this is something I really don't think I can pay any attention to. I would have to find out why the changes were made, what the arguments were, what the definitions were, and I would have to go back and see if I could look at something like some of the surveys that might have been made, and if these data were collected the same way they were collected. For example, in the Haynes survey, something that the Department of Health and Human Services did, which was a health examination assessment kind of measure or survey.

So my general reaction to the section of that particular paper, a couple of sections of that paper, and then the supplement,

was that I really couldn't pay any attention to what was said about the overall health of the workers. I found one that I don't believe was true, and I can't believe this. There was one worker among those hundred. I have written his name down here someplace—one worker whose original code was suicide, and it was listed on his form that he had testicular cancer, written down there, and it had written down whatever the code was for suicide, Code 20, had been on the original form, and it was written on the form that that man had testicular cancer, and the Code 20 was crossed out and Code 00 was written in, which says no illness, and I am sure there was some mistake in that. (Tr. 9873–77)

627. The Court finds that Dr. Shindell's studies lend no weight in this case to any proposition that plaintiffs are not at increased risk of disease or cancer.

## E. The Destruction or Impairment of Plaintiffs' Immuno-Surveillance Systems

628. Plaintiffs called two experts in the field of immunology and allergies:

a. Dr. Alan S. Levin, who has MS and MD degrees and is Board certified in allergy immunology, clinical pathology and emergency medicine (Tr. 3214).

b. Dr. William G. Crook, an MD specializing in allergies in children (Tr. 9933–34), an expert in pediatrics, allergies and clinical ecology. (Tr. 9942).

629. Dr. Levin defined immunology and allergies in the following way:

Q. Dr. Levin, first let me ask you, what is immunology and allergy?

A. To answer that question I'd like to use a little bit of history. First of all, back around the turn of the century there was a group of physicians under the tutelage of a Dr. Von Pirquet and these physicians were studying hay fever. They coined the term allergy, which means altered reactivity, and they studying this phenomena that pri-

marily manifests itself with sneezing and wheezing and hives and the like.

Earlier than that there was a group of physicians and scientists who were studying the capacity of animals and humans to protect themselves from pathogens in the environment and they coined the term immune or immunology, which means exempt from the costs of the disease.

So up until 1967 there were two entirely different groups of people studying basically the same process, one being the allergists who were studying primarily hay fever and sneezing and wheezing and the other being immunologists that were studying the capacity of humans and animals to protect themselves from disease.

Around 1967 there were two groups of investigators, one under the direction of a Johannson, I believe he was in Sweden at the time, and another under the direction of Drs. Ishizaka, and they were in, at the time, Denver, Colorado, and they discovered a molecule, an antibody, which is within the purview of the immunologists an antibody which mediated or caused the symptoms of allergy. So here we had kind of marriage of the two, allergy and immunology, and back around 1967, in fact, the allergists really wanted to adopt immunology, because it gave them credibility, it gave them a mechanism for the disease that they were dealing with. Prior to that time they really didn't have an understanding of the basic biochemical magnetism of the disease, and the politics such as they were, the immunologists were primarily academicians, and so they didn't want to relate to the practicing clinicians, especially the allergists—in other words, there is a town and gown type rivalry, so for a while there was somewhat of a battle.

But then they finally got together, and in fact what has happened is that the immunologists have adopted allergy and are really very active in developing the field and it's turned out to be one of the more sophisticated fields in medicine. We plan to use the principles of allergy treatment in a variety of diseases like rheumatoid arthritis, cancer, and other types of diseases, because when I started this whole thing I was an immunologist at the University and really was mostly involved in the basic biochemistry of the disease process, and it wasn't until I became familiar with what the allergists were doing that I began to recognize how sophisticated that practice is and since that time I have been using these particular principles in the treatment of cancer and other diseases.

Anyway, so basically that's what allergy and immunology is, it's the same thing. The difference between allergy and immunology is that the allergists prior to 1967 were dealing only with one type of immunologic disease, only the type that is manifested clinically by sneezing and wheezing and hives and the like, whereas the immunologists were dealing with all sort of diseases like rheumatoid arthritis, cancer and the like. (Tr. 3221–25)

630. Dr. Levin reviewed and analyzed the blood of each of the five flagship plaintiffs. (Tr. 3259). On the basis of that examination, Dr. Levin concluded:

"In my opinion their immune systems will never recover.

Q. (By Mr. Wilder) Why not?

A. Because of the nature of the history and the physical findings at this stage of the game, and what I see in the blood tests. Although I believe that they can be made—well, they can be made much less symptomatic. I would always worry about the fact that they are sitting on a time bomb, and the possibility of the development of serious illness, anywhere from cancer to arthritis, or even behavioral changes, can be attributed to the chemical exposures. (Tr. 3259)

631. Dr. Levin explained why he believed the five plaintiffs had problems with their immune suppression systems.

"Now, the striking thing about all of these patients is that they are all abnormal and they all have similar changes. There are some closer similarities in others, which was very interesting. It turns out that—let's see where we are. These are our

normal ranges (indicating) and Johnson appears to have a normal—

\* \* \*

A. Johnson has normal white count, but low absolute lymphocytes, low T cells, low B cells. The helper and suppressor number, although it's low in terms of the absolute numbers, is normal in the range of helper and suppressors, which means that his null cells will be low. Okay, his percent Ts are high, his T to B ratio is high, his T to null ratio is low, and his B to null ratio is low and his helper-suppressor ratio is low normal. Now, the point is that he has high percent of Ts and low absolute lymphs, absolute Ts and absolute Bs.

So what I'm saying here is that we have evidence that this individual has significant immune disregulation and I would say he, amongst the whole bunch, is the most likely to have problems.

Wilbanks, on the other hand, has—let's see if we can get all this in here. Let me just put this down here. Wilbanks has normal white cells, low normal absolute lymphs, low normal absolute T cells, low B cells, normal helper and normal suppressors, a high percentage of T cells again—and all of these patients have high percentage of T cells—

BY MR. WILDER:

Q. Doctor, excuse me, what do you mean by a high percentage of T cells?

A. Okay. Of the absolute lymphocytes how many of them or what percentage of them are T cells? Well, it turns out that higher than normal, in other words greater than forty percent, of all the lymphocytes in the circulation are T lymphocytes.

Anyway, and he has—where are we here?

MR. GENTRY: A little further over.

A. —normal helper, normal suppressor, high T. The T to B ratio and the T to null ratio is normal, the B to null ratio is normal, and the helper-suppressor ratio is normal. And that, I would say, is indicative that he's probably the least damaged by the whole thing, but it's interesting that he had the renal cell carcinoma, was it, and

the cobalt, which is very—I don't know how to explain that. But it is very interesting. I would be interested to see how he is physically now. He might, you know, at the time of the blood drawing be much better.

Maness, who is the child—

MR. GENTRY: Can you push it over just a little mover, Doctor, so we can see the name? There we are.

A. Maness, that was the child, has low normal white count, normal absolute lymphocytes, normal absolute Ts, normal absolute Bs, high helper cells, normal suppressors, a high percentage of T, so he has a high T to B ratio, a high T to null ratio, a high B to null ratio, and a normal helper-suppressor ratio.

The next one is Ivy. Ivy has a high white count, and he's the one with chronic obstructive pulmonary disease or one of the two. He has a normal absolute lymphocyte count, a normal absolute T cell, a normal absolute B cell, high helper cells, high suppressor cells, high percent T, normal T to B ratio, high T to null ratio, high B to null ratio, and a normal helper-suppressor ratio.

And Sterling, who also is similar to Ivy in terms of his clinical condition, has high white count, normal absolute lymphs, normal absolute Ts, normal absolute Bs, high helper cells, high suppressor cells, a high percentage of Ts, normal T to B ratio, normal T to null ratio, high B to null ratio, and a low helper-suppressor ratio.

Now, the interesting fact about these patients is that none of them are normal and that they all seem to have high percent T cells and none of them have high null cell levels. In other words, they all seem to have—and I don't have that number displayed here—they all seem to have low or low normal levels of null cells despite the fact that they can have high helper and suppressor cells. And that suggests that their major defect, which is different from the patients that we've seen exposed to the chemicals in the Santa Clara Valley, their defect is someplace in the very early stages

of the development of these cells involved in the immune system.

And so on the basis of that data and the information available on the clinical histories and physicals and laboratory findings, I would say that this is consistent with the diagnosis of chemically-induced immune disregulation. (Tr. 3263–66)

632. Dr. Levin then testified as to the result of such damage to the human immuno-suppression system. He stated:

"Q. Doctor, what does this mean as far as the patients are concerned?

A. That means that these individuals could be susceptible or could have an increased susceptibility to infectious diseases, autoimmune disease processes, and allergies. They can also have arthritis, behavioral aberrations and a variety of other problems.

Q. Doctor, what about such diseases as diabetes and epilepsy?

A. Well, let's start out with diabetes. Diabetes is, at least in terms of the insulin-dependent diabetic type, an immunologic disease. It appears to be caused by immune disregulation and, therefore, yes, it's very reasonable to consider that diabetes could be one of the problems with this type of exposure. I've seen, I believe, now three patients who have diabetes which can be associated to chemical exposures. None of them had a family history of diabetes and two of them worked in the same chemical dumpsite—or not dumpsite, they were disposing of chemicals from something in the semi conductor industry, and they both developed diabetes from this, and then this other individual developed it while working in the engine room of destroyers off the coast of Vietnam in the Navy.

Q. What about eye problems?

A. Yes, eye problems could be associated with this, because, of course, the immune complexes can circulate and then manifest itself as problems in the eye. We see eye problems in many immune disregulation diseases, iritis and uveitis and several other diseases.

Q. Doctor, what about the respiratory illness that Mr. Steve Sterling has at this time, is it your opinion, within a degree of medical certainty, could this have been caused?

A. Certainly he is a smoker or was a smoker and the disease process is very common in smokers, but the nature of the precipitous change in his disease process makes it reasonable to conclude that the chemical exposures caused this precipitous change in his status or well-being, yes.

Q. Doctor, so that we understand specifically what you are saying, is it that the chemicals destroy this ability of the body to protect itself?

A. Correct, Correct, Yes.

Q. And then it is the subjection to these other forces that may cause disease that the body cannot ward off?

A. Correct, were it not for the chemical exposure the course of his disease more than likely would not have been so precipitous.

Q. Doctor, of these five individuals, is there any treatment for this particular problem?

A. Yes.

Q. And what would that be?

A. Well, the treatment would be the first symptomatic. In other words, if, of course, the individual has an acute bacterial infection, you'd want to treat that with the appropriate antibiotics, and if the individual has a seizure disorder you'd want to treat that with the appropriate drugs. But the primary treatment is alteration of the environment, in other words getting away from the chemicals and by that I mean avoiding exposure to things like cigarette smoke, stopping smoking would be very advantageous for these people, avoiding scented agents like perfumes and deodorants, avoiding things like ventilated cleaning compounds, like hydrocarbon or like—can I use brand names? (Tr. 3267–69)

\* \* \*

Also it's wise to use foods that are minimally chemically contaminated, like stop

using processed foods where there is all sorts of preservatives and food coloring and food additives in it. Also many canned foods have phenol in them and things in it that leach from the canning process into the foods. Liquids that are stored in plastic bottles taste of the polymers from the plastic. And those are the kinds of things that they should avoid.

And new carpets and new drapes and wall paneling that outgasses formaldehyde, the type that you find in the newer mobile homes. The plastic covering on new cars, the vinyl chloride, I guess it is, or whatever else that outgasses from the plastics of the new cars and stuff that makes the film on the inside of the windshield. Those are the kinds of things they should avoid. So that's what we call environmental control and I think that that's particularly important for these people to make the quality of their life reasonable for the rest of their life.

The next thing we do is diet control, and diet control I mean that we should avoid the potential allergens in the individual's diet. Now, the average adult that has allergies will react to at least one of a combination of foods. Those are milk, wheat, corn, sugar, white flour, and the processed foods like alcoholic beverages that are processed and things like that. (Tr. 3270–71)

633. Dr. Levin also testified:

Q. Doctor, would they have to continue to watch their diet and environment for the rest of their lives?

A. Yes. The severity of the problem or the amount that they have to watch their diet and environment gets less as the years go on, as long as they watch themselves and are careful. Now, the follow-up on these patients, however, is not long enough to say what's going to happen in ten or fifteen years. I have a sense that we are dealing with a problem that is rather similar to asbestos or silicone or the radium dial painters. We just don't know what's going to be happening in the future. We are kind of sitting on a time bomb.

Q. Doctor, in summary, is there anything else you would like to comment on these particular five individuals?

A. On these particular five individuals, no. (Tr. 3273–74)

634. Dr. Levin further stated:

Now, there's something very important to bring up right now and that is that this whole system is very fragile and very easily damaged and these cells, the T suppressor cells, are the easiest damaged by viral infections and certain chemicals or many chemicals. When this particular cell (indicating) is destroyed or damaged, then this cell (indicating) dominates. So you can see that when this cell (indicating) goes, this cell (indicating) will cause immune reactions against almost anything. Depending upon how severe this destruction is or how widespread the destruction is, this particular situation could manifest itself clinically as either hives or sneezing and wheezing or as recurrent infections or as food allergies and behavioral aberrations or as autoimmune disease, like systemic lupus, like rheumatoid arthritis and the like.

If this system is destroyed, we can have diseases that are much less common in the population, primarily because this destruction is often lethal. So either the infant doesn't survive or the individual dies of an infectious disease, but these are—if this system is destroyed, the individuals manifest clinically serious immunodeficiency disorders, and we won't discuss that.

Anyway, some alteration in this particular system can also cause cancer. Now, how does it cause cancer? Well, there are a variety of ways that chemicals can cause cancer. Do you want me to get into that?

Q. Yes.

A. Okay. There are a number of ways that chemicals can cause cancer and one is that it can destroy one of the protective systems in the body. When the chemical destroys one of the protective systems in the body, another system attempts to take over from what was lost and what we call hypertrophies. For example, if you lose a muscle, then the other muscles around that

will hypertrophy or get stronger in order to make up for the loss. Hypertrophy involves the rapid division of cells, in other words the increased synthesis of new cells. Everytime you have an increased synthesis or an increased rate of division you have the chance for a mutation, and this is natural.

635. Dr. Levin also described how psychiatric problems can indicate that someone suffers from immune disregulation. He testified:

Q. ... Can someone with immune disregulation suffer psychiatric problems?

A. Yes. We are studying now the immune systems of people with diagnosed psychiatric disease, and we are finding a very high incidence of this disease, immune disregulation, amongst these people, and we are beginning to—I am beginning to say that at least in a significant number of people with psychiatric diagnoses, we believe we have some of the basic physiologic reasons for this psychiatric problem. In other words, part of the—one of the clinical manifestations of the disease immune disregulation is behavioral aberrations. There is a disease called systemic lupus erythemastosus, and in systemic lupus erythematosus some of the patients develop psychiatric problems which are directly related to the immune problem. In other words, as the immune problem gets worse, then there are behavior changes. And, in fact, if you see a schizophrenic episode or paranoid schizophrenic episode in a lupus patient, the first thing you have to think about is that the disease has, quote, gone to the brain, end quote. In other words, that it is affecting the brain in the way it manifests itself clinically is aberrant behavior. So, yes, many people carrying psychiatric diagnoses do have immune disregulation, and when the immune disregulation is normalized, their psychiatric problems become normalized. (Tr. 3225–26)

636. As to plaintiff James O. Maness, Jr., Dr. Levin testified:

THE COURT: Doctor, as a physician, how do you see the overall future treatment of the child in the five here? You talked about the five generally a few minutes ago, but let's isolate the child a little, specifically the child.

A. He's the most difficult one to deal with because he's the youngest and his exposure was when he was in utero and then also he drank the water as a young child, so it's really hard to know what is going to happen to him. But I can foresee that at least he's going to have to be treated for allergies and environmental control.

Now, in terms of the dollar cost of that I can't necessarily say, but I could imagine that he would for the allergies and environmental control not require much more than the average patient does, which in my practice is about, well, the initial workup is about five to seven hundred dollars and then a couple of hundred to three hundred dollars a year for treatment of the allergies. The problem is that we don't know what else is going to happen to him, like arthritis, like potential cancer, or even behavioral changes or anything else, so I would like to have him reevaluated on a regular basis by an ordinary pediatrician and then eventually an ordinary internist to be sure, so he needs screening.

Right now I don't think that—unless something—he also has some urologic problems which will require treatment that's way beyond my area of expertise, so I can't really tell you how much that would cost, but I would guess that if this is not appropriately treated that he might then have renal damage and that then may go to dialysis and that costs a great deal of money.

So in terms of the allergy I can tell you that the treatment for that is not terribly expensive, but I would say that, again, he's sitting on a time bomb and that he does have other problems that are outside of my area of expertise and understanding in terms of the cost, but I would watch for them. (Tr. 3292–93)

637. Dr. Levin also testified:

... there is just no question that these people have disease and that they all have one common type of disease, which

is immune disregulation. They manifest it differently as individuals, and that the most reasonable cause of that is the chemical exposures. (Tr. 9310–11)

638. Finally, on his rebuttal examination, Dr. Levin reiterated that if properly treated, the destruction of plaintiffs immuno-surveillance systems was not necessarily fatal if prompt and good medical care were provided for the rest of each plaintiff's lives and then only if they took care of themselves. He testified:

Q. What do you expect of these people? Let's just talk in terms of Wilbanks right now. What do you expect of him as it relates to his immune disregulation that you have prescribed? What is the prognosis as far as you are concerned?

A. Oh, I think that in these cases if you can eliminate the exposure that the prognosis gets much better. Just getting away from those particular chemicals, the immune system has an opportunity to heal itself, and if the individual washes [sic watches] himself and is appropriately cared for—and one of the things I'd like to be able to do is to set up seminars to the local physicians to teach them how to treat these patients, because the treatment is inexpensive and it's safe and it is very helpful, and I think the prognosis is reasonably bright.

I would say, however, that he probably has an increased risk on the basis of this exposure, an increased risk to be recurrence of his original cancer or some other type of cancer, but that in the main I would say that he could live a healthy and productive life if he were appropriately treated and followed the rules.

Now, the rules are to avoid chemicals, to watch your diet, to stop smoking, to pay common sense to your health. There's no particular drugs that I'd like to use.

Q. Would I be fair in assuming that what you said with reference to Wilbanks would also be true of Maness, Ivy, Johnson and Sterling?

A. Except for Ivy and Sterling, who obviously have an irreversible component to their disease process—

Q. That's the emphysema?

A. That's right. But even Ivy and Sterling, with the irreversible component to their disease process, I think appropriately treated, and that implies compliance by the patient, they would have a reasonably good prognosis. (Tr. 9458–59)

639. Dr. Crook, in a lucid metaphor, also described the permanency of the effect to one's immuno-surveillance system. He testified:

It was my opinion that because of the controversial nature of chemical sensitivity, and I felt this child's problems were triggered, that the match that lit the fire that led to this succession of problems very probably affected the immune system, and since my own level of knowledge and competency about the various tests was not sufficiently great, I felt that referral to an immunologist who specialized in that area would be appropriate. (Tr. 9946).

\* \* \*

Q. Well, we know that we have eliminated carbon tetrachloride from his environment. So then carbon tetrachloride is not the thing that is causing his allergies?

A. Let me answer your question in this way by saying if you throw a match in the forest and start the forest burning, and you take the matches away from the child who started the fire, your fire is going and that doesn't solve the problem. So when people who have an immune system or the irresistance triggered by chemical exposures, this breaks the barrier and gets them sick, and then all sorts of other things start bothering them.

Q. Well, what is the prognosis? Do you just get worse and worse until you die?

A. Well, the prognosis for this child I am very concerned about. Here is a child who is doing very poorly in school, and he is hyperactive on a whole bunch of medicine and allergy shots, and he still has health problems. His development is not good, and he is having to go to the doctor a lot.

So I personally, and I am speaking egotistically. So I think I could help this child better than the doctors he is going to. But, again, he is not my patient.

Q. Well, you have seen him twice and he has been normal both times, what help does he need?

A. Let's take a building across the street that is riddled with termites. You walk around the outside of the building, and it isn't falling down, you can't say the building is normal. You look at a child on the outside, or you take a car—the best test of an automobile is the performance test. If you take a car into a filling station and you don't tell the man how it is running, he may look the car all over and not know that there is any trouble with it. This child's performance test—well, here is a kid that is on all sorts of medicine, all sorts of shots, who is hyperactive, not learning, has stuffy nose, nausea, vomiting, and all sorts of things, and this is the most important thing, is the history or the story of how the child is getting along, not how he looks on physical examination. (Tr. 9974–75).

640. Dr. Crook believed that as to Jimmy Maness:

Q. Dr. Crook, is your opinion based upon a degree of medical certainty?

A. Yes, reasonable medical certainty that this child's mother's ingestion of toxic chemicals in the water and the child's ingestion of toxic chemicals in the water so compromised his resistance that it set him up for a wide variety of health problems.

Q. All right, sir. Do you have an opinion as to the health problems he is presently suffering with that—

A. Recurrent infections, seizures, of course even before that premature birth, learning problems, all of the symptoms which have plagued him since the early months of life. (Tr. 9961).

641. Dr. Crook was asked his opinion concerning the prognosis of Jimmy Maness. He responded:

Q. (By Mr. Spragins) The question is, "What is the prognosis as far as you are concerned?" And Dr. Levin said, "Oh, I think in these cases if you can eliminate the exposure, that the prognosis gets much better. It's just getting away from those particular chemicals, the immune system has an opportunity to heal itself, and if the individual watches himself and is appropriately cared for, and one of the things I would like to be able to do is to set up seminars to the local physicians to teach them how to treat these patients, because the treatment is inexpensive and it's safe and very helpful. I think the prognosis is reasonably bright." Do you agree or disagree with that?

A. I agree in part and disagree in part.

Q. Well, tell us what you agree with?

A. I agree that if you had a utopian situation where the child was under the care of physicians who knew all about immune system problems related to chemicals, who knew about nutrition, who knew about the yeast problem, and if the family had the economic, and the finances and other things to provide the foods, to provide the environment, if the child could have special teachers and a lot of things that are difficult to find, I think he could improve. But once a child is as far behind in learning disability, and has seizures, I don't think this child has a very bright prognosis. Even if this child was your child or my child and had all the cultural, economic and other advantages, that lawyers and doctors can provide for their children, I still would have a very guarded prognosis as to his future. I think Dr. Levin is overly optimistic. (Tr. 9978–79).

\* \* \*

THE COURT: Dr. Crook, before you go, let me at some risk of raising the lawyers' eyebrows ask you a question.

You indicated that this child's prognosis is one you considered very guarded.

THE WITNESS: Yes.

THE COURT: And you indicated you were very concerned about that. Will you spell out that concern?

THE WITNESS: Yes.

THE COURT: And state in terms a layman can understand what you mean when you say that you hold a very guarded prognosis as to this child's future?

THE WITNESS: All right. I'm not worried about the nasal congestion and the routine allergies. The child hasn't had asthma. Half the people in West Tennessee have a stuffy nose, or maybe three fourths of them. I'm not worried about that. I'm worried about his development, his school progress, his learning problems. Over a period of years I've had a chance to follow children from birth. One of my associates now I looked after as a newborn. I have some of my former patients who are in jail for murder. I found that children who get into trouble with the law, who become alcoholics often are children with learning problems who do not do well in school.

And so this is a child who is overactive, who cannot sit still, and I didn't do a detailed psychological examination on the child, but apparently is not performing well in school now. So this is a major area of concern. And he also is on a whole bunch of very potent and powerful drugs for seizures, and if not the usual falling down epileptic spell, it's some sort of maybe bizarre sort of thing where he gets weak. And so this is my main area of concern.

I can elaborate further, if you want me to.

THE COURT: I want you to go ahead.

THE WITNESS: All right. In other words, here's a little guy that's seven and a half years old and who is on a whole bunch of drugs given to him by a very competent physician at a leading American university. He's on about three or four drugs. Only last week on one of the national TV shows on health they point out that some of these drugs can cause in themselves permanent brain damage and they can add to the problem. They may temporarily control the seizures.

And as I pointed out, even if this was my child, Mr. Spragins' child or Mr. Wilder's child, why, I think the odds are very much against him being able to come through,

get an education, get a good job, relate well to his peers, because as he goes along, if his hyperactive behavior continues and he doesn't do well, he develops a poor self-image and this poor self-image in turn may make him depressed, and then he develops secondary emotional problems on top of his biochemical, immunologic, allergic, atoxic problems, whatever they may be.

THE COURT: What are secondary emotional problems?

THE WITNESS: Well, whatever the cause, and putting it simply, let's just say supposing that you and I needed glasses and nobody knew that we needed glasses and we are in some sort of a contest or maybe we are just taking a postgraduate course in school and the professor comes by and says, "Horton, why haven't you got your work," and, well, you are not seeing very well and you are—you don't know that you are supposed to see better. And this is what happens very often to these children who do not do well in school. The teachers may have thirty or thirty-five children in the class and they give more attention to the ones that don't do well, and the ones that don't do well often to attract attention to themselves may make more noise or do other things to get attention, so they get criticized and put down, and when somebody's criticized and put down they—again they develop more emotional problems.

In other words, a person has to have a good self-image, they have got to succeed more than they fail in order to have good mental health. (Tr. 9983–88)

642. The Court has carefully reviewed the testimony of Velsicol's witnesses including Dr. Wedner and Dr. Sullivan. The Court believes the testimony of these witnesses are against the preponderance of the evidence. Moreover, Dr. Sullivan had never even seen plaintiffs' medical records, much less plaintiffs themselves. The same is true of Dr. Wilroy who had never seen the medical records of Jimmy Maness (Tr. 8230). Finally, questions concerning the validity of Dr. Levin's blood sampling appear to have been adequately handled by him on his rebuttal and cross-examination.

**F. The Neurological and Psychological Damage**

(1) The Neurological Damage Caused by Carbon Tetrachloride and the Other Chemicals

643. Plaintiffs were individuals who were happy with their lives. They were born into the area and they desired to live their lives there. They had that right. Velsicol, by its actions, invaded that world and shattered those lives, both physically as well as psychologically. While money can never recompense these plaintiffs for their loss, Velsicol must be forced to make amends to the fullest extent possible.

644. Plaintiffs called two witnesses:

a. Dr. William J. Jennings, an M.D. practicing neurologist who is chief executive officer of the Western Mental Health Institute for the State of Tennessee. (Tr. 3099) This is a state hospital for the mentally ill. (Tr. 3099); and

b. Dr. John E. Sawyer, Ph.D., an expert clinical psychologist who is an adjunct associate professor of psychology at the University of Mississippi (Tr. 3155–56) and Assistant Superintendent of the Western Mental Health Institute (Tr. 3157).

645. In addition, plaintiffs called another clinical psychologist who had been hired by Velsicol to examine plaintiff Daniel Johnson. The Court relies heavily on her testimony to rebut the testimony of Velsicol's other witnesses that Velsicol ultimately called. Her name is Dr. Cheryl Lynn Robley (Tr. 9522) and she was introduced as an expert in clinical psychology (Tr. 9528) as was Dr. Sawyer. Two other physicians, Dr. Cone and Dr. Wiles had their testimony read through depositions.

646. In sum, this expert testimony proved by a preponderance of the evidence that all plaintiffs suffered from peripheral neuropathy of a mild nature except as to Daniel Johnson. All the expert witnesses identified above agreed however that there *was* psychological damage generally referred to as post-traumatic stress disorder

syndrome (PTSD) and that plaintiffs Johnson, Wilbanks and Sterling would need treatment for much, if not all, of the rest of their natural lives.

647. Dr. Rhamy originally contacted Dr. Jennings concerning possible neurological damage to the five flagship plaintiffs. (Tr. 3110, 3109, 6523).

648. After the examinations of the four adult plaintiffs, Dr. Jenning's conclusions were that their neurological problems were mild or minor and that their problems were mainly psychological. (Tr. 6525). At the outset, Dr. Jennings related attitudes of plaintiffs at their examinations:

Q. Did these individuals that you saw relate a history of any of these elements being interfered with in their lives?

A. Yes. This was, I think, important to me at the time. In the examination—in the entrance of these people to my office, they seemed to be very angry and hostile, and, of course, that's unusual for a treating physician to experience in patients; that they are negative before you even have time to have any sort of relationship with them as far as any verbal relationships, and I—of course, another reason that I felt that they needed a psychologist to see these people was that their attitude was very hostile and very angry, and they almost were just to the point of refusal to fill out some of my sheets on family history, and to get them to fill out the review of symptoms, and so forth. I detected this mainly from the fact that they were from a certain area. In talking with them, I got the feeling that they felt like—well, they were very suspicious. Some of this that I was interpreting as anger was more suspicion and distrust, and after talking with them a while and trying to get through to them what I was trying to do physically for them, they seemed to indicate to me that they were sitting over here in a nice little quiet neighborhood, and some of them— one, by the way, was very outstanding, Mr. Johnson. He had moved away from the environmental pressures of Memphis, and so forth, to Toone.

MR. SPRAGINS: Excuse me, Dr. Jennings, I hate to interrupt. But I think, if Your Honor please, that the doctor should state the names of the people that he is talking about when he says "these people" or "they". Who are we talking about here?

THE WITNESS: Mr. Sterling, Mr. Wilbanks, Mr. Ivy and Mr. Johnson are the five that I saw, and, of course, I have seen one, James Elvis Maness, and we are just beginning an evaluation on him. But I don't mean to keep dragging this out. But I think that a psychological test would be very important, because these people were feeling very suspicious, very distrustful, and even to the point of being angry that their environment—they felt their environment had been invaded by the enemy, and they couldn't get any help. They were desperate as well. Of course, maybe I was relating to them a little bit closely since I am from the same area.

Q. Doctor, did you observe similarities in the physical characteristics or complaints of these particular individuals?

A. Yes, I did. This is one of the things that I noticed particularly; that each of them, in giving their history, and, of course, the history of their symptoms, they would almost invariably start out with the fact that they had easy fatigability, and that was a major symptom. They had numbness, describing several months or years of a numbness and tingling in the extremities, syncopal episodes, and of course, once or twice at least with them, fainting. They all complained about visual complaints, and invariably a cough, difficulty with breathing, shortness of breath and so forth, muscular weakness and lassitude, of course, was a general symptom with them, and as I mentioned, the tingling of the peripheral portions of their body, or numbness in various areas of their body. (Tr. 3112–14)

649. Dr. Jennings first defined peripheral neuropathy:

Q. Doctor, let me stop you there and ask you to define those terms for us? What is peripheral neuropathy?

A. Well, peripheral neuropathy, of course, let me explain those three terms first. First, peripheral means distal, outside, in the extremities, say, distally, like in the feet, and in the hands, and when it becomes more proximal, it involves the trunk, the upper portion of the legs and the shoulders and so forth. So peripheral, meaning distally, in the extremities, and neuro, of course, means nerves—neuropathy meaning a psychological condition of those nerves. The pathological condition of the nerves is such that they are—the nerves themselves are affected in some way by some agent demyelinizing or at least—let me explain demyelinizing—That is a breakdown of the fatty tissue, so to speak, that covers the electrical system of the nerves, the axon. So that a peripheral neuropathy could be looked at as an electrician maybe as damage to the wire, and there is no transmission of the function going to that damaged area. Now, this can either be in a local area of that nerve or a generalized area of the nerve. In other words, it is a breakdown in the nerve tissue itself that prevents transmission up the axons of that nerve back to the brain, to be interpreted as to that input that is at that nerve ending. That input can be sensory or motor, hot-cold, painful-pleasant or whatever. So neuropathy is actually just destruction of that nerve. If it's one nerve, of course, we would call it a mononeuropathy, and explain whether it is peripheral or proximal. If it's multiple nerves, but not all of them, of course, we would try to explain this as being a multiple peripheral neuropathy rather than a generalized peripheral neuropathy, if all of them are involved, see.

We have a condition here—the reason I am bringing this out—we have one fellow here that has, Mr. Sterling, I believe, if you want me to mention names, that has a generalized decrease, very mild peripheral neuropathy everywhere distally, then we have Mr. Ivy here that has neuropathies in multiple areas but they are not generalized, see. There is a difference.

In order to transmit sensory perception back up a nerve, of course, the nerve mem-

brane has to be intact and it has to filter out such electrolytes as potassium and sodium, and as they cross the membrane, the membrane discharges, so to speak, and goes back up to the brain. When this membrane is not insulated properly and when it is sick, then it won't transmit that message. That's the pathology of neuropathy.

Q. Doctor, are there any laboratory tests that can be done to prove this?

A. Yes, there is. Our testing devices are getting better. However, they are not as finite as what one, or not as exact as what one would like to have. For example, they certainly—electrical diagnostic testing procedures such as nerve conduction and velocity testing, which is the testing names of those diagnostic procedures, are not—they don't go down far enough yet to demonstrate a very mild type of neuropathy. It seems that the patients, and even the physicians, can detect a peripheral neuropathy or nerve damage before the machines that we have can do it. But they are very good after you get past a certain level, see. Say if you go from one to ten, and the more severity is the ten, the machines will pick it up around two or three, and the patients will pick it up around one, and we pick it up around two. So that as it gets worse, the more the machine picks it up it used to be like the machine couldn't pick it up until it got to four or so. But they are getting better, and they are devising better techniques for picking up peripheral neuropathy. Still, the machine doesn't tell us why they are there.

Q. Is that what is called the electromyographic study?

A. The electromyographic study, of course, is an electrical study of muscle itself. The nerve conduction velocity is a conduction of the nerve itself. (Tr. 3133–36)

650. Dr. Jennings testified about the chronic nature of the neuropathy he observed, no matter how mild in plaintiffs:

Q. You stated that the condition as you observed it or diagnosed it was chronic and will persist. How can you tell that's true?

A. What condition are you speaking of now?

Q. The peripheral neuropathy.

A. Oh, the peripheral neuropathy. The duration of the patient's illness has a lot to do with your estimation of whether it's a chronic disease or not. In histories, as these people gave, of having hypesthesias over a period of time would certainly be consistent here if they are not corrected in any way they will be persistent and chronic.

Speaking of the neuropathies, before we get off of that subject, it also is somewhat impressive to me, and you can—at least it gives you some thought as to when these people, these particular people that I see here, have more compression neuropathies than what I would expect to see with four or five people coming into my office from just the general public. Mr. Wilbanks had, as we were mentioning earlier, a median nerve and I think it was electrically tested. This person as we are speaking of here, Mr. Ivy, had nerve compression neuropathies in four different areas. And we will, I assume, get to Mr. Sterling in a minute. I think that's of interest, at least, that these people would have as much difficulty with their peripheral nerves, even though they are not the generalized type of peripheral neuropathy that one would expect from chemical neuropathy. (Tr. 6550–51)

a. *Daniel Johnson*

651. As to plaintiff Daniel Johnson, he was extremely agitated for his examination with Dr. Jennings (Tr. 3115–6530). Dr. Jennings concluded:

"The examination that I had on him I could not find any neurological deficits. All I had was a history of passing out spells, and so forth. The physical examination related to the neurological and otherwise was normal. It was my impression that the patient had multiple symptomatology that had been evaluated in the past. Of course it would be very important to consider these evaluations. Now, this information, as I

stated, would be gathered by me and reviewed if possible.

The patient had a great deal of acute anxiety, post-traumatic neurosis with multiple symptomatology, and certainly needs psychological evaluation and therapy, for which I referred him to a clinical psychologist.

Q. Doctor, who was that clinical psychologist you referred him to?

A. Dr. John Sawyer.

Q. Where is Dr. Sawyer located?

A. Bolivar, Tennessee. (Tr. 3124)

b. *Mr. James Wilbanks*

652. Dr. Jennings examined Mr. Wilbanks. He concluded:

It's my feeling that Mr. Wilbanks in giving me his history, he stated that he had a great deal more problems early of numbness, headaches, easy fatigability, some memory loss, syncopal episodes. I had seen these earlier in other patients that I had seen in Toone. I thought it was rather remarkable that Mr. Wilbanks had gotten into the symptomatology early while he was living here in Toone. When he moved away I asked him if he got better and he said, no, he didn't, he got worse. He explained that he continued to work near Toone. However, he told me that he did get better with some of the symptomatology such as the peripheral nerve numbness, tingling, and so forth, since his surgery, which I don't feel physically had a great deal to do with it.

I sent him to Dr. Sawyer because of the chronicity of the symptomatology and the fact that I felt that a lot of the symptomatology that still was present, such as the dizziness, headaches, and so forth, that neurotic symptoms, so to speak, were somewhat—were certainly a psychological problem. (Tr. 3128)

c. *Mr. Curry Ivy*

653. Dr. Jennings testified that he had examined Mr. Ivy and referred him to the neurodiagnostical laboratory at Baptist Me-

morial Hospital in Memphis, Tennessee (Tr. 3136). The results of those tests were:

Consistent with possibly early entrapment neuropathy of the peritoneal motor nerve at the fibular head; also compression neuropathy of the left ulner nerve across the elbow, and the prolonged blink reflex upon stimulation to the left would be indicative of pathology of the left trigeminal nerve. The absence of the H reflex on the right could be the result of patient's previous surgery.

Q. Doctor, can you attribute this diagnosis to exposure to any of the toxic chemicals Mr. Ivy related to you?

A. This is—well, let me explain this. If the chemical that Mr. Ivy was exposed to was carbon tetrachloride, which I assume it is from the signs here, there is good—there is good evidence that this particular chemical will cause a peripheral neuropathy. Peripheral neuropathies however, get better after exposure. I don't know how badly they were exposed and how bad they were, so to speak, how pathological they were before I saw them. But it appears here that these nerves were probably decreased in function, and he did from his history have peripheral neuropathy that was generalized. Of course, the nerves being sick, if I may say that, they were, at least pathologically, and where they were going through portions of the body like at the tip of a head here, and there was probably a bony prominance or pressure on the trigeminal nerve, and the postsurgical lesions, and so forth in the back, caused those sick nerves, so to speak, more pathology because of their susceptibility, since they were sick to start with, in those areas of pressure. So he has that pathology even though the generalized nerve or neuritis has improved, if not gotten a great deal better, because it's just barely possible to pick it up with sensory testing. So he is ending up with this residual that we found here from evidently the peripheral neuropathy that was caused by the toxic chemical.

Q. Doctor, would you expect this condition to persist?

A. I would think it is a chronic condition, and this is based on the fact that the history is over a three or four year period, three or four years old. This is what—it has been four years now, or so, according to his history, and he still has enough damage to those nerves to be reported as absolute entrapment. It's a chronic condition and will persist, yes. (Tr. 3137–38)

654. Dr. Jennings reiterated that:

Q. Now, what did your neurological examination of Mr. Ivy disclose?

A. I felt that he had neuropathies as well and had him tested by nerve conduction EMG. Of course I think neurologically or not, I think we would have to diagnose him as hypertensive. And the nerve conduction EMG's demonstrated that he did have neuropathies, yes.

Q. He has demonstrated by the electromyogram possible entrapment neuropathy, correct?

A. Yes. (Tr. 6545–46)

\* \* \*

Q. Those neuropathies were the only neuropathies that the electro diagnostic studies, the electromyogram picked up, is that correct?

A. Yes.

Q. And you stated in September also that you felt that he may have some mild peripheral neuropathy?

A. Yes. I certainly detected on light touch that there was—at least to give me an impression that there was a peripheral neuropathy.

Q. How do you detect it on light touch?

A. It's a subjective test, as you are insinuating. You have to ask the patient to describe what he's feeling.

Q. In other words, you touch him and you say do you feel that and he says it feels funny or—

A. Maybe a little bit more. In testing you use different types of like a light touch, pinprick, this sort of thing. It's strictly subjective.

Q. If he has it, it was so mild that the electronic studies wouldn't pick it up?

A. They have a certain level, but it has to be of a certain degree of pathology before they can pick it up, yes.

Q. I think you described that as on a scale of one to ten that the electronic devices would pick it up at around two or three, but not below two?

A. Probably not.

Q. All on a relative scale?

A. The patient could certainly tell by their own feeling, of course, earlier than what the test can pick it up.

Q. On page 3137 you said that there was good evidence that carbon tetrachloride will cause a peripheral neuropathy. What is that evidence?

A. I think it's common knowledge in physicians that certainly that carbon tetrchloridie is a solvent that has been used for years in the past and been incriminated since then in the text books. I hesitate to mention that because I don't have one of them handy, but I could certainly supply you with—

Q. Can you supply us with any materials that make that statement?

A. I believe I can. If I can't, I will certainly send you a letter of apology, but I think I can. I have certainly been impressed in training and in practice that carbon tetrachloride does in fact have as one of the contraindications of its use peripheral neuropathies. (Tr. 6547–49)

d. *James O. Maness, Jr.*

655. Dr. Jennings examined Master Maness in his office in the presence of his legal guardian, his grandmother. Dr. Jennings noted his hyperactivity and referred him to Dr. Sawyer.

656. Dr. Jennings stated:

Q. And why did you say that you had referred him to see Dr. Sawyer?

A. I would like to have some help in trying to differentiate as to the cause of hyperactivity. I have certainly a feeling, and an opinion that the body weight and aller-

gies, and, of course, the developmental, physical developmental problems are certainly attributing to the hyperactivity. However, that's not necessarily a hundred percent. He has a great deal of—a great many reasons also to have psychological and personality changes to be causing the activity that we are seeing. So I would like to differentiate that out and pull out as much of that as possible that we can treat. It certainly makes a difference in treatment as far as medication. If he has organic problems, there are several cerebral dysfunctions that are certainly treated different chemically, and you end up—if he has, say, organic hyperactivity, you will end up more treating his grandmother psychologically than you will him. If he has a psychological hyperactivity, you will end up treating him, and his grandmother less.

Q. Doctor, can this cerebral problem be caused by exposure to toxic chemicals?

A. It's a suppressed developmental function, which is a toxic chemical or alcohol injury, and certainly toxic chemicals have more potential to cause cellular damage than even alcohol.

Q. How would you go about establishing whether or not this was more probably caused by exposure to toxic chemicals?

A. By his psychologicals. Well, there are other finite tests, developmental tests now. Of course, we are going to have to get into those, and this is one of the situations where you have a pathological entity standing in front of you in your office, and you are trying to remember all your medical school data, you know, and all the latest literature that is coming out, and it takes two or three days to get all of this stuff together and fit him into a pattern, you see—what direction you want to go and what tests you are going to do and who is doing what in this area.

This is a child, let me mention, that regardless of what happened here, how he got this way, certainly needs direction. He goes to school everyday and his pattern and his behavior in that school is very important. You know, if he's not treated, then—and he has the ability. I'm sure that this child has a fairly good I.Q., so why waste that with his activity and the hyperactive, being bored, not paying any attention to the teacher, and then having personality problems between he and his teacher, and so forth.

He ends up after a whole year and flunked, you know, or doesn't pass. We need to treat him and need to, you know, take care of that situation of getting him within the normal limits of his school behavior, and so forth, and figure out what went on as we can, see.

So it's most important that we evaluate him physiologically and get him treated and get him in school and back to making good grades, and then we'll figure out all this technical and medical problems. (Tr. 3142–44)

### (f) *Steve Sterling*

657. Dr. Jennings examined Steve Sterling. He stated:

Mr. Sterling came to the office, of course, with a chief complaint again of having trouble with his nerves, having more increasing difficulty with breathing, increasing difficulty with getting nervous, causing more coughing. He also complained of pains in his chest. He states that he has had, still has, lumbar pain with radiation to the left lower extremity, stating that it is a lot better than it was, but that he still has pain in the lower extremity on the left. When asked to describe the pain, he states that—characterizes it as a tingling characterization, numb but hurting.

He also complained in the hip area over the sciatic area. He stated that—this is something unusual in his mind—that when he rubs this area, rubbing it becomes a pain, it feels numb. So he was describing this pain as being a numb type pain when it hurts. (Tr. 3145)

\*　　\*　　\*

The patient did complain of pulling pain in the lumbar area and the sciatic area when he was asked to cross his left lower extremity. This was not present on the leg crossing exam on the right.

On light touch the patient did demonstrate a mild peripheral neuropathy which was subjective. It seemed to be generalized and distally. The patient's weight and physical condition really was that he had very little excessive fat but no demonstrable muscle atrophy.

In testing the sensory input, space/time relationships testing, I didn't find any pathology. It's my impression that the patient have lumbar degenerative disease, but moderate lumbar nerve root irritation and a mild peripheral neuropathy, post-traumatic neurosis with moderate anxiety and depression which was chronic. I did send him for evaluation for electrodiagnostic studies of the muscles and nerves. They were within normal limits.

I sent him to—because of the somaticism being chronic, nervous, anxiety and depression, also for evaluation and suggested treatment by Dr. Sawyer.

Q. Doctor, you stated what Mr. Sterling was suffering from mild peripheral neuropathy?

A. On examination, yes.

Q. All right. This, however, was not confirmed by the laboratory tests?

A. No, it was not.

Q. Does this cause you to believe that it does not exist?

A. Not particularly, no. I believe it's of such a mild nature and residual and recovering that it's most likely present to light touch and just too mild to be picked up by the electrodiagnostic machinery.

Q. Doctor, can you state within a reasonable degree of medical certainty whether or not this particular condition was caused by exposure to chemicals?

A. According to his history that he gave me over the period of time of the other complaints, I feel that this was related to some toxic exposure in the past and that we still have some residual here.

Q. Doctor, did you state whether or not this condition would be chronic or would it dissipate?

A. I would assume that the minor degree that we are seeing here now would be a chronic problem because of his age and nutritional state as well as what it was to start with, which I don't know, just by history of talking with these people. But the mild peripheral neuropathy that he has I'm sure it's chronic. (Tr. 3146–48)

(2) *The Psychological Damage*

658. In addition to the neurological examinations given plaintiffs by Dr. Jennings, Dr. Sawyer gave a whole range of psychological testing to Mr. Sterling and Mr. Wilbanks (Tr. 3158–61; 6587). He attempted but was unable to give such tests to Mr. Daniel Johnson because of his mental condition at the time. Dr. Sawyer generally found that the flagship plaintiffs were suffering from psychological trauma called post-traumatic stress disorder or PTSD (Tr. 6594). Dr. Robley, originally hired by Velsicol to examine David Johnson found that Mr. Johnson had a "genuine emotional disorder" (Tr. 9531) which she also diagnosed as post-traumatic shock disorder.

659. Dr. Sawyer described PTSD: "But can you diagnose post-traumatic stress disorder from test results?

A. I see what you mean. You mean if somebody just brought in some test results and didn't tell me anything about the patient, just said, Here, what do you see in these test results?

Q. Right.

A. No, probably not. No, sir, I'm sorry. I didn't know what you driving at there.

Q. What is post-traumatic stress disorder?

A. That's a term describing a set of psychopathology symptoms, set of psychiatric symptoms that are related to a person's being involved in some traumatic event that occurs consequent to that event.

Q. It's a diagnosis, is it not?

A. Yes, sir, a label.

Q. How long has it been a recognized diagnosis?

A. Well, the literature goes back about a hundred years in the medical literature. Of course, Hippocrates wrote about it in the wars, Greek wars. I don't know, a long time. Shakespeare wrote about it.

Q. You are familiar, I'm sure with the Diagnostic and Statistical Manual of Mental Disorders, Third Edition, are you not?

A. Yes, sir.

Q. That is the document known as DSM III, as the diagnostic bible for psychologists, isn't that correct?

A. I don't know if I could relate it to the gospel necessarily.

Q. A lot of people disagree about the bible, but it's a generally accepted authority?

A. It's an accepted nosology for behavior, yes.

Q. You use it in the diagnosis stated in it is your practice?

A. Yes, sir, I do.

Q. Do you know when DSM III was published?

A. I got my first copy around '78. I don't know when the actual publication date is, probably around '80 would be my guess. (Tr. 6599–6600)

660. Dr. Robley introduced as exhibit 520 the relevant definition from the DSM III. It stated in relevant part:

*Diagnostic criteria for Post-Traumatic Stress Disorder*

A. Existence of a recognizable stressor that would evoke significant symptoms of distress in almost everyone.

B. Reexperiencing of the trauma as evidenced by at least one of the following:
(1) recurrent and intrusive recollections of the event
(2) recurrent dreams of event
(3) sudden acting or feeling as if the traumatic event were reoccurring, because of an association with an environmental or ideational stimulus

C. Numbing of responsiveness to or reduced involvement with the external world, beginning some time after the trauma, as shown by at least one of the following:

(1) markedly diminished interest in one or more significant activities
(2) feeling of detachment or estrangement from others
(3) constricted affect

D. At least two of the following symptoms that were not present before the trauma:
(1) hyperalertness or exaggerated startle response
(2) sleep disturbance
(3) guilt about surviving when others have not, or about behavior required for survival
(4) memory impairment or trouble concentrating
(5) avoidance of activities that arouse recollection of the traumatic event
(6) intensification of symptoms by exposure to events that symbolize or resemble the traumatic event" (Tr. 520)

661. In sum, both Dr. Sawyer and Dr. Robley were convinced that Dan Johnson was suffering post traumatic stress disorder as the result of Velsicol's actions. Dr. Sawyer who examined Mr. Sterling and Mr. Wilbanks concluded that these two gentlemen also suffered the same traumatic damage but to a lesser extent than Mr. Johnson.

a. *Daniel Johnson*

662. Dr. Sawyer testified that during his examinations, Mr. Johnson was extremely agitated and at one point Dr. Sawyer was afraid Mr. Johnson would become violent. He described Mr. Johnson's illness as chronic (Tr. 3166) although he was not able to give Mr. Johnson the full battery of tests. Dr. Sawyer testified:

"Psychological trauma can occur from situations that are life threatening or threatening in the sense of your psychological well-being, markedly disruptive to your life.

Q. Doctor, in your opinion, based upon a reasonable degree of medical certainty, is Mr. Johnson suffering from psychological trauma?

A. Yes, sir.

Q. And what caused, in your opinion, this psychological trauma?

A. The ingestion of the chemical substances and the aftermath of physical illness in himself, his inability to care for his family, discharge what he considered his responsibilities to his family, inability to do anything about it, the lack of success in his efforts to find a remedy from outside sources, which, of course, were troublesome for him to ever call upon in the first place. This traumatized him psychologically to such an extent it, of course, had an immediate effect that generally is not picked up. It becomes worse over the months and years, particularly when you go through repeated medical treatments without complete success or cure. (Tr. 3166–67)

\* \* \*

One of the diagnostic criteria for a chronic illness of a traumatic nature is that the symptoms don't show up for six months after the event, which doesn't seem logical, but it's a situation where your defense mechanisms or your ability to deal with things take hold and will get you through certain months of your life, function at a marginal level, perhaps, but still function, and then finally it will wear you out psychologically, so to speak, to the point that you can't continue to function and then illness will present itself and come on full force. (Tr. 3168–69)

\* \* \*

Yes, he could be dangerous. He's a markedly suspicious individual. He relates what's happened to him in a very hostile manner. He's very frustrated. He'd always been able to operate on his environment and change things or at least function, and he's not able to do that any more and he has a very great animosity toward the individuals that he thinks caused the problems out at Toone Chemical Dump and all.

It's particularly manifest in his concern for his family. The family, of course, the fact that you see your children with severe medical illnesses and you are unable to do anything about it is a terrible psychological blow to a person, particularly a person such as himself with a limited education that has been able to get by in life without depending on other people and he now has to, which has caused him great difficulties in his, you know, attempts at finding some remedy or reconciliation with various federal agencies and state agencies that has gone very poorly for him, so it's understandable how he's developed the situation he has. (Tr. 3171–74)

663. Dr. Sawyer concluded:

Q. Doctor, do you have an opinion as to whether or not he is emotionally or psychologically impaired

A. Yes, sir, he's impaired. He has a posttraumatic stress disorder, is the name of it, and emerging paranoid disorder.

Q. And what is the degree of his impairment?

A. You mean the psychological? It would be moderate to severe.

Q. Does this prevent him from doing the normal work that he has done in his lifetime?

A. Oh, yes, sir, he can't do that any more.

Q. Doctor, this impairment that Jr. Johnson has, is it permanent?

A. Well, you know, we always hope for improvement. He hadn't had any real treatment over the years and the longer psychological illness such as he has goes on, you know, the more entrenched it becomes, and his is obviously quite chronic at this time. The main concern I had is that it has gone beyond the instance of a neurotic or emotional illness, a base of emotional illness, to intruding in his thoughts. You know, he's not got a thought disorder, the paranoid ideation, the marked hostility, the inability even to come into a doctor's office who was there to help him, you know, and be able to conduct himself in an appropriate manner. So he is a very disturbed individual. (Tr. 3175–76)

\* \* \*

Q. Doctor, would you recommend any treatment for Mr. Johnson?

A. Oh, definitely. He needs to be hospitalized, probably. I mean he might be able to be treated with psychotropic medications, you know. That would be up to a physician to do, of course, which I recommend, but I would doubt that that could be done on an outpatient basis. It might could. He probably needs to be hospitalized. He certainly needs extensive treatment.

Q. What kind of medication?

A. Well, that would be up to a physician. That's out of my area of expertise, but psychotropic medication. I don't know specifically what they would prescribe. (Tr. 3181–82)

664. At some point in time, Mr. Johnson was referred to Dr. Robley by defendant Velsicol to determine whether or not Mr. Johnson was suffering from any mental or emotional illness and to rule out the possibility that he might be malingering in presenting symptoms (Tr. 9528–29).

665. After extensive testing Dr. Robley reached an opinion. She testified.
"A. Both in the clinical interview and the history provided by the patient, and in the testing were congruent elements. There was agreement in all three of those areas that suggested that Mr. Johnson did have a genuine emotional disorder.

Q. Was he malingering?

A. No. ·

Q. Did you provide or were you asked to provide the results of your examination to Velsicol's attorneys?

A. I provided no written results. I did communicate to them by phone, I believe, that I felt that he had a genuine emotional disturbance.

Q. Were you asked to make a clinical diagnosis at that time?

A. No, not specifically.

Q. Did you perform sufficient clinical testing, and do you feel that your clinical examination of Mr. Johnson was such that you could make a professional diagnosis today of Mr. Johnson's condition at that time?

A. I performed at that time sufficient testing to help me determine that he had a diagnosable mental illness, and based on the materials that I obtained I can make a diagnosis. (Tr. 19531–32)

\* \* \*

Q. Doctor, based upon your examination of Daniel Johnson and his test results, do you have an opinion today based upon a reasonable degree of professional certainty within the practices of your profession as to what the appropriate diagnosis would be for Dan Johnson?

A. I think to address that it's important to point out the things that were revealed on the testing.

The MMPI observation of Mr. Johnson and of his self report all indicate that he was severely depressed, fairly agitated, had a high degree of anxiety, and a lot of concern about body integrity, physical integrity. (Tr. 9532–33)

\* \* \*

Q. And did you arrive at a secondary clinical diagnosis for Dan Johnson?

A. Yes.

Q. What was that?

A. Post-traumatic stress disorder, chronic. (Tr. 9534–35)

666. As a result of her psychiatric examination of Daniel Johnson, Dr. Robley testified as to her opinion concerning his ability to ever work again. She stated:

Q. (By Mr. Garrety) Doctor, the date that you saw Dan Johnson, do you have an opinion as to whether or not Dan Johnson was capable of being actively and gainfully employed at that time?

A. The day that I saw Mr. Johnson he was very agitated, very anxious, very flat in his effect, very depressed, had some trouble with concentration, and attention. It would have been very difficult that day for him to hold any kind of routine paying position.

Q. Was he incapable of performing any labor?

A. On that particular day I don't think he would have been safe performing any kind of labor.

Q. Doctor, assume, if you would, that Dan's wife testified later in this case that between the time you saw him and late September, 1983, that Dan had attempted to work on three or four occasions in exchange for food or credit on the grocery bills personally on the bulldozer and in exchange for a hog for his family, and, in fact, the Velsicol Chemical Corporation from about the time that you saw him and slightly before followed Mr. Johnson and spent approximately $9,000 in surveillance and found him working on only one occasion. Would that be inconsistent with your opinion on the day you saw him as to his ability to carry out active, gainful, substantial employment?

A. The fact that he was working on a single day, would not necessarily be inconsistent. People have better days than other days. I would hope that Mr. Johnson would not be as agitated every single day as the day which I saw him. There is also a difference, I think, in a person being able to do some work where they can set their own pace and set their own time, and if they get upset they can walk away and leave it, a difference in that than holding down a full time job where they have to deliver to someone else and work eight to five. (Tr. 9552–54)

667. Dr. Robley concluded as to Mr. Johnson's prognosis:

"Q. Well, if we accept your diagnosis that Mr. Johnson has post-traumatic stress disorder, so what? What's the prognosis? You weren't asked about that. What is the prognosis of a person with post-traumatic stress disorder?

A. The prognosis for a person with post-traumatic stress disorder who receives treatment is usually pretty good.

Q. What do you mean by good?

A. In most cases you expect a favorable outcome. The longer that they go untreated, the stronger the reinforcers to the symptomatology, then perhaps the more difficulty, but you usually expect a good outcome from treated post-traumatic stress disorder—

Q. Based upon your examination of Mr. Johnson, would you say he had a treatable post-traumatic tomatology, then perhaps the more difficulty, but you usually expect a good outcome from treated post-traumatic stress disorder—stress disorder?

A. I'm sorry, I didn't hear you.

Q. Would you say he had a treatable stress disorder?

A. Yes, sir.

Q. And you would then expect him to improve from what he was the day you saw him?

A. I would expect, given time and distance from the stressor—that's one of the things the DSM-3 says, that time and distance from the stressor with or without treatment he should improve somewhat and more so with treatment. (Tr. 9595–96)

b. *Steve Sterling*

668. Dr. Sawyer testified he had examined Mr. Sterling. He testified.

"He again received psychological insult from ingesting this chemically contaminated water, which caused various somatic complaints and medical problems with him. He became progressively dysfunctional over the years. (Tr. 3182–83)

\* \* \*

"The psychological testing corroborated the clinical impression of a dysfunctional individual with a clinically significant level of depression and anxiety. He was markedly worried about life and what was going to happen to him. These individuals, himself as well as Mr. Johnson, they are the individuals that I evaluated, not only sustained immediate trauma of the ingestion of the chemical and the physical ailments that came consequent to that, but they also had been told so many stories by so many people that are purported experts in the field, that they have an extreme fear of what's coming in the future, you know, in the future tomorrow as well as the future

ten or twenty years down the road. And so their psychological trauma is being sustained daily. They are not through yet. I mean they are being retraumatized through recollection of the events and through the information that's been given to them by various health agencies, and so their illnesses, in a sense, are continuing to worsen and emerge, which is the case with Mr. Sterling, more prominently with Mr. Johnson.

Q. Doctor, again you mentioned trauma, and was the trauma the same for Mr. Sterling as it was for Mr. Johnson?

A. Yes, sir. All these psychological illnesses arose consequent to the ingestion of that chemically contaminated water, and then the aftermath of what it did to them physically—the fact that they became dysfunctional, were unable to carry out their responsibilities, meet their responsibilities in life, what it did to their perception of themselves, what it did to their inability to take care of their family, almost a phobic response to what was going to happen in the future was a recurrent theme with them.

Q. Doctor, in your opinion and based upon a reasonable degree of medical certainty, is Mr. Sterling suffering from psychological trauma?

A. Yes, sir.

Q. Is this condition acute or chronic?

A. It's a chronic condition now." (Tr. 3184–85)

669. Dr. Sawyer added:

He had the same diagnosis, post-traumatic stress disorder, moderate, chronic anxiety and depression were manifest in there. (Tr. 3186)

\* \* \*

Q. Do you have an opinion as to whether or not Mr. Sterling is psychologically impaired?

A. Yes, sir. He is.

Q. Do you have an opinion as to what degree his impairment is?

A. It would be of a moderate degree. What we have there. Some people don't

understand that term, and are not familiar with it. You have illnesses that range from being subclinical or not of enough severity to warrant diagnosis, and then they go into a borderline stage where it's not really intrusive enough to cause a breakdown in your functioning. Then you go into mild, moderate and severe. So when I say moderate, that doesn't mean that he is moderately disturbed. He is clinically ill, you know, diagnosable ill, and of the three categories or four categories of severity within the clinical illnesses, he is moderate, and, of course, severe would be almost a total dysfunction where people would normally have to be hospitalized. Mr. Johnson is bordering on that now. (Tr. 3189–90)

670. Finally, Dr. Sawyer recommended:

He needs psychotherapy and to be referred to a psychiatrist—I think I have here. I said, "The man is most certainly a candidate for regular and intense psychotherapy. The patient should be referred to a psychiatrist or other physician for consideration of treatment and psychotropic medications. (Tr. 3195)

### c. *James Wilbanks*

671. Dr. Sawyer gave Mr. Wilbanks the standard psychological tests. He concluded that:

He had the same as the others—post-traumatic stress disorder, chronic. It had been going on quite a while, and I put mild. It might even be borderline. He was in the best shape of any of these fellows I saw. (Tr. 3197)

672. Dr. Sawyer added:

Q. Doctor, in your opinion, and to a reasonable degree of medical certainty, are his psychological problems at this time attributable to the chemical dump?

A. They arose originally as a consequence of that, yes.

Q. Do you believe they will be permanent in nature?

A. Well, you know, they are chronic. (Tr. 3198)

#### (d) *Conclusions*

673. Dr. Sawyer concluded as to all plaintiffs he had examined that:

"They were members of a very close-knit community. They had as a hierarchy of needs, very basic needs, literally air, water and food, and the basic sustenance of life. There was an intrusion into their community, and into their personal psychological well-being as well as the well-being of society at large that caused physical illnesses in many of them. This in turn caused an inability to function in the manner that they had previously. There was an effect throughout the society with interactive effects, in that the fabric of their support system broke down, both individually and in society at large. They were unable to continue functioning, many of them. Of course, Wilbanks here did pretty good. But many of them were unable to function in the manner that they had previously. They were the sort of individuals, like I say, that you would read about their sort of personalities in history books, more than concurrently, and they had been markedly traumatized psychologically, and this trauma is continuing. They all are in need of psychotherapeutic and medical intervention on a long-term basis.

\* \* \*

THE COURT: So while he talks in global terms, he is really talking about these three. [Johnson, Sterling and Wilbanks].

MR. SPRAGINS: Well, as long as that is understood.

THE WITNESS: I will be more succinct.

\* \* \*

THE COURT: All right. Doctor, while you are here, let me ask you a a question at the risk of an objection here from somebody. But your testimony raises serious questions in terms of constructive resolution of these kinds of difficult problems these people face. Now, speaking from your experiences with these three individuals in a general way, how do you see the beginning of a constructive resolution, a reconstruction of their lives, so to speak, professionally? Am I making sense to you?

THE WITNESS: Yes, sir you are. I just don't have a good answer. These sorts of situations are in the sense of a defect in the whole society, and within the context I have only seen three, but I think they are representative of that society as a whole, and this sort of thing has not been done very often, and the kind of psychological interventions that you are doing with the diplomats that were kept prisoner over in Iran, you know, were very new sorts of things, and, you know, should these people be in a situation to avail themselves of such treatment, there might be hope for them. From a pragmatic standpoint of a practicing psychologist in Bolivar, Tennessee, and what we can provide for them there, or the state system could provide, you know, the prognosis is very poor. I think there is going to be some resolution in these people. These are basically good, moral, ethical sort of people, and I think there is going to be some symbolic resolution in them if a situation could occur from the outcome of this trial or another trial to prevent this from occurring in the future, and I think that they, you know, very honestly are concerned that this sort of thing not be allowed to happen to people; that it is an unfair thing and it is a situation that causes them to doubt the very fabric of American society, and they are not so intellectual and philosophical that they might can state it in that manner, but that's at the base of their problems. I don't hold a lot of practical hope that we can reconstruct their lives in the sense of what they went through. I just wish to goodness I could have seen these people four years ago. I wasn't even out there then—or somebody could have. But I don't really have an answer to your question. (Tr. 3201–05)

#### (B) *Velsicol's Defense*

674. Velsicol countered the evidence concerning psychological damage with basically two witnesses:

a. James A. Ryan, a forensic psychiatrist and graduate lawyer (Tr. 7664–65) and

b. Steve L. Gryll, a clinical psychologist (Tr. 7709).

675. Although their testimony was not limited to the following arguments, the Court as stated below believes that plaintiffs have proven the psychological damage claimed:

(a) That Dan Johnson and the others were malingerers;

(b) That if plaintiffs suffered any psychological damage, it was the result not of Velsicol's actions at the dump but either the newspaper accounts of Velsicol's actions or the effects which frightened plaintiffs and created mass hysteria (Tr. 7679) or the failure of government to come to their aid (Tr. 7680);

(c) That Velsicol's two witnesses took a ride through the blighted neighborhood and things looked fine, *ergo* plaintiffs must be too; and

(d) That any problems Jimmy Maness may have aren't Velsicol's fault.

676. At the outset, it should be pointed out that Velsicol's witnesses, Drs. Gryll and Ryan *never* interviewed Daniel Johnson or any of the other plaintiffs before rendering their testimony. (Tr. 7665; 7817) In fact, they were asked for their "diagnosis" for each plaintiff (see e.g., Tr. 7708, 7709). The Court finds this kind of testimony worthy of little weight. On this basis alone the Court rejects their testimony. In any event, it also appeared that their testimony was against the preponderance of the evidence.

677. Both Drs. Robley and Sawyer, practicing clinical psychologists with advanced professional degrees agreed that in this case of psychology, personal contact with the patient is necessary. Dr. Robley testified:

"Q. Doctor, with respect to the testimony of Dr. Ryan at page 7721 and with respect to the testimony of Dr. Gryll at Page 7817, neither of those men had talked to Dan Johnson or interviewed him before rendering these opinions, do you have an opinion as to the professional weight or validity that could be given to that opinion without examining a patient such as Dan Johnson?

A. I think the thing that has to be said is that anyone who is going to render opinion based on written material of another professional is limiting themselves very drastically. Observations, there are many professional observations that go into arriving at a diagnosis. Some of those things I recorded, some of them are in test materials, some of them recorded through history, but some of them simply register in the interaction with the patient and they are there and maybe not recorded anywhere. I think it's very important to have as many resources of information available as possible before making a diagnosis of a patient. Certainly I would be very hesitant to make a diagnosis myself on the basis of any written material. (Tr. 9546–47)

678. Although Dr. Ryan diagnosed these five plaintiffs, he did not appear too comfortable with "diagnosing" patients he had not seen. He testified:

Q. Doctor, how important is it to you to be able to see and observe a person in whom you make an evaluation of their current mental status or emotional status?

A. I would vastly prefer to do it that way. But at the same time, I feel that it is possible to make observations from other professional's findings and have a degree of certainty about certain aspects of the case. But it isn't what I would want to do to be able to have the responsibility for treating an individual. (Tr. 7721)

\* \* \*

Q. Doctor, in your CV you listed that you spend ninety percent of your time in direct patient care. When you are seeing a patient for the first time, intending to evaluate the person or make a diagnosis, how much of that time is spent merely listening to the person and how much is spent watching and observing that person?

A. That's a variable. It depends upon the condition that the person presents with. A lot of our technique involves listening. We don't want to intrude on what a person is telling us. We like to give a person a

maximum chance to express himself. But at the same time it is necessary to ask questions and to ask the right question at the right time. So that the technique involves both listening and asking questions, and the observations are made all the time and that is one way that we have in the process of establishing their background really. (Tr. 7722–23)

\* \* \*

Q. Doctor, you mentioned in your direct testimony that in order to make the diagnosis of a patient that you would want to clinically examine him or them?

A. I mentioned that in reply to your question.

Q. But you can give a diagnosis in this case without seeing these patients?

A. I can have an impression as to diagnosis, yes. At the same time, I wouldn't want to treat the person myself in that way, but I can have a tentative opinion about what is happening. (Tr. 7743).

679. Dr. Robley specifically rejected Dr. Ryan's testimony in this regard and stated:

A. I myself would not offer an opinion as to diagnosis of a person that I hadn't seen.

Q. Even if you were provided the opinions and results of physical or personal examinations by other professionals that were given to you to examine?

A. I think as I indicated earlier, I think there are many nuances that a clinician picks up that they may or may not record. Now, if—you know, every piece of information that's added to that, I suspect the more comfortable a person can become. If you have raw test data and the person's test report and you have an extremely detailed history and you have all the raw data information about that, then I might feel a little more comfortable, but I personally would never want to tender a diagnosis without having seen the person.

Q. Even if you weren't going to treat the patient?

A. No. Again in an academic exercise, where it didn't really impact on anyone's opinion judgment, I would probably feel comfortable doing that. In a situation where it was going to impact on someone, I would not want to without having eyes-on experience. (Tr. 9602)

680. Dr. Sawyer testified:

Q. I understand that. But let me put it to you this way. If you had simply administered the test to these people and not conducted the interview, not found out anything else about their circumstances, would you have been able to come to that diagnosis?

A. Not without thinking, no, sir.

Q. Sir?

A. Not without thinking.

Q. Well, think about it all you want to, but if you had not interviewed, simply administered the tests, could you have come to that diagnosis based on test data alone?

A. It's such—well, it's a hypothetical question, of course. I don't know. It's just inconceivable to me why anybody would want to do something like that.

As a practicing clinician, you go in and try to do the best job you can, acquiring all the data you can use to make a professional judgment. (Tr. 6598)

(a) *The "Malingerer" defense*

681. As to Velsicol claims of malingering on the part of Daniel Johnson, the DSM–III which Velsicol's counsel called the "Bible" and the expert testimony of Drs. Sawyer and Robley—who actually saw and tested Dan Johnson, far outweighed the testimony of the Velsicol witnesses. In fact, Dr. Ryan only had "suspicions" insofar as Mr. Johnson was concerned because of what he read in the testimony of Dr. Sawyer. Dr. Robley saw Mr. Johnson and, applying the DSM III criteria endorsed by Dr. Ryan, found that Mr. Johnson was not malingering. Finally, Dr. Ryan pointed out that he had only "suspicions" of malingering and had not found in fact that anyone was malingering much less Mr. Johnson. (Tr. 7743).

682. Dr. Robley testified:

Q. Doctor, with respect to Dr. Gryll's diagnosis of malingering at Page 7785, do you have an opinion with respect to the propriety of that diagnosis?

A. Having interviewed and taken a history from Mr. Johnson, having observed him and then administering and getting results from testing, it's my professional opinion that he was not malingering and he's not malingering.

Q. Doctor, is there a specific set of criteria for malingering which is likewise contained in the DSM-# ?

A. Yes.

Q. Would you refer to that by page number, please, Doctor, and tell the Court why you feel Dan Johnson was not malingering.

A. That's Page 331.

Q. And what is the criteria?

A. Essentially the DSM-3 outlines four criteria and says that any combination of the following—if there are any combination of the following noted, then malingering should be suspected. The first thing is the medical-legal context of presentation, which is true in this case, that existed.

The marked discrepancy between the person's claimed distress or disability and the objective findings, did not find a discrepancy, I did not find a discrepancy and what the testing revealed.

Number three is a lack of cooperation with the diagnostic evaluation and prescribed treatment regimen. He was not guilty of that in his interaction with me. He was very cooperative in all those things I asked him to do.

And the last is the presence of an antisocial personality disorder, which testing did not reveal.

For that reason, not having the other three in the face of the medical-legal context, I don't think we could make that diagnosis based on the DSM-3. (Tr. 9543-45)

683. The Court concludes that Mr. Daniel Johnson is not a malingerer and does in fact suffer from PTSD.

(b) *The Newspaper and Government Inaction Defense*

684. As to Velsicol's argument that newspaper reports of Velsicol's activities (and their effects) or the inability of government agencies to intervene and/or help plaintiffs were intervening causes, Dr. Robley testified:

Q. (By Mr. Garrety) With respect to the mixed messages, Doctor, let me ask you do you have an opinion as to whether or not news reports can ever be the stressor necessary to initiate a post-traumatic stress disorder?

A. Newspaper reports play a role in post-traumatic stress disorder, but it's not the stressor. There has to be something to report first. The role that it does play, the role that newspaper articles do play, is they serve as a reinforcer to the stressor. They remind one of the event and in that way frequently strengthen the symptoms and make them last maybe for longer than they would have.

Q. Is recurrent recollection of the even one of the criteria that must be present to make—to ultimately make a diagnosis of post-traumatic stress disorder?

A. Once you identify the stressor, then you look at the areas B, C and D in the diagnostic category. In terms of reexperiencing the trauma, there are three possible ways of doing that. One is simply recollection or preoccupation, thinking about it all the time, thinking about the event all the time, the other one would be recurrent dreams of the event, and finally there may be the flashback phenomena of the suddenly acting as though they were reliving the experience.

It's required that you evidence at least one, but not necessarily all of these. (Tr. 9537–38)

Dr. Robley further testified:

Q. Doctor, with respect to the delay of any governmental agencies or the newspaper articles testified to by Dr. Gryll and Dr. Ryan, do you have a professional opinion as to whether or not those events, the newspaper coverage, the media coverage,

and the governmental delay, could—excuse me—were causative of Mr. Johnson's problems or additive?

A. My understanding of the impact of the newspaper or media reports on this as well as the information obtained from various governmental agencies is based pretty much on one theory and that says that any behavior—and that can be a thought, a feeling, an action—any behavior that's randomly reinforced, where there's no particularly scheduled kind of reinforcement, is very difficult to extinguish, that means it's strengthened. Now, it's additive in response directly that it very sporadically reinforced the behaviors here and the feelings and thoughts. (Tr. 9545–46)

685. Dr. Ryan testified that "mob psychology" (Tr. 7682) and "mass hysteria" (Tr. 7679) were caused *inter alia* by newspaper reports and mass media (Tr. 7684–85). Dr. Ryan then stated that such reports:

"would fan a fire that is there already, a fire that I spoke about being there already, of there being neglected and abused by government agencies." (Tr. 7691–92)

686. The Court rejects this testimony out of hand. The stressor in this case was Velsicol's actions. Velsicol knew or should have known that its actions would be given notoriety, as similar actions had been when the Mississippi River became contaminated with its own pesticide waste. As to the "intervening cause" defense, the Court finds that while there may be a reinforcing of the trauma as a result of the newspaper articles and other stress such as this trial itself, the damage to plaintiffs occurred as a result of Velsicol's actions for which it is liable.

(c) *The ride Through the Neighborhood Test*

687. Dr. Ryan testified that he had ridden through the Toone-Teague Road area (Tr. 7670) and noticed *inter alia:*

"I saw one man painting his home, and I saw homes that were freshly painted, several of them. I saw a condition that struck me—I saw an area that struck me as being lived in by people who wanted to be there and were taking care of their properties" (Tr. 7671).

688. Dr. Ryan concluded *on the basis of his automobile ride:*

"Well, it struck me as being an area lived in by people who were in many ways content with being there. It didn't appear to be a living area that had been abandoned by people that generated any sense of despair on their part, on the part of the people living there." (Tr. 7671).

689. Dr. Ryan spoke to no one on his ride, much less interview anybody (Tr. 7720).

690. Dr. Grill was also given a ride through the neighborhood by Velsicol. He testified:

Q. The observations that you made, what do they say to you as a psychologist about the attitude of the people who lived in that community about themselves and their surroundings?

A. Well, I think it says several things. I think it certainty suggests that these people are very vested in living there and want to improve the environment in which they live; that they seem to have made a commitment to live there, a psychological commitment if you will, to invest both their energies and money to improve their homes, improve the quality of life around them, it doesn't seem to me to be the kind of situation where they have said that it is a noxious environment.

Q. Did you detect any evidence of community despondency?

A. No, I did not.

THE COURT: How would you as a psychologist detect evidence of despondency by driving through a neighborhood? Would you explain that to me?

A. I think if I saw signs of abandoned homes, of a large number of homes that were not painted, where the grass had been allowed to run wild, and the lawn needed to be mowed and the weeds were running all

over the place, I think I would have a sense that the people really weren't psychologically committed to living there and enjoying living there. It seems that when people take pride—when people enjoy living someplace, they take pride, and they attempt to make it as nice as possible. I didn't see evidence of that. (Tr. 7773–74).

691. The Court rejects the testimony of Drs. Ryan and Gryll concerning their rides through the neighborhood. Among other things, the rides proved nothing and were unscientific as shown by Dr. Gryll's own cross-examination, *viz:*

Q. Doctor, you mentioned, and I listened very closely, Mr. Spragins asked you this, that you had an opinion as a psychologist as to those people who were down on the road that you saw when you drove through that area, and you mentioned that you did. In arriving at that opinion, what percentage of the population was outside that you could see?

A. I don't believe that I said that I saw a significant portion of the population. I think I saw two or three groups of about two to three children each.

Q. Well, do you know what percentage of people were inside sick and couldn't come outside?

A. No, I don't.

Q. Was the population or the people that you saw representative of the total numbers of the population of children, adults and adolescents?

A. I have no knowledge of that.

Q. Which road did you drive around?

A. That's going to be hard for me to state. We came in and you have Highway 100, we went down Toone-Teague Road twice, then I believe we went off another road that—Toone-Teague I think ended and this other one went around back to the highway. I don't know the name of that second road.

Q. Doctor, not knowing the total number of people that lived in those houses, not knowing how many were outside and not knowing what current health problems any of them have that might be related, et cetera, doesn't that really violate all of the scientific methodology that you were referring to and what made a good opinion, on your direct testimony?

A. I don't think so. What I testified to was my impression of what the community looked like, and the community looked like one in which people were taking pride in the way their homes looked, were gardening, were growing things to eat, and it looked to be a pleasant place.

Q. Doctor, have you ever been inside a prison, a penal institution?

A. Yes, I have.

Q. And to the extent that the rules allow, don't prisoners attempt to take pride in their cells, fix them up, decorate to the extent of the rules or that they are allowed:

A. Some do.

Q. That doesn't indicate that any of them wouldn't be somewhere else if they could be, does it?

A. No. (Tr. 7812–14).

(d) *Velsicol's Action Didn't Hurt Jimmy Maness*

692. Velsicol was hard-pressed to deny Jimmy Maness' psychiatric problems. Dr. Ryan testified:

The only thing I can say about Jimmy Maness is that he is obviously a very disturbed young man, and whether he has an organic condition or not, it is possible to make a likely access to a diagnosis of an already established chronic personality disorder; that is this young man has a problem with excesses of rage that get discharged and motor activity, physical activity, and in fights at school with his teachers and presumably with others, and in uncontrollable behavior with his parents, which in this case is his grandmother. The same problem with rage is reflected in his having daily ongoing nightmares and already still up to age eight. This is a long time for the young man to be having nightmares every night. But the nightmares about

monsters are an indication of an ongoing problem with rage. It's a familiar fact, clinical piece of knowledge that these nightmares about monsters really have to do with the individuals with rage that is projected out into the monsters.

Now, his fights with people also involve projections with his own rage out into people. When we see an individual who has a predominance of rage over his feelings of self-love and worth, we diagnose that person as a borderline personality, which means that they fall—sometimes they have a characterologic disturbance, and it makes them a little more prone to have other kinds of emotional distresses and more prone to have disturbed relationships with people over the years. I think he already has that diagnosis. (Tr. 7716–17).

693. However, the defense decided to blame Jimmy's problems on:

(a) An early disturbed mother-child interaction (Tr. 7718) and

(b) An operation when he was less than one month old for an inguinal hernia which then created "depression later in his life" (Tr. 7719).

694. Importantly, however, even Velsicol's own witness Dr. Ryan refused to state that these two reasons were more probably the cause of Jimmy's damage than the chemicals that insidiously flowed from the dump into Jimmy's life, *viz:*

Q. Do you have an opinion as to whether those factors, precipitating factors, are more probable than anything else you know about Jimmy as causing his problems?

A. I am hesitant to express an opinion. To the extent that a greater organic component hasn't been defined in the pictures, I would think these are the apparent causes. But I would hesitate, without having more information about the organic aspects of the case. (Tr. 7719).

695. The Court rejects the testimony in this regard as being against the heavy preponderance of the evidence. Velsicol's liability extends to the injuries borne by Jimmy Maness.

## VI. THE DESTRUCTION OF PLAINTIFFS' QUALITY OF LIFE

696. The Court has awarded damages for destruction of plaintiffs' quality of life. For some, this destruction was greater than others. Steve Sterling and his wife Nancy had been born in the area, reared their children there and wanted them all to live there. For others, the devastation of the quality of their lives might not be as great. Because, however, the Court is granting damages for this injury, an injury that cannot be adequately recompensated for loss of property damage alone, the Court cites some of the testimony to support such awards.

### A. *Plaintiff Steve Sterling*

697. Plaintiff Steve Sterling testified:

Q. What was the water like when you bought your property out there on the Toone-Teague Road?

A. The water to start with?

Q. When you first moved out there?

A. It wasn't anything wrong with the water. It was real good water.

Q. What caused you to move to that area?

A. Well, I just was born and raised there, and it was just home.

Q. What have you done for a living?

A. Carpenter.

Q. When you weren't working, did you have any other activities?

A. Well, hunting and fishing and just— well, just mostly hunting and fishing was my things that I done when I wasn't working.

Q. How much of that land out there within, say, a mile and a half or so of your house have you hunted over?

A. All of it.

Q. What kind of place was the Toone-Teague area to live when you moved out there?

A. Well, I thought it was real good. I was pleased as well as anybody could be.

Q. Are the people close together?

A. Which?

Q. Out there on the road, are they good friends?

A. Yes; real good friends.

Q. Did you raise your family out there?

A. Yes.

Q. How many children do you have?

A. I have five.

Q. Do they live near you now?

A. All of them.

Q. How close do they live?

A. Well, just one house really is right after the other, all right there together.

Q. Where do they get their water?

A. From the same well.

Q. Is that what we call the Woodrow Sterling well?

A. Yes.

Q. What was your health like before the dump?

A. As far as I know, it was excellent. I never had no trouble with my health. (Tr. 2043–45)

\* \* \*

Q. Steve, what type of—well; let me ask you this. About how many baths or showers would you take in a week's time? How many times were you noticing the smell in the water?

A. Usually you take one nearly averaging, you know, once a day, sometimes you'd miss, not hardly ever, but it got along in '77, why, I got to where I wouldn't take a bath because I couldn't stand the bathroom. I would open the door and I couldn't stand it, it would just smother me to death.

Q. Tell the Court, if you would, please, what it was that was smothering you.

A. Well, when you run that warm water in the tub, really it wasn't that hot, but I mean you get a little steam like, you know, it just smothered me and it would irritate me breathing in my throat, and of course after you took a bath, why, you would just be dry as a bone and that night you couldn't sleep because you would itch all night long and scratch, and then the next morning you would be scaly, you noticed flaking like on your body, and—

Q. Had you ever had any problems with your skin like that before?

A. No.

Q. Did you put any lotion in it? What did you do for your skin problem?

A. Well, I rubbed alcohol on me and lotion and just everything that I could think of, but it didn't seem to anything do it any good.

Q. Did any of it help?

A. I couldn't tell you that it did.

Q. Steve, you said that your throat would be irritated. Would you explain what you mean by that?

A. Well, I would do a lot of coughing. I would get started to coughing and smothering and just, well, like you had had a real bad cold or something or other and, you know, just got raw down in your chest.

Q. Did taking a bath or shower cause you any problems with your eyes?

A. Yes, my eyes would burn when I was in trying to take a bath, especially—well, you could let that water run, in the kitchen or anything, washing your hands, and if it was real hot and you didn't just really notice it, you know, and run too much hot water and it would come up and hit you in your eyes, it would burn your eyes. (Tr. 2050–51)

\* \* \*

Q. When you stopped using it for drinking where would you get your water?

A. Well, right on to start with we went to going to first one house and another, around to neighbors getting it, and then we went down in the bottoms where Big Springs was and got water out of that spring for awhile, and finally after awhile they brought a little old tank out there from Henderson, so they brought it full of water when they brought it and then we

used it out and we drove first one place and another to get it.

Then later on they brought a bigger tank out there and told us to get the water at Toone, hauled most of it was from Toone, and hauled some of it from a friend who had a well down at Teague.

Q. When you stopped drinking the water and using it for food, was that after you had checked your well?

A. Yes, it was after we checked the well.

Q. Was it much trouble for you to haul water?

A. Well, there was never none there when you got there from work, it was out, and that was about the first thing you had to do was get water, sometimes it was late. We hauled at night and everything else.

Q. Did you ever stop using the water altogether for taking baths and other things?

A. We did on after we quit drinking it, we took baths for quite a smart while after we quit drinking it, because it got to where we couldn't drink it, but I guess we thought, you know, it won't hurt us to take a bath in it, so we tried that for, oh, I don't know how long, not too long after that. It just got then to where you would itch and burn so that you couldn't take a bath in it.

Q. Was it worse for you to take a shower than, than it was when you stopped using it for drinking?

A. I would say it was a little worse, yes, when we quit taking baths in it than it was when we quit drinking it. (Tr. 2055–56)

\* \* \*

Q. So that the record will be clear, Steve, who are your children?

A. Woodrow Sterling is the oldest, Gail Phillips, Nell Grantham and Jane Collins and Fred Sterling.

Q. Do they live in adjacent lots near your home?

A. We all are there.

Q. Did all of you get your water from the Woodrow Sterling well?

A. Yes. (Tr. 2064)

\* \* \*

Q. (By Mr. Garrety) Steve, would you tell the Court how you hauled the water? How you would go about hauling it, what you would haul it in, and things of that nature?

A. Well, we hauled it to start with, and we just used water cans that carry water in to work, you know, plastic cans, and metal cans and jugs, and first one thing and another like that, just all that we could find around, you know, and we would just have to go pretty often, you know, with all that many of us, because we wouldn't have enough to hardly go around until we would have to get some more water.

Q. When you stopped using the water to take showers and baths, where would you go?

A. Well, we went to friends around, first one place and another, and we went several times to Chickasaw and took baths up there.

Q. What is Chickasaw?

A. Well, it's just—well, I don't know what you would really call it. It's just a place that people go, you know, for sports and things and swimming, and stuff like that, and they have a bath up there, and just a lot of things, you know, that you could do with all kinds of games that you can play and stuff like that.

Q. Is it a park?

A. Yes, it's a park, and we used it, you know, and we was welcome to come, and so we done that a right smart.

Q. Did having to haul your water and having to go someplace else to take showers and take baths, did that have any effect on scheduling what you were going to do or your social activities at all?

A. Yes, it did. Well, sometimes it was just plumb, you know, difficult, because knowing you had something else that you needed to be doing, and you would have to go get water and have to drive to take a bath, and it was—well, it was just, you

know, something that kept you uncertain what you was even going to get to do. (Tr. 2065–67)

\* \* \*

Q. Steve, if you would, I would like for you in your own words to tell the Court all of the effect that Velsicol's coming to Toone-Teague in 1964 and the problems that you have discussed today has had on you, how that's affected your life.

A. Well, it's hard to explain. It's—it changed the whole story. Well, the kids, grandkids, I really don't know how to explain it. I don't know what's going to happen.

I really don't know what's going to happen, but everybody is sick out there, kids and all.

Q. Are you concerned about the future?

A. Well, it's it worries me over what is going to happen to the kids, grandkids, their kids.

Q. Did all of your family and your grandchildren drink water from this well—

A. Yes.

Q. —that you put in?

A. It worries me more about the rest of the family than it does myself. (Tr. 2083–84)

B. *Nancy Sterling*

698. Nancy Sterling testified:

Q. Nancy, if you would, as best you can, think back and tell the Court what living in the Toone-Teague community was like before Velsicol opened up the dump.

A. It was a beautiful haven. There were—the neighbors got along great. You could go anywhere and catch a fish, you could go anywhere and get a fresh drink of water, you could smile, you had everything in the world to be happy about. I had five children of my own and all the other kinds in the neighborhood could gather in my yard, they could have a ball game, they could have a picnic, they could go swimming, they could do anything and be happy. And we were all happy.

Q. Did you and your husband raise all of the children that he named at this home?

A. Yes, we did.

Q. Did you and Steve buy your children some property close to you?

A. We bought the property and we gave it to the children.

Q. Did they drink off the same well that we've talked about today?

A. Yes, they did.

Q. Would you tell the Court about the relationship between all the families out on the Toone-Teague Road? Are they good friends?

A. Yes, they are. I don't think there's a neighbor anywhere that you couldn't get out there and yell and say, I need help, and they would all be there.

Q. Nancy, if you would, think back and tell the Court when the first time that you can recall that you noticed anything wrong with the water or suspected anything wrong with the water?

A. It was in late August or September. They were building a house right there on one of the lots that we had bought and give to the kids. We gave it to Fred and he sold it to John Sterling, which is another nephew that came out there about 1967 to live, he and his father. And I was sick. I felt so bad I couldn't hardly go and I had been to the doctor. And, of course, he said you've got a virus and he gave me some antibiotics. And I know that after you take antibiotics for awhile everything you eat or drink tastes terrible. But the water, I could not hardly drink it. I knew down deep in my heart that there was something wrong with that water, I knew it had to be. (Tr. 2112–14)

\* \* \*

Q. Nancy, if you would, tell the judge the other places and uses that you used that you had for water around your house other than taking a bath and taking a shower and drinking the water and the dishwasher?

A. Well, you watered the dogs, you watered the stock. You washed your car. You watered your flowers. You watered

your garden. I even run water in my fish pond, because the water was getting low, and I just took the hose out there and run it in the fish pond.

Q. What type of fish pond did you have?

A. I have a catfish pond.

Q. Did you eat those catfish?

A. I did before I knew they were contaminated.

Q. You mentioned that you watered your dogs. Did anything unusual ever happen to the dogs during this time?

A. Yes. One of them, and he was a very young dog, went blind, and you would have to pick him up to put him where the food was to eat it. He could smell it, I guess, and he could eat the food, but other than that, he didn't know where he was, and he was a young dog.

Q. You said he was young. Can you think back and try to recall about how old he was?

A. Oh, eight months old.

Q. Was this around the time that you noticed the smell and odor in the water?

A. Yes, it was. (Tr. 2117–18)

\* \* \*

Q. As a grandmother, and a mother too, did you notice any changes in the grandchildren during the time that the water was tasting funny and smelling bad?

A. Yes.

Q. What were the—

A. The whole family. They were tired, they were lifeless, they didn't want to have any picnics, they didn't want to have no ball games. They wanted to stay in the house by the TV and be left alone.

Q. Had they been that way before?

A. No.

Q. Did you think that was unusual?

A. I knew it was unusual. (Tr. 2134–35)

\* \* \*

Q. Nancy, you have lived out there a long time and if you would, would you tell the Judge what changes have taken place out there on the road since Velsicol moved up there and what this has meant to you.

A. It has just about completely destroyed everything that my husband and I have worked for for the past forty years. It has about destroyed what my children worked for, the life in their lifetime since they have been there. We have worked hard, we all shared in the work to build what we have out there. We were happy. Overnight our water was contaminated, our lives were completely changed, and they will never be the same no matter what.

Q. Are you concerned about your grandchildren?

A. I'm concerned more about my grandchildren than I am myself. I've lived my life, just about. I've had a good life up until 1977.

My grandchildren haven't lived their life; they are just beginning. My oldest one is seventeen years old. My youngest one's five years old. What will it do to them?

Q. Were they all drinking off of this same well that we've talked about today, the Woodrow—

A. Yes, they were.

Q. —Sterling well?

A. Will I ever have any great grandchildren? Will I ever have the opportunity to tell anybody, that's my great grandchild?

Q. Nancy, I have a few more questions. Would you like to take a break for a moment?

A. I'm sorry. I'll try.

Q. Do you feel comfortable?

A. Yes. (Tr. 2137–38)

C. *James Wilbanks*

699. The Court believes that little needs to be said for the change in the quality of Mr. Wilbank's life. He has already had one kidney removed for cancer and suffered over 25 cobalt treatments.

700. Mr. Wilbanks testified:

Q. And when you were there working at the club did you drink the well water?

A. Yes, made instant coffee too out of it.

Q. Okay. Now, back to when you and your wife and the baby were living there at the trailer, of an evening or afternoon did you sit outside?

A. Yes, some evenings.

Q. At times could you smell that dump?

A. I could smell it when the truck passed by, I could smell it when the wind was right, you could smell it real bad.

Q. Real bad you say. And what kind of smell? Would you describe for the Court what kind of smell it was?

A. Well, it was something like, you know, a spray, like they was spraying a field or something or other, had some kind of odor like that.

Q. What did that smell do to you? How did that make you feel?

A. It would make you sick, give you the headache, you know, if you stayed out in it very long. We always went inside the house.

Q. Would it affect your eyes at all?

A. Make them burn. (Tr. 2204–05)

d. *Daniel Johnson*

701. As to the effect on the quality of Dan Johnson's life, the testimony of his wife stated it simply:

Q. (By Mr. Garrety) As a result of receiving that letter, did you stop using the water for drinking?

A. Yes, sir.

Q. Where would you go to get your water?

A. Well, we've hauled it from the Chickasaw State Park and we've hauled it from Memphis, we've hauled it from Bolivar, anywhere we could get it.

Q. Was that inconvenient to you?

A. Of course, yes, sir.

Q. Did it cause a change in your daily life and routine?

A. Yes, sir. When we first left Memphis to come to Toone-Teague, we had never had a home in our life. It was the first time we ever had. We was proud of it.

The kids liked their schools, our neighbors. Dan liked it because he could get out closer to his fishing and hunting. And when all this fell through when we drank that water that had the chemicals in it, Dan was disappointed, we were all disappointed, but Dan, when he realized what effects it could have on us and our children, he—I don't know how to describe it. He changed. It caused our whole family to change. We lost everything. (Tr. 2310–11).

e. *Master James O. Maness, Jr.*

702. Although Jimmy Maness did not testify, the record is replete with the diminution of the quality of his life and its permanent effects.

f. *Curry A. Ivy*

703. Mr. Ivy was occupationally exposed to Velsicol's chemicals as well as through the drinking water. He testified:

Q. Curry, when you were driving the truck could you smell the chemicals?

A. Yes, sir.

Q. Was there any difference between the winter and the summer?

A. Yes, sir. You couldn't stay in the cab of the truck when the windows was up and you had the heater on. It would burn your eyes so bad you just couldn't see to drive.

Q. Was that the smell of the chemicals?

A. Yes, sir.

Q. Would you tell the Court, Curry, what health problems you noticed while you were hauling for Mr. Thomas and working up there on the dump site?

A. Well, I had eye problems. My eyes would burn and hurt me all the time. A lot of times I would lay down at night, I would have to put damp cloths on my eyes to keep them from burning.

And I got short of breath, I couldn't hardly breathe. I got extremely nervous.

Q. Did you have any throat problems?

A. Well, not too much throat problem. My throat would burn some, but, you know, not too much throat problem. I never had too much throat problem.

Q. You mentioned a problem with your eyes. Did you notice any effect on your eyesight or your ability to see during that time?

A. Yes, sir my eyes would get blurry. They wouldn't clear up.

Q. When you stopped hauling for Mr. Thomas, did that have any effect on your health problems?

A. Well, it seemed like got some better about my seeing.

Q. Did you ever get back to where you felt you were before you started hauling?

A. No.

Q. You testified that you know Rosetta and Albert Brooks. Would you tell the Court how long you've known them and what that relationship is?

A. I've knowed them ever since I moved down there, it was either '68 or '69, up to now. Of course, Mr. Brooks is dead now, but we still visit Mrs. Brooks.

Q. Did she have a daughter?

A. Yes, sir.

Q. Are you related to them in any way?

A. My son married her daughter.

Q. How often would you have occasion after you met the Brooks to visit in their home or them to visit in your home?

A. Well, we was together sometime during the day every day either at my house or their house, and then my son married their daughter and moved down there in her house and they lived in a trailer.

Q. Did that trailer get water off of Rosetta's well—

A. Yes.

Q. —if you know.

A. Yes, sir.

Q. Did you spend some time down there with your son?

A. Yes, sir.

Q. How much time in a month would you be down there, either at Rosetta's or at your son's home?

A. Well, I'd say approximately, when I wasn't at work, half the time.

Q. Did you eat meals there?

A. Yes, sir.

Q. Did you drink water?

A. Yes, sir.

Q. Did you drink any coffee or tea?

A. Yes, sir, I always drank coffee and tea both.

Q. After you stopped hauling for Mr. Thomas did you ever have any more problems with your health?

A. Yes, sir. In about '69 or '70 I commenced having—'79, I mean, '79 or '80 I commenced having more problems.

Q. And had you been spending time at Rosetta's?

A. Yes, all during that time.

Q. From 1969 on up to '79?

A. Yes, sir.

Q. Was there any period of time that you noticed that your problems got worse while you were staying down with Rosetta or with your son?

A. Yes, around '68—'78 or '79 it seemed like my eyes got back worse and my breathing got worse.

Q. Did the State or anyone ever tell your son and Rosetta not to use that water?

A. I don't know.

Q. Have you ever done much hunting, Mr. Ivy?

A. Yes, sir, I used to do a lot of hunting.

Q. What type of game have you hunted?

A. Well, rabbit hunting and squirrel hunting mostly, coon hunting some.

Q. Where would you hunt down in the Toone-Teague area?

A. Well, after I moved down there after Mr. Thomas and them took over the Velsicol place, Mr. Pounder and them give me and my wife a permit to hunt down there on the farm.

Q. Did you hunt down there regularly?

A. Yes, sir, we done most of our hunting down there because it was a good hunting place.

Q. How much of your food would you shoot yourself?

A. Well, quite a bit of it because we killed lots of squirrels. My wife is as good a hunter as I am.

Q. Did you eat those squirrels that you killed down there on the dump site?

A. Yes, sir.

Q. Do you remember Scott Clark?

A. Sir?

Q. Do you remember Scott Clark?

A. I don't believe I do.

Q. Well, did you participate in a health study at Chickasaw State Park?

A. Yes, sir.

Q. What are the problems that you have now, Curry?

A. Well, I have bad breathing problems, my eyes got to where they are blurry. I don't do any driving at all. My wife does all the driving.

Q. Have you had your glasses changed?

A. Yeah—it hasn't been a year, I don't think.

Q. Are you still unable to drive even with your glasses?

A. That's right.

Q. Do you remember seeing Dr. Drewry in Memphis, Tennessee?

A. Yes, sir.

Q. Have you had any problems with any numbness?

A. Yes, sir, on the left side of my face, arm, and on down the left side.

Q. How long have you had that problem?

A. Oh, it's been going on for a year or so, but it's gradually getting worse.

Q. Have you seen any doctor for your eyes other than Dr. Drewry in Memphis?

A. Well, now, Dr. Douglas made my glasses, the last ones, in Jackson.

Q. An optometry doctor?

A. Douglas in Jackson. (Tr. 2269–74).

## VI. THE EFFECTS OF THE CHEMICAL UPON THE VALUE OF PLAINTIFF'S REAL ESTATE

704. It was stipulated that no plaintiff owned an identifiable interest at trial in any real estate, except for Steve Sterling. His property consisted of his home, whose valuation prior to the damage by Velsicol was $34,000 and conceded by Velsicol to be accurate, and a rental home, the value of which was contested.

705. More important, because this is a class action, evidence is submitted concerning all property within three zones, namely the property within a one mile radius of the dump, property within the next one mile area and property the next mile area.

706. Plaintiffs submitted three witnesses:

a. Joseph L. Jones, President of Merchant's and Planters Bank in Toone, Tennessee and the Recorder for Hardeman County. (Tr. 3299);

b. William "Billy" C. Kail, Vice-President of the Delta Mortgage Company, Jackson, Tennessee (Tr. 3327); and

c. James P. Murdaugh, an expert in real estate appraisal (Tr. 3368).

707. All witnesses testifying agreed that some damage had occurred to the real estate in the vicinity of the dump.

708. Mr. Jones testified:

Q. What is your position as the President of the bank there in Toone as to making new purchase or construction loans within this contaminated zone?

A. Well, we want to be extremely careful with it about any loans.

Q. Would you explain what you mean by that?

A. Well, I felt that the property has been, you know, very much devaluated and being chemically exposed as this is, you know, we want to be extremely careful in making a loan that we feel that we could—you know, if it came to a foreclosure that we would receive our funds back. So it goes back to dealing with the individuals that we dealt

with. As far as just to make a new construction loan, I would say no.

Q. Is it correct to say, therefore, that the loans which you are making to the people in this area are people loans?

A. To a certain extent. Several of the people that we have helped, you know, as I said earlier, have been long time customers of Merchants and Planters Bank and we try to help them because of their past credit with Merchants and Planters Bank.

Q. What if someone from outside the country or the community would want to move in and build a house?

A. I don't believe we would go along with it.

Q. All right, sir. I believe you mentioned about the bank looks at whether or not there would be a possibility of foreclosing it, having to resell the property. Do you consider a property's marketability, then, when you make such a loan?

A. Oh, to a degree, yes, we consider this, we have to, and when I'm taking a mortgage or deed of trust against a person's property, you know.

Q. Then in your opinion has the marketability been affected in this area?

A. Yes, definitely so. (Tr. 3299–3301)

\* \* \*

Q. Mr. Jones, has the existence of the Velsicol dump and the contamination of the local water supply caused any problem with the ability of the people in the town of Toone to sell their property?

A. Well, Toone is a small rural town. Property does not change hands as readily as some larger towns. Yes, I feel like it has as far as new families moving into Toone, because this has gotten publicity that most everytime this has come up it's been Toone rather than actually where the location has been, and yes, I feel that we have suffered from it too. (Tr. 3303)

709. Mr. Kail pointed out that financing is an important element in determining the marketability of a piece of property (Tr. 3333). Thus, Mr. Kail believed that the guidelines put out by the lending institutions, particularly the Federal Mortgage Association (Fannie Mae) and the Tennessee Housing Development Agency (THDA) were applicable. He testified:

I have a copy of the Fannie Mae Guidelines, and in this particular area we would refer to Fannie Mae Guidelines section 311.04, Section (a), paragraph 4, "Danger to health and safety: Any property that is ineligible for a loan if its specific physical or environmental influence seriously endangers the health and safety of prospective occupants, such conditions may arise from unsafe conditions, serious danger of flooding, excessive smoke or chemical fumes, excessive noise and danger to health, danger from fire or explosives or inadequate water and sewage facilities or any other facilities."

Q. Is this then a disqualifying factor?

A. Yes. You could not make that loan.

Q. Are there any other factors in this particular Fannie Mae guidelines which would affect whether or not you could make a loan on this particular property?

A. One of the big factors, of course, is what you brought out, the marketability of the loan. It is up to us to determine that should this loan ever foreclose that that house going back on the market would be able to sell for the secondary people that we sold the loan to. So the value of the property as is and later on what it will be, if there is any marketability to the public, what will it be.

Q. All right, sir. What about the THDA guidelines?

A. THDA guidelines have almost identical regulations in that they refer to the same paragraph in their guidelines. They refer to also the exact wording I just read in their guidelines, page 24 of the THDA Guidelines Section 1, Paragraph (d) refers to the "Danger to Health and Safety." Would you like me to read it, exactly the way the guideline reads?

Q. Yes.

A. (Reading) "A property will be ineligible if a specific physical and environmental

influence seriously endangers the health and safety of occupants. Such conditions may arise from the unsafe construction, serious danger of flooding, excessive smoke or chemical fumes, excessive noise and danger to health, danger from fire explosion or inadequate water and waste disposal facilities or other utilities." (Tr. 3333–35)

710. Mr. Kail then testified that Steve Sterling's home would not qualify for a federal or state housing loan.

Q. Mr. Kail, have you inspected the residence of Mr. Steve Sterling on the Toone-Teague Road?

A. Yes.

Q. Would this house qualify for either Fannie Mae or T.H.D.A. loans?

A. No.

Q. Why not?

A. Under the present guidelines of T.H. D.A. and Fannie Mae that I referred to earlier there would be some danger to the health and safety of the individual borrowers; therefore, it would not qualify.

Q. Would it if it had not been for the chemicals in the areas?

A. Yes.

Q. Are you familiar with the homes in this area?

A. Yes.

Q. Who would be the primary lenders in this area?

A. Your number one primary lender would be definitely Tennessee Housing Development Agency because of the below market rates. They do cater to the low to moderate income individuals, and I think that would be your primary lender. Your second probably would be Fannie Mae.

Q. Would your company, Delta Mortgage, have any financing available for these people in this contaminated area?

A. Not at the present. (Tr. 3342–43)

711. Mr. Murdaugh agreed with this assessment of the damage. He testified:

Again this goes back to marketability and back to our determining factor of fair market value. It's my professional opinion from the people that I have talked to, from the lenders that I have talked to, that their right to sale has been drastically influenced by the chemical contamination in this area. This also affects the right to lease it and rent it. A man that has pastureland, again, could not rent his land out to a cattle grower if he adjoined the Pugh Creek area. (Tr. 3367)

712. He testified that:

Marketability, again, is the probability of selling property for fair market value. In this particular case, in this particular report, my objective was to obtain the fair market value of the property, the Steve Sterling residence and the Steve Sterling 14–acre tract, what was the value before the chemical contamination was there and what is the value after the chemical contamination was there. (Tr. 3375)

713. He was then asked and testified:

Q. Mr. Murdaugh, do you have an opinion as to the extent of the decrease of the values of the property in the vicinity of the Velsicol dump?

A. Yes, sir.

Q. What have you based your opinion upon?

A. I based my opinion upon comparable sales that have occurred within and without the area. I based my opinion upon documents that have indicated to me as to what is there and where it is and an analysis of these sales as to determine what is fair market value and what is fair market value for the area and how this relates to the property in the contaminated zone in regard to some sales that have occurred in that area. (Tr. 3417–18).

\* \* \*

Q. Mr. Murdaugh, what in your professional opinion as to the overall property damage in the area surrounding Velsicol dump, what is your opinion?

A. I feel like that there's damage there, considerable damage.

Q. Have you separated the damage into any categories?

A. Yes, sir.

Q. And what are they? Do you have an overlay that reflects this?

A. Yes, sir.

(The document above-referred to was marked Exhibit 286 for identification to the testimony of the witness and same will be found among the exhibits hereto.)

BY MR. WILDER:

Q. Mr. Murdaugh, I'm making this particular overlay for identification Exhibit Number 286, and would ask you what this shows.

A. This is my opinion of the properties that are damaged that touch the contaminated zone.

Q. And what damage have these properties experienced?

A. It's my opinion that these properties within this zone have been rendered to timber value, two seventy-five an acre.

Q. And do you have this zone outlined on this particular exhibit?

A. Yes, sir. The reason that zone is irregularly shaped, rather than being a circle or a football shape or whatever, is because these are the actual property lines, boundary lines, of the properties that are actually considered in the contaminated zone. This is the outline of the properties that actually touch the contaminated zone. (Tr. 3440–41)

\* \* \*

Q. Now, Mr. Murdaugh, you say that there were two categories. What is the second category?

A. I had another area that I considered that I labeled as being an affected area. This is an area that has not been damaged to the point, in my opinion, that the properties in this area have. It's properties that have been affected, it's properties that in generality or general terms would probably be affected somewhere in the neighborhood of twenty, twenty-five, maybe even thirty percent. My computations are that it's fifty percent damage above timberland.

Q. Do you have an overlay that depicts this area?

A. Yes.

MR. WILDER: For identification purposes I'm going to mark this overlay as Exhibit Number 287.

(The document above-referred to was marked Exhibit Number 287 for identification to the testimony of the witness and same will be found among the exhibits hereto.)

MR. GILREATH: What's the title of it?

BY MR. WILDER:

Q. What is the title of this particular overlay?

A. Affected area.

Q. And this affected area, would you state one more time, is damaged to what extent?

A. On the outer edges we are talking about possibly ten percent. The majority of the cropland, the croplands specifically, we are referring to fifty percent over two seventy-five an acre.

Q. All right sir. (Tr. 3442–43)

714. Mr. Murdaugh then specifically addressed the damage to Steve Sterling's property:

Q. Mr. Murdaugh, in your professional opinion what was the value of this particular piece of property belonging to Steve Sterling and used as his residence before the contamination or without the contamination?

A. The indicated value of the property before, without the influence of the damage to the contaminated zone is $31,500.

Q. How did you determine this?

A. I used two approaches to value. I used the cost approach and I used the market approach.

Q. What is your opinion of the value of Mr. Sterling's home with the contamination?

A. My value after is 1.3 acres times $275 or $357.50 for a total damage of $31,142.50. (Tr. 3450–51)

\* \* \*

Q. Now, what is your opinion as to the fair market value of Mr. Sterling's rental house with the contamination?

A. Fourteen acres, two-seventy-five an acre, $3,850, for a damage of $17,350. (Tr. 3456)

\* \* \*

Q. And what is the total damage for both of these pieces of property?

A. Both the tracts together, my estimate of damage is $48,492.50. (Tr. 3456–57)

715. Mr. Murdaugh summed up:

Q. (By Mr. Wilder) Mr. Murdaugh, you have testified that it is your professional opinion that the property within the contaminated zone has been damaged a hundred percent above two-seventy five an acre, and that the property within the affected area has been damaged fifty percent above two-seventy-five an acre. What about the property outside the affected area within the three mile radius? Has it, in your professional opinion, suffered damage?

A. Yes, sir. I feel like that the property that was involved in the three-mile radius within the lawsuit is damaged to the effect that it is probably damaged somewhere in the neighborhood of ten percent. (Tr. 3458–59).

716. The Tennessee Board of Equalization agreed that the value of the land was zero with the exception of the value of the timber bearing potential. (Ex. 279).

717. Mr. Murdaugh explained:

"This is the Wilson house, which is immediately south of the dump. The Wilson house is a very important piece of property [20.8 acres] in this puzzle. In regard to the Wilson house, the Wilsons, on the 1979 tax appraisal, when they went up for reappraisal in 1979, appealed to the State Board of Equalization for relief from the amount of taxation that was placed on them in regard to the assessed value of their property. This particular house was assessed at land

value of $10,200; improvement value, $30,000. (Tr. 3413).

\* \* \* \* \* \*

The final decision that was made by the State Board of Equalization that was set out in this ruling was that the 20.8 acres was valued at two seventy-five per acre for woodland, the improvement value was rendered zero. (Tr. 3415)

718. Mr. Murdaugh however pointed out that *his* conclusion was reached independently from the same conclusion made by the State. He testified:

Q. Tell us what happened in regard to the Wilson property?

A. The 1979 assessment was appealed to the State of Tennessee Assessment Appeals Commission and the findings of that commission were that the property was reduced to timber value of—

Q. That's what you did to the Sterling property, isn't it? You did to the Sterling property just what the commission did to the Wilson property?

A. Yes, sir.

Q. So then is it a fair statement that what happened with respect to that property influenced you considerably?

A. What happened to that property was nothing more than a piece of evidence that I determined that the marketability had been damaged. (Tr. 3454)

719. The Court finds that utilizing Ex. 276, all property belonging to members of the class within the designated "contaminated zone" of the Exhibit has been rendered valueless, except for $275 per acre for timber bearing potential. Within the designated "affected zone" of the Exhibit, the Court finds that the property value has declined 50% over timber value and in the third or tertiary zone, the Court finds that the property value has declined 10% over timber value.

Therefore, it is hereby ORDERED that Velsicol is liable for and is hereby ordered to pay compensatory damages to the five named flagship plaintiffs as follows:

| | |
|---|---|
| Steve Sterling | $ 673,492.50 |
| James E. Wilbanks | 675,000.00 |
| Curry A. Ivy | 350,000.00 |
| Daniel R. Johnson | 1,275,000.00 |
| James O. Maness, Jr. | 2,300,000.00 |

It is further ORDERED that Velsicol is liable for and is hereby ordered to pay punitive damages to the class as a whole in the amount of $7,500,000.00.